UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| YUDIF GLIK, ADMINISTRATOR,<br><br>Plaintiff,<br><br>v.<br><br>INOTEK PHARMACEUTICALS<br>CORPORATION,<br><br>Defendant. | Civil Action No.  05-10360-GAO |

**DEFENDANT INOTEK PHARMACEUTICALS CORPORATION'S MEMORANDUM OF LAW IN SUPPORT
OF ITS MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Plaintiff's ERISA claim (Count IV) fails for three clear reasons.  First, to the extent Plaintiff seeks benefits under Inotek's disability insurance plan pursuant to Section 502(a)(1)(B) of ERISA, Michael Glik was not eligible for any disability insurance benefits because the insurance company declined to approve his policy application in light of medical issues revealed during the policy underwriting process.  Second, to the extent Plaintiff seeks the recovery of damages under ERISA Section 502(a)(3) (providing for equitable relief), the Supreme Court in *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 209 (2002) confirmed that money damages are not recoverable under that Section.  Further, even if the damages Plaintiff seeks could be construed as "equitable" relief and thus, recoverable under ERISA, Michael Glik's "unclean hands" preclude Plaintiff from any equitable relief.

Plaintiff's state law claims seeking benefits under an ERISA employee benefits plan as well as compensatory damages (Counts I, II and III) are preempted by ERISA.  The Supreme Court has repeatedly held that state law claims that directly or indirectly affect or pertain to an

1

ERISA plan are preempted.  Plaintiff's state law wrongful discharge claim (Count I) fails

because Michael Glik was an at-will employee whose employment appropriately ended because

he was not able to return to work.

## FACTUAL BACKGROUND

### I.    Inotek

Inotek is a private pharmaceutical company headquartered in Beverly, Massachusetts.  It

employs approximately 130 employees.  SUMF ¶ 1.

### II.    Michael Glik's Employment With Inotek

Michael Glik ("Glik") commenced employment with Inotek on September 25, 2000 as a

research assistant.  SUMF ¶ 2.  Glik was an employee at-will.  *Id.*  Less than two months after he

started work, on November 16, 2000, Glik requested, and received, a three week medical leave

of absence to undergo and recuperate from surgery to remove an abdominal tumor.  *Id.* at ¶ 4.

On November 21, 2000, Glik had his surgery; however, during the surgery the surgeon

determined that the tumor was inoperable.  *Id.* at ¶ 5.  After the surgery, Glik was too sick ever to

return to work.  *Id.* at ¶ 6.  On December 2, 2000, Glik informed Inotek that his medical

condition prevented him from returning to work.  *Id.* at ¶ 7.  Inotek continued Glik on the payroll

until December 31, 2000.  *Id.* at ¶ 8.  Thereafter, Glik was removed from the payroll and his

employment with Inotek ended.  *Id.*

**III.     Glik's Application For Individual Disability Insurance**

    **A.     Description of the long-term disability insurance offered Inotek employees**

        At the time of Glik's employment, Inotek offered its employees the opportunity to apply for individual long term disability insurance ("LTD insurance").  SUMF ¶ 11.[1]  Employees were eligible to apply for the insurance coverage on their first day of employment.  *Id.*  On an annual basis, Inotek paid the full cost of the insurance coverage for its employees who qualified for this disability insurance.  *Id.* at ¶ 11.  The insurance carrier paid the actual disability insurance benefits under the policy.  *Id.* at ¶ 29.  Inotek had no obligation to pay an employee under the LTD insurance policy, other than to pay the premiums based on group rates if the employee's policy application were approved by the insurer.  *Id.* at ¶¶ 11, 30.  Inotek neither had a contractual relationship with the insurer nor was it a policy holder.  *Id.*

        The insurance company that provided the LTD insurance coverage was UNUM Life Insurance Company of America ("UNUM").  SUMF ¶ 13.

    **B.     Glik's misleading and incomplete application for LTD insurance**

        On October 2, 2002, Glik signed a UNUM application for LTD insurance.  SUMF ¶ 14.  As part of UNUM's normal underwriting procedure, Glik had to provide certain information so UNUM could determine his eligibility for insurance.  *Id.*  In making its eligibility determination, UNUM primarily relies upon the information the applicant provides in his application, including his certified answers to the medical questionnaire in the application.  *Id.* at ¶ 16.  At times, as part of its normal underwriting procedures, UNUM obtains additional information from other sources, including an applicant's treating health care providers.  *Id.*

---

[1] Inotek's Manual of Personnel and Policies contains a brief policy statement regarding long-term disability (Continued on next page)

One of the questions in the application required Glik to disclose whether he had ever had cancer. SUMF ¶ 17. He falsely answered "NO." *Id.* Similarly, another question asked him whether he had ever been treated for any disease of the rectum, and despite having had surgery for rectal cancer, Glik answered "NO." *Id.*

Glik also failed to answer a number of questions on the application. SUMF ¶ 19. For example, he failed to provide the name and address of his personal physician. *Id.* He also did not answer questions about any medication he had taken in the past 12 months and about whether he was experiencing any symptoms, disease or conditions which might require surgery or impair his ability to work and about which he planned on consulting a physician. *Id.* Upon receipt of Glik's application in late October, 2000, Inotek's insurance broker noticed that Glik had failed to fully complete the application. *Id.* at ¶¶ 18, 20. Consistent with her regular practice, the insurance broker returned Glik's application and requested that Glik fully complete it. Glik resubmitted his application, which the insurance broker received no later than November 28, 2000. *Id.* at ¶ 20.

Despite having opportunity to correct his false answers about his history of rectal cancer, Glik did not do so. SUMF ¶ 21. Further, although Glik answered a few of the questions he originally had not answered, he failed to answer the questions about any medication he had taken in the past 12 months and about any symptom or condition about which he planned to consult a physician. *Id.* at ¶ 22.

**IV.  Glik's Medical Condition In The Fall 2000**

On or before October 11, 2000, Glik's primary care physician referred him to an urologist because Glik had complained of testicular pain. SUMF ¶ 26. Glik informed the urologist that

---

insurance and does not describe the type of specific benefit that would be provided. SUMF ¶ 12.

about a week before October 11, he had discovered an abnormality in his left hemiscrotum. *Id.*

He also informed the urologist that he had previously undergone rectal cancer surgery. *Id.*

During an October 11 exam, the urologist discovered the presence of an abdominal mass and

recommended that Glik undergo diagnostic tests to determine if the mass was cancerous. *Id.*

Glik underwent diagnostic testing some time between October 11 and October 22, 2000. *Id.* By

the end of October, 2000, Glik was diagnosed with colon cancer. *Id.* at ¶ 3. In February, 2002,

Glik died from colon cancer. *Id.* at ¶ 28.

**V.    UNUM's Review Of Glik's Application For LTD Insurance**

On November 28, 2000, the insurance broker sent Glik's application to UNUM. SUMF

¶ 24. In the application, Glik had disclosed that he had high blood pressure and neck/back pain,

and that he had last seen his primary care physician on October 24, 1999. *Id.* at ¶ 22. On

January 19, 2001, given Glik's disclosure of high blood pressure and neck/back pain, pursuant to

its ordinary underwriting practice UNUM requested Glik's medical records from his primary

care physician. *Id.* at ¶ 25. In February 2001, it received those medical records and discovered

Glik's medical examination in October, 2000 regarding testicular pain and the abdominal mass.

*Id.* at ¶ 26. UNUM also discovered that Glik had previously undergone rectal cancer surgery.

*Id.* Upon discovery of this previously undisclosed medical information, UNUM postponed a

determination on Glik's LTD insurance application and notified him of its decision. *Id.* at ¶ 27.

## VI.    Glik Files A Complaint Against UNUM With Massachusetts' Division Of Insurance

Upon receipt of UNUM's notification that it postponed a determination on his LTD insurance application, Glik complained to UNUM about its refusal to issue him an LTD insurance policy.  SUMF ¶ 31.  He then filed a complaint against UNUM with the Massachusetts Division of Insurance ("DOI").  *Id.* at ¶ 32.  In its response to the complaint, UNUM explained that it postponed Glik's application for individual LTD insurance coverage based on the previously undisclosed medical information and that it would have never issued Glik coverage because of his diagnosis of cancer.  *Id.* at ¶ 35.  The DOI decided not to bring any action against UNUM.  *Id.* at ¶ 38.  Although Glik threatened to sue UNUM for not approving his policy application, he never did so.  *Id.* at ¶ 34.

## ARGUMENT

## I.    Plaintiff's ERISA Claim Fails As A Matter of Law

Plaintiff[2] purports to bring a claim under ERISA provisions[3] 29 U.S.C. §§ 1132(a)(13)(ii), (d)(1) and (f).  *See Am.* Compl. at ¶¶ 20-23.[4]  Subsection (d)(1) addresses the status of an employee benefit plan and Subsection (f) addresses the District Court's jurisdiction over ERISA claims.  Neither provides the Plaintiff with a claim under ERISA.

---

[2] Plaintiff is not a participant or beneficiary of the relevant ERISA plan.  Accordingly, Plaintiff herself cannot make a claim against Inotek under ERISA.  As the administrator of Glik's estate, she may bring a claim on behalf of his estate, asserting that he was a participant or beneficiary under the ERISA plan.

[3] Plaintiff further asserts that she is bringing a claim under the Labor Management Relations Act of 1947 and specifically 29 U.S.C. § 185.  Section 185 addresses suits by or against labor organizations.  As there is no collective bargaining agreement applicable to this case, a claim under the Labor Management Relations Act must be dismissed.

[4] ERISA does not contain a provision with the citation 29 U.S.C. § 1132(a)(13)(ii).

ERISA contains a "carefully crafted and detailed enforcement scheme" established after "a decade of congressional study of the Nation's private employee benefit system." *See Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 209 (2002) (internal quotations omitted). This civil enforcement scheme, Sections 502(a)(1) –(a)(4) of ERISA, codified as 29 U.S.C. § 1132(a)(1)-(a)(4), authorizes participants and beneficiaries of employee benefit plans to bring only the specific types of civil actions set forth therein. Only two of those types of action could possibly apply to Plaintiff's allegations – Sections 502(a)(1)(B) and 502(a)(3).[5]

### A.    Glik was not eligible for any ERISA benefits

Under Section 502(a)(1)(B), a participant or beneficiary may seek to recover benefits due to the beneficiary under the terms of the plan. The terms of Inotek's plan required that the employee meet UNUM's underwriting requirements to be eligible for potential benefits. The undisputed facts establish that Glik did not meet UNUM's underwriting requirements. UNUM determined that Glik was not eligible for a policy because of his pre-existing medical condition and his history of rectal cancer – facts that Glik did not disclose in his application to UNUM, but which UNUM discovered once it obtained Glik's medical records from his primary care physician.

---

[5] The other subsections of 502(a)(1)-(4) provide for the following relief:

- to obtain relief from an administrator who fails to supply certain requested information, 29 U.S.C. § 1132(a)(1)(A);

- to obtain appropriate relief on behalf of the plan as a whole under Section 409 of ERISA, which imposes personal liability on fiduciaries who breach their fiduciary duties to the plan, 29 U.S.C. § 1132(a)(2); and

- to obtain appropriate relief for failure of an administrator of a pension plan to provide a statement setting forth information in the administrator's report to the Internal Revenue Service, 29 U.S.C. § 1132(a)(4).

Under Inotek's plan, only UNUM had an obligation to pay out LTD insurance benefits to eligible Inotek employees. Since Plaintiff cannot demonstrate that Glik was eligible for LTD insurance benefits available to Inotek employees under Inotek's plan, any claim under Section 502(a)(1)(B) fails as a matter of law.[6]

## B.    Plaintiff cannot recover money damages under ERISA Section 502(a)(3)

Plaintiff's allegations also fail under Section 502(a)(3). Under that subsection a participant or beneficiary can seek to enjoin any act or practice that violates any provision of ERISA or the terms of the plan, or to obtain other "*appropriate equitable relief*," to redress such violations or to enforce any provisions of ERISA or the terms of the plan. 29 U.S.C. § 1132(a)(3) (emphasis added).

Section 502 (a)(3) allows only the recovery of equitable relief. Plaintiff seeks money damages, *see* Am. Compl., at ¶ 23, recovery of which is not available under that section. *See Knudson,* 534 U.S. at 210. The Court in *Knudson* explained that suits seeking to compel the defendant to pay money to the plaintiff are "almost invariably" suits for money damages – the "classic form" of legal (as opposed to equitable) relief. *Id.* at 210. Although "restitution" under Section 502(a)(3) may be available, *Knudson* limited that relief to "equitable" restitution. Restitution is equitable only where "money or property identified as belonging in good conscience to the plaintiff could be traced to particular funds or property in the defendant's possession;" in that case a court of equity, by imposing a constructive trust (or equitable lien), could order the defendant to transfer title to the plaintiff. *Id.* at 213; *see also Sereboff v. Mid Atlantic Med. Servs., Inc.*, 126 S.Ct. 1869, 1874 (2006) (finding that Section 502(a)(3) requires

---

[6] In this lawsuit, Plaintiff does not dispute the eligibility determination of UNUM.

the "nature of the recovery" sought to be equitable). By contrast, restitution constitutes legal relief in cases where the plaintiff "could *not* assert title or right to possession of particular property," but might be able to show just grounds for recovering money from the defendant, for example, based on contract or quasi-contract. *Id.*

Plaintiff does not seek "equitable" restitutionary relief within the meaning of Section 502(a)(3). She does not seek the imposition of a constructive trust or claim an equitable lien on specific identifiable funds. Nor does she allege that Inotek is in possession of specific identifiable funds owed to Plaintiff. Indeed, had Glik qualified for the relevant disability insurance benefits, UNUM would have paid Glik his insurance benefit *from its own funds*. This fact is fatal to Plaintiff's ERISA claim. *E.g., Hubert v. Med. Info. Tech., Inc.,* No. 05-10269, 2006 WL 721540 at *3 (D. Mass. March 20, 2006) (explaining that "[w]ith respect to plaintiffs' … remedy that defendants be ordered to disgorge unjust enrichment, a problem arises with the requirement that restitution in equity be able to 'clearly be traced to particular funds or property *in the defendant's possession.*") (citing *Knudson,* 534 U.S. at 213) (emphasis added);[7] *Kishter v. Principal Life Ins. Co.,* 186 F.Supp.2d 438, 445 (S.D.N.Y. 2002) (holding that any transfer of funds from an employer to the executor of an estate for a beneficiary of an ERISA life insurance plan is not a viable remedy because "such remedies are appropriate only where the specific property being sought is identifiable and in the hands of the defendant … *In this case, the money to which plaintiff has a claim is in the hands of … the life insurance carrier, and not [the employer]*") (emphasis added).

---

[7] A compendium of unpublished cases cited herein has been filed contemporaneously with this Memorandum.

Essentially, Plaintiff seeks a monetary remedy[8] for the alleged loss stemming from UNUM's election to postpone Glik's insurance application because of issues concerning his medical condition. The Court's holding in *Sampson v. Rubin,* No. 00-10215, 2002 WL 31432701 (D. Mass. Oct. 29, 2002) is instructive. In *Sampson*, the plaintiff claimed that his former employer breached its fiduciary duty to him by failing to notify him of the termination of the employer's long term disability insurance plan. *Id.* at *1. The Court concluded that the plaintiff "may not use the equitable enforcement mechanisms of § 502(a)(3) to secure compensatory relief for an alleged breach of fiduciary duty by the defendants." *Id.* at *5. In reaching this determination, the Court reasoned that "[the plaintiff's] request for compensation is, at bottom, an attempt to recover the benefits he would have received had the [insurance policy] not been cancelled … such relief is outside the scope of the equitable remedies envisioned by § [502](a)(3) and summary judgment is therefore appropriate." *Id.* at *6; *see also Coan v. Kaufman*, -- F.3d --, 2006 WL 2075129, slip copy, at * 11-12 (2nd Cir. July 21, 2006) (affirming summary judgment for plan trustees for similar reason); *Perrotti-Johns v. Wal-Mart Stores, Inc.*, No. 05-cv-243-PB, 2006 WL 1911595, slip copy, at * 3 (D.N.H. July 11, 2006) (granting motion to dismiss for similar reason). The reasoning in *Sampson* applies equally to Plaintiff's ERISA claim and warrants summary judgment on it in favor of Inotek.[9]

---

[8] Even if Plaintiff could maintain a claim for monetary relief, she is not entitled to such relief from Inotek. Inotek did for Glik what it did for all its employees seeking individual long-term disability insurance – it facilitated the application process and was prepared to pay the premiums if the insurer issued the policy. It had no obligation to pay out long-term disability insurance proceeds to any of its employees.

[9] Even if Plaintiff's ERISA claim survives summary judgment, her effort to obtain emotional distress or other extra-contractual damages under ERISA should be summarily dismissed. In general, ERISA does not permit recovery of extra-contractual damages, including non-pecuniary compensatory damages such as emotional distress damages. *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 146-147 (1985) (stating that "Congress did *not* intend to authorize other remedies [in ERISA's civil enforcement provisions] that it simply forgot to incorporate expressly" and concluding that Congress did not "authorize the recovery of extracontractual damages"); *Drinkwater v. Met. Life* (Continued on next page)

### C.     Glik's unclean hands bar recovery under Section 502(a)(3) of ERISA

Even if this Court were to conclude that Plaintiff's claim falls within the scope of equitable remedies envisioned by § 502(a)(3), Glik's "unclean hands" warrant dismissal of that claim.

Glik acted inequitably and in bad faith by his false and misleading submissions to UNUM regarding his medical condition. In response to a clear and direct question, Glik failed to disclose critical medical information that any reasonable person would have known an insurance provider requires an applicant to disclose, e.g., his history of cancer. Particularly demonstrating Glik's bad faith is that, during the same period he failed to disclose his cancer history to UNUM, he disclosed it to his urologist. Further, Glik failed to disclose whether he had any condition or symptom about which he planned to consult a physician.

UNUM's application warned Glik that he must disclose all relevant medical information so it could properly assess his eligibility for coverage. He failed to comply with UNUM's requirement. A reasonable fact-finder can only conclude that Glik's omission of his history of rectal cancer from his application and failure to answer particularly pertinent questions about his current medical condition constituted a deliberate design to obtain disability benefits under false pretenses.

The doctrine of unclean hands is "a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he

---

*Ins. Co.*, 846 F.2d 821, 824-825 (1st Cir. 1988) (holding that Section 502(a)(3), and ERISA in general, do not permit the recovery of extra-contractual damages such as compensatory and punitive damages); *Lopez v. Astrazeneca Pharms. LP*, No. Civ. 05-1285-DRD, 2006 WL 508095, slip copy, at * 5 (D.Puerto Rico March 1, 2006) (finding that emotional distress damages are not recoverable under Section 502(a)).[9]

seeks relief, however improper may have been the behavior of the defendant." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945). "Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation" of the unclean hands doctrine. *Id.* at 815.

Courts have applied the doctrine to claims for equitable relief under ERISA. *See Ellenburg v. Brockway, Inc.*, 763 F.2d 1091, 1097 (9th Cir. 1985); *Anweiler v. Am. Elec. Power Serv. Corp.*, 3 F.3d 986, 993 (7th Cir. 1993) (affirming the district court's granting of the defendants' motion for summary judgment as to plaintiff's Section 502(a)(3) claim on the grounds that she came before the court in equity with unclean hands); *Tynan v. Am. Airlines, Inc.*, No. 04-CV-335-SM, 2005 WL 2203172, slip copy, at * 5 (D.N.H. Sept. 9, 2005) (holding that plaintiff's unclean hands precluded him from obtaining an injunction under Section 502(a)(3)).[10] *Ellenburg* is particularly instructive. The plaintiff in *Ellenburg* submitted a false birth certificate in order to obtain early retirement benefits under his employer's pension plan. 763 F.3d at 1094, 1097. The Ninth Circuit affirmed the district court's finding that the plaintiff's "hands are dirty," thereby barring him from seeking equitable relief under ERISA. *Id.* at 1097. Glik's acts and omissions equally warrant summary judgment for Inotek on Plaintiff's ERISA claim.

---

[10] Other courts have recognized that a defendant can invoke equitable defenses in response to a Section 502(a)(3) claim. *E.g.*, *Fotta v. Trustees of the United Mine Workers of Am., Health and Retirement Fund*, 165 F.3d 209, 214 (3rd Cir. 1998) ("And like other equitable remedies, [Section 502(a)(3)] is subject to equitable defenses such as laches…").

## II.    ERISA Preempts Plaintiff's State Law Claims Pertaining To Inotek's Disability Insurance Plan

Plaintiff putatively asserts three state law contract claims: breach of the employee handbook (Count I), breach of implied covenant of good faith and fair dealing (Count II), and breach of a contractual right to long-term disability insurance (Count III). Plaintiff's three contract claims essentially seek benefits under an ERISA employee benefits plan. Since ERISA wholly preempts them, this Court should summarily dismiss those state law claims.

ERISA is a comprehensive statute that regulates the establishment and administration of employee benefit plans. *See* 29 U.S.C. §§ 1001–1461. ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" that is subject to ERISA, *id.* §1144(a). *See also Dennehy v. Dennehy*, No. 05-12204-GAO, 2006 WL 2042373, at * 1 (D. Mass. July 30, 2006) (O'Toole, J.). The state laws preempted by ERISA broadly include "all laws, decisions, rules, regulations, or other State action having the effect of law, of any State." *Id.* §1144(c)(1). These provisions apply to the LTD insurance plan under which the Plaintiff seeks "delinquent contributions." *See* Am. Compl., at Prayer for Relief, at (i).

The United States Supreme Court has repeatedly affirmed preemption of any state law, including common law, that has "connection with or a reference to" an employee benefit plan. *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 656 (1995) (internal quotation omitted); *Egelhoff v. Egelhoff*, 532 U.S. 141, 146-147 (2001). Courts should read ERISA's preemption provision in the broadest sense and give effect to Congress' deliberate intention that ERISA's civil enforcement remedies "were intended to be *exclusive*." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 54 (1987) (emphasis added); *Egelhoff*, 532 U.S. at 146; *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 138 (1990). As the First Circuit has observed, "[t]he policy choices reflected in the inclusion of certain remedies and the

exclusion of others under the federal scheme would be completely undermined if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA."  *Hampers v. W.R. Grace Co., Inc.*, 202 F.3d 44, 50 (1st Cir. 2000).

Accordingly, the Supreme Court, the First Circuit and this Court have held that ERISA preempts all state-law claims—such as Plaintiff's claims of breach of contract and breach of the implied covenant of good faith and fair dealing [11]— that directly or even indirectly affect or pertain to an ERISA plan.  *E.g., Pilot Life Ins. Co.*, 481 U.S. at 47 (state law claim for breach of implied covenant of good faith and fair dealing preempted by ERISA); *Met. Life v. Taylor*, 481 U.S. 58 (1987) (contract and tort claims); *Dennehy*, at * 2 (state common law cause of action for negligence by plan administrator in distributing life insurance proceeds); *DiGiovanni v. The Guardian Life Ins. Co. of Am.*, No. Civ.A. 98-10908-GAO, 2002 WL 1477175, at * 7 n.5 (D. Mass. June 28, 2002) (recognizing that ERISA preempts state law actions to enforce contractual terms of an ERISA plan) (O'Toole, J.); *Hampers*, at 51–54 (state common law cause of action for breach of contract preempted by ERISA).

Plaintiff's three contract claims are precisely the type of claims Congress intended to preempt through the enactment of ERISA.  The claims are entirely dependent upon the terms of the LTD insurance plan, consist singularly of challenging the administration and application of that plan, and ultimately seek long-term disability benefits that Plaintiff contends Glik was entitled to receive.  Indeed, throughout Plaintiff's allegations regarding her state law claims, she repeatedly refers to an LTD insurance plan and the plan "benefits" Glik should have received.

---

[11] *See San Luis Cent. R.R. Co. v. Springfield Terminal Ry. Co.*, 369 F. Supp. 2d 172, 173 n.1 (D. Mass. 2005) (identifying breach of contract, breach of covenant of good faith and fair dealing, unjust enrichment, and request for injunction as state-law claims).

*See* Am. Compl., ¶¶ 7-9, 13-14, 17-18. The First Circuit has "consistently held that a cause of action 'relates to' an ERISA plan when a court must evaluate or interpret the terms of the ERISA-regulated plan to determine liability under the state law cause of action." *Hampers*, 202 F.3d at 52. In addition, Plaintiff's state law claims hinge on the same conduct that underlies her ERISA claim. *Compare* Am. Compl. ¶¶ 7-9, 13-14, & 17-18 *with id.*, at ¶¶ 20 & 22-23. "[A]ny state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 209 (2004); *Hampers*, 202 F.3d at 52. State law claims, such as the Plaintiff's claims, that "aim to provide recovery for a denial of benefits under a benefits plan" are preempted by ERISA." *Campbell v. BankBoston, N.A.*, 206 F.Supp.2d 70, 79-80 (D. Mass. 2002); *Turner v. Fallon Cmty. Health Plan, Inc.*, 953 F.Supp. 419, 424 (D. Mass. 1997), *aff'd* 127 F.3d 196 (1st Cir. 1997); *see also Hampers*, 202 F.3d at 54 (holding that ERISA preempts any request that requires the court to order payment of plan benefits).

Since ERISA provides the exclusive remedy for Plaintiff's wrongful denial of benefits claims, Plaintiff's state law contract claims (Counts I-III) fail as a matter of law.

## IV. Even If Plaintiff's State Law Contract Claims Were Not Preempted By ERISA, Summary Judgment Is Appropriate As to These Claims

### A. Glik did not have any contractual right to group long term disability insurance

In Count I, Plaintiff asserts that Inotek breached Glik's "handbook rights" by allegedly wrongfully failing to have a group LTD insurance program.[12] The undisputed facts establish that

---

[12] In her Amended Complaint, Plaintiff asserts her state law claims both in her capacity as the
(Continued on next page)

this assertion is not true. Glik did not have a contractual right to group disability insurance. Inotek offered Glik, as with all of its employees, the opportunity to apply for individual (but Company paid) LTD insurance with UNUM, but the employees had to meet UNUM's eligibility requirements. Inotek's offering was consistent with its right to determine which benefits, and the form of those benefits, it will offer. *See Lockheed Corp. v. Spink,* 517 U.S. 882, 887, 889 (1996) (determining that "[e]mployers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans").

The undisputed facts establish that UNUM made the determination that Glik was not eligible for an LTD insurance policy because of his pre-existing condition and his history of rectal cancer. UNUM did not involve Inotek in its eligibility decision. Accordingly, Plaintiff's breach of "handbook rights" claim fails as a matter of law.

**B.    Inotek did not make it impossible for Glik to receive LTD insurance benefits**

In Count II, Plaintiff asserts that Inotek "made it impossible for [Glik] to receive LTD benefits…." Am. Compl. ¶ 13. The undisputed facts belie this assertion. The decision to postpone (and effectively deny) Glik's application for LTD insurance coverage was made solely by UNUM. UNUM made its underwriting decision on the basis of Glik's medical issues – not any action of Inotek. Accordingly, Plaintiff's contention that Inotek made it impossible for Glik to receive LTD benefits fails.

---

Administrator of the Glik's estate and individually. Since Plaintiff never worked for Defendant, it is clear Plaintiff mistakenly or inadvertently asserted the state law claims in her individual capacity. SUMF at ¶ 10.

**C.    Glik never had a contract or policy for disability insurance coverage**

In Count III of the Amended Complaint, Plaintiff vaguely claims that Inotek breached a term of Plaintiff's employment requiring long-term disability insurance when UNUM stopped processing his disability insurance policy application because UNUM "was not notified of Glik's employment status and was not forwarded medical forms." Am. Compl. ¶ 17. This assertion is unsupportable and unsubstantiated. Contrary to Plaintiff's allegation, UNUM postponed Glik's application because Glik's medical records revealed that he had a testicular mass and a possible abdominal mass, as well as a history of rectal cancer. SUMF at ¶ 27. Since the factual record is devoid of any support for Plaintiff's claim, summary judgment for Inotek on Count III of the Amended Complaint is appropriate.

**V.    Plaintiff's Wrongful Discharge Claim Fails As A Matter Of Law**

In Count I of the Amended Complaint, at ¶ 6, Plaintiff asserts that Glik was not an at-will employee and that his employment could only be terminated for cause. She alleges that Inotek breached Glik's employee "handbook rights" by terminating him without cause. Her claim fails for several reasons. First, Inotek's employee handbook states that it is not a contract and not binding on Inotek, and that Glik was employed at will. SUMF at ¶ 42. An at will employee may be terminated for any reason or no reason at all, provided the reason is not unlawful. *Gram v. Liberty Mutual Ins. Co.,* 384 Mass. 659, 671, 429 N.E.2d 21, 28 (1981) (citation omitted); *Sargent v. Tenaska,* 914 F.Supp. 722, 726 (D. Mass. 1996). A discharged at will employee may not recover simply by proving that the decision to discharge him was "bad, unjust, and unkind." *Gram,* 384 Mass. at 667, 429 N.E.2d at 26 (citation omitted).

Even if Glik's employment was not terminable at will, Inotek had good cause to terminate his employment because, after his November 21, 2000 surgery, he was unable ever to

return to work and made this fact known to Inotek on December 2, 2000. Thus, Plaintiff's wrongful discharge lacks any merit and should be dismissed.

## CONCLUSION

For all of the foregoing reasons, Defendant asks that the Court GRANT its Motion for Summary Judgment on all counts of Plaintiff's Complaint and dismiss Plaintiff's Complaint in its entirety.

Respectfully submitted,

INOTEK PHARMACEUTICALS
CORPORATION

By its attorneys,

/s/ Wilfred J. Benoit, Jr.
Wilfred J. Benoit, Jr. (BBO No. 037900)
Anne M. Gaeta (BBO No. 643299)
Goodwin Procter LLP
Exchange Place
Boston, MA 02109-2881
(617) 570-1000

Dated: August 30, 2006

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on August 30, 2006.

/s/ Wilfred J. Benoit, Jr.

Wilfred J. Benoit, Jr.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| YUDIF GLIK, ADMINISTRATOR,<br><br>    Plaintiff,<br><br>v.<br><br>INOTEK PHARMACEUTICALS<br>CORPORATION,<br><br>    Defendant. | Civil Action No.  05-10360-GAO |

**COMPENDIUM OF UNPUBLISHED AUTHORITY IN SUPPORT OF
DEFENDANT INOTEK PHARMACEUTICALS CORPORATION'S MOTION FOR
SUMMARY JUDGMENT**

**INDEX**

**Case**                            **Exhibit**

*Hubert v. Med. Info. Tech., Inc.*, No. 05-10269, 2006 WL 721540
(D. Mass. March 20, 2006) ...................................................................................................... A

*Sampson v. Rubin*, No. 00-10215, 2002 WL 31432701 (D. Mass. Oct. 29, 2002)……………..B

*Coan v. Kaufman*, -- F.3d --, 2006 WL 2075129 (2nd Cir. July 21, 2006)……………………...C

*Perrotti-Johns*, No. 05-cv-243-PB, 2006 WL 1911595 (D.N.H. July 11, 2006)………………..D

*Lopez v. Astrazeneca Pharms., LP*, No. Civ. 05-1285-DRD, 2006 WL 508095 (D.Puerto Rico
March 1, 2006)…………………………………………………………………………………..E

*Tynan v. Am. Airlines, Inc.*, No. 04-CV-335-SM, 2005 WL 2203172 (D.N.H. Sept. 9, 2005)…F

*Dennehy v. Dennehy*, No. 05-12204-GAO, 2006 WL 2042373
(D. Mass. July 30, 2006)…………………………………………………………………………...G

*DiGiovanni v. The Guardian Life Ins. Co. of Am.*, No. Civ.A. 98-10908-GAO, 2002 WL
1477175 (D. Mass. June 28, 2002)………………………………………………………………H

Respectfully submitted,

INOTEK PHARMACEUTICALS
CORPORATION

By its attorneys,

/s/ Wilfred J. Benoit, Jr.
Wilfred J. Benoit, Jr. (BBO No. 037900)
Anne M. Gaeta (BBO No. 643299)
Goodwin Procter LLP
Exchange Place
Boston, MA 02109-2881
(617) 570-1000

Dated:  August 30, 2006

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on August 30, 2006.

/s/ Wilfred J. Benoit, Jr.
Wilfred J. Benoit, Jr.

2

# EXHIBIT A

Westlaw.

Slip Copy                                                                                                    Page 1
Slip Copy, 2006 WL 721540 (D.Mass.)
**(Cite as: 2006 WL 721540 (D.Mass.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Massachusetts.
Michael P. HUBERT, David Hinchliffe and William
Trainor
v.
MEDICAL INFORMATION TECHNOLOGY,
INC., Medical Information Technology Profit
Sharing Plan, A. Neil Pappalardo, Lawrence A.
Polimeno, Roland L. Driscoll,
Edward B. Roberts, Morton E. Ruderman and L.P.
Dan Valente.
**No. Civ.A. 05-10269-RWZ.**

March 20, 2006.
Michael A. Collora, Dwyer & Collora, LLP, Boston,
MA, for Michael P. Hubert.

Sara E. Noonan, Dwyer & Collora, LLP, Boston,
MA, for Michael P. Hubert, David Hinchliffe, and
William Trainor.

Jennifer W. Fischesser, Gadsby Hannah, LLP.,
Kevin P. Martin, Stephen D. Poss, Goodwin Proctor
LLP, Boston, MA, for Defendants.

*MEMORANDUM OF DECISION*

ZOBEL, J.

*1 In 1973, defendant Medical Information
Technology, Inc. ("Meditech," or "Company"), a
Massachusetts corporation, established a profit
sharing plan on behalf of its employees in order to
provide pension benefits upon retirement. The
Medical Information Technology Profit Sharing Plan
(the "Plan") is governed by the Employment
Retirement Income Security Act ("ERISA").
Meditech makes cash and stock contributions to the
Plan, and upon termination of employment, each
employee receives a cash payment in the amount of
that employee's vested interest in the Plan. Because
Meditech stock accounts for approximately 85
percent of the Plan's holdings, the total value of an
employee's interest upon leaving Meditech depends
largely upon valuation of the stock held in the
employee's Plan account. Such valuation, among
other responsibilities of the Plan, is handled by the
sole trustee of the Plan, defendant A. Neil Pappalardo
("Pappalardo"), who oversees the Plan in cooperation
with Meditech's directors, defendants Lawrence A.
Polimeno, Roland L. Driscoll, Edward B. Roberts,
Morton E. Ruderman and L.P. Dan Valente
(collectively, the "Directors").

Plaintiff Michael P. Hubert worked for Meditech
until 2004, while his coworkers and co-plaintiffs
David Hinchliffe and William Trainor each left in
1998. According to plaintiffs, Pappalardo has
knowingly undervalued Meditech's stock for at least
the past eight years, and the Directors have approved
this undervaluation. As a result, plaintiffs received
smaller cash payments from the Plan upon
termination than otherwise due if Pappalardo had
valued the Company stock in compliance with a
modem methodology for appraising fair market
value. According to plaintiffs, these Plan payments
do not fairly reflect the true value of plaintiffs'
interests as a function of the Company's financial
success. In an effort to recover the balance, plaintiffs
filed the instant suit for failure to pay benefits due
under the Plan in violation of ERISA (Count 1) and
for breach of fiduciary duty owed under ERISA
(Count 2). After defendants filed a Motion to
Dismiss, plaintiffs filed an Amended Complaint.
Defendants now move for dismissal of the Amended
Complaint.

Defendants raise several grounds for dismissal. First,
they argue that the facts alleged in the Amended
Complaint, even if true, do not establish plaintiffs'
rights to any additional benefits as alleged in Count
1. Defendants assert this ground as a matter of logic,
essentially arguing that the Company's annual
contributions were fixed amounts, and higher
valuation of the stock would have simply led to fewer
shares actually being allocated to the Plan. They
argue that plaintiffs seek to benefit from both a low
valuation at the time stock is contributed to the Plan,
so that more shares are assigned, and a high valuation
at the time stock is distributed from the Plan, so that
termination payments would reflect higher values
without having reduced the number of shares
originally contributed to the Plan and allocable to the
individual plaintiffs. However, defendants' theory
does not foreclose the possibility that an original

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

contribution of fewer, more highly valued shares would, by the time plaintiffs terminated their employment and under an independent appraisal, still have increased in value more quickly than reflected by defendants' methodology, especially given plaintiffs' claims of Meditech's financial strength. In other words, the parties' competing valuation methodologies may involve different rates of growth (or decline) over time, so that the difference in actual share values each year would not necessarily be a constant margin. Defendants' assertion that plaintiffs' have not adequately pled a loss in benefits is, thus, not persuasive. Their second argument that regards standing but also relies upon this first argument similarly fails.

*2 Third, defendants claim that the Amended Complaint fails to allege sufficiently arbitrary and capricious conduct by defendants in making discretionary decisions regarding benefits valuations. While defendants correctly identify the standard of review to be arbitrary and capricious, plaintiffs appropriately note that "[i]n applying [this standard], ... the existence of a conflict of interest on the part of the administrator is a factor which must be considered." *Wright v. R.R. Donnelly & Sons Co. Group Benefits Plan,* 402 F.3d 67, 74 (1st Cir.2005). On the face of the Amended Complaint, plaintiffs have alleged such a conflict. (*See* Am. Compl. ¶ ¶ 56- 58). Further fact-finding as to whether plaintiffs can sustain their assertion is, at this stage in the litigation, premature. Accordingly, defendant's motion on this basis is denied.

Fourth, defendants note that plaintiffs did not exhaust their remedies under the Plan prior to filing the instant suit. "Before a plaintiff asserts an ERISA claim, ... he must first exhaust his administrative remedies." *Madera v. Marsh USA,* 426 F.3d 56, 61 (1st Cir.2005). Plaintiffs do not dispute that they never filed a formal claim for review of the issues addressed in the instant suit. However, they challenge the existence of administrative remedies, as the Plan alluded to "rules ... for filing a claim" that allegedly never materialized, and further deny that they ever received notice that such remedies were available. (*See* Am. Compl. ¶ ¶ 26-30; Ex. A, at 8). If plaintiffs' allegations are true, then they may qualify for relief or exception from the exhaustion requirement. *See Madera,* 426 F.3d at 61-62. On the present record, dismissal for failure to exhaust is inappropriate.

Next, defendants challenge Count 2 as an attempt by plaintiffs to repackage Count 1 as a fiduciary duty claim, even though "individuals cannot obtain compensatory or punitive damages for breach of fiduciary duty." *Watson v. Deaconess Waltham Hosp.,* 141 F.Supp.2d 145, 150 (D.Mass.2001). Plaintiffs argue that Count 2 differs from Count 1 in that the latter pleads a contractual breach while the former pleads a breach of defendants' statutory duties of loyalty and care. To remedy a fiduciary breach under ERISA, plaintiffs may only obtain "appropriate equitable relief." 29 U.S.C. § 1132(a)(3). In Count 2, plaintiffs seek three remedies: (1) restitution, (2) disgorgement of unjust enrichment, and (3) an injunction that requires defendants to hire an outside appraiser for future valuations of Company stock. As to the first, "for restitution to lie in equity, the action must generally seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession." *See Great-West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 214, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002). Although plaintiffs characterize their restitution as seeking to "make whole the named plaintiffs," the remedy derives from benefits that plaintiffs believe they are entitled to under the terms of the Plan. It is, as defendants contend, essentially the same compensation sought in Count 1. As such, it amounts to legal restitution, not equitable restitution, and "this fine distinction between restitution at law and restitution in equity" forecloses plaintiffs' ability to obtain legal restitution for the alleged fiduciary breach. *Id.*

*3 With respect to plaintiffs' second remedy that defendants be ordered to disgorge unjust enrichment, a problem arises with the requirement that restitution in equity be able to "clearly be traced to particular funds or property in the defendant's possession." *Id.* at 213. In the context of a suit by an ERISA plan to recover funds already paid to a beneficiary, "courts have applied a three-part test: 'Does [plaintiff] seek to recover funds (1) that are specifically identifiable, (2) that belong in good conscience to [plaintiff], and (3) that are within the possession and control of the [defendant]?' " *Admin. Comm. of the Wal-Mart Assoc. Health and Welfare Plan v. Willard,* 393 F.3d 1119, 1122 (10th Cir.2004). Here, it is not at all clear how plaintiffs could prove that defendants in fact purchased more shares as a result of the alleged undervaluation than they otherwise would have bought. Additionally, as a practical matter, defendants will not realize profit from these holdings until they sell their shares, and there is no way to determine at this time what the eventual selling price will be. Thus, the actual amount by which defendants may be allegedly unjustly enriched, and thus to be disgorged, is not, according to any allegation set forth

by plaintiffs, specifically identifiable or susceptible to reasonable calculation. Moreover, regarding the second prong of the test, defendants argue that plaintiffs fail to explain at whose expense defendants allegedly unjustly enriched themselves and whether or how anyone was, in fact, harmed by the conduct. Plaintiffs' allegation that Pappalardo and other "insiders" purchased more stock and therefore retained tighter control over the company because the price was artificially low necessarily implies that defendants obtained such control improperly as against other Company owners, namely the other shareholders (including plaintiffs and the Plan). Again, though defendants may still have purchased the same number of shares at a higher price, and even if the difference between the purchase prices may be characterized as unjust enrichment, plaintiffs have not clarified whether or why this amount would belong to them. Thus, the portion of Count 2 regarding unjust enrichment is dismissed.

The remaining plea for prospective relief through an injunction requiring outside appraisal of the stock for future valuations may qualify as equitable, but plaintiffs have not demonstrated standing to obtain this remedy. Under Article III of the Constitution, "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). As defendants argue, the injunctive relief sought in Count 2 cannot redress plaintiffs' alleged injuries, because the relief sought is prospective and plaintiffs are no longer members of the Plan. Plaintiffs have sought class certification, but in defining the "putative class" as those individuals who "had the same or similar experience when receiving their [Plan] distributions," they necessarily include only former Company employees in the class. Because neither plaintiffs nor any of the putative members of the asserted class would benefit from the order of an injunction affecting the future administration of the Plan, plaintiffs do not have standing to seek this relief. Because none of the remedies sought by plaintiffs in Count 2 is permitted under relevant legal authority, "their suit [on this claim] is not authorized" under ERISA. *Great-West Life*, 534 U.S. at 218. The motion to dismiss Count 2 is allowed as to all defendants.

*4 Defendants raise a statute of limitations defense as an additional basis for dismissing both Counts 1 and 2. As Count 2 is dismissed, only the arguments with respect to Count 1 are considered. "Because Congress did not provide a statute of limitations in

the ERISA statute for [benefits] claims, federal courts must apply the limitations period of the state-law cause of action most analogous to the federal claim." *Muldoon v. C.J. Muldoon & Sons*, 278 F.3d 31, 32 (1st Cir.2002). Plaintiffs urge analogy to the six-year limitations period for contract actions under Massachusetts law, while defendants recommend the three-year limitations period under the Massachusetts wage payment statute. Defendants rely upon a thoroughly-reasoned Third Circuit decision that found "[c]laims for recalculation of benefits already paid are essentially claims for past due 'wages' ... [and] are subject to the Pennsylvania Wage Payment and Collection Law's three-year limitation on actions for wages past due." *Gluck v. Unisys Corp.*, 960 F.2d 1168, 1182 (3rd Cir.1992). However, the Third Circuit also acknowledged that "where the ERISA claims asserted differ from those presented in [prior cases], [the court] should not rotely apply the same limitations period...." *Id.* at 1180. For example, the Third Circuit found the Pennsylvania statute of limitations for contracts actions applied to claims for benefits that were bargained for, but noted that the Pennsylvania wage law limitations period might apply to claims for wages due on regular paydays. *Id.* at 1180-81. Of relevance in this case, the Third Circuit also distinguished, for statute of limitations purposes, between claims for past due wages and claims for benefits pursuant to "an ERISA violation," finding these "not analogous." *Id.*

An employer's delinquency or an employee's receipt of diminished payment gives immediate, obvious notice to an employee that something is amiss, but an ERISA violation or a reduction in future benefits may be subtle and will go unnoticed far more often than delinquency. Furthermore, the analogy in [prior cases] between the 'wages' covered by Pennsylvania law and the delinquent employer contributions--which had been collectively bargained for--becomes inoperable when ERISA claims are based on statutory violations, plan interpretation and future benefits. *Id.*

For the reasons articulated by the Third Circuit in *Gluck*, plaintiffs' claim for benefits is distinguishable from a claim for past due wages and renders inapposite the statute of limitations established by the Massachusetts wage payment statute. Additionally, as plaintiffs' contend, to the extent that the payments at issue constitute deferred compensation, "deferred compensation contributions are not 'wages' under the weekly wage law." *Boston Police Patrolmen's Ass'n, Inc. v. City of Boston*, 435 Mass. 718, 721, 761 N.E.2d 479 (2002). Defendants argue that the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 721540 (D.Mass.)
(Cite as: 2006 WL 721540 (D.Mass.))

characterization of deferred compensation as not constituting wages applies only when the contributions are not property of the employee, and that the Plan contributions were, to the contrary, plaintiffs' property. The characterization in *Boston Police* was driven, however, not by whether the contributions were employee property, but rather by the original intent behind the deferred compensation plan, namely, to withhold a portion of participating employees' salaries for later payment and "the benefit of a tax deferment." *Id.* at 720, 761 N.E.2d 479. If the deferred compensation constituted wages, then the tax benefit would not be available. Here, defendants do not allege that the contributions to the Plan on behalf of participants were intended to be wages, in the sense that tax would be due and owing upon contribution. Accordingly, the reasoning that supported the characterization in *Boston Police* dictates the same result in the instant case.

*5 While *Gluck* declined to apply the Pennsylvania contracts statute of limitations because the benefits at issue had not been bargained for, Massachusetts courts have ruled otherwise. When a plaintiff sues for benefits that "are incidents of the plaintiff's employment," and are provided "under an employment contract ... the appropriate statute of limitations is six years [in accordance with the statute of limitations for contract actions]." *Chambers v. Lernuel Shattuck Hosp.*, 41 Mass.App.Ct. 211, 212-213, 669 N.E.2d 1079 (1996), *citing Jones v. Wayland*, 374 Mass. 249, 260, 373 N.E.2d 199 (1978)(finding payments for leave when incapacitated are "incidents of [plaintiff's] employment and are contingent on the continued employment of [plaintiff]," such that "[plaintiff]'s resignation ... operated to terminate his right to continued compensation ..."). The *Chambers* court applied the statute of limitations for contractual disputes, because the benefits sought were originally provided as a result of the plaintiff's status as an employee, even though the benefits sought were mandated by statute and not the employee's contract. Similarly, in the instant case, defendants authorized contributions to the Plan on plaintiffs' behalf simply because plaintiffs were employees. Logically, then, plaintiffs' suit regarding Plan contributions is analogous to suits for payments that are incidents of employment, and the appropriate state statute of limitations is the six-year period for contracts claims as applied by the Massachusetts state courts.

With respect to determining the date on which plaintiffs' action accrued, "[c]onsistent with the [federal] discovery rule, the general rule in an ERISA

action is that a cause of action accrues after a claim for benefits has been made and has been formally denied." *Union Pacific R. Co. v. Beckham*, 138 F.3d 325, 330 (8th Cir.1998). Because plaintiffs never formally filed a claim for benefits, the appropriate date for accrual is less clear. Plaintiffs assert that defendants' conduct constituted a continuing violation, since the undervaluation occurred on an annual basis. This theory is unsatisfactory, because it places no burden on the plaintiffs to exercise reasonable diligence. Defendants argue that the action accrued on the date that the allegedly discounted payments were distributed by the Plan to the plaintiffs, since the amount itself should have raised plaintiffs' awareness of an issue. This suggestion better incorporates the expectation for reasonable diligence and is consistent with a rule set forth by the First Circuit in a case somewhat similar to the facts at hand. *See Geo. Knight & Co., Inc. v. Watson Wyatt & Co.*, 170 F.3d 210 (1st Cir.1999). In that case, the plaintiff was an employer that established an ERISA plan, made contributions in amounts recommended by the defendant actuarial services company, and sued the company under state law when the plan was found to be underfunded. In determining, under the discovery rule, when the employer's action accrued, the First Circuit placed the burden on the employer to demonstrate when it "knew, or in the exercise of reasonable diligence should have known, about the Plan's 'underfunded' status," and based its finding on documentation that was available for review by the employer. *Id.* at 214.

*6 Although the instant case concerns different underlying legal claims and the burden remains on defendants, as the asserting party, to demonstrate why Count 1 falls outside the statute of limitations, these differences do not undermine the relevance of the similar circumstances from which plaintiffs' Count 1 claim arose. Because plaintiffs derived their claim from data summarized over several years after 1998, the complaint as pled does not clearly fall outside the statute of limitations. The motion to dismiss is denied.

The defendant Directors filed separate motions to dismiss on an additional basis. Because these defendants were named only in Count 2, and Count 2 is dismissed, the separate motions are moot.

Accordingly, defendants' Motions to Dismiss the Amended Complaint (# 5 and # 24 on the docket) are denied as to Count 1 but are allowed as Count 2. Defendants' separate Motions to Dismiss (# 3 and # 26 on the docket) are moot.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 721540 (D.Mass.)
**(Cite as: 2006 WL 721540 (D.Mass.))**

Slip Copy, 2006 WL 721540 (D.Mass.)

**Motions, Pleadings and Filings (Back to top)**

• 2006 WL 1726408 (Trial Pleading) Defendants' Answer to the Amended Complaint (May 2, 2006)Original Image of this Document (PDF)

• 2005 WL 2862867 (Trial Motion, Memorandum and Affidavit) Defendants' Joint Reply to Plaintiffs' "Second" Opposition to their Motions to Dismiss (Sep. 6, 2005)Original Image of this Document (PDF)

• 2005 WL 2454543 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Second Opposition to Defendants' Motions to Dismiss the Amended Complaint (Aug. 5, 2005)Original Image of this Document (PDF)

• 2005 WL 691896 (Trial Pleading) Class Action Complaint and Demand for Jury Trial (Feb. 10, 2005)Original Image of this Document (PDF)

• 1:05cv10269 (Docket) (Feb. 10, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2002 WL 31432701 (D.Mass.), 29 Employee Benefits Cas. 1293
**(Cite as: 2002 WL 31432701 (D.Mass.))**

**C**

**Motions, Pleadings and Filings**

United States District Court,
D. Massachusetts.
Russell E. SAMPSON, Jr., Plaintiff,
v.
Michael E. RUBIN, Samuel S. Perlman, Martin B.
Dropkin, Maurice J. Leavitt,
Mitchell E. Weisman, individually and doing
business under the name of Dropkin,
Perlman, Leavitt & Rubin, and Joel A. Stein and
Perlman, Rubin & Stein, P.C.,
Defendants.
No. Civ.A. 00-10215-DPW.

Oct. 29, 2002.

*MEMORANDUM AND ORDER*

WOODLOCK, J.

*1 Plaintiff Russell E. Sampson, Jr. brought this action against his former employer, a law firm; another law firm having overlapping membership with the former employer; and the individual members of both firms for breach of fiduciary and statutory duty under the Employee Retirement Income Security Act ("ERISA"). Specifically, Sampson alleges that the defendants breached their fiduciary duty by failing to notify him of the termination of the firms' term disability insurance plan. Sampson further alleges that the defendants breached their statutory duty under 29 U.S.C. § 1132(c) to provide him with certain plan information upon request. Sampson seeks compensatory and statutory damages.

Before me are multiple motions for summary judgment filed by the defendants. This is the second round of summary judgment practice in this case. I denied the defendants' first motion for summary judgment in my September 28, 2001 Memorandum and Order. The legal landscape for the plaintiff has become decidedly bleaker since the first round of summary judgment motions and I now find it cannot support plaintiff's claims.

I. BACKGROUND

A. The Parties

Plaintiff Sampson is a resident of Norfolk County in Massachusetts and is a member of the Massachusetts Bar. Sampson was diagnosed as HIV positive in 1984.

Individual defendants Martin Dropkin, Samuel Perlman, Maurice Leavitt, Michael Rubin and Mitchell Weisman are residents of Massachusetts and members of the Massachusetts bar. Plaintiff alleges that these defendants do business under the name Dropkin, Perlman, Leavitt and Rubin ("DPLR") the principal place of business of which is located in Middlesex County.

Defendant Perlman, Rubin and Stein, P.C. ("PRS") is a professional corporation organized under the laws of Massachusetts, with its principal place of business in Norfolk County. Sampson is a former employee of PRS. Individual defendant Joel Stein is a resident of Massachusetts, a member of the Massachusetts bar, and a member of PRS, P.C. Sampson alleges that PRS, P.C. is the alter-ego of the individually named defendants and of DPLR.

B. Procedure

In denying the defendants' first motion for summary judgment I determined that Sampson had standing as a plan participant to bring suit. I further determined that material questions of fact existed as to whether the defendants could be considered fiduciaries for ERISA purposes, what the exact nature of the alleged breach of the duty to provide information was, and what harm was suffered by Sampson as a result of these alleged breaches.

The several motions for summary judgment filed on behalf of the defendants in this second round of summary judgment practice focus on aspects of the remaining substantive claims. The motions are variously based on the absence of available remedies (Docket No. 86-1); on the absence of reasonable and detrimental reliance (Docket No. 87-1); on "Indisputably Unclean Hands" (Docket No. 88-1); on the purported insufficiency of the "Functional Fiduciary" allegation (Docket No. 89-1), and on the purported insufficiency of the "Alter Ego" allegation (Docket No. 90-1). Stein filed a separate motion for summary judgment as to the individual suit against

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                           Page 2
Not Reported in F.Supp.2d, 2002 WL 31432701 (D.Mass.), 29 Employee Benefits Cas. 1293
**(Cite as: 2002 WL 31432701 (D.Mass.))**

him (Docket No. 95-1).

C. The Plan

*2 The Group LTD Insurance Policy ("Plan") at issue in this case was provided by Standard Insurance Company and became effective as of January 1, 1994. DPLR was the specified Policyowner. DPLR, PRS and C.A.R.E.S of New Hampshire, Inc. d/b/a Banker's Title and Closing Co. (not a party to this action) are specified as Employers by the plan.

The Policy provided insurance coverage to employees who (1) were Members; (2) completed the Eligibility Waiting Period; and (3) met the requirements in "Active Work Provisions" and "When Your Insurance Becomes Effective." A "Member" was defined to include an active employee who regularly worked at least thirty hours per week. Employees were considered "eligible" on the later of the Group Policy Effective Date or the first day following ninety consecutive days as a Member. Under the plan, insurance continued during a leave of absence of thirty days or less.

The 1994 Standard LTD policy became effective on January 1, 1994. (Pl.Ex. A, at Bates 002). The Policy had an Initial Rate Guarantee Period of two years, and could be renewed for successive 12 month periods by the payment of the policy premiums, subject to potential rate increases after the second year. (*Id.* at Bates 008). The Policy also provided that it could be terminated by the policyowner upon written notice to the Standard Insurance Co. (Pl.Ex. A, ¶ F at Bates 23). Upon receiving such notice, the Policy would terminate on the later date of either the date stated in the notice, or the date Standard received the notice. (*Id.*). The Policy provided that an individual's coverage terminates when the Group Policy terminates or when that individual ceases to be a member, as defined by the plan. [FN1] (*Id.* at Bates 0020).

> FN1. The membership requirement of the Policy is discussed in greater detail below.

D. Factual History

Following my September 28 Memorandum and Order, the parties conducted additional discovery. As a result, several key matters are now resolved. I restate the facts generally as found in my September 28 Memorandum, amended as necessary by the new information.

Sampson was hired as an associate attorney by PRS in March of 1993. He initially worked exclusively for partner Joel Stein, but over time received assignments from other partners and shareholders of both PRS and DPLR. Sampson's paychecks were issued by PRS.

In January of 1994, Rubin obtained a group short and long-term disability policy for PRS employees, to be paid for in full by defendants. [FN2] Rubin characterized the LTD Plan as a "gift" in that there was no cost to the employees. On January 4, 1994, PRS issued a memorandum on DPLR letterhead signed by defendants Rubin, Perlman and Stein, announcing the new group policies. Several weeks later, Sampson received and reviewed copies of the policies.

> FN2. While the Standard LTD policy indicates that DPLR was the "policy owner," and therefore responsible for the premiums, the memo announcing the creation of the plan was signed by the partners of PRS on behalf of PRS.

In January of 1995, Rubin cancelled the LTD Plan, apparently without notifying the other defendants, PRS employees, or Sampson. Sampson and Stein did not learn that the LTD plan had been terminated until 1998.

*3 In May 1995, Sampson was told he was being laid off from PRS due to the firm's weakening financial condition. On May 10, Sampson was given two checks, one for his last week of work, ending May 11, 1995, and one for his accrued annual vacation time. On May 11, Sampson cashed both checks and filed for unemployment compensation with the Massachusetts Department of Employment and Training ("DET"). Sampson indicated on the DET form that his employment separation date was May 12, 1995. Sampson continued to work at PRS for another week and a half after his termination to facilitate the transition. As of May 11, Sampson had ceased performing paid work for PRS.

After the mandatory two-week waiting period, Sampson began receiving unemployment benefits in the third week of June 1995. Sampson acknowledges that during this period he was actively seeking new employment with some assistance and advice from Stein. In the first or second week of June, Sampson received his last PRS check for work performed prior to the lay-off.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 3
Not Reported in F.Supp.2d, 2002 WL 31432701 (D.Mass.), 29 Employee Benefits Cas. 1293
**(Cite as: 2002 WL 31432701 (D.Mass.))**

On June 20, 1995, 40 days after ceasing paid work at PRS, Sampson began working for PRS again on a contract basis at a rate of $35 per hour. Sampson submitted handwritten weekly time sheets directly to Stein, who paid him by personal check. Stein characterized these payments as an office expense and was reimbursed by PRS. Sampson's time sheets cover the period from June 20 through October 27, 1995. During the first three weeks of his contract employment (June 20-July 7, 1995), Sampson worked less than thirty hours per week. In the week of July 14, 1995, and almost every week thereafter, Sampson worked over 30 hours for PRS.

While working on a contract basis for Stein, Sampson did not receive a W-2 or a Form 1099, and expressly asked Stein not to issue a Form 1099. Sampson did not report these monies as income for 1995 to either the IRS or the Department of Employment and Training. Sampson continued to receive full unemployment benefits until the twenty-six week benefits period ended in November of 1995. Stein was aware that Sampson was collecting unemployment benefits while working on an hourly basis for PRS.

In November of 1995, Stein and Sampson agreed upon a reduced weekly salary and Sampson returned to PRS as a full-time associate. The only term of employment discussed was salary compensation. From November of 1995 until November of 1998, Sampson was a full-time salaried employee of PRS.

In 1998, Sampson decided to leave work because of health concerns. During August, 1998 Sampson was unable to locate copies of the Standard short and long term disability policies in his personal files. He then contacted Christina Karogiannis, the bookkeeper for DPLR, to request copies of the policies. Karogiannis informed Sampson that she had only a copy of the short term policy which she could send to him. She also told him that the long term policy had been cancelled in 1995. Sampson asked Karogiannis to confirm the cancellation of the LTD policy, which she did approximately a week later by faxing Sampson a copy of the letter from the insurance carrier acknowledging the cancellation. At this time, Sampson apparently made no other requests for plan documents.

**\*4** Sampson then informed Stein that he was HIV-positive and that the LTD Plan was no longer in effect. Sampson asked if PRS would obtain a new long-term policy. Stein indicated to Sampson that he was unaware of the plan termination, and "had

assumed all that time that it was in place."

Rubin obtained a new short and long-term disability policy for PRS employees in September of 1998. Stein played no direct role in the purchase of this new disability policy. On September 15, 1998, PRS announced the new plan. A letter was sent to all employees, stating that PRS' group insurance plan was "being enhanced by the addition of Long Term Disability for all employees....This has necessitated a change in carriers, from Hartford to U.S. Life Insurance Company for both our Long Term, as well as Short Term Disability Plan."

Sampson left PRS because of his disability on November 5 or 6 of 1998. He applied for short-term disability benefits, and was paid by PRS during the three-week waiting period.

In December of 1999, the long-term disability carrier notified Sampson that, because of his pre-existing condition, his claim for LTD benefits had been denied. Sampson did not appeal the insurance company's decision to deny his claim.

### II. The Absence of Available Remedies
Sampson requests two independent types of relief for the alleged breaches in this case. First, he requests "compensatory damages as contemplated by ERISA" for the defendants' alleged breach of fiduciary duty under 29 U.S.C. § 1132(a). Second, he requests statutory damages for the plan administrator's refusal to comply with requests for information under 29 U.S.C. § 1132(c)(1)(B). The defendants contend that Sampson has no equitable remedy for "compensatory relief" under § 1132(a). Defendants also argue that Sampson's request for ERISA's statutory remedies fails. In the ERISA context, the analyses of demands for equitable remedies and for damages diverge in important ways and, as a result, my discussion will consider the viability of Sampson's remedies accordingly.

#### A. *Equitable Remedies*

The Supreme Court last term analyzed ERISA's equitable relief in considering the viability of requests for money damages under ERISA. In *Great-West Life & Annuity Insurance Company*, 534 U.S. 204, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002), the Court confronted a suit by an insurer under 29 U.S.C. § 1132(a)(3) seeking to enforce the reimbursement provision of an ERISA plan against a plan participant by means of the equitable enforcement mechanisms of § 1132(a)(3). *Id.* at 712. Rejecting the use of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31432701 (D.Mass.), 29 Employee Benefits Cas. 1293
**(Cite as: 2002 WL 31432701 (D.Mass.))**

injunctive relief to secure a monetary award, the Court explained that ")[a]lmost invariably ... suits seeking (whether by judgment, injunction or declaration) to compel the defendant to pay a sum of money to the plaintiff are suits for )money damages' ... since they seek no more than compensation for loss resulting from the defendant's breach of legal duty." *See id.* at 713 (quoting *Bowen v. Massachusetts,* 487 U.S. 879, 918-919, 108 S.Ct. 2722, 101 L.Ed.2d 749, (1988) (Scalia, J., dissenting)). The Court distinguished between those equitable claims which seek to prevent future losses, which are permissible under ERISA, and those which seek past due sums, which are not. *See id.* at 713-714.

**\*5** The Court also rejected the argument that plaintiff's suit was authorized under § 1132(a)(3) as a demand for restitution. *See id.* at 714-15, 716. The Court first noted that "not all relief falling under the rubric of restitution is available in equity." *See id.* The Court determined that a viable equitable restitution claim required that the action could not seek to impose personal liability on the defendant, but instead must seek to restore to the plaintiff particular funds or property in the defendant's possession. *See id.; see also Harris Trust and Sav. Bank v. Salomon Smith Barney Inc.,* 530 U.S. 238, 120 S.Ct. 2180, 147 L.Ed.2d 187 (2000) (equitable restitution seeks restoration of "specific property"). The Court determined that under these rules, Great West Life was not able to use the equitable remedies of ERISA to recover a money damages award. *See* 122 U.S. at 712-716.

The Supreme Court's decision in *Great West Life* further pursued the direction toward a narrowing of the scope of equitable relief available under ERISA earlier staked out in *Mertens v. Hewitt Associates,* 508 U.S. 248, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1996). In *Mertens,* the court held that monetary damages were not available against a non-fiduciary for breach of a fiduciary obligation under ERISA. 508 U.S. at 256-58. The Court read the statutory permission for suits in equity contained in § 1132(a)(3) as limited to forms of relief "traditionally viewed as )equitable' such as mandamus or injunctions and excluding money damages." *Id.* at 256. Furthermore, the Court suggested that "appropriate equitable relief" as defined by ERISA may not permit a court to grant equitable relief "at large," but only that relief appropriate to redress violations or to enforce provisions of ERISA. *Id.* at 253.

In reviewing the record before me in light of *Great West Life* and *Mertens,* I conclude that Sampson may not use the equitable enforcement mechanisms of § 1132(a)(3) to secure compensatory relief for an alleged breach of fiduciary duty by the defendants. *See e.g ., Caffey v. Unum Life Ins. Co.,* 302 F.3d 576, 583-84 (6th Cir.2002) (plaintiff's § 1132(a)(3) claim for consequential losses and lost health benefits, although framed as requests for restitution as form of equitable relief, not permitted by ERISA after *Great West Life* ); *Augienello v. Coast to Coast Financial Corp.,* 2002 WL 1822926, 5-6 (S.D.N.Y. Aug.7, 2002) (rejecting ERISA breach of fiduciary duty claim under § 1132(a)(3) following *Great West Life* where plaintiffs sought deferred compensation funds); *Peterman v. Metropolitan Life Ins. Co.,* 217 F.Supp.2d 807, 809-810 (E.D.Mich.2002) (applying rules of *Mertens* and *Great West Life* in dismissing suit seeking damages equal to basic life insurance coverage for breach of fiduciary duty where plaintiff alleges fiduciary misinformed participant about plan benefits); *Leung v. Skidmore, Owings and Merrill,* 213 F.Supp.2d 1097, 1103-04 (N.D.Cal.2002) (rejecting plaintiff's attempt to frame claim for monetary award of long-term disability benefits as equitable restitution or late request for conversion after *Great West Life* ); *Kishter v. Principal Life Ins. Co.,* 186 F.Supp. 438, 441 (S.D.N.Y.2002) (granting summary judgment on § 1132(a)(1)(b) breach of fiduciary duty claim because plaintiff may not receive monetary damages for employer's failure to provide life insurance beneficiary with complete and accurate plan information after *Great West Life* ).

**\*6** Sampson's complaint does not request a form of relief traditionally available in equity, such as the imposition of a constructive trust or injunction. *See Great West Life,* 122 S .Ct. at 712; *Mertens,* 508 U.S. at 256-58. His request for compensation is, at bottom, an attempt to recover the benefits he would have received had the 1994 LTD policy not been cancelled. *See, e.g., Peterman,* 217 F.Supp.2d at 809-10; *Leung,* 213 F.Supp.2d at 1103-04. Such relief is outside the scope of the equitable remedies envisioned by § 1132(a)(3) and summary judgment is therefore appropriate. *See Great West Life,* 122 S.Ct. at 712; *Mertens,* 508 U.S. at 256-58.

Moreover, ERISA does not permit the imposition of remedies beyond those delineated in the statute. *See Massachusetts Mutual Life Ins. Co., v. Russell,* 473 U.S. 134, 147, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985); *Jordan v. Federal Express Corp.,* 116 F.3d 1005, 1010 (3rd Cir.1997) (noting that Congress provided limited set of remedies for statutory disclosure violations). I am mindful of the Supreme Court's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 5
Not Reported in F.Supp.2d, 2002 WL 31432701 (D.Mass.), 29 Employee Benefits Cas. 1293
**(Cite as: 2002 WL 31432701 (D.Mass.))**

"unwillingness to infer causes of action in the ERISA context, since that statute's carefully drafted and detailed enforcement scheme provides )strong evidence that Congress did not intend to authorize other remedies that it simply forgot to incorporate expressly." ' _Mertens,_ 508 U.S. at 254 (quoting _Russell,_ 473 U.S. at 146-47). Therefore, in Sampson's suit for breach of fiduciary duties, equitable remedies beyond those delineated in the statute and authorized by _Great West Life_ and _Mertens_ are not permitted. _See id._ Consequently, because Sampson has and seeks no essentially equitable remedy, his claim against the defendants for breach of fiduciary duty for failure to timely notify him of the cancellation of the plan must be dismissed. _See Turner v. Fallon Community Health Plans,_ 127 F.3d 196, 198-99 (1st Cir.1997) (breach of fiduciary duty claim dismissed for lack of remedy). [FN3]

> FN3. In light of the First Circuit's recent decision in _Watson v. Deaconess Waltham Hospital,_ 298 F.3d 102 (1st Cir.2002), I would be forced to conclude that, even if Sampson had requested remedies available under ERISA after _Great West Life,_ it is unlikely he would prevail on his claim for breach of fiduciary duty on the basis of the facts here. In _Watson,_ the First Circuit substantially restricted the ability of plan participants to sue for breaches of fiduciary duty in the failure to provide plan information absent "extraordinary circumstances." 298 F.3d 112-113; _see also, Alves v. Harvard Pilgrim Health Care, Inc.,_ 204 F.Supp.2d 198, 213 (D.Mass.2002) ("no breach of fiduciary duty absent evidence of intentional misrepresentation, bad faith, or failure to provide material information."). Rejecting the argument that mere negligence was sufficient to make out a claim of fiduciary breach, the court determined that only in the case of bad faith, active concealment or fraud on the part of plan administrators would technical violations of ERISA's notice provisions be deemed a breach of fiduciary duty. _Id._ Here, there is no evidence that PRS, DPLR or any of the individual defendants engaged in active bad faith, deliberate concealment, or fraud in not informing Sampson of the 1995 termination of the Plan. Furthermore, the _Watson_ court rejected the argument that plan administrators have an affirmative obligation to provide participants with individualized plan information where the administrator does not have knowledge that the failure to provide that information would be harmful. _See id.,_ at 113-14; _see also Barrs v. Lockheed Martin,_ 287 F.3d 202, 207-08 (1st Cir.2002). Here there is no evidence that any of the defendants had any reason to know that the cancellation of the LTD plan in January 1995 would have a particular harmful effect on Sampson.

## B. _Statutory Remedies_

I turn to the question whether the absence of equitable remedies has a similar effect on Sampson's remaining claim for breach of statutory duties. Here Sampson seeks enforcement of rights afforded to him by statute, namely the prompt release of information to plan participants upon request and notification of the termination of the plan. _See_ 29 U.S.C. § § 1132(c)(1)(B), 1024(b)(1).

Defendants argue that Sampson's statutory claims are barred first because of Sampson's alleged failure to make an affirmative inquiry as to the existence and terms of the plan, and second because Sampson's lay-off during 1995 "cut-off" his right as an employee to receive notification of the plan termination.

I note at the outset, Sampson bases his § 1132(c)(1)(B) claim on defendant Rubin's failure to respond to a request made on Sampson's behalf in connection with this litigation for information related to the plan in effect during Sampson's employment. The defendants' contention that Sampson did not make an "affirmative" request is plainly without merit. Nevertheless, as I discuss below, I decline in this context to award statutory damages.

### 1. _Section 1024_

*7 Deciding whether Sampson's lay-off in May of 1995 cuts off his statutory rights to be notified of changes to the plan requires that I construe the LTD Policy in light of the recent resolution of certain factual disputes in the most recent round of discovery. In particular, the clarification of Sampson's employment history at PRS following his termination in May 1995 permits a determination of the duties PRS owed to Sampson regarding the disclosure of plan information.

Section 1024(b)(1) provides:
    The administrator shall furnish to each participant, and each beneficiary receiving benefits under the plan, a copy of the summary plan description, and

Not Reported in F.Supp.2d                                                                                      Page 6
Not Reported in F.Supp.2d, 2002 WL 31432701 (D.Mass.), 29 Employee Benefits Cas. 1293
**(Cite as: 2002 WL 31432701 (D.Mass.))**

all modifications and changes ... (A) within 90 days after he becomes a participant, or within 90 days after he first receives benefits, or (B) if later, within 120 days after the plan becomes subject to this part ... If there is a modification or change described in section 102(a) [29 U.S.C. § 1022(a) ] ... a summary description of such modification or change shall be furnished not later than 210 days after the end of the plan year in which the change is adopted to each participant.

As the text of the statute indicates, the duty created by 1024(b)(1) attaches to administrators only on behalf of participants and beneficiaries under a plan. Thus, in this case, the central question is whether Sampson was a "participant" at the time the plan administrator of the Standard LTD policy was required to provide notification of the plan's termination.

The Effective Date of the Standard LTD Plan was January 1, 1994. The creation of the Plan was announced to PRS employees three days later, on January 4. On the one year anniversary of the Plan's creation, in January 1995, Defendant Rubin cancelled the Policy, apparently without notifying the other defendants or PRS employees. Therefore, under § 1024(b)(1), the plan administrator was obligated to notify participants and beneficiaries within 210 days of January 1, 1995, or July 29, 1995.

The record has now established that Sampson was in fact laid-off on May, 11 1995, the last day for which he was compensated as a regular full-time employee. Under the terms of the LTD Plan, coverage automatically ends on the date the individual ceases to be a member of the plan, which may occur if the individual stops working for the employer. Nevertheless, the Plan also provides that disability coverage continues for a period of 31 days after employment ends.

Furthermore, the Policy provides that, once coverage ends, an individual may become insured again as a new Member. Several conditions apply to this reinstatement of insurance, however. For present purposes, the relevant provision states that "if your insurance ends because you cease to be a Member, and if you become a Member again within 90 days, the Eligibility Waiting Period will be waived." A Member is defined as "an active partner or employee of the Employer ... regularly working at least 30 hours each week ..." In other words, an individual covered by the plan who ceases to be employed will be immediately reinstated as a plan participant if he or she becomes a member again, i.e. an employee

working at least 30 hours per week, within 90 days.

*8 Applying these terms to Sampson's PRS work history, I note it is undisputed that Sampson began contract work for PRS, or defendant Stein, on June 20, 1995, more than 31 days after his lay-off on May 11. Therefore, the question that must be answered is whether Sampson's contract work for PRS met the requirements for membership under the plan, that is whether he thereafter worked regularly at least 30 hours each week, and, if he did, whether he met this requirement within the 90-day reinstatement period.

It is evident from the hand-written invoices that Sampson submitted to Defendant Stein that he had begun working more than 30 hours per week as of July 14, 1995. In the sixteen weeks between July 10 and October 27, 1995, Sampson worked less than 30 hours on only five weeks: the weeks ending July 28 (21 hours), August 4 (24.5 hours), September 8 (24 hours), October 13 (27 hours), and October 20 (28 hours). During this entire period, Sampson averaged 30.5 hours of work per week. Therefore I conclude that Sampson was an employee of PRS regularly working more than 30 hours per week as of July 14, 1995 and a "Member" according to the Standard LTD Policy membership provision.

I also conclude that Sampson was effectively "reinstated" as a plan participant in the LTD Plan. Although Defendants are correct in their assertion that the week of July 10 is more than 60 days after Sampson's lay-off, and more than 29 days after Sampson ceased to be a member, these facts are not dispositive of Sampson's status given the terms of the reinstatement provision. In fact, under this provision, Sampson had ninety days in which to return to regular, 30-plus hour work weeks. Thus, by resuming regular, 30-plus hour weeks during the week of July 14, Sampson returned to the status of plan participant.

Defendants contend however that because the plan was lawfully cancelled on January 1, 1995, there simply was no plan in which Sampson could be a participant in July of 1995. This argument misses the point. The statutory duty created by § 1024(b), and by ERISA generally, does not immediately disappear upon either the termination of a plan or upon the end of employment. The 210 day notification period described by § 1024(b), not to mention the reinstatement provisions contained within the LTD Plan itself, define a continuing obligation to an individual, like Sampson, who was a participant in a duly qualified ERISA plan. Therefore, I conclude that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                                  Page 7
Not Reported in F.Supp.2d, 2002 WL 31432701 (D.Mass.), 29 Employee Benefits Cas. 1293
**(Cite as: 2002 WL 31432701 (D.Mass.))**

Sampson, like other PRS participants in the LTD Plan, was entitled to receive notification of the cancellation of the plan by July 29, 1995. Furthermore, I find that by not providing notice to Sampson prior to the expiration of the 210 day period prescribed by § 1024(b) the plan administrator breached its statutory duty to Sampson (as well as others).

Whether Sampson may recover the statutory penalties for this breach is, however, a separate question. Given the complex and "reticulated" character of ERISA, it is essential that I identify and assign the proper remedy defined by the statute to the particular breaches of fiduciary duty found here. See *Russell,* 473 U.S. at 146. The First Circuit has observed that "trust principles cannot be transferred wholesale, and where ERISA itself specifies a notice requirement, courts must be especially cautious in creating additional remedies." *Barrs v. Lockheed Martin Corp.,* 287 F.3d 202, 207 (1st Cir.2002). This observation applies with even greater force to the selection of remedies for ERISA notice deficiencies. In this respect I note that the ERISA treats breaches of duty relating to disclosure of plan information differently depending on whether the breach is a result of a failure or refusal following a request for information or the breach concerns one of the "automatic" disclosure requirements set out in § 1024(b). See *Meyer v. Phillip Morris, Inc.,* 575 F.Supp. 1232, 1235 (E.D.Mo.1983) (articulating difference between ERISA's "automatic" duties and duties expressly conditioned upon written request). In essence, the difference in the available remedies comes down to the difference in the scope of the enforcement provisions delineated by § 1132(a)(3) and § 1132(c)(1)(B).

### 2. *Section 1132*

**\*9** Section 1132(a)(3)(A) and (B) permits suit by a participant, and certain others, "to enjoin any act or practice which violates any provision of this title or the terms of the plan" or to obtain other *equitable* relief." 29 U.S.C. § 1132(a)(3)(A) and (B)(emphasis supplied). As I have discussed above, the effect of the Supreme Court's recent decision in *Great West Life* is to restrict relief under § 1132(a)(3) to traditional forms of equitable relief, almost entirely foreclosing the possibility of receiving money damages for a breach of a fiduciary duty under ERISA. See *Great West Life,* 122 S.Ct. at 712. On the other hand, § 1132(c)(1)(B) specifically authorizes the assessment of statutory damages for certain enumerated breaches. 29 U.S.C. § 1132(c)(1)(B). Specifically, §

1132(c)(1)(B) contemplates the award of money damages of up to $100 per day for each violation of the duty "to comply with a *request for information* which such administrator is required by this title to furnish ..." § 1132(c)(1)(B)(emphasis supplied).

Therefore Sampson's claim for money damages for the plan administrators' violation of the duty to provide plan information within the 210 day period as defined by § 1024(b) is squarely barred by ERISA's limitation of available remedies. See *Great West Life,* 122 S.Ct. at 712; *Mertens,* 508 U.S. at 254; *Russell,* 473 U.S. 147. That is, while Sampson could have sought some form of equitable relief, such as an injunction against PRS or DPLR requiring them to provide plan information under the automatic notification requirements of § 1024(b), he may not pursue a claim for damages under the statutory penalties of § 1132(c)(1)(B). In short, the monetary damage enforcement provisions contained within § 1132 do not offer Sampson a general damage remedy for the failure to provide notification, in the absence of a request, of the termination of the plan within the 210 day period described by 1024(b). See *Meyer v. Phillip Morris, Inc.,* 575 F.Supp. at 1235.

Sampson's request for damages provided by § 1132(c)(1)(B) for PRS's failure to respond to his written request for plan information does not suffer from this defect. Indeed, Sampson's claim seems to fall squarely within the set of circumstances contemplated by Congress as calling for the imposition of a statutory penalty. However, because I have determined that, with respect to his request for plan information on December 21, 1999, Sampson was not a plan participant, his request for statutory penalties must be denied. Under ERISA, the term participant means "any employee or former employee of an employer or any member or former member of an employee organization *who is or may become eligible* to receive a benefit of any type." 29 U.S.C. § 1002(7) (emphasis supplied). The Supreme Court has explained that "participant" in the ERISA context means either "employees in, or reasonably expected to be in, currently covered employment," or "former employees who 'have ... a reasonable expectation of returning to covered employment' or who have 'a colorable claim' to vested benefits." *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101 117, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) (citations omitted).

**\*10** At the time Sampson made the relevant request for plan information in December 1999, he was neither employed by PRS nor covered by the LTD Plan, the latter having been cancelled in 1995. [FN4]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 8
Not Reported in F.Supp.2d, 2002 WL 31432701 (D.Mass.), 29 Employee Benefits Cas. 1293
**(Cite as: 2002 WL 31432701 (D.Mass.))**

Because he knew of the cancellation of the plan as of August 1998, Sampson had no reasonable expectation of returning to covered employment at PRS at the time he made his request for information. Furthermore, I find that Sampson had no "colorable claim" to vested benefits because his claim on this issue in this litigation concerns a failure to notify him of the cancellation of the plan, not a wrongful denial of benefits to which he was entitled. *See Winchester v. Pension Comm. of Michael Reese Health Plan,* 942 F.2d 1190, 1193 (7th Cir.1991) (finding no colorable claim for vested benefits where former employee did not seek benefits denied under plan but rather damages for failure to provide plan information upon request); *see also, Kamler v. H/N Telecommunication Serv., Inc.,* 305 F.3d 672, 682 (7th Cir.2002) (denial of statutory penalties for failure to provide "outdated" plan documents).

> FN4. I note that Sampson does not base his § 1132(c)(1)(B) request for information claim upon his August, 1998 discussion with Christina Karogiannis but upon his attorney's request in December, 1999. In any event, the outcome would be the same because Sampson was not a plan participant at either time.

Furthermore, even if Sampson were a plan participant, I find that an award of statutory penalties under 1132(c)(1) is not called for under the circumstances. The purpose of the request obligation is to insure that participants have access to plan materials to make decisions under the plan. Sampson, in fact, received in 1994 when he was a participant the materials he requested again in 1999 when he ceased to be one. Sampson bears some burden of maintaining materials he has received to avoid making duplicative requests upon which he seeks to mount a claim for statutory damages.

Although § 1132(c) permits an award of up to $100 per day for each violation, the decision whether to award the statutory penalties is placed strictly within the discretion of the court. 29 U.S.C. § 1132(c)(1)(B). That discretion is most likely to be exercised on behalf of those who have done what they can to maintain the relevant documentation they have received. *Cf., Faircloth v. Lundy Packing Co., 91 F.3d 648* (4th Cir.1996) (purpose of damage provisions of § 1132(c)(1) is not to compensate plan participants but to punish noncompliance with ERISA); *Davis v. Featherstone,* 97 F.3d 734 (4th Cir.1996) (purpose of penalty provision is to provide plan administrators with incentive to give timely

response to requests for information); *see also, Kamler,* 305 F.3d at 368.

Courts evaluating claims for statutory damages have commonly looked to factors including prejudice and the presence of bad faith in shaping their exercise of discretion. *See e.g., Rodriguez-Abreu v. Chase Manhattan Bank, N.A.,* 986 F.2d 580 (1st Cir.1993) (prejudice and bad faith not prerequisites but proper factors in court's exercise of discretion regarding penalties); *Godwin v. Sun Life Assurance Co.,* 980 F.2d 323 (5th Cir.1992) (showing of prejudice not required but may be considered as factor).

*11 Sampson first requested plan information, through his attorney, on December 21, 1999. Neither this request, nor Sampson's subsequent requests in January and February, 2000, yielded the information Sampson sought. It appears that Defendant Rubin's responses to these requests were at best belligerent and at worst obstructionist. Nevertheless, I do not find any evidence in the record that Sampson as a *plan participant* was in any way prejudiced by Rubin's recalcitrance. *See Rodriguez-Arbreu,* 986 F.2d 588-89 (no evidence of prejudice where plan administrator mailed copies of plan administration booklet only after third written request). For example, the delay in receiving this information did not delay receipt of benefits to which he was entitled, compromise his ability to secure other insurance, or have any other deleterious effect on his reliance on plan coverage, particularly because Sampson knew he was no longer covered at the time he made his request. *See, e.g., Winchester,* 942 F.2d at 1193; *see also, Lesman v. Ransburg Corp.,* 719 F.Supp. 619, 622 (W.D.Mich.1989) (no statutory penalty under § 1132(c) where plaintiffs failed to show prejudice in obtaining severance benefits due to failure to respond to request for information); *Shlomchik v. Retirement Plan of Amalgamated Ins. Fund,* 502 F.Supp. 240, 245 (E.D.Pa.1980) (same, regarding retirement benefits).

This is not, of course, to ignore that as a plaintiff in a law suit Sampson could have been hindered by Rubin's tardy production of plan documents for Sampson's review. Indeed, it is arguable that Sampson was somewhat set back in developing the theory of his claims by Rubin's failure to mail the documents as required by § 1132(c)(1)(B). But that is a litigation problem not a plan participation problem.

The goal of ERISA is not to protect litigants but to assist participants in making informed choices about

Not Reported in F.Supp.2d                                                                                                    Page 9
Not Reported in F.Supp.2d, 2002 WL 31432701 (D.Mass.), 29 Employee Benefits Cas. 1293
**(Cite as: 2002 WL 31432701 (D.Mass.))**

their insurance arrangements. *See Pension Ben. Guar. Corp. v. Greene, 570 F.Supp. 1483, 1502 (W.D.Pa.1983).* By December 21, 1999, Sampson knew that the Standard LTD Policy under which he had been insured was no longer in force. In fact, the primary, if not sole reason, he requested the plan information was to prepare his law suit, preparations which, I find, would have gone forward even if Rubin had provided a timely and appropriate response. *See Winchester, 942 F.2d at 1193; Rodriguez-Arbreu, 986 F.2d 589, n. 11* (no prejudice to ensuing legal action from delay of response). I conclude therefore that Sampson has not shown any actual detriment or prejudice as a result of the plan administrator's failure to provide plan information upon written request.

Likewise, I find no evidence that the conduct of Rubin, or any other person responsible as plan administrator, descended to the level of bad faith or malfeasance sufficient to prompt the award of statutory damages for the failure to answer Sampson's request in a timely fashion. [FN5] There is an essential difference between the antagonism of the adversarial process and bad faith. In this respect, Sampson has produced no evidence that the plan administrator's refusal to comply in a more timely manner with his information request was an attempt to deprive Sampson of disability benefits, to conceal the misuse of plan assets, or to commit any other act touching upon a duty involved in plan management. In other words, there is nothing in the record to show that the refusal to respond to Sampson's request for information had any bearing on Sampson's rights as a plan participant, which is the core circumstance by which the statutory penalties of 1132(c)(1)(B) are implicated. *See Winchester, 942 F.2d at 1193.*

> FN5. To be sure, Rubin's failure to give notice of the termination of the plan in 1995 can be termed reprehensible but that is not the breach of duty § 1132(c)(1)(B) is directed to remedy.

### 3. *Conclusion*

**\*12** I conclude that because the monetary penalties of § 1132(c)(1)(B) do not attach to claims for a failure to notify participants of plan modification under § 1024(b)(1), Sampson's request for money damages for the Plan Administrator's failure to notify him of the cancellation of the plan within the 210 period must be denied. Moreover, Sampson does not state a viable claim for the imposition of statutory penalties for the refusal of the Plan Administrator to provide information upon written request because he

is not a plan participant according to terms governing requests for information. In any event, he has failed to describe factors which would prompt, in the discretion of this court, the imposition of the statutory penalties.

### CONCLUSION

For the reasons set forth more fully above, summary judgment for the defendants is GRANTED.

Not Reported in F.Supp.2d, 2002 WL 31432701 (D.Mass.), 29 Employee Benefits Cas. 1293

**Motions, Pleadings and Filings (Back to top)**

• 2000 WL 35302455 (Trial Motion, Memorandum and Affidavit) Motion to Compel (Aug. 16, 2000)Original Image of this Document (PDF)

• 1:00CV10215 (Docket) (Feb. 04, 2000)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C

Westlaw.

--- F.3d ----, 2006 WL 2075129 (2nd Cir.(Conn.)), 38 Employee Benefits Cas. 1609
**(Cite as: 2006 WL 2075129 (2nd Cir.(Conn.)))**

# H

**Briefs and Other Related Documents**

United States Court of Appeals,
Second Circuit.
Karen B. COAN, Plaintiff-Appellant,
v.
Alan H. KAUFMAN and Edgar W. Lee, Defendants-
Appellees.
**Docket No. 04-5173-CV.**

Argued: Aug. 24, 2005.
Decided: July 21, 2006.

**Background:** Former employee and retirement plan
participant brought Employee Retirement Income
Security Act (ERISA) action against former
cotrustees of profit sharing plans, alleging breaches
of fiduciary duty. Former cotrustees moved for
summary judgment. The United States District Court
for the District of Connecticut, Mark R. Kravitz, 333
F.Supp.2d 14, granted motion and, 349 F.Supp.2d
271, granted reconsideration but adhered to its
decision. Former employee appealed.

**Holdings:** The Court of Appeals, Sack, Circuit
Judge, held that:
   (1) it was not necessary to decide whether former
employee who participated in defunct 401(k) plan
was entitled to bring suit as "participant" in benefit
plan for purposes of ERISA;
   (2) claim for breach of fiduciary duty was not
brought in a "representative capacity" on behalf of
plan; and
   (3) relief sought was not "equitable" within meaning
of ERISA.
   Affirmed.

**[1] Federal Courts** ☞776

170Bk776 Most Cited Cases
Court of Appeals reviews de novo district court's
grant of summary judgment.

**[2] Federal Courts** ☞776
170Bk776 Most Cited Cases
Interpretation of ERISA is question of law that is
subject to de novo review. Employee Retirement
Income Security Act of 1974, § 2 et seq., 29

U.S.C.A. § 1001 et seq.

**[3] Labor and Employment** ☞534
231Hk534 Most Cited Cases
In order to establish that he or she "may become
eligible" for benefits within meaning of ERISA
definition of participant, claimant must have a
colorable claim that (1) he or she will prevail in a suit
for benefits, or that (2) eligibility requirements will
be fulfilled in the future. Employee Retirement
Income Security Act of 1974, § 3(7), 29 U.S.C.A. §
1002(7).

**[4] Labor and Employment** ☞632
231Hk632 Most Cited Cases
It was not necessary to decide whether former
employee who participated in defunct 401(k) plan
was entitled to bring suit as "participant" in ERISA
benefit plan, given decision that should be dismissed
on other grounds; her status as participant was
question of statutory, not constitutional, standing.
Employee Retirement Income Security Act of 1974,
§ 3(7), 29 U.S.C.A. § 1002(7).

**[5] Federal Civil Procedure** ☞103.2
170Ak103.2 Most Cited Cases
Unlike Article III standing, which ordinarily should
be determined before reaching the merits, statutory
standing may be assumed for purposes of deciding
whether plaintiff otherwise has a viable cause of
action. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[6] Corporations** ☞207.5
101k207.5 Most Cited Cases
Federal civil rule governing derivative actions by
shareholders does not apply to suits under ERISA
subsection governing civil actions for breach of
fiduciary duty; such suits are neither brought by
shareholders or members nor to enforce right of
corporation or of unincorporated association.
Fed.Rules Civ.Proc.Rule 23.1, 28 U.S.C.A.;
Employee Retirement Income Security Act of 1974,
§ 502(a)(2), 29 U.S.C.A. § 1132(a)(2).

**[6] Labor and Employment** ☞646
231Hk646 Most Cited Cases
Federal civil rule governing derivative actions by
shareholders does not apply to suits under ERISA
subsection governing civil actions for breach of
fiduciary duty; such suits are neither brought by
shareholders or members nor to enforce right of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

corporation or of unincorporated association. Fed.Rules Civ.Proc.Rule 23.1, 28 U.S.C.A.; Employee Retirement Income Security Act of 1974, § 502(a)(2), 29 U.S.C.A. § 1132(a)(2).

**[7] Labor and Employment** ☜643
231Hk643 Most Cited Cases
ERISA subsection governing civil actions for breach of fiduciary duty cannot, in any meaningful sense, be governed by the same general principles of procedure that control derivative actions. Employee Retirement Income Security Act of 1974, § 502(a)(2), 29 U.S.C.A. § 1132(a)(2).

**[8] Labor and Employment** ☜400
231Hk400 Most Cited Cases
Common law of trusts offers starting point for analysis of ERISA unless it is inconsistent with language of statute, its structure, or its purposes. Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.

**[9] Trusts** ☜257
390k257 Most Cited Cases
Under common law of trusts, ordinarily when beneficiary brings suit against trustee on behalf of trust, other beneficiaries should be joined as parties, either as plaintiffs or as defendants, if their interests would be affected by decree.

**[10] Federal Civil Procedure** ☜184.5
170Ak184.5 Most Cited Cases
Although ERISA plan participants need not always comply with class certification rule to act as a representative of other plan participants or beneficiaries, those who do will likely be proceeding in a "representative capacity" for purposes of ERISA breach of fiduciary duty claim, and participant who joins or makes good faith effort to join other participants as parties has seemingly discharged duty to proceed on plan's behalf; ultimately, however, participant need only take adequate steps under the circumstances properly to act in representative capacity on behalf of plan. Fed.Rules Civ.Proc.Rules 19, 23, 28 U.S.C.A.; Employee Retirement Income Security Act of 1974, § 502(a)(2), 29 U.S.C.A. § 1132(a)(2).

**[10] Labor and Employment** ☜647
231Hk647 Most Cited Cases
Although ERISA plan participants need not always comply with class certification rule to act as a representative of other plan participants or beneficiaries, those who do will likely be proceeding

in a "representative capacity" for purposes of ERISA breach of fiduciary duty claim, and participant who joins or makes good faith effort to join other participants as parties has seemingly discharged duty to proceed on plan's behalf; ultimately, however, participant need only take adequate steps under the circumstances properly to act in representative capacity on behalf of plan. Fed.Rules Civ.Proc.Rules 19, 23, 28 U.S.C.A.; Employee Retirement Income Security Act of 1974, § 502(a)(2), 29 U.S.C.A. § 1132(a)(2).

**[11] Labor and Employment** ☜647
231Hk647 Most Cited Cases
Breach of fiduciary duty claim by former employee and retirement plan participant was not brought in a "representative capacity" on behalf of plan under ERISA, where she took no steps to become bona fide representative of other interested parties; plaintiff's failure to do anything to permit court to safeguard interests of others or of court's proceedings, or to demonstrate her action was intended to benefit former plan participants other than herself, rendered specious her claim of acting on behalf of others. Employee Retirement Income Security Act of 1974, § § 409, 502(a)(2), 29 U.S.C.A. § § 1109, 1132(a)(2).

**[12] Labor and Employment** ☜639
231Hk639 Most Cited Cases
Relief sought by former employee and 401(k) plan participant was not "equitable" within meaning of subsection of ERISA civil enforcement provision permitting actions to obtain other appropriate equitable relief; regardless of whether it was sought from fiduciary the type of relief had to be equitable, and alternative request for injunction did not transform what was effectively money damages request into one for equitable relief. Employee Retirement Income Security Act of 1974, § 502(a)(3), 29 U.S.C.A. § 1132(a)(3).
  Thomas G. Moukawsher, Moukawsher & Walsh LLC (Ian O. Smith, of counsel), Hartford, CT, for Plaintiff-Appellant.

  Glenn W. Dowd, Day, Berry, & Howard, LLP, New Haven, CT, for Defendants-Appellees.

  Susan J. Luken, Trial Attorney, United States Department of Labor (Howard M. Radzely, Solicitor of Labor, Timothy D. Hauser, Associate Solicitor, Plan Benefits Security Division, Elizabeth Hopkins, Counsel for Appellate and Special Litigation, Plan Benefits Security Division, of counsel), Washington,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2075129                                                                                       Page 3
--- F.3d ----, 2006 WL 2075129 (2nd Cir.(Conn.)), 38 Employee Benefits Cas. 1609
**(Cite as: 2006 WL 2075129 (2nd Cir.(Conn.)))**

DC, for Amicus Curiae Elaine L. Chao, Secretary of Labor, in support of plaintiff-appellant.

Mary Ellen Signorille, AARP Foundation (Melvin Radowitz, AARP, of counsel) Washington, DC, for Amicus Curiae AARP in support of plaintiff-appellant.

Before MESKILL, SACK, and B.D. PARKER, Circuit Judges.

SACK, Circuit Judge.

*1 This appeal presents several difficult questions regarding the ability of a former employee who participated in a retirement plan established pursuant to section 401(k) of the Internal Revenue Code, to bring suit against the plan's trustees for breach of fiduciary duty under the Employee Retirement Insurance Security Act (ERISA), 29 U.S.C. § 1001 et seq. [FN1] Plaintiff Karen Coan was the controller of a company called KLC Inc. Coan asserts that KLC president Alan Kaufman and vice-president Edgar Lee, as trustees of two employee retirement funds included in the company's 401(k) plan, mismanaged the funds and improperly failed to diversify its investments, and that the mismanagement resulted in a combined loss to the plan of more than $500,000. Coan, who was a participant in the now-terminated 401(k) plan, brought suit under ERISA for damages or equitable relief. The district court (Mark R. Kravitz, Judge) granted the defendants' motion for summary judgment and reaffirmed its decision upon reconsideration. See Coan v. Kaufman (Coan I), 333 F.Supp.2d 14 (D.Conn.2004); Coan v. Kaufman (Coan II), 349 F.Supp.2d 271 (D.Conn.2004).

The three issues on this appeal do not concern Coan's underlying claim of breach of fiduciary duty, but rather the scope of the rights of action created by ERISA's civil enforcement provisions. The first issue, which the district court concluded it did not need to decide, is whether Coan, as a former employee who participated in the defunct KLC 401(k) plan, is entitled to bring suit as a "participant" in a benefit plan for purposes of ERISA. The second issue is whether the district court erred in dismissing the claim brought by Coan on behalf of the 401(k) plan on the ground that individual plaintiffs bringing suit on behalf of employee benefit plans under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), must comply with procedural safeguards applicable to suits brought in a representative or derivative capacity. The third issue is whether the district court erred in dismissing Coan's claim for individual equitable relief under

section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), on the ground that the relief she seeks is not "equitable" within the meaning of the statute. We agree with the district court as to the first and third issues. Although we have doubts about some of the grounds for the district court's decision as to the second issue, we agree with its ultimate conclusion and therefore affirm.

## BACKGROUND

The facts relevant to this appeal are not in dispute. Coan was employed at KLC as its controller while KLC was being acquired by another company, Unicapital Corporation. During that 1998 acquisition, the two defendants, Kaufman and Lee, rolled one of the three funds comprising KLC's 401(k) plan into Unicapital's 401(k) plan, but, for some three years thereafter, maintained control over the other two funds. At first, Kaufman and Lee invested money from the two funds principally in a government-bond mutual fund. Later they transferred a significant portion of it to stock funds. Between 1999 and 2001, the two funds earned returns totaling about $500,000 less than benchmark funds identified by Coan's expert. Upon the final dissolution of the KLC plan in 2001, the plan's assets were distributed in lump sums to its participants, including Coan, according to their individual account balances. Coan continued to be employed by Unicapital after its acquisition of KLC but was laid off soon thereafter, in July 2000. She does not assert that any of the events relevant to this lawsuit played a role in her termination.

*2 In September 2001, Coan brought this action in the United States District Court for the District of Connecticut asserting that she was doing so both individually and on behalf of KLC's 401(k) plan. She alleged that the plan lost some $500,000 as a result of the imprudent investment decisions of Kaufman and Lee, which, according to Coan, constituted breaches of fiduciary duty in violation of ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

Invoking section 409 of ERISA, 29 U.S.C. § 1109, which establishes personal liability for breaches of fiduciary duty, Coan asked for damages and restitution pursuant to section 502(a)(2) of ERISA, which allows participants in an employee benefit plan to bring suit on behalf of the plan for legal and equitable remedies allegedly caused by breaches of fiduciary duty. Coan also sought restitution and "other appropriate equitable relief" under section 502(a)(3) of ERISA, which provides equitable relief for any violation of ERISA or of the terms of an ERISA-covered plan. Coan suggests that appropriate

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2075129                                                                                          Page 4
--- F.3d ----, 2006 WL 2075129 (2nd Cir.(Conn.)), 38 Employee Benefits Cas. 1609
(Cite as: 2006 WL 2075129 (2nd Cir.(Conn.)))

equitable relief might entail "make whole monetary relief" or an injunction "reinstating the terminated plans, requiring the trustees to pay into them additional benefits lost through a breach of fiduciary duty, and directing them to pay the additional benefits to Coan as required by the terms of the plans." Coan Br. at 14.

At the close of discovery, the defendants moved for summary judgment, arguing (1) that Coan did not have statutory standing as a "participant" under ERISA; (2) that Coan could not recover under section 502(a)(2) of ERISA because, having failed to take any steps to include other plan participants in the action, her suit was not properly brought on behalf of KLC's 401(k) plan as required by section 502(a)(2); and (3) that section 502(a)(3) relief was unavailable to her because the remedies Coan sought were not equitable but legal. After oral argument, the district court granted the defendants' motion. Assuming without deciding that Coan was a "participant," the court agreed with the defendants that relief was, in any event, not available to Coan under sections 502(a)(2) and 502(a)(3) of ERISA. *See Coan I,* 333 F.Supp.2d at 23- 27.

Coan moved for reconsideration, arguing principally that the district court erred in dismissing her section 502(a)(2) claim. The district court granted the motion to reconsider, but having reconsidered, reaffirmed its decision in *Coan I. See Coan II,* 349 F.Supp.2d at 277.

Coan appeals.

## DISCUSSION

### I. Standard of Review

[1][2] We review de novo a district court's grant of summary judgment. *Island Software & Computer Serv., Inc. v. Microsoft Corp.,* 413 F.3d 257, 260 (2d Cir.2005). The interpretation of ERISA is a question of law that is also subject to de novo review. *Burke v. Kodak Retirement Income Plan,* 336 F.3d 103, 111 (2d Cir.2003), *cert. denied,* 540 U.S. 1105, 124 S.Ct. 1046, 157 L.Ed.2d 890 (2004).

### II. "Participant" Standing

The rights of action that Coan seeks to assert are available only to--other than the Secretary of Labor-- participants, beneficiaries, or fiduciaries of an employee benefit plan. 29 U.S.C. § § 1132(a)(2) & (a)(3); *Nechis v. Oxford Health Plans, Inc.,* 421 F.3d 96, 100-01 (2d Cir.2005); *Connecticut v. Physicians*

*Health Servs. Of Conn., Inc.,* 287 F.3d 110, 121 (2d Cir.) ("[N]on-enumerated parties lack statutory standing to bring suit under [ERISA] even if they have a direct stake in the outcome of the litigation."), *cert. denied,* 537 U.S. 878, 123 S.Ct. 77, 154 L.Ed.2d 133 (2002). Coan asserts that she is a plan participant. Before the district court and again on appeal, the defendants argue that Coan lacks statutory standing because at the time she brought suit she was no longer a participant in the KLC 401(k) plan for purposes of ERISA.

*3 After thoughtful consideration, the district court declined to decide that question. The court noted that "[t]hough the Second Circuit has not yet expressly addressed this issue, many federal courts have denied participant standing to former employees such as Ms. Coan where the plans in question have been fully disbursed via lump sum distributions." *Coan I,* 333 F.Supp.2d at 19. But it also noted that "there is support in Second Circuit case law for [a]broad 'zone of interests' approach to ERISA standing" that would allow Coan's suit. *Id.* at 22 (citing *Mullins v. Pfizer,* 23 F.3d 663, 664, 668 (2d Cir.1994)). Given these countervailing considerations and its ultimate conclusion that Coan's suit should be dismissed on other grounds, the court assumed without deciding that Coan was a "participant" under ERISA. *Id.* at 23.

[3] ERISA defines a "participant" as "any employee or former employee of an employer ... who is or may become eligible to receive a benefit of any type from an employee benefit plan." 29 U.S.C. § 1002(7). The Supreme Court has explained that "[i]n order to establish that he or she 'may become eligible' for benefits, a claimant must have a colorable claim that (1) he or she will prevail in a suit for benefits, or that (2) eligibility requirements will be fulfilled in the future." *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 117-118, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).

As the district court pointed out, several circuits have concluded that former employees such as Coan who have accepted lump-sum payments of their retirement benefits are no longer "participants" for purposes of ERISA. *See Raymond v. Mobil Oil Corp.,* 983 F.2d 1528, 1535-36 (10th Cir.) *cert. denied,* 510 U.S. 822, 114 S.Ct. 81, 126 L.Ed.2d 49 (1993); *Kuntz v. Reese,* 785 F.2d 1410, 1411 (9th Cir.) (per curiam), *cert. denied,* 479 U.S. 916, 107 S.Ct. 318, 93 L.Ed.2d 291 (1986). And, as the district court also noted, Coan does not allege that she would be entitled to further benefits "but for"

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2075129                                                                                                    Page 5
--- F.3d ----, 2006 WL 2075129 (2nd Cir.(Conn.)), 38 Employee Benefits Cas. 1609
(Cite as: 2006 WL 2075129 (2nd Cir.(Conn.)))

misrepresentations made by the defendants, so she is not entitled to "participant" standing on that ground. *See Mullins*, 23 F.3d at 667 (concluding that a former employee has participant standing when he alleged that "but for the fact that [the defendant] misled him, he would have been a 'participant' ").

On the other hand, whether acceptance of a lump-sum payment terminates a person's status as a participant may depend on whether the plan is a "defined benefits" or a "defined contribution" plan. [FN2] Coan, unlike the plaintiffs discussed in other circuits' case law, participated in a 401(k) plan, which is an "individual account" or "defined contribution" plan under ERISA. *See* 29 U.S.C. § 1002(34). According to ERISA, an individual's "accrued benefit[s]" under such a plan are simply "the balance of the individual's account." *Id.* § 1002(23)(B). Arguably, therefore, Coan's claim that the lump-sum distribution of her account balance would have been greater absent the defendants' breach of fiduciary duty is a claim "for benefits"-- which, if "colorable," means that she "may become eligible for benefits" and thus qualifies as a "participant" under ERISA. *See Firestone*, 489 U.S. at 117-118, 109 S.Ct. 948 (internal quotation marks omitted); *see also Gray v. Briggs*, 1998 WL 386177, at *4-*6 (S.D.N.Y. July 7, 1998), 1998 U.S. Dist. LEXIS 10057, at *9-*13 (concluding that former employee who claimed that distributions received under a defined contribution plan were reduced because of defendants' breach of fiduciary duty was a "participant" for purposes of ERISA).

*4 [4][5] Like the district court, we do not think it necessary to determine whether Coan was a "participant." Although we have referred to a plaintiff's status as a "participant" under ERISA as a question of "standing," *see, e.g., Nechis*, 421 F.3d at 100-02, it is a statutory requirement, not a constitutional one. Unlike Article III standing, which ordinarily should be determined before reaching the merits, *see Steel Co. v. Citizens for a Better Env'.*, 523 U.S. 83, 94-95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998), statutory standing may be assumed for the purposes of deciding whether the plaintiff otherwise has a viable cause of action, *see id.* at 97, 118 S.Ct. 1003 (citing *Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*, 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974)); *see also Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 127 (2d Cir.) ("[C]ourts may determine whether a cause of action exists under a given statute, an issue of statutory construction that goes to the merits of the action, before addressing ... statutory standing."), *cert. denied,* 540 U.S. 1012,

124 S.Ct. 532, 157 L.Ed.2d 424 (2003). [FN3] Because we agree with the district court that Coan's suit should be dismissed irrespective of whether she is a "participant" under ERISA, we too will assume rather than decide that she is.

III. Section 502(a)(2)

Coan seeks relief under section 502(a)(2) of ERISA, which provides, in relevant part, that civil actions may be brought "by the Secretary [of Labor], or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title." 29 U.S.C. § 1132(a)(2). Section 409 of ERISA (29 U.S.C. § 1109), in turn, provides, *inter alia,* that a plan fiduciary "who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach." ERISA § 409(a), 29 U.S.C. § 1109(a).

Under sections 502(a)(2) and 409(a), plan participants may unquestionably bring actions against plan fiduciaries for breaches of fiduciary duty. But in *Massachusetts Mutual Life Insurance Co. v. Russell*, 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985), the Supreme Court stated that such claims may not be made for individual relief, but instead are "brought in a representative capacity on behalf of the plan." *Id.* at 142 n. 9, 105 S.Ct. 3085; *see also Lee v. Burkhart,* 991 F.2d 1004, 1009 (2d Cir.1993) (concluding that *Russell* "bars plaintiffs from suing under [s]ection 502(a)(2) because plaintiffs are seeking damages on their own behalf, not on behalf of the Plan").

The district court decided that Coan's section 502(a)(2) claim should be dismissed because she failed to take procedural steps to ensure the protection and adequate representation of absent plan participants. The court based its decision on three alternative grounds. First, it concluded that our decision in *Diduck v. Kaszycki & Sons Contractors, Inc.,* 974 F.2d 270, 287 (2d Cir.1992), abrogated on other grounds, *see Gerosa v. Savasta & Co.,* 329 F.3d 317, 322-23, 327-28 (2d Cir.) (explaining that other aspects of *Diduck* are inconsistent with subsequent Supreme Court decisions), *cert. denied,* 540 U.S. 967, 124 S.Ct. 435, 157 L.Ed.2d 312 (2003), requires plaintiffs bringing suit on behalf of an employee benefit plan to follow Federal Rule of Civil Procedure 23.1, which sets forth procedures to be followed in shareholder derivative actions. *Coan II*, 349 F.Supp.2d at 274-75. Second, the court reasoned that even if plaintiffs bringing suit under

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

section 502(a)(2) are not strictly required to follow Rule 23.1, they must adhere to the "general principles that apply in shareholder derivative actions." *Id.* at 275 (internal quotation marks and citation omitted). Finally, the district court concluded that, in any event, Coan's "failure to do *anything* to demonstrate that her action actually was intended to benefit former plan participants other than Karen Coan ... rendered specious [her] claim to be acting on behalf of others." *Id.* at 277 (internal quotation marks, citation and ellipsis omitted; emphasis in original). We agree with the district court's decision based on the third ground.

*A. Rule 23.1*

**\*5 [6]** In her brief, Coan focuses primarily on the first ground for the district court's decision--Rule 23.1--and argues that the court erred in imposing the requirements of the rule on her. There is significant doubt as to whether under section 502(a)(2) of ERISA plaintiffs are required to follow Rule 23.1. Rule 23.1 "applies only to derivative actions 'brought by one or more *shareholders* or *members* to enforce a right of a *corporation* or of an *unincorporated association*.' " *Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1462 (9th Cir.1995) (quoting Rule 23.1) (emphasis added by *Kayes*). By its terms, the rule does not apply to section 502(a)(2) suits, which are neither brought by shareholders or members nor are brought to enforce the right of a corporation or of an unincorporated association. *See id.* at 1462-63 (concluding that plaintiffs suing under section 502(a)(2) do not have to meet requirements of Rule 23.1); *In re AEP ERISA Litig.*, 327 F.Supp.2d 812, 820-21 (S.D.Ohio 2004) (same); *cf. RCM Secs. Fund, Inc. v. Stanton*, 928 F.2d 1318, 1325 (2d Cir.1991) (stating that "[t]he plain language of [Rule 23.1] ... governs our construction of it").

It is true that in *Diduck,* which the district court treated as controlling, we concluded that Rule 23.1 was applicable to a suit brought by participants on behalf of an ERISA plan. *Diduck,* 974 F.2d at 287. But *Diduck* involved an action brought under ERISA § 502(g)(2), 29 U.S.C. § 1132(g)(2), not section 502(a)(2). Section 502(g)(2) authorizes fiduciaries, but no one else, to obtain unpaid contributions pursuant to ERISA § 515, 29 U.S.C. § 1145, which requires employers participating in multi-employer ERISA plans to make obligatory contributions to the plans. Because section 502(g)(2) only applies to suits by fiduciaries, it is sensible to require plan participants, if they may assert the fiduciaries' right of action at all, to follow Rule 23.1, which applies when

the appropriate plaintiff has "failed to enforce a right which may properly be asserted by it." Fed.R.Civ.P. 23.1. Section 502(a)(2), unlike section 502(g)(2), provides an express right of action for participants-- presumably because the drafters of ERISA did not think fiduciaries could be relied upon to sue themselves for breach of fiduciary duty. Because plan participants are expressly authorized to bring suit under section 502(a)(2), the situation here is not controlled by *Diduck.*

*B. General Principles of Derivative Suits*

For similar reasons, we harbor some doubt about the district court's second ground for dismissing Coan's section 502(a)(2) claim, namely, Coan's failure "to comply with the general principles that apply in shareholder derivative actions." *Coan II,* 349 F.Supp.2d at 275 (internal quotation marks and citation omitted). As the Supreme Court explained in *Daily Income Fund, Inc. v. Fox,* 464 U.S. 523, 529, 104 S.Ct. 831, 78 L.Ed.2d 645 (1984), "the term 'derivative action' ... has long been understood to apply only to those actions in which the right claimed by the shareholder is one the corporation could itself have enforced in court." Relying in part on this general "understanding ... of the term 'derivative action,' " *id.* at 528, 104 S.Ct. 831, the *Daily Income Fund* Court concluded that the demand requirement of Rule 23.1 did not apply to a shareholder suit brought under section 36(b) of the Investment Company Act of 1940(ICA), 15 U.S.C. § 80a-35(b), because the ICA did not grant a cause of action to the corporation, *see Daily Income Fund,* 464 U.S. at 542, 104 S.Ct. 831.

**\*6 [7]** The Court thus explained in *Daily Income Fund* that because corporations could not bring suit in their own right under the ICA, individual shareholders' suits were not derivative. That reasoning applies with equal force here. Because ERISA plans cannot bring suit against fiduciaries on the plans' own behalf under section 502, the lawsuits of individual participants are not derivative either. *See Pressroom Unions-Printers League Income Sec. Fund v. Cont'l Assurance Co.,* 700 F.2d 889, 893 (2d Cir.) ("In light of the frequent references in [ERISA] and its legislative history to 'participants, beneficiaries and fiduciaries,' [the] conclusion [that funds also have standing to bring suit] is untenable.") (citations omitted), *cert. denied,* 464 U.S. 845, 104 S.Ct. 148, 78 L.Ed.2d 138 (1983). Section 502(a)(2), like the law considered by Supreme Court in *Daily Income Fund,* creates an "unusual cause of action ... [that] differs significantly from those traditionally

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

asserted in shareholder derivative suits." _Daily Income Fund, 464 U.S. at 535, 104 S.Ct. 831._ We therefore doubt that section 502(a)(2) actions can, in any meaningful sense, be governed by the "same general principles" of procedure that control derivative actions. _Coan II, 349 F.Supp.2d at 275_ (internal quotation marks and citation omitted).

### C. Bringing Suit in a "Representative Capacity"

Irrespective of the applicability of Rule 23.1 or the principles of derivative actions, however, we agree with the district court that Coan's section 502(a)(2) claim fails because it was not "brought in a representative capacity on behalf of the plan." _Russell, 473 U.S. at 142 n. 9, 105 S.Ct. 3085._

### 1. Procedural Requirements of _Section 502(a)(2)._

In _Russell,_ the Supreme Court considered whether an individual participant in an ERISA plan could recover damages under section 502(a)(2) for alleged misfeasance--in that case, delay in awarding disability benefits--that harmed only the plaintiff. The Court noted that section 409 of ERISA, 29 U.S.C. § 1109, on which the section 502(a)(2) right of action is based, [FN4] requires plan fiduciaries " 'to make good _to such plan_ any losses _to the plan_ ' " resulting from a breach of fiduciary duty. _Russell, 473 U.S. at 140, 105 S.Ct. 3085_ (quoting ERISA § 409(a), 29 U.S.C. § 1109(a)) (emphasis added by _Russell)._ According to the Court, "[a] fair contextual reading of the statute makes it abundantly clear that its draftsmen were primarily concerned with the possible misuse of plan assets, and with remedies that would protect the entire plan, rather than with the rights of an individual beneficiary." _Id. at 142, 105 S.Ct. 3085._

The central holding of _Russell_ is that sections 409 and 502(a)(2) of ERISA do not provide for the recovery of extra-contractual damages for breaches of fiduciary duty that affect only an individual plaintiff. _See id. at 136- 37, 105 S.Ct. 3085_ (interruption in provision of plan benefits to the plaintiff); _Lee, 991 F.2d at 1006-07_ (health benefits denied to two persons upon bankruptcy of plan sponsor); _cf. Matassarin v. Lynch, 174 F.3d 549, 566 (5th Cir.1999)_ (alleged breaches of fiduciary duty affected only the individual retirement accounts of the plaintiff and few others), _cert. denied, 528 U.S. 1116, 120 S.Ct. 934, 145 L.Ed.2d 813 (2000)._ Unlike the plaintiffs in those cases, Coan complains of an alleged breach of fiduciary duty--failure to diversify plan assets--that would have harmed all the participants in the KLC 401(k) plan. And she asks for, among other things, "[d]amages and/or

restoration of losses to the 401k Plan." Compl. at 5.

*7 But, like the district court, we do not see how an action can be brought in a "representative capacity on behalf of the plan" if the plaintiff does not take any steps to become a bona fide representative of other interested parties. _Russell, 473 U.S. at 142 n. 9, 105 S.Ct. 3085._ It seems to us that the representative nature of the section 502(a)(2) right of action implies that plan participants must employ procedures to protect effectively the interests they purport to represent.

Although ERISA does not specify the procedures that a plan participant must follow in order to bring suit on behalf of a benefit plan, its drafters considered the issue. As early as 1970, four years before ERISA was enacted, a Senate version of the bill would have required participants and beneficiaries bringing suit for breach of fiduciary duty to bring class actions. _See_ S. 3589, 91st Cong., § 9(e)(2) (1970) _as reprinted in Arnold & Porter Legislative History: Employee Retirement Income Security Act of 1974 ("ERISA-LH")_ 16, at * 23. [FN5] In their final versions, the House and Senate ERISA bills contained contrasting class-action requirements: The House bill provided that participants and beneficiaries _must_ in most circumstances bring class actions in order to bring suit on behalf of a plan for breach of fiduciary duty, while the Senate bill provided that they _may. See_ Summary of Differences Between the Senate Version and the House Version of H.R.2 to Provide for Pension Reform § 10 (Comm. Print 1974), _as reprinted in ERISA-LH_ 85-C, at *26. [FN6]

The fact that Congress, having considered mandatory and permissive provisions relating to class actions, ultimately remained silent on the issue suggests to us that it deliberately declined to adopt any general rule as to whether class actions are mandatory or permissive. _See_ 29 U.S.C. § 1132(a)(2). [FN7] But it does not mean that Congress intended to allow individual participants and beneficiaries to bring suit on behalf of an employee benefit plan without observing _any_ procedural safeguards for other interested parties. It seems to us, rather, that Congress was content to leave the procedures necessary to protect absent parties, and to prevent redundant suits, to be worked out by parties and judges according to the circumstances on a case by case basis.

[8][9] This is the approach of the common law of trusts, which "offers a starting point for analysis of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ERISA unless it is inconsistent with the language of the statute, its structure, or its purposes." _Harris Trust and Sav. Bank v. Salomon Smith Barney, Inc., 530 U.S. 238, 250, 120 S.Ct. 2180, 147 L.Ed.2d 187 (2000)_ (internal quotation marks and citation omitted; alterations incorporated). Ordinarily, when a beneficiary brings suit against a trustee on behalf of the trust, other beneficiaries "should be joined as parties, either as plaintiffs or as defendants, if their interests would be affected by the decree." _See_ 3 Austin W. Scott et al., _The Law of Trusts_ § 214 (4th ed.2001). But, as a case decided shortly before the enactment of ERISA noted:

*8 "[There] are two well-established exceptions to the general rule that the _cestuis que trustent_ are necessary parties in actions by or against a trustee relating to the trust or its property. The first is where the absent parties are properly represented.... The second exception to the general rule arises where the beneficiaries are very numerous, so that the delay and expense of bringing them in becomes oppressive and burdensome. In such case they will not be deemed necessary parties where the trustee representing them is made a party."

_Hebbard v. Colgrove, 28 Cal.Rptr.3d 1017, 1027, 105 Cal.Rptr. 172, 178 (1972)_ (quoting _Anderson v. Elliott, 117 N.E.2d 876, 879, 1 Ill.App.2d 448 (1954)_) (alterations in _Hebbard;_ emphasis omitted). In the latter situation, a class action is the appropriate procedural device. _See id.; see also Ortiz v. Fibreboard Corp., 527 U.S. 815, 833-34, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999)_ (noting that "actions charging 'a breach of trust by an indenture trustee or other fiduciary similarly affecting the members of a large class' of beneficiaries, requiring an accounting or similar procedure 'to restore the subject of the trust,' " are among the "[c]lassic examples" of _Rule 23(b)(1)(B)_ class actions (quoting Advisory Committee's Notes on _Fed.R.Civ.P. 23_)).

[10] We think it neither necessary nor helpful to delineate minimum procedural safeguards that _section 502(a)(2)_ requires in all cases. But in our view, although plan participants need not always comply with _Rule 23_ to act as a representative of other plan participants or beneficiaries, _[FN8]_ those who do will likely be proceeding in a "representative capacity" properly for purposes of _section 502(a)(2)._ Similarly, a plan participant who joins or makes a good-faith effort to join other participants as parties pursuant to _Rule 19_ would seem to have discharged his or her duty to proceed on behalf of the plan. Ultimately, however, the requirement is only that the plaintiff take adequate steps under the circumstances properly to act in a "representative capacity on behalf

of the plan." _Russell, 473 U.S. at 142 n. 9, 105 S.Ct. 3085._

[11] _2. Application to Coan's Lawsuit._ Here, the district court concluded that Coan's "failure to do _anything_ to demonstrate that her action actually was intended to benefit former plan participants other than Karen Coan ... rendered specious [her] claim to be acting on behalf of others." _Coan II, 349 F.Supp.2d at 277_ (internal quotation marks and ellipsis omitted; emphasis in original). We agree. Allowing Coan to bring this action without notifying or otherwise involving other plan participants would, it seems to us, create significant practical difficulties and opportunities for abuse. Because Coan does not proceed under _Rule 23,_ for example, we see nothing to prevent her from reaching a settlement with the defendants that would disproportionately, or even exclusively, benefit her. _Cf._ _Fed.R.Civ.P. 23(e)(1)(A)_ (requiring courts to approve class action settlements and to direct notice to absent class members); _accord_ _Fed.R.Civ.P. 23.1_ (requiring court approval and notice to shareholders prior to dismissal or compromise of a shareholder derivative suit).

*9 If, on the other hand, Coan were to prevail, the district court would face a difficult task in ensuring that recovery "inures to the benefit of the plan as a whole." _Russell, 473 U.S. at 140, 105 S.Ct. 3085._ The court would likely be required to issue an order mandating that the now defunct KLC 401(k) plan be temporarily resuscitated, funds restored to it, its participants located, their entitlements calculated, and distributions disbursed to them. Without the benefit of a procedural mechanism for the protection of interested parties, it is unclear how the court could satisfy itself that their interests were in fact being taken into consideration without a great deal of improvisation, effort, and expense. _See Coan I, 333 F.Supp.2d at 24_ ("[T]here is no guarantee, aside from Ms. Coan's personal assurances, that the former participants will benefit from any possible recovery.").

Permitting Coan to proceed would, moreover, complicate any subsequent litigation. If a participant in the KLC 401(k) plan who is not included in this action were to bring a subsequent lawsuit against the defendants regarding the same alleged breach of fiduciary duty, the issue of collateral estoppel (issue preclusion) would likely arise. The question would be whether the second participant is in "privity" with Coan such that he or she would be bound by the earlier judgment. _See, e.g., Hoblock v. Albany County Bd. of Elections, 422 F.3d 77, 90-91 (2d Cir.2005)_

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(discussing the privity requirement). If privity and therefore preclusion were found, the second participant would be bound by a judgment that was reached without his or her involvement or reliable safeguards for his or her interests. *But see Richards v. Jefferson County, Ala.,* 517 U.S. 793, 801-02, 116 S.Ct. 1761, 135 L.Ed.2d 76 (1996) (issue preclusion without prior notice raises due process concerns).

If, on the other hand, the issue were not deemed precluded, multiple further lawsuits might ensue, the ultimate result of which might well be an unsatisfactory resolution of the dispute as a whole. *See Thornton v. Evans,* 692 F.2d 1064, 1079-80 (7th Cir.1982) (concluding that plan beneficiaries bringing suit on behalf of employee benefit plan "must sue either as representatives of the Fund in a derivative action or as representatives of the beneficiaries in a class action" in order to "avoid multiple litigation").

Because Coan has not taken any steps to permit the court to safeguard the interests of others or the court's proceedings under these circumstances, we agree with the district court that she has failed to represent adequately the interests of other plan participants and has therefore not properly proceeded in a representative capacity as required by section 502(a)(2). We further agree that it is "far too late in the day" for Coan to cure the procedural defects in her lawsuit. *Coan II,* 349 F.Supp.2d at 276 n. 9. We therefore conclude that the court properly granted summary judgment to the defendants on Coan's section 502(a)(2) claim.

IV. Section 502(a)(3)

*10 Coan also seeks relief under section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), which the Supreme Court has described as a "catchall" remedial section "offering appropriate equitable relief for injuries caused by violations that § 502 does not elsewhere adequately remedy." *Varity Corp. v. Howe,* 516 U.S. 489, 512, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996) (internal quotation marks omitted). Unlike section 502(a)(2), section 502(a)(3) permits ERISA plan participants to bring suit for individual remedies; but relief under section 502(a)(3) must be "equitable." 29 U.S.C. § 1132(a)(3). The district court denied Coan's section 502(a)(3) claim based on its conclusion that the "remedy Ms. Coan seeks in this case is not equitable in form or substance." *Coan I,* 333 F.Supp.2d at 27.

The district court's conclusion is strongly supported by recent Supreme Court decisions interpreting the scope of section 502(a)(3). In *Mertens v. Hewitt Assocs.,* 508 U.S. 248, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993), former employees of a steel company brought a section 502(a)(3) action against a non-fiduciary actuary of their pension plan, seeking monetary relief for the actuary's alleged participation in the breach of fiduciary duties by the plan's fiduciaries. The Supreme Court, noting that "what petitioners in fact seek is nothing other than compensatory damages--monetary relief for all losses their plan sustained as a result of the alleged breach of fiduciary duties," *id.* at 255, 113 S.Ct. 2063 (emphasis omitted), held that such monetary damages did not constitute "appropriate *equitable* relief" under section 502(a)(3), *id.* (internal quotation marks omitted; emphasis in original).

In *Great-West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002), the Court again addressed an attempt to pursue money damages under section 502(a)(3). The petitioner, an insurance company, sought to use section 502(a)(3) to obtain reimbursement from a policyholder who had received compensation for her medical expenses pursuant to a settlement of a tort claim. As in *Mertens,* the Supreme Court held that the relief sought was not equitable, rejecting the petitioner's argument that it was merely seeking an equitable injunction to require payment, *see id.* at 210- 12, 122 S.Ct. 708, and concluding that the petitioner was not seeking the equitable remedy of restitution because it had not identified "particular funds or property in the defendant's possession," *id.* at 214, 122 S.Ct. 708.

After briefing and oral argument in this case, the Supreme Court decided *Sereboff v. Mid Atlantic Medical Services, Inc.,* --- U.S. ----, 126 S.Ct. 1869, 164 L.Ed.2d 612 (2006), which "involved facts similar to those" in *Knudson. Id.* at 1873-74. The Court concluded that the relief sought by the insurance company was equitable because the company "sought its recovery through a constructive trust or equitable lien on a specifically identified fund, not from the [petitioner's] assets generally." *Id.* at 1874. But the Court reaffirmed the holding of *Knudson* that money damages are unavailable under section 502(a)(3) when the plaintiff does "not seek to recover a particular fund from the defendant." *Id.*

*11 [12] Coan seeks monetary relief; she does not attempt to recover a specifically identified fund from the defendants. She contends that the relief she wants is nevertheless equitable for purposes of ERISA.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Relying on our decision in *Strom v. Goldman, Sachs & Co.,* 202 F.3d 138 (2d Cir.1999), Coan points out that neither *Mertens* nor *Knudson* involved suits against plan fiduciaries, against whom, she argues, section 502(a)(3) provides for broader remedies than against non-fiduciaries. *Strom,* which was decided after *Mertens* but before *Knudson,* did indeed distinguish between fiduciaries and non-fiduciaries, noting that suits against fiduciaries for breach of trust were traditionally in the exclusive jurisdiction of courts of equity. *Strom,* 202 F.3d at 145. Similarly, Justice Ginsburg, concurring in *Aetna Health Inc. v. Davila,* 542 U.S. 200, 124 S.Ct. 2488, 159 L.Ed.2d 312 (2004), suggested that monetary relief under section 502(a)(3) may be more broadly available in suits against ERISA fiduciaries than against non-fiduciaries:

> Recognizing that "this Court has construed Section 502(a)(3) not to authorize an award of money damages against a *non-fiduciary,*" the Government suggests that the Act, as currently written and interpreted, may "allo[w] at least some forms of 'make-whole' relief against a breaching *fiduciary* in light of the general availability of such relief in equity at the time of the divided bench." Brief for United States as Amicus Curiae 27-28, n. 13 (emphases added).... [T]he Government's suggestion may indicate an effective remedy others similarly circumstanced might fruitfully pursue.

> *Id.* at 223-24, 124 S.Ct. 2488 (Ginsburg, J., concurring).

But whether sought from a fiduciary or not, the type of relief a plaintiff requests must still be "equitable." As we noted in *Strom, Mertens* precludes the conclusion that relief sought from fiduciaries is "equitable" under ERISA section 502(a)(3) solely because it was generally available in equity at the time of the divided bench. *See Strom,* 202 F.3d at 145. The *Mertens* Court said:

> Since *all* relief available for breach of trust could be obtained from a court of equity, limiting the sort of relief obtainable under § 502(a)(3) to "equitable relief" in the sense of "whatever relief a common-law court of equity could provide in such a case" would limit the relief *not at all.* We will not read the statute to render the modifier ["equitable"] superfluous.

> *Mertens,* 508 U.S. at 257-58, 113 S.Ct. 2063 (footnote omitted; emphases in original). And in *Sereboff,* the Court made clear that section 502(a)(3) requires *both* that the "basis for [the] claim" *and* the "nature of the recovery" sought be equitable. *See Sereboff,* 126 S.Ct. at 1874. Even if breach of fiduciary duty is an equitable *claim,* therefore,

remedies for breach of that fiduciary duty do not constitute "equitable relief" under section 502(a)(3) unless the plaintiff seeks a "categor[y] of relief that [was] typically available in equity." *Mertens,* 508 U.S. at 256, 113 S.Ct. 2063 (emphasis omitted).

*12 We recently recognized that the Supreme Court's reasoning in *Knudson* "cuts across the grain of *Strom.*" *Pereira v. Farace,* 413 F.3d 330, 340 (2d Cir.2005), *cert. denied,* 126 S.Ct. 2287, 2006 WL 1374513, 2006 U.S. LEXIS 3965 (May 22, 2006). We concluded in that case that restitutionary monetary relief was not "equitable" under section 502(a)(3) when, as here, the defendants "never possessed the funds in question and thus were not unjustly enriched." *Id.* at 339.

We agree with the district court, moreover, that the alternative relief Coan seeks under section 502(a)(3), an injunction requiring the defendants to restore funds to the defunct 401(k) plan to be distributed to former participants, "does not transform what is effectively a money damages request into equitable relief." *Coan I,* 333 F.Supp.2d at 26.

Coan's attempt to cast this action as one for "equitable relief" therefore fails. We conclude that the individual remedies Coan seeks are unavailable under ERISA section 502(a)(3).

## CONCLUSION

Based on the foregoing analysis, we conclude that the district court correctly granted summary judgment to the defendants. The court's decision is therefore affirmed.

> FN1. "An employee who participates in a deferred compensation plan to save for retirement qualifies for tax benefits pursuant to 26 U.S.C. § 401(k)." *In re Schering-Plough Corp. ERISA Litig.,* 420 F.3d 231, 232 n. 1 (3d Cir.2005). Such a plan is "referred to in ERISA as an 'individual account plan' or a 'defined contribution plan.'" *Id.* (quoting 29 U.S.C. § 1002(34)).

> FN2. For a discussion of the differences between defined benefit plans and defined contribution plans with respect to a participant's interest in the plan's surplus, see *Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432, 438-41, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999) (explaining that participants in defined benefit plans, in contrast to participants in defined contribution plans,

"have no entitlement to share in a plan's surplus").

FN3. In *Lerner,* we stated that statutory standing is "generally treated as jurisdictional in nature," *Lerner,* 318 F.3d at 127 (citing *Thompson v. County of Franklin,* 15 F.3d 245, 248 (2d Cir.1994)), but found an exception to this general rule in cases where statutory standing is "sufficiently intertwined with the merits of the action, such that its determination requires an evaluation of the merits of the action and makes any potential distinction between the merits and ... standing exceedingly artificial," *id. at 130.* Whether or not statutory standing is jurisdictional, however, it may be assumed for purposes of deciding the merits. *See Steel Co.,* 523 U.S. at 97 n. 2, 118 S.Ct. 1003 (stating that "a merits question can be given priority over a statutory standing question"); *cf. United States v. Canova,* 412 F.3d 331, 348 (2d Cir.2005) (explaining in the context of criminal sentencing that "because the jurisdictional challenge in this case is statutory rather than constitutional, we may assume hypothetical jurisdiction").

FN4. *See* ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) (providing right of action "for appropriate relief under section 1109 of this title").

FN5. Available in Westlaw, database identifier "ERISA-LH."

FN6. The conference staff's comparison of the two class-action provisions reads: 10. Jurisdiction of Courts, etc.
House bill.--
....
(2) Where participants or beneficiaries bring actions with respect to breach of fiduciary responsibility or to enjoin an act or practice violating the Act, the action *must* be brought as a class action if the jurisdiction allows it and the requirements for a class action are not unduly burdensome in the circumstances.
Senate amendment.--
....
(2) Suits for breach of fiduciary duty, to enjoin acts or practices violating the Act, and for benefits *may* be brought as class

actions.
*ERISA-LH* 85-C, at *26 (emphasis added by conference staff).

FN7. *Cf. Hamdan v. Rumsfeld,* --- U.S. ----, 126 S.Ct. 2749, 2006 WL 1764793, *14 n. 10 (2006)* (concluding, "[i]n light of [Congress's] extensive discussion of the [Detainee Treatment Act of 2005, Pub.L. 109- 148, 119 Stat. 2739]'s effect on pending cases," that its removal of a provision that would have expressly made statute applicable to pending cases meant that it did not intend the statute to apply to pending cases).

FN8. We note that even the rejected provision in the House bill that would have made class actions mandatory in most circumstances would have required them only "if the jurisdiction allow[ed them] and the requirements for a class action [were] not unduly burdensome in the circumstances." *ERISA-LH* 85-C, at *26.

--- F.3d ----, 2006 WL 2075129 (2nd Cir.(Conn.)), 38 Employee Benefits Cas. 1609

**Briefs and Other Related Documents (Back to top)**

• 04-5173 (Docket) (Sep. 28, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D

**Westlaw.**

Slip Copy
Slip Copy, 2006 WL 1911595 (D.N.H.), 38 Employee Benefits Cas. 1495, 2006 DNH 79
**(Cite as: 2006 WL 1911595 (D.N.H.))**

---

**Motions, Pleadings and Filings**

NOT FOR PUBLICATION

United States District Court,
D. New Hampshire.
Lori PERROTTI-JOHNS
v.
WAL-MART STORES, INC. and John Does One
through Five.
**No. 05-cv-243-PB.**

July 11, 2006.

Paul R. Cox, John Merwin Clothier, Burns Bryant
Cox Rockefeller & Durkin PA, Dover, NH, for
Plaintiff.

Christopher R. Hedican, Hedican Law Office,
Omaha, NE, David W. McGrath, Sheehan Phinney
Bass & Green, Manchester, NH, for Defendant.

***MEMORANDUM AND ORDER***

PAUL BARBADORO, District Judge.

**\*1** Lori Perrotti-Johns, a former management-level
employee of Wal-Mart Stores, Inc. ("Wal-Mart")
alleges that Wal-Mart wrongfully allowed her health
insurance to be cancelled and wrongfully terminated
her employment. Wal-Mart has filed a motion to
dismiss for failure to state a claim upon which relief
can be granted (Doc. No. 24). For the reasons set
forth below, I grant Wal-Mart's motion in part and
deny it in part.

I. *BACKGROUND* [FN1]

FN1. I describe the facts in the light most
favorable to Perrotti-Johns.

Perrotti-Johns held a management-level position at
Wal-Mart. Am. Compl. ¶ 6. She was eligible for and
participated in Wal-Mart's Associates' Health and
Welfare Plan (the "Plan"), which provided health and
dental insurance. *Id.* ¶ ¶ 6, 8-9.

On September 27, 1999, Perrotti-Johns suffered an
injury at work and became disabled. *Id.* ¶ 13. She
stopped working and commenced a workers'

compensation proceeding. *Id.* Shortly thereafter, she
testified against Wal-Mart in an employment
discrimination lawsuit. *Id.* ¶ 30.

Although she was no longer working, Perrotti-Johns
remained eligible to participate in the Plan so long as
she paid the applicable premiums. *Id.* ¶ 4. Wal-Mart
instructed her to pay the premiums by sending checks
to an address that the company provided. *Id.* ¶ 16.
Perrotti-Johns mailed all of her premiums in a timely
fashion. *Id.* ¶ ¶ 16, 19. Nevertheless, the Plan
notified her that her benefits had been cancelled for
nonpayment of premiums. *Id.* ¶ 18.

Perrotti-Johns contacted Wal-Mart about the
cancellation of her benefits and the company
repeatedly promised that her coverage would be
reinstated. *Id.* ¶ 29. Perrotti-Johns eventually
received a "refund" from Wal-Mart, although she had
not requested a refund and the amount she received
was not equal to the amount she had paid in
premiums. *Id.* ¶ ¶ 21-23. Wal-Mart ultimately
informed Perrotti-Johns that it had accidentally
applied her premium payments to the purchase of
Wal-Mart stock. *Id.* ¶ 24.

On May 25, 2005, Perrotti-Johns sued Wal-Mart in
Rockingham County Superior Court. *See* State Court
Writ of Summons. Wal-Mart timely removed the
action to this court, *see* Notice of Removal (Doc. No.
1), and filed a motion to dismiss (Doc. No. 6). On
January 19, 2006, I granted the motion to dismiss. I
held that Perrotti-Johns' negligence, breach of
contract, and breach of fiduciary duty claims were
preempted by the Employee Retirement Income
Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001,
*et seq.,* and that Perrotti-Johns had failed to state a
claim for wrongful discharge because her complaint
did not allege that Wal-Mart fired her or that she
resigned because of intolerable working conditions.
*See* Order on Wal-Mart's First Motion to Dismiss
("First Order") (Doc. No. 19), 2006 DNH 5, at 7, 9.
Perrotti subsequently amended her complaint. The
amended complaint (Doc. No. 22) consists of ERISA
claims for benefits due and breach of fiduciary duty,
two state statutory claims, and a common law claim
for wrongful discharge.

II. *STANDARD OF REVIEW*
**\*2** In considering a motion to dismiss under Federal
Rule of Civil Procedure 12(b)(6), [FN2] I "accept as

Slip Copy                                                                          Page 2
Slip Copy, 2006 WL 1911595 (D.N.H.), 38 Employee Benefits Cas. 1495, 2006 DNH 79
(Cite as: 2006 WL 1911595 (D.N.H.))

true the well-pleaded factual allegations of the complaint, draw all reasonable inferences therefrom in the plaintiff's favor and determine whether the complaint, so read, sets forth facts sufficient to justify recovery on any cognizable theory." *Martin v. Applied Cellular Tech., 284 F.3d 1, 6 (1st Cir.2002).* An action should be dismissed "only if the plaintiff's factual averments hold out no hope of recovery on any theory adumbrated in its complaint." *In re Colonial Mortgage Bankers Corp., 324 F.3d 12, 15 (1st Cir.2003).*

> FN2. Wal-Mart states that its motion is pursuant to Rule 12(b)(6) *and* Rule 12(b)(1). Rule 12(b)(1) authorizes dismissal for lack of subject matter jurisdiction. I cannot discern a subject matter jurisdiction argument in Wal-Mart's briefs. Thus, I analyze Wal-Mart's motion under Rule 12(b)(6).

III. *ANALYSIS*
A. *ERISA Claim to Recover Benefits Due*

In Count I, Perrotti-Johns seeks to recover Plan benefits that she alleges have been wrongfully withheld. A claim to recover benefits due arises under 29 U.S.C. § 1132(a)(1)(B), which provides that a participant in an employee benefit plan may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." Wal-Mart argues that Perrotti-Johns has failed to state a claim to recover benefits due because (1) Wal-Mart is not a proper defendant in an action to recover benefits due; and (2) Perrotti-Johns has failed to exhaust the Plan's internal administrative remedies.

Ordinarily, the proper defendants in an action for benefits due under 29 U.S.C. § 1132(a)(1)(B) are the employee benefit plan itself and the named plan administrator. *Thiffault v. Butler Home Prods., Inc.,* No. 05-4001 1-FDS, 2006 U.S. Dist. LEXIS 6236, at *4 (D.Mass. Jan. 5, 2006); *see also Terry v. Bayer Corp., 145 F.3d 28, 36 (1st Cir.1998).* Wal-Mart has submitted a portion of the applicable summary plan description, the authenticity of which Perrotti-Johns does not contest, demonstrating that it appointed a plan administrator. If an employer has appointed a plan administrator, the employer is not a proper defendant unless it "controlled or somehow influenced the administration of the plan." *Id.* There is very little in Perrotti-Johns' amended complaint to support an argument that Wal-Mart controlled or

otherwise influenced plan administration. However, even if I assume that Perrotti-Johns' factual allegations are sufficient to support a claim for Wal-Mart can be named as a defendant in a claim for benefits due because it influenced the administration of the plan, her claim is premature because she has failed to exhaust the internal administrative remedies available to her.

Exhaustion of internal administrative remedies is a necessary prerequisite to judicial review under § 1132(a)(1)(B). *Terry, 145 F.3d at 36.* Perrotti-Johns concedes that she did not avail herself of the Plan's internal administrative remedies, which required her to file an appeal within 60 days of receiving a written notice denying her benefits claim. Pl.'s Obj. at 3. Instead, she argues that her failure to exhaust should be excused by the equitable estoppel exception to the exhaustion requirement. [FN3]

> FN3. Perrotti-Johns also contends that her failure to exhaust is excused because exhaustion would be futile and because the remedies available to her in the administrative process are inadequate. She bases her futility argument on allegations that Wal-Mart repeatedly told her it would reinstate her health coverage. This amounts to a restatement of her equitable estoppel argument. In support of her inadequacy argument, Perrotti-Johns states that the internal administrative remedies are inadequate because the only relief they offer is reinstatement of her health benefits. This argument is unavailing because compensatory and punitive damages are not recoverable on a claim for benefits due regardless of the forum. *See Turner v. Fallon Community Health Plan, 127 F.3d 196, 198 (1st Cir.1997).*

*3 In order for equitable estoppel to prevent dismissal of a claim to recover benefits due based on failure to exhaust, a plan participant must show "(1) a promise, (2) reasonable reliance on the promise, (3) injury caused by the reliance, (4) an injustice if the promise is not enforced, and (5) extraordinary circumstances .... tantamount to fraud." *Greifenberger v. Hartford Life Ins. Co., 131 Fed. Appx. 756, 758-59 (2d Cir.2005)* (unpublished); *see also Bourgeois v. Pension Plan for the Emples. of Santa Fe Int'l Corps., 215 F.3d 475, 481-82 (5th Cir.2000).* [FN4]

> FN4. Wal-Mart cites *Mauser v. Raytheon*

Slip Copy                                                                                                                    Page 3
Slip Copy, 2006 WL 1911595 (D.N.H.), 38 Employee Benefits Cas. 1495, 2006 DNH 79
(Cite as: 2006 WL 1911595 (D.N.H.))

*Co. Pension Plan for Salaried Emples.*, 239 F.3d 51, 57 (1st Cir.2001) for the proposition that "[t]his circuit has not recognized the doctrine of estoppel to excuse failure to exhaust administrative remedies." Def.'s Reply at 5. Wal-Mart's reliance on *Mauser* is misplaced. *Mauser* did not discuss equitable estoppel in the context of administrative exhaustion.

Here, the doctrine of equitable estoppel cannot save Perrotti-Johns' claim to recover benefits due. Although Wal-Mart allegedly promised Perrotti-Johns that it would reinstate her health insurance, it eventually informed her that it did not intend to make good on its promise. At that juncture, Perrotti-Johns elected to seek judicial review immediately rather than to pursue an administrative appeal. Although the doctrine of equitable estoppel may excuse Perrotti-Johns' failure to comply with an administrative deadline, it does not allow her to circumvent the administrative process altogether. Accordingly, Wal-Mart's motion to dismiss Count I is granted without prejudice to Perrotti-Johns' right to seek administrative review of her claim.

B. *ERISA Claim for Breach of Fiduciary Duty*

In Count II, Perrotti-Johns argues that Wal-Mart violated fiduciary duties it owed to her as a Plan participant. Count II arises pursuant to 29 U.S.C. § 1132(a)(3), which is known as ERISA's "catch all" provision. [FN5] *Watson v. Deaconess Waltham Hosp.*, 298 F.3d 102, 109 (1st Cir.2002). Section 1132(a)(3) provides that

> FN5. 29 U.S.C. § 1132(a)(2) authorizes civil actions by participants for "appropriate relief under section 1109," which imposes liability on plan fiduciaries for breach of fiduciary duty. *See* 29 U.S.C. § 1109(a). However, the Supreme Court has held that § 1109 "provides relief only for a plan and not for individual participants." *Tregoning v. Am. Community Mut. Ins.Co.*, 12 F.3d 79, 83 (6th Cir.1993); *see also Miller v. Nortel Networks Long Term Dis. Plan*, No. 03-258-PB, 2005 U.S. Dist. LEXIS 1161, at *43-44 (D.N.H. Jan. 25, 2005). Perrotti-Johns does not seek relief on behalf of the plan. Thus, she may not maintain an action under 29 U.S.C. § 1132(a)(2).

[a] civil action may be brought ... by a participant, beneficiary, or fiduciary (A) to enjoin any act or

practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan.

Wal-Mart argues that Perrotti-Johns' claim should be dismissed because she seeks money damages rather than equitable relief. I agree.

The Supreme Court has explained "that the term 'equitable relief' in [§ 1132(a)(3) ] must refer to 'those categories of relief that were *typically* available in equity.' " *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002) (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256 (1993)). If a plaintiff seeks legal relief rather than equitable relief, § 1132(a)(3) does not authorize her lawsuit. *Id.* at 221. Generally, money damages are " 'the classic form of *legal* relief.' " *Id.* (quoting *Mertens*, 508 U.S. at 255).

Perrotti-Johns seeks only money damages. [FN6] *See* Am. Compl. ¶ 68 ("plaintiff demands judgment against the defendants in an amount sufficient to fully compensate her for her losses, plus interest, costs and attorneys' fees"). Because money damages are not an equitable form of relief, Count II fails to state a claim under 29 U.S.C. § 1132(a)(3). Accordingly, Wal-Mart's motion to dismiss Count II is granted.

> FN6. Perrotti-Johns has not requested a refund of any monies she allegedly paid to Wal-Mart for health insurance benefits. Damages of that variety might amount to equitable restitution available under 29 U.S.C. § 1132(a)(3). *See Great-West*, 534 U.S. at 214 (restitution is a form of equitable relief if the plaintiff asks the court "to restore to the plaintiff particular funds or property in the defendant's possession").

C. *State Statutory Claims*

1. *RSA § 275:48, II*

*4 In Count IV, Perrotti-Johns alleges that Wal-Mart violated RSA § 275:48, II, which provides as follows:

> If an employer making a deduction of an employee's wages ... fails to make any payment relative to such deduction on the employee's behalf, and such employee loses any benefit or fails to meet an obligation caused by such failure, the employer shall be liable for such lost benefit or failed obligation.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 1911595 (D.N.H.), 38 Employee Benefits Cas. 1495, 2006 DNH 79
(Cite as: 2006 WL 1911595 (D.N.H.))

Wal-Mart contends that this claim is preempted by ERISA. I agree.

ERISA's preemption clause, 29 U.S.C. § 1144, provides that ERISA preempts state laws that "relate to any employee benefit plan." 29 U.S.C. § 1144(a); see also Hampers v. W.R. Grace & Co., 202 F.3d 44, 49 (1st Cir.2000). The parties agree that the Plan was an "employee benefit plan" within the meaning of ERISA. Am. Compl. ¶ 9. Their only dispute is whether RSA § 275:48, II relates to the plan within the meaning of § 1144.

A state law relates to an employee benefit plan " 'if it has a connection with or reference to such a plan.' " Hampers, 202 F.3d at 49 (quoting Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 98 (1983)). In particular, "a cause of action 'relates to' an ERISA plan when a court must evaluate or interpret the terms of the ERISA-regulated plan to determine liability under the state law cause of action." Id. at 52. In order to evaluate WalMart's potential liability for lost benefits, I would be required to interpret the terms of the Plan. Therefore, I conclude that RSA § 275:48, II relates to employee benefit plans and is preempted by ERISA. See Ball v. Ripley, No. 04-cv-183- PB, 2006 U.S. Dist. LEXIS 4346, at *3 (Jan. 25, 2006) (claim under RSA § 275:48, II preempted by ERISA); cf. Jackson v. Wal-Mart Stores, Inc., 24 Fed. Appx. 132, 133 (4th Cir.2001) (unpublished) (claim under South Carolina Payment of Wages Act for alleged excessive deductions from wages for employee benefit plan premiums was preempted by ERISA). In fact, Perrotti-Johns' claim under RSA § 275:48, II is preempted by the very ERISA claims she asserts in Counts I and II. See Lamberty v. Premier Millwork & Lumber Co., 329 F.Supp.2d 737, 742 (E.D.Va.2004) (plaintiff's state law claim is preempted where it "alleges the same conduct comprising" plaintiff's ERISA claims). Accordingly, Wal-Mart's motion to dismiss Count IV is granted.

### 2. RSA §§ 275:48, III, 415:18, VII(g)(4)

In Count VI, [FN7] Perrotti-Johns alleges that Wal-Mart violated RSA § 275:48, III and § 415:18, VII(g)(4). RSA § 275:48, III requires insurers and plan administrators to "notify an employee in writing of termination of an employee benefit plan pursuant to the notification requirements of RSA § 415:18, VII(g)(4) or [ERISA], as applicable." In addition to setting out notification requirements, RSA § 415:18, VII(g)(4) provides that participants in health insurance plans are eligible for a 39-week extension of benefits after their coverage terminates. Perrotti-

Johns contends that Wal-Mart violated these statutes by (1) failing to provide her with proper notice of its intent to terminate her health insurance benefits; and (2) failing to notify her that she was eligible for a 39-week extension of her health insurance benefits. Wal-Mart responds that RSA § 275:48, III and RSA § 415:18, VII(g)(4) are preempted by ERISA. Once again, I agree.

> FN7. There is no Count V in the amended complaint.

*5 Perrotti-Johns does not have a colorable argument that these two statutes do not relate to employee benefit plans. See Dawson v. Whaland, 529 F.Supp. 626, 632-33 (D.N.H.1982) (RSA § 415:18, VII(g) is preempted by ERISA). Instead, she argues that ERISA's so-called "savings clause," 29 U.S.C. § 1144(b)(2)(A), exempts the statutes from preemption. The savings clause provides that ERISA does not preempt "any law of any State which regulates insurance, banking, or securities." 29 U.S.C. § 1144(b)(2)(A).

Perrotti-Johns' argument is without merit. Although ERISA's savings clause exempts from preemption any state laws that regulate insurance, the statute's "deemer clause" specifies that "an employee benefit plan ... shall [not] be deemed to be an insurance company or other insurer ... for purposes of any law of any State purporting to regulate insurance companies, insurance contracts, banks, trust companies, or investment companies." 29 U.S.C. § 1144(b)(2)(B); see also FMC Corp. v. Holliday, 498 U.S. 52, 58 (1990). The two statutes at issue in Count VI address employee benefit plans. The deemer clause therefore precludes application of the savings clause and the statutes are preempted by ERISA. Wal-Mart's motion to dismiss Count VI is granted.

### D. Common Law Wrongful Discharge

After Perrotti-Johns stopped working, she testified in an employment discrimination action against Wal-Mart. She also pursued a workers' compensation claim. In Count III, she alleges that Wal-Mart retaliated against her for these activities by firing her. Wal-Mart responds that Perrotti-Johns' common law wrongful discharge claim is barred by the applicable state and federal statutory remedies. [FN8]

> FN8. Wal-Mart also argues (1) that Perrotti-Johns' wrongful discharge claim is preempted by ERISA; and (2) that I should ignore her wrongful discharge allegations

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-10360-GAO    Document 27-6    Filed 08/30/2006    Page 6 of 7

Slip Copy                                                                                    Page 5
Slip Copy, 2006 WL 1911595 (D.N.H.), 38 Employee Benefits Cas. 1495, 2006 DNH 79
(Cite as: 2006 WL 1911595 (D.N.H.))

because they "contradict the allegations in her original pleading." Def.'s Br. at 6; *see Reddy v. Litton Indus.*, 912 F.2d 291, 296 (9th Cir.1990) (amendments to a complaint must be consistent with the original pleading). I disagree on both counts.

As to Wal-Mart's preemption argument, Perrotti-Johns' wrongful discharge claim is premised on Wal-Mart's alleged retaliation for her testimony in an employment discrimination lawsuit and her prosecution of a workers' compensation claim. It is independent of her claims regarding the cancellation of her health insurance benefits and therefore does not relate to an employee benefit plan. *Compare Woodcock v. Bristol-Myers Squibb Co.*, No. CV-03-168-PB, 2005 U.S. Dist. LEXIS 12633, at *9 (D.N.H. Jun. 27, 2005) (ERISA preempted a wrongful discharge claim where facts connected with an ERISA plan were "at the heart of" the dispute).

As to Wal-Mart's argument that Perrotti-Johns has pled contradictory allegations, I disagree that the original complaint and the amended complaint contradict one another. Perrotti-Johns' allegation in her original complaint that she stopped working because she became disabled does not contradict her current position, which is that "while she was out due to her work related injury, she was terminated." Pl.'s Obj. at 7. Nor is Perrotti-Johns' allegation that Wal-Mart terminated her employment in retaliation for her participation in the employment discrimination lawsuit *and* her pursuit of workers' compensation benefits inconsistent with her earlier allegation that the retaliation was based only on the employment discrimination lawsuit.

Under the First Circuit's binding interpretation of New Hampshire common law, an employee may not assert a wrongful discharge claim if she has a statutory cause of action based on the same conduct. *Smith v. F.W. Morse & Co.*, 76 F.3d 413, 429 (1st Cir.1996); *see also Parker v. MVM, Inc.*, No. 05-cv-380- SM, 2006 U.S. Dist. LEXIS 41447, at *7 (D.N.H. Jun. 20, 2006) ("[T]he Court of Appeals for the First Circuit has interpreted New Hampshire common law to preclude a cause of action for wrongful termination when the aggrieved employee has a statutory cause of action arising out of the same conduct."). Here, Wal-Mart argues that Perrotti-Johns may avail herself of (1) Title VII of the Civil Rights

Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, and the New Hampshire Law Against Discrimination ("LAD"), N.H.Rev.Stat. Ann. ("RSA") § 354-A:1, *et seq.*; and (2) the New Hampshire Workers' Compensation Law ("WCL"), RSA § 281-A:1, *et seq.*

I agree with Wal-Mart that Title VII and the LAD preclude Perrotti-Johns' wrongful discharge claim insofar as it is premised on Wal-Mart's alleged retaliation for her testimony in the employment discrimination lawsuit. Title VII prohibits employers from discriminating against employees because they have "testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). Similarly, the LAD prohibits retaliation or discrimination against a person who has "testified or assisted in any proceeding under [the LAD]." RSA § 354- A:19. Both statutes authorize a private right of action for alleged violations. *See* 42 U.S.C. § 2000e-16(c); RSA § 354-A:21-a, I. The availability of these statutory remedies bars Perrotti-Johns from pursuing a common law wrongful discharge claim arising from her participation in the employment discrimination action. *Cf. Smith*, 76 F.3d at 429 (Title VII precludes wrongful discharge claim based on pregnancy discrimination). Accordingly, Wal-Mart's motion to dismiss is granted as to Perrotti-Johns' wrongful discharge claim arising from her participation in an employment discrimination lawsuit against Wal-Mart.

*6 I reject Wal-Mart's argument that the WCL precludes Perrotti-Johns' wrongful discharge claim arising from Wal-Mart's alleged retaliation against her for pursuing a workers' compensation claim. Under the WCL, "[a]n employee is entitled to compensation ... for 'accidental injury or death arising out of and in the course of employment.' " *Karch v. BayBank FSB*, 147 N.H. 525, 530 (2002) (quoting RSA § 281-A:2, XI). Unlike Title VII and the LAD, however, the statute does not provide a private right of action for retaliation stemming from an employee's pursuit of a claim under the statute. Furthermore, the New Hampshire Supreme Court has squarely held that the WCL does not bar common law wrongful discharge claims. *Id.* at 537; *see also Bruning v. D.E. Salmon, Inc.*, No. 03-352-JD, 2003 U.S. Dist. LEXIS 22787, at *12 (D.N.H. Dec. 18, 2003). Thus, I proceed to the merits of Perrotti-Johns' claim.

To make out a wrongful discharge claim in New Hampshire, "a plaintiff must allege and prove that: (1) the termination of employment was motivated by

Slip Copy                                                                                          Page 6
Slip Copy, 2006 WL 1911595 (D.N.H.), 38 Employee Benefits Cas. 1495, 2006 DNH 79
**(Cite as: 2006 WL 1911595 (D.N.H.))**

bad faith, retaliation, or malice; and (2) that she was terminated for performing an act that public policy would encourage or for refusing to do something that public policy would condemn." *Karch,* 147 N.H. at 536. Wal-Mart argues that Perrotti-Johns has once again failed to adequately plead that Wal-Mart terminated her employment. *See* First Order at 9 (dismissing Perrotti-Johns' wrongful discharge claim because she did not allege that she was fired or that she resigned). I disagree. While Perrotti-Johns concedes that she "does not recall getting any formal notice of termination," Am. Compl. ¶ 52, she contends that Wal-Mart "conducted itself" as if it had fired her "by requiring [her] to surrender her employee discount card, by ceasing to offer her stock options and completely excluding her from the normal 'Wal-Mart Employee Loop.' " *Id.* These factual allegations permit a reasonable inference that Wal-Mart terminated Perrotti-Johns' employment and therefore are sufficient to survive a 12(b)(6) motion. Wal-Mart has not advanced any additional arguments in support of its motion to dismiss this claim. Accordingly, Wal-Mart's motion to dismiss is denied as to Perrotti-Johns' wrongful discharge claim based on her prosecution of a workers' compensation claim.

### IV. *CONCLUSION*

For the reasons described above, Wal-Mart's motion to dismiss (Doc. No. 24) is granted as to Perrotti-Johns' ERISA claims, her state statutory claims, and her wrongful discharge claim premised on Wal-Mart's alleged retaliation for her participation in an employment discrimination lawsuit. WalMart's motion is denied as to Perrotti-Johns' wrongful discharge claim premised on Wal-Mart's alleged retaliation for Perrotti-Johns' prosecution of a workers' compensation claim.

SO ORDERED.

Slip Copy, 2006 WL 1911595 (D.N.H.), 38 Employee Benefits Cas. 1495, 2006 DNH 79

**Motions, Pleadings and Filings (Back to top)**

• 2006 WL 1466822 (Trial Motion, Memorandum and Affidavit) Memordandum in Support of Plaintiff's Objection to Defendant's Motion to Dismiss Plaintiff's Amended Complaint (Apr. 21, 2006)Original Image of this Document (PDF)

• 2006 WL 811831 (Trial Pleading) First Amended Complaint (Feb. 21, 2006)

• 2005 WL 2398508 (Trial Motion, Memorandum

and Affidavit) Memorandum in Support of Motion to Dismiss Plaintiff's Complaint (Jul. 21, 2005)

• 1:05cv00243 (Docket) (Jul. 1, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT E



Slip Copy                                                                    Page 1
Slip Copy, 2006 WL 508095 (D.Puerto Rico)
**(Cite as: 2006 WL 508095 (D.Puerto Rico))**

and attorneys' fees.

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Puerto Rico.
Gina LOPEZ, Luis F. Cabrera, Plaintiffs,
v.
ASTRAZENECA PHARMACEUTICALS LP;
Broadspire Services, Inc.; Kemper Insurance
Co., Defendants
**No. Civ. 05-1285 DRD.**

March 1, 2006.
Damaris Quinones-Vargas, Quinones Aviles Law
Office, Cabo Rojo, PR, for Plaintiffs.

Lourdes C. Hernandez-Venegas, Ricardo Guzman-
Lopez De Victoria, Schuster Usera & Aguilo LLP,
Hector Cuebas-Tanon, Vicente & Cuebas, San Juan,
PR, PHV David F. Schmidt, Chittenden, Murday &
Novotny, LLC, Chicago, IL, for Defendants.

*OPINION AND ORDER*

DOMINGUEZ, J.

*\*1* Pending before the Court is a civil action
instituted pursuant to the Employment Retirement
and Income Act ("ERISA"), 29 U.S.C. §
1132(a)(1)(B), to recover benefits due under the
terms of plaintiff's, Gina Lopez, retirement plan; and
Articles 1802 *et seq.* of the Civil Code of Puerto
Rico, 31 P.R. Laws Ann. § 5141 *et seq.* In sum,
plaintiffs allege that Lopez was an employee of co-
defendant Astrazeneca Pharmaceuticals LP ("Astra")
from 1988 to 2004. Plaintiff alleges that she was
wrongfully denied Long Term Disability ("LTD")
benefits in violation of the Plan provisions and
ERISA. This denial, in turn, constitutes, according to
plaintiff, a tort action under Article 1802 of the Civil
Code of Puerto Rico. In sum, plaintiff is seeking
various remedies, to wit: 1) declaratory relief finding
that she is entitled to LTD benefits under Astra's
policy; 2) the payment of the LTD benefits since she
became disabled and until she reaches the age of
sixty five (65); 3) damages for failure to comply with
fiduciary duty; 4) damages for pain and suffering;
and 5) punitive damages, in addition to costs, interest

I. FACTUAL BACKGROUND
   Plaintiff alleges in the complaint that due to part of
her obligations as said employee (i.e. the loading and
unloading of medical products and promotional
material), she began to suffer joint and back pain
which became progressively worse and, ultimately,
limited her movements. By 2002 she was diagnosed
with Rheumatoid Arthritis, Arterial Hypertension,
and Cardiac Arrhythmia. Due to her illnesses, she
developed major depression. Plaintiff had almost
daily crying spells, severe irritability, almost daily
insomnia, severe memory deficit, and severe
concentration deficit. Because of this condition,
plaintiff avers, that she was allegedly forced to take
leave from work from May 2003 to November 2003.
According to the complaint, both her physical and
emotional condition worsened during said leave.
Once she had to return to her employment as her
leave benefits expired, she filed an application for
LTD benefits and submitted the pertinent medical
information to Kemper Insurance Co. ("Kemper"),
the claims administrator for Astra's LTD policy.
Kemper ultimately denied plaintiff's LTD benefits.
She then requested a reconsideration and provided
further medical evidence. Notwithstanding, on March
3, 2004, plaintiff received a letter form Broadspire
Services, Inc. ("Broadspire"), Astra's LTD Insurance
Plan Administrator, denying the solicited benefits
based on a purported lack of medical evidence.
Plaintiff alleges that, by that time, her condition had
become so severe that she was forced to leave her
employment. Finally, plaintiff avers having
exhausted all administrative remedies.

   Now, pending before the Court are *Defendant's*
[Broadspire Service, Inc., and Lumbermens Mutual
Casualty Company (erroneously named in the
*Complaint* as Kemper Insurance Co.) ] *Rule 12(b)(6)*
*Motion to Dismiss Count II of the Plaintiff's*
*Complaint* (Docket No. 13); *Broadspire's Rule*
*12(b)(6) Motion to Dismiss* (Docket No. 11); and *Co-*
*defendant Astrazeneca's Motion to Dismiss Plaintiff's*
*Claims for Damages and to Strike Demand for Jury*
*Trial* (Docket No. 7).

II. MOTION TO DISMISS STANDARD R. 12(b)(6)
   *\*2* Under Rule 12(b)(6) of the Federal Rules of Civil
Procedure, a party may, in response to an initial
pleading, file a motion to dismiss the complaint for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 2
Slip Copy, 2006 WL 508095 (D.Puerto Rico)
**(Cite as: 2006 WL 508095 (D.Puerto Rico))**

failure to state a claim upon which relief may be granted. It is well-settled, however, that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *see also Miranda v. Ponce Fed. Bank,* 948 F.2d 41 (1st Cir.1991). The Court must accept as true "all well-pleaded factual averments and indulg[e] all reasonable inferences in the plaintiff's favor." *Aulson v. Blanchard,* 83 F.3d 1, 3 (1st Cir.1996) (citations omitted); *see also Berríos v. Bristol Myers Squibb Caribbean Corp.,* 51 F.Supp.2d 61 (D.Puerto Rico 1999). A complaint must set forth "factual allegations, either direct or inferential, regarding each material element necessary to sustain recovery under some actionable theory." *Romero-Barceló v. Hernández-Agosto,* 75 F.3d 23, 28 n. 2 (1st Cir.1996) (quoting *Gooley v. Mobil Oil Corp.,* 851 F.2d 513, 514 (1st Cir.1988)).

Therefore, in order to survive a motion to dismiss, plaintiff must set forth "factual allegations, either direct or inferential, regarding each material element necessary to sustain recovery." *Gooly v. Mobil Oil Corp.,* 851 F.2d 513 (1st Cir.1988). In sum, a claim shall be dismissed under Rule 12(b)(6) only if it appears beyond doubt that the pleader can prove no set of facts in support of the claim that would entitle the pleader to relief. *See Conley,* 355 U.S. at 78 (*emphasis added*).

However, the Court is not obligated to accept plaintiff's "bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like." *Aulson v. Blanchard,* 83 F.3d 1, 3 (1st Cir.1996). The Court must only accept those facts that are "well pleaded," limiting its inquiry into the allegations of the complaint. *Litton Indus., Inc. v. Colon,* 587 F.2d 70, 74 (1st Cir.1978). In sum, the Court's focus should always be on "whether a liberal reading of [the complaint] can reasonably admit of a claim...." *Id.; see also Rogan v. Menino,* 175 F.3d 75 (1st Cir.1998).

A district court's dismissal of a claim under Rule 12(b)(6) is reviewed *de novo* by the appeals court; such court "accept[s] as true all well-pleaded factual averments and indulg[es] all reasonable inferences in the plaintiff's favor." *Calderon Ortiz v. Laboy Alvarado,* 300 F.3d 60, 62-63 (1st Cir.2002); *SEC v. SG Ltd.,* 265 F.3d 42, 46 (1st Cir.2001). Accordingly, "if the facts contained in the complaint, viewed in this favorable light, justify recovery under any

applicable legal theory", any order of dismissal shall be set aside. *Calderon Ortiz,* 300 F.3d at 63; quoting, *Conley,* 355 U.S. at 45-46; *Aulson,* 83 F.3d at 3.

*\*3* Finally, "it is well established that affirmative defenses [such as time prescription] may be raised in a motion to dismiss an action for failure to state a claim". *Blackstone Realty LLC v. FDIC,* 244 F.3d 193, 197 (1st Cir.2001); *La Chapelle v. Berkshire Life Ins. Co.,* 142 F.3d 507, 509 (1st Cir.1998) ("In the case of the affirmative defense of statute of limitations, dismissal is entirely appropriate when the pleader's allegations leave no doubt that an asserted claim is time barred".); *Aldahonda-Rivera v. Parke Davis and Company,* 882 F.2d 590, 592 (1st Cir.1989) ("When a defendant raises an affirmative defense that is obvious on the face of plaintiff's pleadings, and the court makes the ruling based only on those pleadings, the motion is treated as a Rule 12(b)(6) motion to dismiss). In cases in which the affirmative defense is based on the statute of limitations, the Court may grant a motion to dismiss if the pleader's allegations leave no doubt that the asserted claim is time barred. *See, Street v. Vose,* 936 F.2d 38, 39 (1st Cir.1991); *Kali Seafood Inc. v. Howe Corp.,* 887 F.2d 7, 9 (1st Cir.1989). *See also Estate of Alicano-Ayala v. Philip Morris, Inc.,* 263 F.Supp.2d 311, 315 (D.P.R.2003).

## III. ANALYSIS

1. *Broadspire/Lumbermens, and Astra's UNOPPOSED Motions to Dismiss:* (Docket Nos. 13, and 7, respectively)

Count II of the *Complaint* seeks an award of $150,000.00 for the alleged pain and suffering plaintiff suffered due to the defendants' "unreasonable and completely bad faith basis" when denying her LTD benefits claim. Count II also moves the Court to award an amount of no less than $75,000.00 for the allegedly severe mental anguish co-plaintiff Luis F. Cabrera, plaintiff-employee's husband, suffered due to defendant's purported gross negligence in not providing long term disability benefits to Ms. Lopez. The awards sought through Count II of the *Complaint* are pursuant to state law-- 31 P.R. Laws Ann. § 5141.

Broadspire and Lumbermens quite succinctly argue in their request that this type of local claim is preempted and superceded by ERISA, and, thus, should be dismissed with prejudice. Although Broadspire and Lumbermens do not cite any case law or specific statute to support their argument, they do specifically request the Court to allow their joinder to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Astra's motion to dismiss plaintiffs' claims for damages and to strike the demand for jury trial. Accordingly, the Court now proceeds to analyze Astra's request.

Through Astra's request all defendants in the instant case request, not only that Count II be dismissed inasmuch as ERISA does not authorize damages and preempts state causes of action related to LTD plans, but also that co-plaintiff husband's claims be dismissed provided that ERISA also preempts such claim and does not make available any remedies as to him. Finally, defendants further move the Court to strike plaintiffs' request for a jury trial due to the fact that, under ERISA, jury trials are not available in LTD benefits claims.

*4 In particular, Section 514(a) of ERISA preempts any and all state law an causes of action that may be related to employee benefit plans. *See* 29 U.S.C. § 1144(a). Moreover, as has been consistently held in following the Supreme Court's mandates that, "[p]reemption is [to be] broadly applied, and state laws which affect the interpretation or implementation of a plan are preempted even if not inconsistent with ERISA's substantive provisions or specifically designed to target employee benefit plans." *Rodriguez Hernandez v. National Life Ins. Co.,* Civil No. 04-1096(HL), 2005 U.S. Dist. LEXIS 23271, at *11 (D.P.R. Jul. 12, 2005); *see also District of Columbia v. Greater Washington Bd. Of Trade,* 506 U.S. 125, 113 S.Ct. 580, 121 L.Ed.2d 513 (1992); *Mackey v. Lanier Collection Agency & Serv.,* 486 U.S. 825, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988); *Pilot Life Ins. Co. v. Dedaux,* 481 U.S. 41, 47-48, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987); *Metro Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 739, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985); *Shaw v. Delta Airlines, Inc.,* 463 U.S. 85, 98, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983); *Otero Carrasquillo v. Pharmacia,* 382 F.Supp.2d 300, 314-15 (D.P.R.2005); *Alamo Rodriguez v. MCS Life Ins. Co.,* 283 F.Supp.2d 459, 467 (D.P.R.2003; *Framingham Union Hosp., Inc. v. Travelers Ins. Co.,* 721 F.Supp. 1478, 1489 (D.Mass.1989). However, it has been equally established that preemption cannot take place where the state law has only a "tenuous, remote, or peripheral" connection with covered plans. *District of Columbia v. Greater Washington,* 506 U.S. at 121.

The express preemption provisions of ERISA are deliberately expansive, and designed to "establish pension plan regulation as exclusively a federal concern." *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). ERISA's

sweeping preemption clause, 29 U.S.C. § 1144(a), declares that with some exceptions not relevant to this case, ERISA supersedes "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" (*emphasis added*). In turn, a law "relates to" an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan. *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983). However, "a state law may 'relate to' an employee benefit plan and thereby be preempted, even if the law is not specifically designed to affect such plans and even if its effect is indirect." *Rosario-Cordero v. Crowley Towing & Transp. Co.,* 46 F.3d 120, 122-123. Also a state law may relate to an employee benefit plan even if it does not conflict with ERISA's own requirements and represents an otherwise legitimate state effort to impose or broaden benefits for employees. *See Simas v. Quaker Fabric Corp. of Fall River,* 6 F.3d 849 (1st Cir.1993).

The Supreme Court has held that ERISA's "preemptive force 'is so powerful as to displace entirely any state cause of action[.]'" ' *Pilot Life Ins. Co.,* 481 U.S. at 44, 107 S.Ct. at 1551 quoting *Franchise Tax Bd. v. Construction Laborers Vac. Trust,* 463 U.S. 1, 23, 103 S.Ct. 2841, 2853, 77 L.Ed.2d 420 (1983); *FMC Corp. v. Holiday,* 498 U.S. 52, 58, 111 S.Ct. 403, 407, 112 L.Ed.2d 356 (1990) ("the [ERISA] preemption clause is conspicuous for its breadth"). "Section 1144(a) of ERISA has the effect of preempting any state statue dealing with benefit plans covered under ERISA 'even if the law is not specifically designed to affect such plans, or the effect is only indirect.'" *Cintron Parrilla v. Lilly Del Caribe,* Inc., 32 F.Supp.2d 35, FN1 (1st Cir.1998) *quoting Greater Washington Bd.,* 506 U.S. 125, 113 S.Ct. 580, 121 L.Ed.2d 513.

*5 These "powerful" preemption provisions, *Pilot Life Ins.,* 481 U.S. at 44, containing elongated federal reach have been justified by the "Congress' desire to avoid a 'patchwork scheme of regulation [which] would introduce considerable inefficiencies in benefit program operation." ' *McCoy v. Massachusetts Institute of Technology,* 950 F.2d 13, 18 (1st Cir.1991) (*citation omitted* ). In enacting ERISA's preemption provision, which preempts all state laws that relate to an employee benefit plan, "Congress intended to bring uniformity to this area by eliminating the 'threat of conflicting or inconsistent State and local regulation.'" ' *Boston Mut. Ins. v. Murphree,* 242 F.3d 899, 902 (9th Cir.2001) (*citation omitted* ). In conclusion, if a state law "relates to" an employee benefit plan, it is undoubtedly preempted.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The Court harbors no doubt that the causes of action asserted in the *Complaint* directly "relate to" an employment benefit plan and therefore fall under ERISA's express preemption clause, and as such the field has been occupied by federal law.

Considering the restrictive scope of ERISA's civil enforcement scheme, this Court finds that plaintiffs' assertion of claims for benefits under ERISA-regulated plan falls within its expansive clauses exclusive of state action. In sum, throughout the entire *Complaint,* plaintiffs repeatedly refer to the LTD plan in the causes of action for emotional distress. Furthermore, the basis of their negligent and/or intentional infliction of emotional distress claims depends exclusively upon defendants' failures to be forthcoming and reasonable when determining that plaintiff-wife was not to be provided the long term disability benefits she was allegedly entitled to under the Plan. For the foregoing reasons, this Court concludes that the plaintiffs' state law claims for damages under Article 1802 of the Puerto Rico Civil Code, 31 P.R. Laws Ann. § 5141 are preempted by federal law, and, thus must be DISMISSED because the only duty of defendant is under Section 502(a), 29 U.S.C. § 1132(a) which does not contemplate damages. Section 502(a) provides for a remedy "to secure benefits under the plan, rather than damages for the breach of the plan". *Hampers v. W.R. Grace & Co.,* 202 F.3d 44, 55 (1st Cir.2000). [FN1]

> FN1. *See also Aetna Health Inc. v. Davila,* 542 U.S. 200, 124 S.Ct. 2488, 2496, 159 L.Ed.2d 312 (2004) (holding that the exclusive remedy is the granting of the benefits under ERISA).

Having dismissed the state law claims, defendants' request to dismiss the claims brought forth by Mr. Cabrera--plaintiff-husband--now becomes MOOT provided that it stems from the *Complaint* that said state law damages claim was the only claim instituted by plaintiff-husband. Finally, as for the defendants' request to strike plaintiffs' request for jury trial, the Court understands that, although ERISA does not expressly grant the right to a trial by jury, it does not categorically deny it either. However, it has been previously held that jury trials would be unsuitable where the nature of the claim being requested is strictly equitable in nature. *See Padilla de Higginbotham v. Worth Publishers, Inc.,* 820 F.Supp. 48 (D.P.R.1993); *see generally Liston v. UNUM Corporation Officer Severance Plan,* 330 F.3d 19, (1st Cir.2003) and citations therein. Moreover, the Circuit Courts that have considered the question have

concluded that juries are not available for ERISA benefit claims. *Id.* Because claims for benefits under ERISA are equitable in nature, [FN2] right to jury trial is inapposite.

> FN2. *See generally Tischmann v. ITT/Sheraton Corp.,* 145 F.3d 561 (2nd Cir.1998), *cert. denied* 525 U.S. 963, 119 S.Ct. 406, 142 L.Ed.2d 329; *Adams v. Cyprus Amax Minerals Co.,* 149 F.3d 1156 (10th Cir.1998); *Turner v. Fallon Community Health Plan, Inc.,* 953 F.Supp. 419 (D.Mass.1997), *aff'd* 127 F.3d 196 (1st Cir.)

*2. Broadspire's Rule 12(b)(6) Motion to Dismiss:*

*\*6* Broadspire moves the Court to dismiss al claims against it arguing that, as the third party claims administrator, it is not a proper defendant in the action. Boradspire further argues, citing to § 1132(d)(2), that no individual capacity claims have been averred against it, thus, plaintiffs failed to properly state a claim against it. Accordingly, since plaintiff cannot establish that it will be liable for the payment of benefit claims, Broadspire concludes that it must be dismissed from the instant claim. Plaintiffs, on the other hand, contend that Broadspire did not establish that it was not acting as a delegate of the plan. Plaintiffs also understand that, having Broadspire's Appeal Committee been the party to re-affirm the original denial of benefits, Broadspire was, in fact, acting as a delegate of the plan and, as such, granted the discretionary authority to review claims and decide upon them. Consequently, plaintiffs allege, Broadspire is certainly an appropriate party to the instant claim.

At this very early point in the proceedings the Court, having accepted all well pleaded facts, made all reasonable inferences in plaintiffs' favor, and having made a liberal reading of the complaint, as we are required to do under *Aulson,* deems that plaintiffs sufficiently set forth "factual allegations necessary to sustain recovery from Broadspire (the Plan Administrator). It is not clear to the Court "that plaintiff can prove no set of facts in support of [her] claim" warranting potential relief. *Conely v. Gibson,* 355 U.S. at 45- 46. Hence, the Court cannot dismiss the claims against Broadspire when it is unclear if Broadspire was acting as a delegate of the plan when it's Appeals Committee denied plaintiffs' claim.

IV. CONCLUSION

For the foregoing reasons, the Court rules as follows:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 5
Slip Copy, 2006 WL 508095 (D.Puerto Rico)
**(Cite as: 2006 WL 508095 (D.Puerto Rico))**

 1. All state law claims for damages are hereby
DISMISSED;
 2. Request for Jury Trial is STRICKEN;
 3. Motion to Dismiss as to Broadspire (Docket No.
11) is DENIED WITHOUT PREJUDICE as to
latter being filed under Summary Judgment
Standard. *See Conely v. Gibson,* 355 U.S. at 45-46.

IT IS SO ORDERED.

Slip Copy, 2006 WL 508095 (D.Puerto Rico)


 **Motions, Pleadings and Filings (Back to top)**

• 3:05cv01285 (Docket) (Mar. 14, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT F



Not Reported in F.Supp.2d                                                                Page 1
Not Reported in F.Supp.2d, 2005 WL 2203172 (D.N.H.), 36 Employee Benefits Cas. 1640, 2005 DNH 127
**(Cite as: 2005 WL 2203172 (D.N.H.))**

**c**

**Motions, Pleadings and Filings**

NOT FOR PUBLICATION

United States District Court,
D. New Hampshire.
Don M. TYNAN, Plaintiff
v.
AMERICAN AIRLINES, INC. Pilot Retirement
Benefit Program, Defendant
**No. 04-CV-335-SM.**

Sept. 9, 2005.
Stanley H. Robinson, Robinson Law Office,
Franklin, NH, for Plaintiff.

Daniel E. Will, Devine Millimet & Branch PA,
Manchester, NH, Kevin L. Wright, Littler Mendelson
PC, Washington, DC, for Defendant.

*ORDER*

MCAULIFFE, Chief J.

*1 Plaintiff, a retired airline pilot, brings suit
pursuant to section 502(a) of the Employee
Retirement Income Security Act of 1974, 29 U.S.C. §
1132(a) ("ERISA"), challenging the defendant
retirement plan's decision to recoup excess benefit
payments that were mistakenly paid to him. Plaintiff
says the plan's decision to recoup "was both arbitrary
and capricious." Complaint at para. 7. Defendant
moves for summary judgment, asserting that its
decision to recover overpayments (and the means by
which it plans to recover them) was neither arbitrary
nor capricious. Plaintiff objects. For the reasons
given below, defendant's motion for summary
judgment is granted.

Standard of Review
When ruling on a party's motion for summary
judgment, the court must "view the entire record in
the light most hospitable to the party opposing
summary judgment, indulging all reasonable
inferences in that party's favor." *Griggs-Ryan v.
Smith,* 904 F.2d 112, 115 (1st Cir.1990). Summary
judgment is appropriate when the record reveals "no
genuine issue as to any material fact and ... the

moving party is entitled to a judgment as a matter of
law." Fed.R.Civ.P. 56(c). In this context, "a fact is
'material' if it potentially affects the outcome of the
suit and a dispute over it is 'genuine' if the parties'
positions on the issue are supported by conflicting
evidence." *Intern'l Ass'n of Machinists and
Aerospace Workers v. Winship Green Nursing Ctr.,
103 F.3d 196, 199-200 (1st Cir.1996)* (citations
omitted).

Background
Plaintiff was employed by American Airlines from
1965 until his retirement in 1984. He participated in
the American Airlines, Inc., Pilot Retirement Benefit
Program (the "Program"). Upon his retirement,
plaintiff began receiving retirement benefits from two
plans administered by the Program: the Fixed Income
Plan and the Variable Income Plan. Plaintiff and his
wife subsequently divorced and, in December of
1996, the Program received a state-court qualified
domestic relations order ("QDRO") awarding one-
half of plaintiff's benefits under each plan to his
former wife. Accordingly, in February of 1997, the
Program notified plaintiff that it had received a copy
of the QDRO and that it met the requirements of the
Retirement Equity Act of 1984. Defendant's Exhibit
B (Part 3) at AA-120. Then, in March of 1997, the
Program notified plaintiff that, pursuant to the
QDRO, monthly benefit checks sent to him under
each plan would be reduced by fifty percent. Included
with that letter was a statement disclosing exactly
how much he should expect to receive each month
from each plan. Defendant's Exhibit B (Part 3) at
AA-0122 through AA-0124.

In March of 1997, plaintiff received the proper
(reduced) benefit checks from both plans. Thereafter,
however, due to an error on the part of the Program
(or its bank), plaintiff began receiving checks in the
original (unreduced) amount from the Variable
Income Plan; the benefit checks he received from the
Fixed Income Plan, however, continued to be reduced
by fifty percent. The monthly payments made by the
two plans to plaintiff's former wife appear not to have
been adversely affected. That is to say, she has
consistently received monthly checks from each plan
that properly reflect her entitlement to fifty percent of
plaintiff's benefits.

*2 Plaintiff did not report the payment error to the
Program. And, the Program did not notice the error

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 2
Not Reported in F.Supp.2d, 2005 WL 2203172 (D.N.H.), 36 Employee Benefits Cas. 1640, 2005 DNH 127
(Cite as: 2005 WL 2203172 (D.N.H.))

for approximately six years, at which point an audit revealed that it had been over-paying plaintiff as well as two other beneficiaries of the Program. During that six-year period, plaintiff received $118,150.90 in overpayments from the Variable Income Plan.

Once the Program became aware of the overpayments, it notified plaintiff of the error. It then calculated the total amount of those overpayments and suspended payments to him from the Variable Income Plan in an effort to recover the sums paid in error by offset. Although it claims it was legally entitled to do so, the Program did not suspend any payments to plaintiff from the Fixed Income Plan, nor did it sue him in an effort to recover the overpaid amounts in a lump sum. *See* Defendant's Reply Memorandum at 7 n. 2. The Program says it decided to recover the overpayments by suspending payments under the Variable Income Plan after taking into account: (1) plaintiff's age (72); (2) the amount that he was scheduled to receive each month from the Variable Income Plan ($1,300); (3) his life expectancy; (4) the amount of time it would take to recover the sums erroneously paid to him (approximately seven years); and (5) the effect its planned recoupment efforts would have on both the Variable Income Plan and plaintiff.

Plaintiff administratively appealed the decision to suspend payments under the Variable Income Plan to the Pension Benefit Administration Committee. After reviewing plaintiff's appeal, the Committee rejected his assertion that he was unaware of the payment error. Instead, it concluded that he knew he was receiving twice the benefits to which he was entitled under the Variable Income Plan and, nevertheless, failed to report the error to the Program.

> In light of the information provided to Mr. Tynan regarding his QDRO and the Pension Administration Benefit Authorization, it is evident that American Airlines notified Mr. Tynan of his reduced monthly pension benefit payment. Yet, when he continued to receive twice that amount for six years, he chose to accept the overpayment and did not report it to the Company.

Defendant's Exhibit B (Part 1), at AA-0007. Accordingly, plaintiff's appeal was denied. This proceeding ensued.

## Discussion
### I. *Plaintiff's Equitable Argument.*

The parties agree that the Program documents vest the Plan Administrator with discretionary authority to determine eligibility for benefits and to construe the

terms of the Program. *See* Defendant's Exhibit A (Part 4) at AA-0296, Section 16.7 of the Program document. Accordingly, this court applies the familiar "arbitrary and capricious" standard to the Plan Administrator's decision to recoup the over-payments by suspending plaintiff's benefits under the Variable Income Plan. That same deferential standard of review applies to the factual determinations upon which the Program relied in reaching that decision. *See generally Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).* Under the applicable standard of review, then, the administrator's decision "will not be disturbed if reasonable." *Id.* at 111.

\*3 The pertinent language of the Program's governing document provides that:

> If any error, including an error resulting from any statement made or omitted to be made by any Member, surviving spouse or Beneficiary in any document or other information required to be submitted in connection with the Plan, *shall result in the payment to any individual or entity of more or less than such person would have received but for such error,* the Administrator *may correct such error and adjust payments hereunder* as far as possible, in such manner that the Actuarial Equivalent of the benefit to which such person was correctly entitled shall be paid.

Defendant's Exhibit A (Part 4) at AA-296, Section 16.8 of the Program document (emphasis supplied). Plaintiff does not dispute that the overpayments made to him by the Variable Income Plan total $118,150.90. Nor does he challenge defendant's right, under both the terms of the Program documents and applicable trust law, to seek recoupment. *See generally Hoffa v. Fitzsimmons, 673 F.2d 1345, 1354 (D.C.Cir.1982)* ("[W]hen a trustee overpays a beneficiary the trustee is entitled to recover the excess payment, even when it was the product of unilateral mistake on the part of the trustee.") (citations omitted).

Nevertheless, plaintiff says he should not have to repay the Program for the sums erroneously paid to him or, at the very least, that those monies should be recovered in a more "equitable" manner. [FN1] *See* Plaintiff's memorandum (document no. 9) at 1 ("The question before the Court is not whether the Defendant has a legal right to seek recoupment, but whether the method and manner of recoupment implemented is equitable."). In support of that position, plaintiff invokes an equitable exception to the plan's legal right to recoup:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 3
Not Reported in F.Supp.2d, 2005 WL 2203172 (D.N.H.), 36 Employee Benefits Cas. 1640, 2005 DNH 127
(Cite as: 2005 WL 2203172 (D.N.H.))

FN1. Plaintiff does not, however, suggest what he believes would be a more equitable repayment plan.

[R]ecovery [of excess benefits paid in error] is precluded if the beneficiary, in reliance on the correctness of the amounts of benefits, changes his position so that it would be inequitable to compel him to make restitution.

Plaintiff's memorandum at 2 (citing *Thorn v. U.S. Steel & Carnegie Pension Fund,* No. CV-P-1829-S, slip op. at 3 n. 6 (M.D.Ala.1983) and Restatement (Second) Trusts § 254, cmt. e).

This case is somewhat atypical in that plaintiff acknowledges the Program's *legal* entitlement to seek reimbursement of the excess benefits paid to him in error, but claims principles of *equity* foreclose (or, at a minimum, limit) such recovery, given the particular circumstances of this case. Along those lines, plaintiff points out that: (1) the amount of the overpayments made to him is substantial and recovering those sums, even if done over the course of several years, would place an undue financial strain on him in retirement; (2) despite the Program's conclusion to the contrary, he maintains that he never realized that he was being overpaid by the Variable Income Plan; and (3) he reasonably relied upon the Program to insure that payments made to him were correct. In short, plaintiff asserts that it would be unfair to allow the Program to recover the overpayments in the manner it has selected and, therefore, he says equity should intervene to prevent such a result. [FN2]

FN2. Plaintiff does not advance any equitable defenses to the Program's effort to recover the excess benefits mistakenly paid to him, such as laches (i.e., unreasonable delay once the overpayments were discovered) or equitable estoppel (i.e., the plan's knowingly false representation of the benefits to which plaintiff was entitled, with the intent to induce reliance thereon). But, that failing is not necessarily dispositive. *See, e.g., Texaco Puerto Rico, Inc. v. Dept. of Cons.Affairs,* 60 F.3d 867, 878 (1st Cir.1995) ("[A]s part of balancing the equities, the court looks at the conduct of both parties and the potential hardships that might result from a judicial decision either way. From a practical standpoint, then, even when an equitable defense does not bar the claim, the total balance of equities and hardships might do so.") (citations and

internal punctuation omitted).

II. *ERISA and Federal Courts' Equitable Powers.*

**\*4** Plaintiff asserts that the Program's decision to suspend his payments under the Variable Income Plan until all excess payments are recouped by offset was arbitrary and/or capricious. Thus, he couches his argument in familiar ERISA terms. But, at the same time, he acknowledges that the plan is entitled (under both the Program documents and applicable trust law) to recover the sums that were paid to him in error. So, rather than challenging the Program's decision on legal grounds, he has chosen to challenge it on equitable grounds. Thus, it would seem that what plaintiff really seeks is relief in the nature of an injunction precluding the plan from exercising (or at least limiting the exercise of) its right to recover the overpayment. *See generally* 29 U.S.C. § 1132(a)(3) (authorizing an ERISA-governed plan beneficiary to sue the plan to obtain "other appropriate equitable relief.").

The scope of this court's equitable authority in the ERISA context is not well-defined. It would appear, however, to extend to the issuance of injunctive relief of the type plaintiff (implicitly) seeks. *See generally Mertens v. Hewitt Assocs.,* 508 U.S. 248, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993) (narrowly interpreting the phrase "other appropriate equitable relief," as used in 29 U.S.C. § 1132(a) to include only "those categories of relief that were *typically* available in equity (such as injunction, mandamus, and restitution ... ).") (emphasis in original). *See also Wells v. U.S. Steel & Carnegie Pension Fund, Inc.,* 950 F.2d 1244, 1251 (6th Cir.1991) ("Although the Plan language permits recoupment, this court is concerned with the possible inequitable impact recoupment may have on the individual retirees.... We thus remand this case to the district court to consider whether, under principles of equity or trust law, relief is unwarranted); *Butler v. Aetna U.S. Healthcare, Inc.,* 109 F.Supp.2d 856, 862 (S.D.Ohio 2000) ("[W]ithout question, the plan grants [defendant] a *legal* right to withhold [plaintiff's] entire monthly benefit award until it recoups the overpayment caused by her retroactive receipt of Social Security Disability benefits ... [H]owever, ... *equitable* principles may limit an ERISA fiduciary's legal right to recoup an overpayment of benefits.") (emphasis in original). So, for purposes of resolving plaintiff's claim, the court assumes it has the equitable authority to enjoin the Program from recovering the excess benefit payments erroneously made to plaintiff, or recovering them in a particular manner.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 4
Not Reported in F.Supp.2d, 2005 WL 2203172 (D.N.H.), 36 Employee Benefits Cas. 1640, 2005 DNH 127
**(Cite as: 2005 WL 2203172 (D.N.H.))**

Turning to the merits, it is apparent on this record that plaintiff has failed to demonstrate that he is entitled to such equitable relief. The Program, through the Pension Benefit Administration Committee, supportably and plausibly concluded that plaintiff was well aware of the continuing overpayments but elected not to report them to the Program, choosing instead to retain the benefit of the Program's obvious error. The record before the Committee supports that decision, particularly given the fact that: (1) plaintiff was notified in writing of the precise amount by which his benefits under each plan would be reduced; and (2) after one month of correct (reduced) benefit payments, those under the Variable Income Plan reverted to their full, unreduced amount, while those under the Fixed Income Plan continued to be properly reduced by fifty percent--a situation that could not have escaped plaintiff's notice. Nothing in plaintiff's filings, except his general denial of any knowledge of the error, undermines the Program's conclusion that he was aware of the payment error but chose to remain silent.

*5 Consequently, the court cannot find that the Program acted arbitrarily or capriciously when it concluded that plaintiff *was* aware that, each month for six years, he was receiving twice the amount that he should have been receiving from the Variable Income Plan while receiving a benefit reduced by half from the Fixed Income Plan and, nevertheless, chose not to report that error. In turn, that supportable factual finding precludes plaintiff from invoking principles of equity in an effort to defeat the Program's legitimate efforts to recoup funds properly belonging to the Variable Income Plan.

For equity to intervene on plaintiff's behalf in a case such as this, at least two related elements would have to be present. First, plaintiff's reliance on the Program to send him the correct amount each month, and the related assumption that he was entitled to the full amount of the payments he received, would have to be reasonable. Neither assumption is reasonable. On two occasions (February 6 and March 3, 1997), plaintiff was notified that all future monthly benefits would be reduced as a result of the QDRO. In the latter communication, the Program provided plaintiff with an itemized statement, specifically notifying him of the reduced amount he should expect to receive each month from both the Fixed and Variable Income Plans. Given that detailed level of information, it was not reasonable for plaintiff to have remained silent when, after one month of correct payments, he began

(and continued) receiving *twice* the proper amount from the Variable Income Plan, despite the fact that his benefits under the Fixed Income Plan continued at one-half of the previous level.

Second, for plaintiff to invoke principles of equity to block reimbursement, he must appear before the court with "clean hands." *See, e.g., Texaco Puerto Rico,* 60 F.3d at 880 ("It is old hat that a court called upon to do equity should always consider whether the petitioning party has acted in bad faith or with unclean hands."). Given his knowledge of the Program's mistake, as plausibly and supportably found by the Committee, and given the fact that he did nothing to notify the Program of the continuing error, choosing instead to accept the benefit of the erroneous payments, plaintiff does not have "clean hands" in this matter.

Conclusion

In light of the foregoing, the court concludes that the Program did not act arbitrarily or capriciously when it decided to suspend plaintiff's monthly benefits under the Variable Income Plan until the sums erroneously paid to plaintiff are recovered. In fact, because the Program might well have sought recovery of those funds in a lump sum, rather than over time, its decision is fairly characterized as reasonable.

It goes without saying that plaintiff would prefer that the Program recover the sums owed over a longer period of time (if at all), thus imposing less of a financial strain upon him. But, the Program's decision to recover the overpayments over the course of seven years, rather than in a lump sum and without suspending his monthly benefits under the Fixed Income Plan, exhibits appropriate sensitivity to his current circumstances, and demonstrates a reasonable effort to balance the Plan Administrator's fiduciary duty to the Program's members in general (i.e., the obligation to recover the overpayments for the benefit of the trust and all its beneficiaries) with its desire to minimize the economic hardship felt by plaintiff in repaying what he unquestionably owes. *See generally Hoffa* 673 F.2d at 1354 n. 27 ("It thus appears that, in compelling overpaid beneficiaries to restore the trust res the excess amount, courts are primarily concerned with possible inequity to other beneficiaries."). [FN3]

> FN3. Parenthetically, the court notes that in *Hoffa,* the Court of Appeals for the Sixth Circuit pointed out that defendants had, pursuant to an indemnification agreement with the plan, already made the plan whole

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 5
Not Reported in F.Supp.2d, 2005 WL 2203172 (D.N.H.), 36 Employee Benefits Cas. 1640, 2005 DNH 127
**(Cite as: 2005 WL 2203172 (D.N.H.))**

for the overpayments at issue. Thus, regardless of the outcome of that litigation, no beneficiary of the trust would be harmed, because the plan itself would not incur any loss, nor would it reap any windfall. In this case, however, plaintiff has not pointed to anything suggesting that a third party has made (or will make) the Program whole, should it be unable to recover the overpayments made to plaintiff. Thus, if this court were to enjoin the Program from collecting those sums from plaintiff, the other beneficiaries of the Variable Income Plan would be adversely affected to some degree, albeit minimally.

**\*6** Finally, while the court might, under appropriate circumstances, possess equitable authority to enjoin an ERISA-governed plan from recovering excess benefit payments erroneously made to a plan beneficiary, this is not a case in which the exercise of that authority would be appropriate. In the end, the question posed by this case is whether the financial burden caused by the overpayments made by the Program, but knowingly retained by plaintiff, should be borne by plaintiff or the other beneficiaries of the plan. Principles of equity dictate that plaintiff bear that burden. To determine otherwise, would condone unjust enrichment.

Defendant's motion for summary judgment (document no. 8) is granted. The Clerk of Court shall enter judgment in accordance with this order and close the case.

SO ORDERED.

Not Reported in F.Supp.2d, 2005 WL 2203172 (D.N.H.), 36 Employee Benefits Cas. 1640, 2005 DNH 127

**Motions, Pleadings and Filings (Back to top)**

• 2004 WL 3127680 (Trial Pleading) Complaint under Section 502(a) of the Employee Retirement Income Security Act of 1974 (Sep. 3, 2004)

• 1:04cv00335 (Docket) (Sep. 03, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT G



Slip Copy                                                          Page 1
Slip Copy, 2006 WL 2042373 (D.Mass.)
**(Cite as: 2006 WL 2042373 (D.Mass.))**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Massachusetts.
Shannon DENNEHY, Personally and as
Administratrix of the Estate of Daniel H.
Dennehy, Plaintiff
v.
Florence M. DENNEHY, Donna L. Goulet and
Metropolitan Life Insurance Company,
Defendants.
**Civil Action No. 05-12204-GAO.**

July 20, 2006.
Edward J. Hayes, Hayes & Hayes LLC, North
Reading, MA, for Plaintiff.

Thomas Kirwan MacMillan, MacMillan Law
Offices, Bradford, MA, Constance M. McGrane,
James F. Kavanaugh, Jr., Conn, Kavanaugh,
Rosenthal, Peisch & Ford, LLP, Boston, MA, for
Defendants.

*ORDER*

O'TOOLE, D.J.

*1 Shannon Dennehy commenced this action in
Massachusetts Superior Court in 2004, alleging on
behalf of herself and the estate of her father, Daniel
H. Dennehy, that Florence M. Dennehy (Daniel
Dennehy's mother) and Donna L. Goulet (Daniel
Dennehy's sister) had committed fraud and
conversion. Among the fraud and conversion
allegations is a claim that Florence Dennehy and
Donna Goulet had shortly before Daniel Dennehy's
death submitted a change of beneficiary form to
Daniel Dennehy's life insurance policy administrator,
MetLife. [FN1] Shannon Dennehy alleges that she
had been the named beneficiary on her father's life
insurance policy since November 1986 and that he
had assured her up through the time of his death that
she was the beneficiary of the life insurance plan.
Shortly after her father's death, MetLife paid the
proceeds of the policy to the newly named
beneficiary, Florence Dennehy. Shannon Dennehy
alleges that Florence Dennehy and Donna Goulet

fraudulently obtained the change of benefits form and
submitted it to Daniel Dennehy's insurer, changing
the named beneficiary to someone other than herself.
She also makes a claim for the full insurance
proceeds under a conversion theory.

> FN1. This life insurance policy had been
> provided to Daniel Dennehy by his
> employer Lucent Technologies, Inc.

In early October 2005, the plaintiff filed, with leave
of the state court, what she called a "Third Party
Complaint." The pleading is more accurately
considered an amendment to the original complaint.
It added a new claim against a new defendant,
Metropolitan Life Insurance Company (MetLife).
[FN2] The gist of the new claim against MetLife is
that MetLife was negligent in distributing the
proceeds from Daniel Dennehy's life insurance policy
to Florence Dennehy because two beneficiary
designation forms submitted in September 2002,
which named Florence Dennehy as beneficiary and
Donna Goulet as contingent beneficiary, allegedly
were not signed by Daniel Dennehy. The plaintiff
alleges that MetLife breached a duty to issue
payment to her as the named beneficiary designated
by the 1986 beneficiary designation form, and she
seeks as damages the full amount of the insurance
proceeds distributed, which she claims would have
gone to her but for the negligence of MetLife.

> FN2. The "Third Party Complaint"
> erroneously identified this defendant as
> MetLife Group, Inc.

MetLife removed this case to this Court on the
ground that the claim against it relates to the Lucent
Technologies Employee Welfare Benefit Plan ("the
Plan"), an employee welfare benefit plan governed by
the Employee Retirement Income Security Act
(ERISA), 29 U.S.C. § § 1001 *et. seq.* MetLife has
now moved for judgment on the pleadings in its favor
as to the single claim asserted against it.

I conclude that MetLife's unopposed motion for
judgment on the pleadings ought to be allowed. The
claim against MetLife purports to be one based on a
state law negligence theory. Such a claim is
preempted by ERISA. *See* 29 U.S.C. § 1144(a)
(stating that ERISA "shall supersede any and all State
laws insofar as they may now or hereafter relate to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                            Page 2
Slip Copy, 2006 WL 2042373 (D.Mass.)
**(Cite as: 2006 WL 2042373 (D.Mass.))**

any employee benefit plan"); *Egelhoff v. Egelhoff,* 532 U.S. 141, 146-47 (2001); *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 52-53 (1987); *Hotz v. Blue Cross and Blue Shield of Mass.,* 292 F.3d 57, 60 (1 st Cir.2002); *see also Metropolitan Life Ins. Co. v. Flinkstrom,* 303 F.Supp.2d 34, 40 (D .Mass.2004). To the extent that the complaint might be construed as attempting to assert a claim under ERISA, it does not appear to state any cognizable cause of action under ERISA's civil enforcement provisions. The plaintiff has come forward with no argument as to why her claim is permitted under ERISA.

**\*2** Accordingly, MetLife's Motion for Partial Judgment on the Pleadings (Dk. # 15) is GRANTED. A separate judgment in MetLife's favor shall enter forthwith in accordance with Fed.R.Civ.P. 54(b).

The remaining claims are all based on state law theories as to which original jurisdiction in this Court is not proper. Accordingly, the case is REMANDED to the Essex County Superior Court, from which it was removed.

It is SO ORDERED.

Slip Copy, 2006 WL 2042373 (D.Mass.)

**Motions, Pleadings and Filings (Back to top)**

• 2006 WL 1033062 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Defendant's Motion for Judgment on the Pleadings (Mar. 31, 2006)Original Image of this Document (PDF)

• 2005 WL 3534163 (Trial Pleading) Answer of Metlife to "Third Party Complaint" (Nov. 9, 2005)Original Image of this Document (PDF)

• 1:05cv12204 (Docket) (Nov. 3, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT H

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1477175 (D.Mass.), 28 Employee Benefits Cas. 2126
(Cite as: 2002 WL 1477175 (D.Mass.))

C

United States District Court, D. Massachusetts.
Joyce DiGIOVANNI, Plaintiff
v.
THE GUARDIAN LIFE INSURANCE COMPANY
OF AMERICA, Defendant
No. CIV.A. 98-10908-GAO.

June 28, 2002.

MEMORANDUM AND ORDER

OTOOLE, D.J.

*1 The plaintiff, Joyce DiGiovanni, alleges that the defendant, The Guardian Life Insurance Company of America ("Guardian"), her former employer and insurer, denied her total disability benefits in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § § 1001 et seq., (Counts I and IV, and V) [FN1], that Guardian failed to administer the plan with the care, skill, prudence and diligence required by 29 U.S.C. § 1104(a)(1)(B) (Count II), and that Guardian did not give timely notice of the opportunity for continued health care coverage in violation of the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), 29 U.S.C. § 1161 et seq. (Count III). Guardian counterclaimed seeking repayment of amounts it advanced to DiGiovanni that are offset by her receipt of Social Security benefits. Guardian has moved for summary judgment on all claims (Docket No. 34). The motion is GRANTED as to Counts I, II, IV, and V and as to Guardian's counterclaim. On the other hand, on the undisputed facts judgment shall enter for DiGiovanni on Count III.

> FN1. Count I seeks damages pursuant to 29 U.S.C. § 1132(a)(1)(B). Count IV seeks a declaratory judgment pursuant to 29 U.S.C. § 1132(a)(3)(B). Count V seeks an injunction pursuant to § 1132(a)(3)(A).

I. Background

In December 1987, Guardian hired DiGiovanni as a medical claims analyst in its Norwell, Massachusetts office. Compl. ¶ 11; DiGiovanni Aff. ¶ 10. DiGiovanni was approximately 34 years old; prior to accepting the position, she had been a housewife. DiGiovanni Aff. ¶ ¶ 29, 30. The parties dispute her

exact job description, but the plaintiff claims that her primary duty was to enter data into a computer "eight hours a day, five days a week" and that her pay was based on the amount of information she processed. DiGiovanni Aff. ¶ ¶ 15, 16. Guardian offers a written job description for DiGiovanni's position, group claims approver, indicating that her duties included, but were not limited to, reviewing and approving claims for payment or denial, evaluating questionable claims, and referring claims to a senior approver or supervisor. [FN2] The job description states that the position requires a high school diploma or equivalent work experience and math and communications skills. Ryan Aff. Ex. D at 2015. DiGiovanni has a general education degree ("GED") and no other pertinent training or work experience. DiGiovanni Aff. ¶ ¶ 25, 27.

> FN2. The job description states that the "statement of duties is for the purpose of identifying the position. It does not cover in detail all of the duties required of the position." Ryan Aff. Ex. D, note at 2015

In April 1991, DiGiovanni fell down some stairs near the front of Guardian's Norwell office and severely injured her left hand. Compl. ¶ 14. She subsequently had four surgeries, underwent approximately thirteen nerve blocks, and had a spinal cord stimulation device installed in her back to treat the injury. DiGiovanni Aff. ¶ 1.

While employed at Guardian, DiGiovanni qualified as a beneficiary under Guardian's Group Life Insurance Policy ("the Policy"), which provided short and long term disability benefits. Compl. Ex. A. Between April 1991 and April 1994, DiGiovanni was periodically in and out of work due to various surgeries and treatments, and she received short term disability benefits under the Policy accordingly. DiGiovanni Aff. ¶ 2. DiGiovanni never returned to work after March 1993. Compl. ¶ 15. In April 1994, Guardian approved long term disability benefits for DiGiovanni and continued those benefits until June 1997. Compl. ¶ 18; Ex. B. In a letter dated June 30, 1997, Guardian informed DiGiovanni that after reviewing the results of her independent medical evaluation it found that she was no longer eligible for long term disability benefits because she was not "totally disabled" as that term is defined by the Policy. Ryan Aff. Ex. 7. DiGiovanni appealed the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                  Page 2
Not Reported in F.Supp.2d, 2002 WL 1477175 (D.Mass.), 28 Employee Benefits Cas. 2126
**(Cite as: 2002 WL 1477175 (D.Mass.))**

termination of her benefits, but after review, Guardian affirmed the termination. Ryan Aff. Ex. 8. Subsequently DiGiovanni submitted medical reports from two additional doctors and requested a re-evaluation of her claim in light of these reports. Ryan Aff. Exs. 9, 10. Her request prompted Guardian to arrange another independent medical examination and seek two additional expert opinions. On December 11, 1997, Guardian found that its further investigation affirmed the initial decision that DiGiovanni was not "totally disabled" as the term is defined by the Policy. Ryan Aff. Ex. 14.

*The Policy*

**\*2** The Policy provides that it might "be amended at any time, without the consent of the Employees insured hereunder ... but any such amendment shall be without prejudice to any claims arising prior to the date of the change." Compl. Ex. A, Part VI, § 6 at 12. Guardian revised and reissued the Policy effective as of December 31, 1994. Ryan Aff. Ex. 3. Guardian argues that the revised policy should govern the termination of DiGiovanni's benefits, which occurred in 1997. Compl. Ex. C. Significantly, the revised policy provides (while the earlier one did not) that "Guardian is the Claims Fiduciary with discretionary authority to determine eligibility for benefits and to construe the terms of the plan with respect to claims." Ryan Aff. Ex. 3 at 22. This explicit grant of discretionary authority potentially allows the administrator's decisions to be reviewed under the deferential arbitrary and capricious standard. *See Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101 (1989). The pre-1994 policy does not provide such discretion and thus the Court's review of an administrator's decision under that policy would be de novo. Since DiGiovanni first became eligible for long term disability benefits in 1994 and since the revised policy might be thought to be prejudicial to DiGiovanni in the sense that it made it harder for an employee successfully to challenge benefits decisions under a more deferential standard of review, the Court will assess the claim under the provisions of the pre-1994 policy. Moreover, DiGiovanni claims that the policy attached to the Complaint as Exhibit A, the pre-1994 policy, is the policy Guardian sent her in response to her written request for a copy of the controlling policy. *See* Ryan Aff. Ex. 10 at 167, 175. Guardian ought not to be heard to argue otherwise now.

II. Standard of Review

Summary judgment is appropriate where "the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Barbour v. Dynamics Research Corp.,* 63 F.3d 32, 36 (1st Cir.1995).

A denial of benefits, "challenged under 29 U.S.C. § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone,* 489 U.S. at 115. On the other hand, if a policy provides the administrator with discretionary authority, an arbitrary and capricious standard of review applies to the administrator's factual determinations. *See Diaz v. Seafarers Int'l Union,* 13 F.3d 454, 456 (1st Cir.1994); *Grady v. Paul Revere Life Ins. Co.,* 10 F.Supp.2d 100 (D. R.I.1998); *Guarino v. Metro. Life Ins. Co.,* 915 F.Supp. 435 (D.Mass.1995). A benefits plan "must clearly grant discretionary authority to the administrator before decisions will be accorded the deferential, arbitrary and capricious, standard of review." *Rodriguez-Abreu v. Chase Manhattan Bank,* 986 F.2d 580, 583 (1st Cir.1993) (holding de novo standard of review appropriate where delegated discretionary authority was unclear). While particular "magic words" are not necessary to find discretionary authority, "explicit language" is required. *Allen v. Adage, Inc.,* 967 F.2d 695, 697-98 (1st Cir.1992); *Kiley v. Travelers Indem. Co.,* 853 F.Supp. 6, 10 (D.Mass.1994); *Coleman v. Metro. Life Ins. Co.,* 919 F.Supp. 573, 580 (D.R.I.1996) (finding discretionary authority in a plan that gave its administrator the power "to interpret and construe the Plan, [and] to determine all questions of eligibility and the status and rights of Participants" and that provided that all decisions of the administrator "shall, to the extent not inconsistent with the provisions of the Plan, be final and conclusive and binding upon all persons having an interest in the Plan") (internal citations omitted) (quoting *Block v. Pitney Bowes, Inc.,* 952 F.2d 1450, 1452-53 (D.C.Cir.1992)).

**\*3** The pre-1994 Guardian policy does not explicitly provide discretionary authority to the plan administrator; it merely articulates the mechanics required for the application and receipt of benefits under the plan. [FN3] The Guardian policy is very like the policy interpreted in *Grady,* 10 F.Supp.2d at

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                   Page 3
Not Reported in F.Supp.2d, 2002 WL 1477175 (D.Mass.), 28 Employee Benefits Cas. 2126
(Cite as: 2002 WL 1477175 (D.Mass.))

100, which required the claimant to submit proof of claim, proof of loss, and written proof of entitlement, and to give the insurer the right to request additional information and to order an independent medical exam. The *Grady* court found that such policy provisions were "simply garden-variety contract terms specifying the procedure by which claims are to be processed, and by which the Policy is to be administered. It would require a logical leap of Olympic proportions to find that these provisions give defendant the last word in interpreting the contract, or in determining eligibility for benefits." *Grady,* 10 F.Supp.2d at 110. Similarly, the Guardian policy does not sufficiently provide the administrator with the discretionary authority necessary to trigger the arbitrary and capricious standard, and the Court will review the termination of DiGiovanni's benefits de novo.

> FN3. Part VII, entitled "Claim Provisions' provides that "[w]ritten proof of loss must be furnished to the Insurance Company within 30 days after the commencement of the period for which the Insurance Company is liable. Subsequent written proofs of the continuance of such disability must be furnished to the Insurance Company at such intervals as the Insurance Company may reasonably require," that the "Insurance Company shall have the right and opportunity to examine the person whose injury or sickness is the basis of claim when and so often as it may reasonably require during pendency of claim hereunder," and that "[s]ubject to due proof of loss, all benefits for loss of time will be paid not later than at the expiration of each period of thirty days during the continuance of the period for which the Insurance Company is liable ...." Compl. Ex. A § § 1(B), 1(E), 2(A) at 14.

III. Discussion

A. *ERISA Claims*

In Count I, DiGiovanni seeks to recover her long term disability benefits pursuant to 29 U.S.C. § 1132(a)(1). The parties do not dispute the facts material to the determination that DiGiovanni is no longer "totally disabled" as that term is defined in the Policy.

The Policy provides short term disability benefits in accordance with the length of the insured's

employment (Plan A) and long term disability benefits for an insured who becomes totally disabled (Plan B). Compl. Ex. A., Part III, at 6; Part IV, at 8. Under the Policy, the term "total disability"

> "means the complete inability of the Employee to perform any and every duty pertaining to [her] occupation, except that if benefits have been paid under either Plan A or Plan B of this Policy for twenty-four months of any continuous period of disability, then for the balance of the period of disability, Total Disability shall mean complete inability of the Employee to engage in any reasonably gainful occupation for which he is or may become fitted by education, training or experience, having due regard for the nature of the Employee's occupation at the time [she] became disabled and for [her] prior average earnings."

Ryan Aff. Ex. A, Part II, at 5. Prior to becoming disabled, DiGiovanni performed clerical duties and earned an annual income of approximately $29,900. DiGiovanni Aff. ¶ 32. Therefore, the standard for determining whether DiGiovanni was totally disabled in 1997 is not whether she could return to a position that required her to type for eight hours a day, but whether she could engage in any position fit for a person with a GED, earning almost $30,000 per year, with approximately four years of clerical experience. The record of undisputed facts supports the conclusion that in June 1997, DiGiovanni was not "totally disabled" as that term is defined by the Policy.

*4 In December 1994, Dr. Richard Greenberg conducted an independent medical examination of DiGiovanni. He predicted that DiGiovanni would have "permanent, partial disability due to discomfort in the thumb. It should be in the region of 10% of her thumb function which is approximately 2% of hand function and perhaps 1% of total body function .... She is expected to be able to return to the marketplace in full capacity as long as she doesn't have to use her left hand." Ryan Aff. Ex. 2 at 249.

In March 1997, DiGiovanni's attending physician, Dr. James Doyle, found that DiGiovanni was "unable to perform the material duties of his/her occupation with reasonable continuity" explaining that "the repetitive motion of the keyboard flares up the hand pain." Ryan Aff. Ex. 4 at 237. Dr. Doyle made no finding as to DiGiovanni's ability to engage in any reasonable and appropriate occupation that did not involve repeated use of a keyboard.

In April 1997, Guardian hired an outside company to interview DiGiovanni. Ryan Aff. Ex. 5 at 230.

Not Reported in F.Supp.2d                                                                                                    Page 4
Not Reported in F.Supp.2d, 2002 WL 1477175 (D.Mass.), 28 Employee Benefits Cas. 2126
(Cite as: 2002 WL 1477175 (D.Mass.))

During the interview, DiGiovanni stated that she does "household chores and some limited gardening." She also stated that she "drive [s] and do[es] local errands." Ryan Aff. Ex. 5 at 231. DiGiovanni claimed that the injury to her left thumb prevented her "from performing a full range of daily activities." Ryan Aff. Ex. 5 at 231. The report from this interview prompted Guardian to request an independent medical examination by Dr. Barry Simmons. Ryan Aff. Ex. C at 218. On June 16, 1997, Dr. Simmons reported that despite the fact that she has persistent pain, she certainly doesn't present the picture of a patient with a chronic pain problem.... [I]t would certainly seem at this time that she can return to work. There is no doubt that she can return to full-time employment using her right hand predominantly. She could use her left hand as an assistive hand, as long as there is no lifting of more than 2 or 3 pounds and as long as she doesn't have to do multiple repetitive motions for more than 5 or 10 minutes every hour. Another alternative would be to have her return to a full, part-time job in which she works only 4 hours a day. In that situation, I think she could not necessarily do any more heavy lifting than she would in a full day, but she might be able to do longer periods of repetitive motion, such as keyboard work or filing.

Ryan Aff. Ex. 6 at 21. Following the receipt of this report, Guardian terminated DiGiovanni's long term disability benefits stating only that she was no longer "totally disabled" as that term is defined in the Policy. Ryan Aff. Ex. 7 at 188.

After Guardian denied her initial appeal, DiGiovanni submitted additional reports from Dr. Leonard Ruby and Dr. James Doyle and requested that Guardian reconsider the termination of her long term benefits. Ryan Aff. Exs. 9, 10. Dr. Ruby had begun treating DiGiovanni around early 1992. He reported that when he last saw her on July 14, 1997 (after Guardian's letter terminating her benefits), he agreed to refer her to the Pain Management Center because she could not sleep at night due to the pain and was taking prescription painkillers. Ryan Aff. Ex. 9 at 96. Dr. Doyle reported that DiGiovanni's acupuncture treatments provided some pain relief such that she could "sleep comfortably without the need for propping the arm" and that she "takes medication ... at a lower frequency." Ryan Aff. Ex. 10 at 119. Dr. Doyle also stated that DiGiovanni uses "her left hand for activities of daily living, although it does produce more pain to do so. Pain is present most of the time, and the use of the hand for hobbies is too pain-inducing." *Id.* He concluded that DiGiovanni was "disabled from work involving the use of both

hands," implying that she was capable of work involving the use of her right hand. *Id.*

*5 These reports prompted Guardian to request another independent medical examination of DiGiovanni, this time by Dr. Hillel D. Skoff. Ryan Aff. Ex. 6 at 51. Dr. Skoff reported that DiGiovanni was a right-handed woman who stated that she was formerly a "claims appraiser" at Guardian and that her duties "required the use of phones, typing, writing and all manner of repetitive manual skills." Ryan Aff. Ex. 11 at 10. Dr. Skoff rated DiGiovanni's impairment "[i]n accordance with AMA Guidelines" to be 10% of her upper extremity and 6% of her whole person. Ryan Aff. Ex. 11 at 11. Dr. Skoff's review of the "medical facts" in the case led him to conclude that DiGiovanni was "capable of some degree of work based upon her use of her right dominant and upper extremity and some capability in the left upper extremity despite the minor causalgia." He further stated that "repetitive two-handed typing for prolonged periods will [not] be possible, but certainly phone work, writing and a very limited degree of typing should be possible ." Ryan Aff. Ex. 11 at 11.

DiGiovanni argues that Guardian's termination of her long term benefits was based on the allegedly erroneous conclusion that she could return to the same position that she held within Guardian at the time she became disabled. She claims that because Guardian did not have an accurate description of duties prior to her disability it was not able to determine the type of position for which she would be "fitted by education, training, or experience." Compl. Ex. A, Part II, at 5. DiGiovanni claims that an assertion in a letter from Guardian dated August 11, 1997, which affirms the termination of her benefits and the deposition testimony of Kettly E. Philippe, a claims analyst who was designated by Guardian as the most knowledgeable witness for purposes of Fed.R.Civ.P. 30(b)(6), support this argument. In the letter Guardian states that "as her employer, we are very familiar with the major duties of her own occupation and other occupations that would be suitable. We have concluded that she can perform the material duties of a suitable occupation. In fact, she is capable of performing the material duties of her occupation as a claim approver." Ryan Aff. Ex. 10 at 169. Phillipe testified that she believed that DiGiovanni could return to work as a claims analyst as that position is described in the job description form and that she believed that the job description accurately reflected DiGiovanni's duties. Cronin Aff. at 17-19. Phillipe further testified that DiGiovanni's

Not Reported in F.Supp.2d                                                                                    Page 5
Not Reported in F.Supp.2d, 2002 WL 1477175 (D.Mass.), 28 Employee Benefits Cas. 2126
**(Cite as: 2002 WL 1477175 (D.Mass.))**

duties were "similar or the same" as her duties as a claims analyst but when asked how often she entered data into a computer, she responded, "[n]ot much, really." Cronin Aff. at 34-35. These statements do not indicate that Guardian applied an erroneous standard, but rather reflect the judgment that DiGiovanni was able to perform full time work for which she was suited, *including* the work she had previously performed.

*6 There is no genuine dispute that DiGiovanni can drive a car, perform basic household chores and has full use of her dominant, right hand, though the parties dispute the duration and intensity with which DiGiovanni can perform these tasks. However, the medical evidence in the record clearly supports Guardian's conclusion that DiGiovanni was not "totally disabled" as defined in the Policy. Contrary to DiGiovanni's argument, testimony of a vocational analyst is not necessary in light of the facts and opinions in the record.

Summary judgment should also be granted for the defendant on Counts IV and V, which seek relief under 29 U.S.C. § § 1132(a)(3)(A), 1132(a)(3)(B), because DiGiovanni has an available, albeit unsuccessful, claim under 29 U.S.C. § 1132(a)(1). "[F]ederal courts have uniformly concluded that, if a plaintiff can pursue benefits under the plan pursuant to Section a(1), there is an adequate remedy under the plan which bars a further remedy under Section a(3)." *Larocca v. Borden, Inc.,* 276 F.3d 22, 28 (1st Cir.2002).

Similarly, a claim for breach of fiduciary duty under ERISA is only available to "participants who are unable to avail themselves of other remedies." *Mauser v. Raytheon Co. Pension Plan for Salaried Employees,* 239 F.3d 51, 58 (1st Cir.2001) (following the general principle from *Varity Corp. v. Howe,* 516 U.S. 489 (1996) that courts "should avoid creating duplicative remedies for violations of ERISA's provisions"). Therefore summary judgment is also appropriate as to Count II, which alleges that Guardian breached its fiduciary duty under ERISA by wrongfully terminating DiGiovanni's right to long term disability benefits, is also granted.

B. *COBRA claim under 29 U.S.C. § 1161*

DiGiovanni also alleges that Guardian failed to notify her timely of her statutory right to continuing health care coverage. Under COBRA, an employer must notify an insured of the opportunity for continuing health care coverage within fourteen days

of a "qualifying event," which in this case is the "termination ... of the covered employee's employment." 29 U.S.C. § 1163(2); 29 U.S.C. § 1166(c) ("For purposes [of notifying the beneficiary of rights under this section], any notification shall be made within 14 days" of a qualifying event.). The continuing coverage is available for a minimum of 18 months after the date of the qualifying event. *See* 29 U.S.C. § 1162(2)(A)(i). DiGiovanni seeks the statutory remedy of $100.00 per day commencing September 1, 1997, for Guardian's failure to give her timely notice, *see* 29 U.S.C. § 1132(c)(1), and her medical expenses for the period August 31, 1997 through April 20, 1998.

In a letter dated April 17, 1998, Guardian informed DiGiovanni of her right to continued health insurance coverage under COBRA. Ryan Aff. Ex. B at 4. The letter stated that because her disability benefits ended on August 31, 1997, her "separation date [would] also be recorded as August 31, 1997," that she could continue her Guardian medical coverage for September through December at the stated monthly rates, and that "[i]n order to be covered retroactively to the date of termination, [she] must pay the premium from September 1997 through April 1998." *Id.* The letter requested that DiGiovanni complete and return the enclosed COBRA form stating whether or not she elected or declined coverage. *Id.* The form attached to the letter calculated the amount DiGiovanni owed for retroactive premium payments to be approximately $3,300.00. Ryan Aff. Ex. B at 5. DiGiovanni declined the COBRA coverage.

*7 According to Guardian, DiGiovanni's employment terminated on August 31, 1997. [FN4] Guardian had 14 days from this date, until September 14, 1997, to inform DiGiovanni of her rights under COBRA. *See* 29 U.S.C. § 1166(c). The actual notice given in the letter dated April 17, 1998, came 215 days late.

> FN4. Guardian argues that DiGiovanni's "qualifying event" occurred in March 1993 when DiGiovanni began to receive total disability benefits because the Policy provides that "[t]ermination of employment shall, for the purposes of this Policy, be deemed to occur when an Employee ceases to be actively engaged in work on a full-time basis with the Policyholder ...." Compl. Ex. A, Part I, § 4(B) at 4. Guardian claims that its obligation to provide 18 months of continuing coverage pursuant to COBRA expired in September 1994. However, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1477175 (D.Mass.), 28 Employee Benefits Cas. 2126
(Cite as: 2002 WL 1477175 (D.Mass.))

letter dated April 22, 1994, in which Guardian informed DiGiovanni that she was entitled to long term disability benefits also states that she will receive group medical and dental coverage as long as she receives long term disability benefits and "will no longer be required to make a contribution toward these coverages." Ryan Aff. Ex. 2 at 279. Guardian is bound to the termination date it announced to DiGiovanni in the April 17, 1998 letter.

Guardian's failure to provide timely notice was prejudicial to DiGiovanni, an unemployed woman on a fixed income, because it presented her with the unreasonable option of paying a large lump sum for retroactive health care coverage. If DiGiovanni had received timely notice of the opportunity to continue her health care coverage on September 14, 1997, she might well have been able to budget the approximately $400 per month to continue the coverage. Instead, she was faced in April 1998 with the option of paying approximately $3,300 dollars for the same coverage. This "option" was not practical for a person in her situation.

Although DiGiovanni has not formally moved for summary judgment on this claim, the case comes to the Court as an appeal of a ERISA decision, and accordingly, the Court may resolve the merits of her claim on the available record. The statute permits a penalty of "up to $100 per day" for failure to provide timely notice. For a 215-day delay, the penalty is $21,500. While there is no evidence of bad faith on the part of Guardian, the length of the delay and the prejudice to DiGiovanni's practical ability to make a retroactive lump sum premium payment combine to justify an assessment in that amount. On the other hand, DiGiovanni is not entitled to an award of medical costs for the period in which she was not a Guardian employee and during which she did not pay the premium for the COBRA coverage.

C. Guardian's Counterclaim

The Policy provided that an insured's benefits, payable under either Plan A or Plan B "shall be reduced by the amount the Employee receives or is entitled to receive for the same period or any part thereof, from any of the following sources: Any periodic payments under Title II of the Social Security Act ...." Compl. Ex. A, Part III, § § 4(A), (A)(1) at 6; Part IV, § 5(A), (A)(2) at 9. In September 1993 and March 1994, Guardian reminded DiGiovanni that the Policy required her to apply for

Social Security benefits and that Guardian would pay the benefits without reduction while her application for benefits was pending before the Social Security Administration. Ryan Aff. Ex. 15 at 288, 281. In September 1994, DiGiovanni submitted to Guardian a Social Security Notice of Reconsideration that denied reconsideration of her claim for benefits because she "experience[d] hand pain but ... [did] not have any manipulative limitations." Ryan Aff. Ex. 2 at 262. DiGiovanni appealed the denial and in 1999 received an award from the Social Security Administration totaling $32,440.80 covering the period from September 1993 through July 1998. Ryan Aff. Ex. E at 2. Guardian's counterclaim seeks reimbursement by way of an offset of the Social Security benefits paid against the disability payments made under the Policy. [FN5]

> FN5. Since state law actions to enforce the contractual terms of an ERISA Plan are preempted by the federal statutory scheme, *see Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 53-56 (1987), the Court construes the counterclaim as a claim for equitable relief in the form of restitution pursuant to 29 U.S.C. § 1132(a)(3). *See Metro. Life Ins. Co. v. Socia*, 16 F.Supp.2d 66, 72 (D.Mass.1998).

\*8 DiGiovanni does not dispute that she received disability benefits from Guardian from September 1993 through July 1997, and she does not dispute that she later was granted Social Security benefits for the same time period. Guardian's counterclaim seeks $20,065, a figure obtained by (a) rounding the monthly Social Security disability benefit downward to the nearest dollar, (b) excluding the cost-of-living increases, and (c) allowing the $4000 attorney fee awarded by Social Security. *See* Def.'s Countercl. ¶ 9(a); 9(b). DiGiovanni has submitted no documentation to show that this calculation is inaccurate. Accordingly, Guardian is entitled to summary judgment on its counterclaim in the amount of $20,065.

IV. Conclusion

Based on the foregoing reasons, judgment shall enter in the defendant's favor under Counts I, II, IV, and V of the Complaint, and under the counterclaim in the sum of $20,065. Judgment shall enter for DiGiovanni under Count III in the amount of $21,500. No attorneys' fees are awarded to either party.

IT IS SO ORDERED.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                  Page 7
Not Reported in F.Supp.2d, 2002 WL 1477175 (D.Mass.), 28 Employee Benefits Cas. 2126
**(Cite as: 2002 WL 1477175 (D.Mass.))**


END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.