UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

YUDIF GLIK, ADMINISTRATOR,

Plaintiff,

v.                                                    Civil Action No.  05-10360-GAO

INOTEK PHARMACEUTICALS
CORPORATION,

Defendant.

## DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant Inotek Pharmaceuticals Corporation ("Inotek" or "Defendant") submits this
Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgment.
Defendant submits that even if Plaintiff Yudif Glik's version of the facts in this case are
accepted, in their entirety, Plaintiff's claims fail as a matter of law.

Many of the facts contained in this statement of undisputed material facts are disputed by
Defendant.  Defendant has accepted these facts (including Plaintiff's deposition testimony) as
true only for the purposes of its motion for summary judgment.  In doing so, Defendant does not
waive its right to dispute any of these facts at trial.

Pursuant to Local Rule 56.1, the following documentation is submitted in the Appendix
to Defendant's Statement of Undisputed Material Facts in Support of Its Motion for Summary
Judgment ("Appendix"):

(1)     Pertinent pages and exhibits from the Deposition of Plaintiff Yudif Glik's
("Y. Glik Dep.").  (Appendix Ex. 1).

(2)    Pertinent pages and exhibits from Volume I of the Deposition of UNUMProvident Corporation's corporate representative ("UNUM Dep."). (Appendix Ex. 2).

(3)    Pertinent pages from Volume II of the Deposition of UNUMProvident Corporation's corporate representative (UNUM Dep. Vol. II"). (Appendix Ex. 3).

(4)    Pertinent pages from Dr. Christopher Doyle's deposition ("Doyle Dep."). (Appendix Ex. 4).

(5)    Affidavit of Carolyn Tyson ("Tyson Aff."). (Appendix Ex. 5).

(6)    Affidavit of Jean-Paul Gosselin ("Gosselin Aff."). (Appendix Ex. 6).

## I.    Michael Glik's Employment with Inotek Pharmaceuticals Corporation

1.    Inotek is a private development-stage pharmaceutical company founded in 1996. Inotek currently develops several products targeting cancer and cardiovascular and inflammatory diseases. Inotek pursues indications in hospital cardiovascular markets as well as specialty care markets including cancer treatment, dermatology, and gastroenterology. All of Inotek's technologies were discovered and developed by Inotek researchers. Inotek currently has approximately 130 employees, based in its headquarters and main laboratories in Beverly, Massachusetts, its clinical operations and manufacturing facilities in Israel and its offices in Australia and New Zealand. Gosselin Aff. at ¶ 3.

2.    Michael Glik ("Glik") commenced employment with Inotek on September 25, 2000 as a research assistant. Glik's annual salary was $37,000. Glik was an at-will employee. Gosselin Aff. at ¶ 4.

3.    On October 21, 2000, Glik was diagnosed with colon cancer. On November 21, 2000, Glik had surgery for colon cancer and his cancer was deemed non-removable. Y. Glik Dep. at

23-24; UNUM Dep. at 74-78, 82, Ex. 13 (Glik's Explanation), Ex. 18 (March 20, 2001 letter

from Glik to Antonio Ferrante at UNUM).

4.      On November 16, 2000, when he had worked for Inotek for under two months, Glik

requested a three-week leave of absence from Inotek due to surgery for a medical condition.

Inotek approved Glik's leave of absence.  Y. Glik Dep. at 24-25.

5.      On November 21, 2000, Glik had surgery to remove a cancerous abdominal tumor, but

the surgeon determined the tumor was inoperable.  Y. Glik Dep. at 25.

6.      After the surgery on November 21, 2000, Glik was too sick ever to return to work.

Y. Glik Dep. at 26.

7.      On December 2, 2000, Glik informed Dr. Timashpolsky, his immediate supervisor at

Inotek, that his medical condition prevented him from returning to work.  Y. Glik Dep. at 27-28.

8.      Inotek continued Glik on the payroll until December 31, 2000.  Thereafter, Glik was

removed from the payroll and was no longer employed by Inotek.  Y. Glik Dep. at 28.

9.      Glik was unable to ever work again because of his medical condition.  Y. Glik Dep. at 28;

UNUM Dep. at 96, Ex. 22 (May 10, 2001 letter from Glik to UNUM indicating Glik is not able

to work because of his non-removable tumor, ongoing chemotherapy and overall poor health).

10.      Inotek never employed Yudif Glik, Glik's wife.  Y. Glik Dep. at 9.

**II.      Glik's Application For Individual Disability Insurance**

11.      One of the benefits that Inotek offered employees at the time of Glik's employment was

the opportunity to apply for individual long term disability insurance.  Inotek paid the full cost of

the insurance coverage for its employees who were deemed by the insurer to be qualified for this

disability insurance.  The insurance premium for employees was based on group rates and paid

on an annual basis.  Gosselin Aff. at ¶ 5.  Employees were eligible to apply for such insurance

coverage on their first day of employment.  Gosselin Aff. at ¶ 5.

12.    Inotek's Manual of Personnel Policies and Procedures (the "Manual") that was in effect

at the time of Glik's employment contained a policy statement regarding long-term disability

insurance.  That policy did not describe the type of specific benefit that would be provided.

Y. Glik Dep. at 76-77, Ex. 12 at Attachment B.

13.    The insurance company that provided this coverage for Inotek employees was UNUM

Life Insurance Company of America ("UNUM").  Inotek's insurance broker facilitated the

application process.  At the time of Glik's employment, Boyd-Neelon Associates was the

insurance broker.  UNUM Dep. at 15; Tyson Aff. at ¶ 3; Gosselin Aff. at  ¶ 6.

14.    On October 2, 2000, Glik signed a UNUM application for individual disability insurance.

UNUM Dep. at 23, Ex. 3 (Application for Disability Insurance).

15.    Glik did not enter into a premium prepayment agreement with UNUM.  If Glik had

selected prepayment (paying $1/10^{th}$ of the cost of the annual premium at time the application was

submitted), the effective date of the coverage, if UNUM approved of the application, would have

been the latest date of the application or any required exam, test, questionnaire or other

supplemental application.  If the policy requested were not issued (as is the case here), or were

declined, cancelled or returned, prepayment would be refunded.  Since the prepayment option

was not selected, the effective date of the policy would have been the date the policy issued.

Inotek, as a matter of general practice, did not offer to pay for premium prepayment on behalf of

its employees.  UNUM Dep. at 23, Ex. 3; Gosselin Aff. at ¶ 7.

16.    The application completed by Glik states that "[a]s part of our [UNUM's] normal

underwriting procedure, we need to obtain information to determine a Proposed Insured's

eligibility for insurance. Much of that information will come from you [the Proposed Insured]; however, we often obtain additional information or verify information through other sources." The application indicates that, in making eligibility determinations, UNUM relies primarily on the Proposed Insured's application, including his certified answers to the medical questionnaire. However, UNUM may need to obtain additional information from other sources. The application completed by Glik also states that "[a]ny person who knowingly presents … false information in an application for insurance is guilty of a crime and may be subject to fines and confinement." UNUM Dep. at 23, Ex. 3.

17.    One of the specific questions in the application required Glik to disclose whether he had ever had a "polyp, tumor, cancer…." Although Glik had previously undergone surgery for rectal cancer, he answered "NO" to this question. Similarly, one of UNUM's questions asked whether Glik had ever been treated for any disease or disorder of the rectum, and again he answered "NO." UNUM Dep. at 23 & Ex. 3.

18.    Carolyn Tyson, an underwriting manager with Boyd-Neelon Associates, received Glik's application for individual disability insurance coverage from Inotek in the later part of October 2000. Tyson Aff. at ¶ 4.

19.    Glik's application was incomplete in several ways. For example, Glik failed to provide the name and address of his personal physician on the application. Glik also failed to complete Sections 22 and 23 on the application. Specifically, Glik did not respond to questions 22(b), 22(c), 23(b) or 23(c). UNUM Dep. at 35-36, Ex. 3; Tyson Aff. at ¶¶ 2, 5.

20.    As Glik's application was incomplete and pursuant to Ms. Tyson's regular practice, she returned Glik's application to Inotek with a request that the application be fully completed. Tyson Aff. At ¶¶ 5-6.

21.     At some point thereafter, Ms. Tyson received the application back from Inotek.  While Glik provided the name of his treating physician and responded to questions 22(b) and 22(c), he still did not respond to questions 23(b) or 23(c).  Question 23(b) asks:  "Are you now taking or have you taken medication (prescription or non-prescription) for any reason within the last 12 months)?"  Question 23(c) asks:  "Are you experiencing any symptoms, disease, disorder or condition which might require surgery, impair your health or your ability to work, now or in the future, for which you plan to consult a physician?"  Glik also failed to correct his answers to questions about cancer and rectal diseases.  Tyson Aff. at ¶¶ 6; UNUM Dep. at 23, 35-36, Ex. 3.

22.     When Glik's application was returned, it indicated that he had high blood pressure and that he was last seen by his physician, Dr. Vaninov, on October 26, 1999.  Glik's application stated that he had not had any indication of, been told or been treated for cancer within the last 12 months.  Tyson Aff. at ¶ 6; UNUM Dep. at 23, 34, 36-37, Ex. 3.

23.     The application signed by Glik contains an affirmation that he agreed that "[a]ll of the statements made in this application must be true, complete and correctly recorded to the best of [his] knowledge and belief" and that "[i]f [he] did not prepay [the] premium with [his] application, insurance will be effective when a policy has been delivered to [him] and [he] has paid the first premium, provided that, on the later of the delivery date or payment date, the answers in this application and in any supplemental application, medical exam or other questionnaire are then still true and complete."  UNUM Dep. at 23, Ex. 3.

24.     On November 28, 2000, Ms. Tyson sent Glik's application to UNUM in Woburn, Massachusetts.  After the application was sent to UNUM's Woburn office it had to be forwarded to UNUM's offices in Maine.  UNUM received the application in December 2000.  Tyson Aff. at ¶ 7; UNUM Dep. at 12, Ex. 1 (Application-Routing Ticket), Ex. 3.

25.    On January 19, 2001, given Glik's disclosure of hypertension and neck/back pain,

pursuant to its regular underwriting practice, UNUM requested Glik's medical records from

Dr. Vaninov.  UNUM Dep. at 45-46, 54-56, Ex. 4 (Underwriting Notes), Ex. 5 (Records

Request).

26.    In February 2001, UNUM received Glik's medical records from Dr. Vaninov.  These

records revealed the following:  On or before October 11, 2000, Glik was referred by

Dr. Vaninov to a urologist, Dr. Christopher Doyle, because of testicular pain.  Dr. Doyle

examined Glik on October 11.  Glik described to Dr. Doyle that he had discovered an

abnormality in his left hemiscrotum about a week prior October 11, 2000.  Glik informed

Dr. Doyle that he had previously undergone rectal cancer surgery.  During his examination of

Glik, Dr. Doyle "suspected the presence of a mid abdominal mass."  Dr. Doyle suggested a CT

scan of the abdomen and pelvis to evaluate the possibility of the abdominal mass, tumor markers

and a scrotal ultrasound.  On October 22, 2000, Dr. Doyle wrote to Glik and advised him that his

blood tests were normal but that he should proceed with the ultrasound study.  UNUM Dep. at

56-61, Ex. 4 (October 11, 2000 letter from Dr. Doyle to Dr. Vaninov), Ex. 5, (October 22, 2000)

letter from Dr. Doyle to Glik); Doyle Dep. at 5-7, 10-15.

27.    As a result of the above described medical records, on February 13, 2001, UNUM sent

Glik a letter informing him that it was postponing a determination concerning Glik's application

for individual disability insurance because of Glik's medical records it had received.  UNUM

Dep. at 66-70, Ex. 4, Ex. 7 (Final Processing Sheet), Ex. 8 (February 13, 2001 letter from

UNUM to Dr. Glik).

28.    In February 2002, Glik died as a result of colon cancer.  Y. Glik Dep. at 5.

29.    If UNUM had deemed Glik qualified for individual disability insurance coverage and approved his application, disability benefits would have been paid to Glik by UNUM. Such benefit payments would have commenced ninety days after the commencement of the disability. Glik would have received payments from the insurer on a periodic basis as opposed to a lump sum payment. Such benefits would have ceased on the date of Glik's death. The maximum benefit that Glik could have received, if UNUM had deemed him qualified for a policy, was $3,100 per month for approximately one year. UNUM Dep. at 23-24, 28-29, Ex. 3; Y. Glik Dep. at 31, 67-70, Ex. 18, Plaintiff's Responses to Defendant's Interrogatories; Ex. 19, "Damages."

30.    There is no contractual relationship between Inotek and UNUM. Inotek is not a policy holder. Inotek facilitated the application process for its employees and, if UNUM approved an employee's application, Inotek paid the policy premiums while the employee was employed with it. Gosselin Aff. at ¶ 8; UNUM Dep. at 104-105, Ex. 29 (June 7, 2001 letter from UNUM to the Massachusetts Division of Insurance); UNUM Dep. Vol. II at 133-135.

**III.    Glik's Complaint Against UNUM**

31.    On February 25, 2001, Dr. Glik wrote to UNUM complaining about UNUM's "refus[al] to issue a Long-Term Disability policy for [him]." UNUM responded to Glik's complaint in a letter explaining that UNUM's decision was based upon the medical records from Dr. Vaninov and, specifically, the October 11, 2000 letter from Dr. Doyle to Dr. Vaninov regarding his examination of Glik. That letter indicated that Glik had an October 2000 consultation regarding a testicular mass and possible abdominal mass, with no indication of a diagnosis for those issues, as well as a history of surgery for cancer. UNUM Dep. at 71-74, Ex. 11 (February 25, 2001 letter from Glik to UNUM), Ex. 12 (March 8, 2001 letter from UNUM to Glik).

32.     Glik then filed a complaint against UNUM with the Massachusetts Division of Insurance (the "DOI").  Glik further described his surgery for colon cancer in November 2000 and his surgery for a rectal tumor in 1973.  The DOI forwarded Glik's complaint to UNUM for a response.  UNUM Dep. at 74-78, Ex. 13 (Glik's Complaint).

33.     When UNUM received the complaint, it learned for the first time that Glik did indeed have colon cancer.  Since UNUM had not issued a policy to Glik, it was not necessary to change its determination to a denial.  Notably, however, if UNUM had not already made the decision to postpone Glik's application, it would have denied Glik's application based on the diagnosis of cancer.  UNUM Dep. at 76.

34.     Glik threatened to file a lawsuit in court against UNUM for not approving his application for insurance coverage, but he never filed such an action.  UNUM Dep. at 82, Ex. 18 (March 20, 2001 letter from Glik to UNUM); Y. Glik Dep. at 58.

35.     In a March 22, 2001 letter to the DOI, UNUM again explained its reasons for postponing Glik's application, as follows:  Glik's medical records indicated a history in October 2000 of consultation regarding testicular pain and possible abdominal mass, as well as a history of rectal cancer.  UNUM Dep. at 86-88, Ex. 20 (March 22, 2001 letter from UNUM to DOI).

36.     In its March 22, 2001 letter, UNUM also noted that pre-payment was not made with Glik's application.  However, even if pre-payment had been made, this would not have changed the result.  Glik's application would still have been postponed and would never have been issued because of his diagnosis of cancer.  As the prepayment agreement in the application states, the effective date of coverage is not until the *latest* date of the application or any required exam, test, questionnaire, or other supplemental information.  UNUM required supplemental information (in

the form medical records) from Glik based on his application. These medical records led UNUM to postpone Glik's coverage. UNUM Dep. at 23, 86-88, Ex. 3, Ex. 20.

37.    Glik blamed the fact that he did not receive insurance coverage on UNUM's "inertia." UNUM Dep. at 92, 94, Ex. 21 (April 7, 2001 letter from Glik to the DOI); Y. Glik Dep. at 54-55, Ex. 10 (Letter April 10, 2001 Glik to dePontbriand).

38.    The DOI chose not to take any action against UNUM. Y. Glik Dep. at 58.

**IV.    Inotek's Manual of Personnel Policies and Procedures**

39.    Inotek's Manual (that was in effect at the time of Glik's employment) states that "[t]he policies and procedures that are contained in this manual are not terms and conditions of your employment, nor a contract, and the manual itself is not a contract or an offer to enter into a contract." Gosselin Aff. at ¶ 9, Ex. 1, Manual.

40.    The Manual states that "[t]he Company … reserves the right to change or eliminate its policies and procedures as necessary and without having to consult with or obtain agreement from anyone" and "[t]he Company remains free to establish and change employee's … benefits." Gosselin Aff. at ¶ 10, Ex. 1.

41.    The Manual explains that "[u]nless otherwise agreed in writing by the Board of Directors, no employee is hired for a specific term, upon any specific condition, or pursuant to any contract of employment … the Company has the … right to terminate the employment of any employee as it determines in its sole discretion, and for any reason, is appropriate." Accordingly, "[t]he Company remains free to … discharge any employee with or without just cause and with or without notice." Inotek's employment at-will policy (policy number E5) states, in relevant part, "[y]our employment with the Company is 'at will' and, accordingly, may be terminated by you or the Company at any time without notice." Gosselin Aff. at ¶ 11, Ex. 1.

42.    Manual policy E9 concerning termination of employment (which states that it must be read in conjunction with the Company's Employment At-Will policy), makes clear that an employee's employment may be involuntarily terminated for reasons including, for example, excessive unexcused absence/unauthorized absenteeism and job abandonment.  Gosselin Aff. at ¶ 12, Ex. 1.

Respectfully submitted,

INOTEK PHARMACEUTICALS
CORPORATION

By its attorneys,

/s/ Wilfred J. Benoit, Jr.
Wilfred J. Benoit, Jr. (BBO No. 037900)
Anne M. Gaeta (BBO No. 643299)
Goodwin Procter LLP
Exchange Place
Boston, MA 02109-2881
(617) 570-1000

Dated:  August 30, 2006

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on August 30, 2006.

/s/ Wilfred J. Benoit, Jr.
Wilfred J. Benoit, Jr.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| YUDIF GLIK, ADMINISTRATOR,<br><br>          Plaintiff,<br><br>v.<br><br>INOTEK PHARMACEUTICALS<br>CORPORATION,<br><br>          Defendant. | Civil Action No.  05-10360-GAO |

**APPENDIX OF EXHIBITS TO DEFENDANT INOTEK PHARMACEUTICALS
CORPORATION'S STATEMENT OF UNDISPUTED FACTS**

**INDEX**

**Exhibit**                                                                                      **Number**

Pertinent pages and exhibits to Deposition of Yudif Glik…………….................................1

Pertinent pages and exhibits to Volume I of the Deposition of UNUMProvident Corporation's
corporate representative………………………………………………………………...2

Pertinent pages to Volume II of the Deposition of UNUMProvident Corporation's corporate
representative………………………………………………………………………...3

Pertinent pages to Deposition of Dr. Christopher Doyle……………………………………4

Affidavit of Carolyn Tyson………………………………………………………………5

Affidavit of Jean-Paul Gosselin………………………………………………………..6

Respectfully submitted,

INOTEK PHARMACEUTICALS
CORPORATION

By its attorneys,

/s/ Wilfred J. Benoit, Jr.
Wilfred J. Benoit, Jr. (BBO No. 037900)
Anne M. Gaeta (BBO No. 643299)
Goodwin Procter LLP
Exchange Place
Boston, MA 02109-2881
(617) 570-1000

Dated:  August 30, 2006

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on August 30, 2006.

/s/ Wilfred J. Benoit, Jr.
Wilfred J. Benoit, Jr.

# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|  |  |
|---|---|
| YUDIF GLIK, INDIVIDUALLY AND AS ADMIN. OF THE ESTATE OF MICHAEL GLIK, | \* \* \* |
| Plaintiff | \* CIVIL ACTION \* NO. 05-10360-GAO |
|  | \* |
| VS | \* \* |
| INOTEK PHARMACEUTICALS CORPORATION, | \* \* |
| Defendant | \* \* |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF YUDIF GLIK, taken on behalf of the defendant pursuant to the Massachusetts Rules of Civil Procedure before Kathleen M. Benoit, CSR # 1368F94, Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts at the offices of Goodwin Procter, Exchange Place, Boston, Massachusetts, on Tuesday, June 20, 2006, commencing at 10:04 a.m.

APPEARANCES:

ROBERT O. BERGER, ESQ., 11 Beacon Street, Suite 1210, Boston, MA 02108, For the plaintiff

WILFRED BENOIT, ESQ., Goodwin Procter, Exchange Place, Boston, MA 02109, For the plaintiff

## Leavitt Reporting, Inc.

1207 Commercial Street, Rear
Weymouth, MA 02189

Tel. 781-335-6791
Fax: 781-335-7911
leavittreporting@att.net

Hearings ◆ Conferences ◆ Legal Proceedings

9

1  my husband, myself and my kids.

2      Q.  Are you suing Inotek individually because of what

3  you think Inotek did with respect to your husband,

4  Dr. Glik?

5      A.  Yes.

6      Q.  Is there any other basis for your lawsuit

7  individually against Inotek?

8      A.  No, it was all about my husband.

9      Q.  Did you ever have any contact with Inotek other

10  than on behalf of your husband?

11      A.  No.

12      Q.  Did you have any contractual relationship with

13  Inotek?

14      A.  No.

15      Q.  I take it you were never employed by Inotek --

16      A.  No.

17      Q.  -- is that correct?

18      A.  Correct.

19      Q.  Did you ever apply to Inotek for insurance benefits

20  yourself?

21      A.  No.

22      Q.  Did you ever apply for insurance benefits through

23  Inotek for yourself?

23

1            (Document Perusal.)

2            MR. BERGER:  I think you're going to see a

3 lot of material you're familiar with.

4            MR. BENOIT:  Let's get somebody to make a

5 copy of this anyway.  It will help move things along a

6 little faster.

7            (Recess taken.)

8    Q.  What I'd like you to do is to testify without

9 looking at your notes.

10    A.  Okay.

11    Q.  But on the other hand, you let me know if you need

12 to look at them to refresh your recollection on the date or

13 something, okay?

14    A.  Okay, I will.

15    Q.  Who was the colon surgeon?

16    A.  Well, he first went to see Dr. Ashley and then he,

17 Dr. Ashley referred him to Dr. Saltzman for a colonoscopy,

18 and by the results of that colonoscopy he went on to

19 Dr.  -- may I consult something?

20    Q.  Do you want to consult your notes?

21    A.  Sure.  Dr. Osteen, a surgeon at Brigham and Women's

22 who did the surgery.

23    Q.  What were the results of the surgery?

24

1        A.   The tumor was not removed.

2        Q.   Was it during the surgery that the tumor was

3    discovered?

4        A.   No, the tumor was discovered during the

5    colonoscopy.

6        Q.   When did the surgery take place?

7        A.   On November 21, 2000.

8        Q.   Up until the date of the surgery, did your husband

9    continue to work at Inotek?

10       A.   I think it was almost up to this date.  I don't

11   remember exactly, but yes, and right before that he talked

12   to Dr. Saltzman, the president of Inotek, and they agreed

13   on the date that he would come back in three weeks.

14            MR. BERGER:  Could I get that answer back

15   please.

16            THE REPORTER READ BACK THE ANSWER AS FOLLOWS:

17            "ANSWER:  I think it was almost up to this

18   date.  I don't remember exactly, but yes, and right before

19   that he talked to Dr. Saltzman, the president of Inotek,

20   and they agreed on the date that he would come back in

21   three weeks."

22       Q.   So in essence, did Inotek give your husband a

23   three-week leave of absence for the surgery?

25

1      A.   Maybe.  I don't know of the agreement.

2      Q.   And did your husband tell you that he had this

3   conversation with Dr. Saltzman at Inotek --

4      A.   Yes.

5      Q.   -- and that it was agreed that he would come back

6   three weeks after the surgery?

7      A.   Yes.

8      Q.   And by the way, Dr. Saltzman at Inotek, is he any

9   relation to the Dr. Saltzman --

10     A.   No.

11     Q.   -- who treated your husband or was involved in your

12  husband's treatment?

13     A.   No.

14     Q.   Was it determined that the tumor was inoperable?

15     A.   During the surgery, yes.

16     Q.   So there was nothing they could do for your

17  husband, is that right?

18     A.   Yes, exactly.

19     Q.   And at that point once the surgery was concluded,

20  did Dr. Osteen give your husband a prognosis with regard

21  to --

22     A.   Yes.

23     Q.   -- his situation?

26

1    A.   Yes.

2    Q.   What did he tell him?

3    A.   That he has 12, 18 months to live.

4    Q.   Did Dr. Glik return to work at Inotek --

5    A.   No.

6    Q.   -- after his surgery?

7    A.   No.

8    Q.   I have to ask these questions, you understand.

9    A.   Sure.

10   Q.   Why didn't he return?

11   A.   First of all, he had to spend four weeks in the

12   hospital after the surgery.  The recovery was very slow.

13   And after that he was too sick to work at all.

14   Q.   Do you know whether your husband spoke to

15   Dr. Saltzman at Inotek after his surgery?

16   A.   Um, I'm not sure.  He spoke to Dr. Timashpolsky who

17   was his immediate supervisor.

18             MR. BERGER:  Could we have a spelling of that

19   for the record?

20   A.   Timashpolsky would be T I M A S H P O L S K Y.  Can

21   I again look at that?

22   Q.   Sure.

23             (Document Perusal.)

27

1       A.   No, he didn't speak with Dr. Saltzman after the

2   surgery.

3       Q.   I'm not, oh, here it is.

4                (Document Perusal.)

5       Q.   Your notes indicate that Dr. Glik informed

6   Dr. Timash --

7       A.   Timashpolsky.

8       Q.   -- polsky about his situation on December 2nd,

9   2000?

10      A.   That's right.

11      Q.   And what's the basis for that statement in your

12  notes?

13      A.   I was making these notes as the things were going,

14  so, but whatever was happening I would just make a note of

15  it.

16      Q.   Were you present when Dr. Glik spoke with

17  Dr. Timashpolsky on that occasion?

18      A.   No.

19      Q.   So do you have that information as a result of your

20  husband telling you about it?

21      A.   That's right.

22      Q.   Was anybody else present when your husband told

23  you?

28

1     A.  I don't remember that.  My husband was in the

2  hospital at the time.

3     Q.  Did your husband receive any messages from Inotek?

4     A.  Well, first Dr. Timashpolsky, I think even came to

5  visit him there, I'm not sure about it, he called him and

6  talked to him but I don't really remember anything more.

7     Q.  Did your husband tell Dr. Timashpolsky that he

8  would not be able to return to work?

9     A.  I think so.  I don't know.

10    Q.  Your notes indicate that your husband got messages

11  about people missing him?

12    A.  Yea.

13    Q.  What do you remember about that?

14    A.  I think people called him while he was in the

15  hospital and he was telling me that he got some messages.

16    Q.  Did Dr. Glik speak to anyone else at Inotek to your

17  knowledge after his surgery?

18    A.  No.

19    Q.  Did Inotek continue to pay Dr. Glik his salary?

20    A.  Up to the end of December 2000.

21    Q.  Were you personally aware prior to your husband's

22  surgery of any insurance applications that your husband had

23  made through Inotek?

31

1   application?

2        A.   Yes.

3        Q.   And if you'd turn to the last page, page 3, it says

4   "please see enclosed computer printout."  Is the computer

5   printout that's referenced, is that page 2 of this

6   document?

7        A.   Yes.

8        Q.   And did you see that document at the time that

9   Dr. Glik prepared it?

10        A.   Yes.

11        Q.   Did you assist him in preparing it?

12        A.   Yes.

13        Q.   Did you review it to make sure that in your view it

14   was accurate?

15        A.   Yes.

16        Q.   Did you provide any assistance to Dr. Glik in

17   connection with the preparation of the application for

18   individual disability insurance that he filed?

19        A.   Not that I remember.  I'm not sure.

20        Q.   Was it your understanding that if the UNUM

21   Insurance Company accepted Dr. Glik's application that

22   Inotek would pay the premiums for that policy?

23        A.   Absolutely, yes.

54

1    information, but she explained it to me that she was in the

2    mediation business, she couldn't make them do whatever they

3    should do, and she finally said that there are cases when

4    the employers step forward and do the right thing, but

5    evidently, it didn't happen in this case, and at the end of

6    our relationship, she said that I have a very good case for

7    a private attorney, that's what I should do.

8        Q.  Did she tell you that she was closing her file?

9        A.  Yes.

10       Q.  Did she tell you that the Attorney General's Office

11   wasn't going to take any formal action on the complaint?

12       A.  Yes.

13               (Exhibit No. 10 marked.)

14       Q.  I'm going to show you what's been marked as

15   Exhibit 10.   Is Exhibit 10 a copy of a letter that your

16   husband wrote to Judith dePontbriand in the Attorney

17   General's Office?

18               (Document Perusal.)

19       A.  Yes.

20       Q.  Now, would you look at the second page, and in the

21   third to the last paragraph your husband writes "These are

22   the results of inertia and deliberate procrastination of

23   the Inotek Corp. and UNUM Life Insurance Company."   Do you

55

1   see that?

2       A.   Which, the third one down?

3       Q.   The third to the last paragraph.

4       A.   Yes.

5       Q.   Do you see that?

6       A.   Yes.

7       Q.   Did you help him write that sentence?

8       A.   Well, he wrote it and I helped with translation and

9   I typed it, yes.

10      Q.   And what was the basis for that accusation that

11  UNUM had engaged in deliberate procrastination with respect

12  to Dr. Glik's application?

13      A.   Because the long-term disability was not being

14  issued.

15      Q.   Is there any other basis for that statement that

16  Inotek Corporation engaged in deliberate procrastination?

17      A.   Could you repeat that?

18      Q.   Is there any other basis for that statement that

19  Inotek engaged in deliberate procrastination --

20      A.   It was --

21      Q.   -- with respect to your husband's application?

22      A.   I'm sorry.  It was all about the long-term

23  disability not being issued to my husband.

58

1    this document to you?

2        A.   I don't remember how I got it.

3        Q.   And do you see that attachment D --

4        A.   Yes.

5        Q.   -- to the letter is a copy of the individual

6    long-term disability insurance application that your

7    husband submitted to UNUM?

8        A.   Yes.

9        Q.   What was the result of the Division of Insurance's

10   investigation into your husband's complaint?

11       A.   The result was that the case was complicated and

12   the Division of Insurance is not going to litigate it.

13   It's for a private attorney to do.

14       Q.   And Dr. Glik's complaint to the Division of

15   Insurance was against UNUM, is that right?

16       A.   Yes.

17       Q.   And did the Department of Insurance communicate

18   that result that you've described to you or to Dr. Glik?

19       A.   No, all the communications were to Dr. Glik.

20       Q.   He was still alive at the time?

21       A.   Yes.

22       Q.   And did Dr. Glik ever sue UNUM?

23       A.   No.

67

1    Q.  Did you at some point come to understand that?

2    A.  At some point, yes, somebody explained it.

3    Q.  So the, is it fair to say that from your husband's

4    and your point of view, Inotek punished your husband

5    financially because his application for long-term

6    disability insurance was not approved?

7    A.  It was, it was, he was punished financially because

8    it was not paid.

9    Q.  And Dr. Glik stopped working in late November of

10    2000, is that correct?

11    A.  Right before his surgery.

12    Q.  And did you understand that if the long-term

13    disability insurance had been approved there would have

14    been a 3-month elimination period before long-term

15    disability benefits would begin to be paid?

16    A.  As I understood and as I'm sure my husband did,

17    that there is, in every company there is a policy of

18    short-term disability and then long-term disability so that

19    every period is covered.

20    Q.  And with respect to the policy that Dr. Glik was

21    applying for at UNUM, did you understand that if it had

22    been approved by UNUM that Dr. Glik would be paid

23    disability, long-term disability benefits starting 3 months

68

1    after he was unable to work?

2        A.   When he was applying for long-term disability, yes,

3    filling out the forms, he was just filling out the forms

4    for regular long-term disability without any dividends.

5        Q.   With all that's passed, do you now understand that

6    if UNUM had approved the application Dr. Glik's disability

7    benefits would have begun 3 months after he was unable to

8    work?

9                MR. BERGER:   Objection.

10       A.   Now that I read it, maybe yes, if that's their

11   policy.

12       Q.   And 3 months after he began to be unable to work

13   would have been sometime in late February or early March of

14   2001?

15       A.   Yes, yes.

16       Q.   And he died in February of, late February of 2002?

17       A.   Two.

18       Q.   So if UNUM had granted the application, approved

19   the application, he would have received approximately one

20   year of long-term disability benefits from UNUM, is that

21   right?

22       A.   If that was the policy, yes.

23       Q.   And did you understand that the benefit that UNUM

69

1    would pay if the policy had been approved was not his total

2    salary but a percentage of his salary?

3        A.   I never thought about the details of this policy.

4        Q.   You indicate in your answers to Inotek's

5    interrogatories that he would have received $30,251 of

6    income until his death --

7        A.   Okay.

8        Q.   -- following December 30, 2000, right?

9        A.   Right.

10       Q.   Do you mean there that if he continued working he

11   would have earned $30,251, or that he would have received

12   $30,251 in disability insurance benefits?

13       A.   Disability.

14       Q.   So from your point of view, did Inotek punish your

15   husband financially in the amount of $30,251?

16            MR. BERGER:   Objection.

17       A.   I think in one of the exhibits, in the application

18   that was kind of processed through UNUM, they have a number

19   there, the benefits that would have been paid in case it

20   was done.   So the benefits would be, there are two kinds of

21   benefits - income benefits and disability plus benefits and

22   the numbers are 2,150 and 950.

23       Q.   This is a document that you've handed me.   Did you

70

1   produce this?

2       A.  I just did it, well, that's the calculation that I

3   did.

4               (Exhibit No. 18 marked.)

5       Q.  Can you identify Exhibit 18?

6               (Document Perusal.)

7       A.  Yes.

8       Q.  Is that a copy of your answers to Inotek's

9   interrogatories?

10      A.  Yes.

11      Q.  And you were asked to state the damages that

12  Dr. Glik suffered as a result of the acts or omissions of

13  Inotek?

14              MR. BERGER:  Is there a copy I can read

15  along?  Thanks.

16      Q.  And you stated that he suffered $30,251 in income

17  loss?

18      A.  Yes, I had another way, I realized there might be

19  documents which give a number of 2,149 a month, and this

20  time around I looked at the application that went through

21  UNUM and somebody put these numbers there.

22      Q.  Okay.  We'll get back to this maybe after lunch and

23  I don't think we will be too long after lunch.

76

1    any Inotek policies, is that correct?

2                (Document Perusal.)

3        A.  I'm just looking for it.

4                (Document Perusal.)

5        Q.  I think, if I can help you, are you looking for the

6    entry of January 30th on page 3, Mrs. Glik called Mr.

7    Gosselin to ask for an employee handbook --

8        A.  Yes.

9        Q.  -- that he never received?

10       A.  We received it after; he did mail it to me.

11       Q.  So he never got any policy book explaining what the

12   long-term disability benefit was at Inotek while he was

13   working there, is that correct?

14       A.  Yea, that's correct, I don't remember any.

15       Q.  And while he was receiving pay from Inotek, he

16   never got a policy from Inotek describing the long-term

17   disability benefit, correct?

18       A.  Not to my recollection, I don't think so.

19       Q.  Did you eventually receive the employee handbook?

20       A.  Yes.

21       Q.  I'm going to show you again Exhibit 12, and

22   Attachment B in Exhibit 12 if you could look at that.

23       A.  Mm-hmm.

77

1    Q.   Is that a copy of the Inotek policy regarding the

2    long-term disability plan that was in the employee handbook

3    that you eventually received?

4    A.   Yes.

5    Q.   And that policy statement there, Attachment B in

6    Exhibit 12, doesn't give any specifics as to the type of

7    specific benefit that would be provided under long-term

8    disability, does it?

9    A.   No, it doesn't.

10   Q.   While Dr. Glik was employed by Inotek, did he ever

11   receive any group disability insurance booklet?

12   A.   What group disability, what are you referring to?

13   Q.   On page 1 of your notes, Exhibit 4, would you just

14   take a look at the fifth paragraph.

15            (Document Perusal.)

16   A.   It's about application for individual disability

17   insurance.

18   Q.   The last sentence says "He never received a group

19   disability insurance booklet which outlines the specifics

20   of LTD coverage."

21   A.   That's right.

22   Q.   Is that a correct statement?

23   A.   Yes.

82

1                    COMMONWEALTH OF MASSACHUSETTS

2        I, Kathleen Benoit, a Notary Public in and for the
    Commonwealth of Massachusetts, do hereby certify there came
3   before me on June 20, 2006, the person hereinbefore named
    was duly sworn to testify to his knowledge concerning the
4   matters in controversy in this cause; that he was thereupon
    examined upon oath, and that the deposition is a true
5   record of the testimony given by the witness.
        I further certify that I am neither attorney nor
6   counsel for, nor related to or employed by any of the
    parties to the action in which this deposition was taken;
7   and further, that I am not a relative or employee of any
    attorney or counsel employed in this case, nor am I
8   financially interested in this action.

9        IN WITNESS WHEREOF, I have hereunto set my hand and
    affixed my seal June 22, 2006.

10

11

12

13

14                               Kathleen M. Benoit
                                 Notary Public
15
                                 My commission expires
16                               May 25, 2012

17
    PLEASE NOTE:
18
        THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT
19  APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS UNLESS
    UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE CERTIFYING
20  REPORTER.

21

22

23

                     LEAVITT REPORTING, INC.



April 10, 2001

Judith dePontbriand
Regulated Industries Division
Public Protection Bureau
Office of the Attorney General
200 Portland Street
Boston, MA 02114

From: Michael Glik

Dear Madam,

Since I wrote to your office on March 10, 2001, I have received additional information:

1.    Inotek Corporation started my application for long-term disability in mid-
      December, 2000. (I would remind you that I was hired on September 23, filled
      out the application on October 2, and had surgery on November 21, 2000).

      Thus, intentionally or by chance, Inotek Corp. created a situation that can be
      regarded as a pre-existing condition by the Insurance Company.

2.    Up to this time, Inotek Corp. did not make a pre-payment for the policy, which
      contributed to postponing of my disability policy – the benefit that every full-time
      employee is entitled to in Inotek Corp.

3.    The management of Inotek Corp. was aware of the nature of my disease --
      sigmoid cancer even before my surgery (October 27, 00), and that the cancer was
      nonremovable after my surgery (November 27,00). I personally talked to Dr.
      Saltzman (President of Inotek Corp.) regarding this situation. Mr. Gosselin
      (CFO) knew about it when he first spoke to the insurance company about the
      application. He could not have avoided this question because it was the very
      reason for seeking the long-term disability. Still, they failed to communicate this
      information to the Insurance Co.

As a result of the violations that Inotek Corp. did, the UNUM insurance Co. would not
pay my disability insurance.

On their own part, the UNUM Life Insurance Company has also violated my rights:

1.    In their response UNUM Company mentioned that my individual disability
      application was received on December 15, 2000. I applied for Individual

Disability Insurance (October 2, 2000) soon after I was hired. It was never my responsibility to transfer the application to the insurance company.

2.    The fact that no pre-payment was made with the application cannot be held against me. It is the duty of the underwriting company to discuss this question with my employer with whom they have the contract to ensure the disability policy for the employees.

3.    UNUM Co. is asserting that up to this moment they have no information about the diagnosis of my condition. The UNUM insurance Co. has the responsibility to request the information from Dr. Eugene Vaninov – my Primary Care Physician (t. 617-254-4966), Dr. Robert Osteen– surgeon at General Surgery Department of BWH (t. 617-732-6718), and Dr. Peter Enzinger- oncologist at Dana-Farber Institute (t. 617-632-5136). They chose not to do it.

In my letter of March 20, 2000, I informed the Insurance Co. as to the nature of my condition, as well as the date of the application, the reason why the pre-payment had not been made etc. However, I never got an answer to this letter.

To sum it up, lack of diagnosis, no pre-payment and late date of application did not happen through my fault or oversight. These are the results of inertia and deliberate procrastination of the Inotek Corp. and UNUM Life Insurance Co.

As a result, being terminally ill, I do not have any income whatsoever.

Please notify me about the potential administrative or legal ways to resolve my situation.

Sincerely yours,

Michael Glik





**UNUM.**

*Protecting everything you work for·*

June 7, 2001

Walter Marcinkus, Senior Insurance Compliance Analyst
Commonwealth of Massachusetts
Office of Consumer Affairs and Business Regulation
Division of Insurance
One South Station
Boston, MA  02110-2208

RE:     DOI File #:      565036
        NAIC#:           565-62235 – UNUM Life Insurance Company of America
        Policy #:        LAR451315
        Insured:         Michael S. Glik

Dear Mr. Marcinkus:

Your letter dated May 21, 2001, addressed to Joan Sarles Lee, has been forwarded to this department for response.  We appreciate the opportunity to respond to your request.

The situs of the Individual Disability Income contract applied for by Dr. Glik is Massachusetts.

In keeping with your request, each concern raised by Dr. Glik in his letter dated April 7, 2001, is addressed below:

1)  As noted in my original letter dated March 22, 2001, to you, a copy of which is enclosed as Attachment A, there is no group policy and there is no contractual relationship between UNUM and Inotek Corporation.  Dr. Glik's application was for an individually underwritten, guaranteed renewable disability insurance policy.  The page Dr. Glik submitted with his original complaint, a copy of which is enclosed as Attachment B, is neither a UNUM document, nor a reflection of the individual disability insurance coverage Dr. Glik applied for from UNUM.

If UNUM had approved Dr. Glik's application for coverage, the policy issued would have been an individual policy issued to Dr. Glik.  The premiums for the policy would have been remitted to UNUM by Inotek in accordance with UNUM's list bill.  Inotek merely provides certain administrative services; it is not the policyholder. Inotek has no rights or obligations under the terms of the individual policies.  The mere fact that Inotek's management had knowledge of Dr. Glik's diagnosis has no bearing upon Dr. Glik's application for insurance.  Moreover, Inotek's management did not share their knowledge with UNUM and UNUM had no responsibility or authorization to obtain it from

UNUM PROVIDENT CORPORATION
2211 Congress Street, Portland, Maine 04122
207.575.2211

Unum is the marketing brand of UnumProvident Corporation

Inotek. Accordingly, UNUM did not seek or obtain any information from sources other than the doctor whom Dr. Glik authorized to provide us with medical records (i.e., Dr. Eugene Vaninov) and the applicant himself.

Currently, the only knowledge UNUM has regarding Dr. Glik's diagnosis of sigmoid cancer is from the summary of events that Dr. Glik provided to you as support for his original complaint, a copy of which is enclosed as Attachment C. As a result of the summary of events and the medical records provided by Dr. Vaninov, UNUM has sufficient documentation to support a denial of Dr. Glik's application. Moreover, it also appears that Dr. Glik failed to complete questions 23(b) and 23(c) on the Application for Disability Insurance, regarding symptoms and medication over the prior 12 months and responded falsely to questions 21(b) and 21(d). Dr. Glik's Application for Disability Insurance is enclosed as Attachment D.

Regarding Dr. Glik's statement that "UNUM Insurance Co. had the responsibility to request the information from Dr. Eugene Vaninov…,Dr. Robert Osteen…, and Dr. Peter Enzinger", UNUM did request records from Dr. Vaninov. UNUM did not become aware of Dr. Osteen and Dr. Enzinger, however, until the summary of events was received by UNUM. By the time UNUM was in receipt of the information, the underwriting decision had already been made and there was neither a need nor an obligation to order additional medical records. Moreover, Dr. Glik has not identified any inaccuracies in the information provided by Dr. Vaninov, which might have changed the underwriting decision.

2)   As explained above, UNUM does not have a contractual relationship with Inotek. In fact, by signing the application, Dr. Glik agreed to the following provision: "Payment of all premium is my responsibility as owner of the policy. If my employer, producer, or any other person collects, pays or forwards any part of the premium for this policy, they act as my agent and not as agent for the Company." See page 5, provision 5 of the Application which is enclosed as Attachment D. Thus, Dr. Glik's application makes clear that UNUM had no obligation to discuss prepayment or lack thereof with Dr. Glik's employer.

Further, Dr. Glik did not enter into a prepayment agreement at the time of application. UNUM's standard application includes a prepayment option, the terms of which are outlined on the application itself. See Attachment D, page 9. Since Dr. Glik did not make any prepayment and did not enter into prepayment agreement, Dr. Glik had no reasonable expectation of coverage.

3)   The date Dr. Glik's application was received by UNUM was only mentioned in my March 22, 2001, letter to establish the chronology of events leading up to our underwriting decision. It had no bearing on our review of Dr. Glik's application.

If you have specific questions about this response, please contact me directly. If you require additional written correspondence or documentation on this matter, please send your request to: Deborah Jewett, Manager, Customer Relations, 2211 Congress Street, Portland, Maine 04122. Forwarding this request

through our Compliance Department will ensure that it is logged appropriately and responded to within the required timeframe.

As requested, I have enclosed two copies of this letter. In addition to the attachments mentioned above, per your request, I am attaching a specimen contract enclosed as Attachment E. No contract was ever issued to Dr. Glik.

Sincerely,

*Susan R. Nelson*

Susan R. Nelson
Chief Underwriter
UNUM Life Insurance Company of America

Enc

*ATTACHMENT A*

 UNUM.

**Unum Life Insurance
Company of America**
2211 Congress Street
Portland, Maine 04122

March 22, 2001

Walter Marcinkus
Senior Insurance Compliance Analyst
Commonwealth of Massachusetts Office of Consumer Affairs and Business Regulation
Division of Insurance
One South Station
Boston, MA 02110-2208

RE:     Michael S. Glik
        Policy Number: LAR451315
        DOI File Number: 565036

Dear Mr. Marcinkus:

I am responding to your letter of March 13 regarding a complaint received by your office from the above mentioned applicant relative to the postponement of his individual disability application to UNUM Life Insurance Company.

Dr. Glik's application for individual disability coverage was received by UNUM Underwriting on December 15, 2000. Dr. Glik signed this application on October 2, 2000.

During the course of underwriting, medical records were requested from Dr. Vaninov due to medical history as outlined on the application. These records noted a history in October 2000 of consultation regarding testicular pain and a possible abdominal mass. Of note in these records as well was a history of surgery for rectal cancer; this history was not disclosed on Dr. Glik's application. As no diagnosis for the current complaint was available at time of underwriting, and no pre-payment was made with the application, the decision was made to postpone any consideration until such time as a diagnosis was available.

Please note that the policy applied for was an individually underwritten, guaranteed renewable disability policy, with no underwriting limitation as to pre-existing conditions. Based on the information sent to you by Dr. Glik, it appears he may be confusing this policy with a group long-term disability policy possibly available through his employer

Please feel free to contact me should you have any questions or need additional information.

Sincerely,

Susan R. Nelson
Chief Underwriter
Individual Disability Underwriting
Unum Life Insurance Company of America

ATTACHMENT B

| Authorized: | Policy: | Long-Term Disability |
| --- | --- | --- |
| | Effective Date: | |
| | Policy Number: | B5 |

1.0    Purpose

To establish a Long - Term Disability plan for all full-time employees of Inotek Corporation.

2.0    Policy

2.1    It is the responsibility of the Human Resources Department to administer the Long-Term Disability Plan and employee enrollment.

2.2    All full time employees are eligible for LTD Insurance on the first day of active employment.

2.3    Each full-time employee will receive a Group Disability Insurance booklet, which outlines the specifics of the LTD coverage.

2.4    LTD insurance premiums are fully paid by Inotek Corporation with no co-payment by the employee.

3.0    Procedure

After an employee has been absent from work due to sickness or injury for a period of 60 days, the Human Resources Department will contact the employee and the attending physician to receive a prognosis on the employee's condition. If the prognosis is such that the employee is expected to be away from work for a period longer than 90 days, Human Resources will assist the employee in completing the insurance forms necessary to apply for benefits under the LTD policy.

4.0    Exceptions

Exceptions to this policy require the prior written approval of the President of Inotek Corporation.

ATTACHMENT C

Explanation

Since September 22 through December 31, 2000 I was a full-time employee of Inotek
Corporation that provided me as part of my benefit package with the Individual Long-
Term Disability insurance coverage with UNUM Life-Insurance Company of America.
November 21, 00 – I had surgery for cancer of transverse colon that proved to be non-
removable.
February 13, 2000 – UNUM Life Insurance Company of America denied my insurance
coverage for the reasons of pre-existing condition (see enclosed copy of the letter).
However, this is not true for the following reasons:
- I had my surgery for rectum tumor in Moscow, Russia, in 1973 (about 28 years
  ago). The surgery dates and extent can be witnessed by a dozen of US citizens.
- Since I came to the USA in February 1993 I first sought medical advice for my
  colon problem in October 2000.
For the eight year period:
- I did not receive any medical treatment or consultation for the colon disease.
- The first apparent symptoms of the disease were discovered accidentally by an
  urologist in October, 2000
- In 1973 I had rectal tumor, in 2000 – it is colon cancer (which can be verified by
  colonoscopy results).
- The suggestion by the Insurance Co. that these two diseases can share the same
  etiology is groundless for the following reasons:
    a. There is no way of biopsy verification (of the 1973 tumor)
    b. Absolutely no symptoms of the disease and good health till October, 2000:
  ■ invariable 80-100 hour working week (can be substantiated by my paychecks)
  ■ stable stamina in the working place
  ■ no sick days throughout my whole working history
  ■ never sought medical advice except for my high blood pressure problem
I am looking forward for your help in reinstating my Long-Term Disability policy at the
time when my life span is limited and I do not have any other means to provide for
myself.
            You can request my medical records from:
Dr. Eugene Vaninov – Primary Care Physician – t. 617-254-4966
Dr. Robert Osteen – Surgeon at Brigham and Women's Hospital – t. 617-732-6718
Dr. Peter Enzinger – Oncologist at Dana-Farber Center – t. 617-632-5136

Contacted:    UNUM Life Insurance Company of America, Individual Disability
              Underwriting Dept.2211 Congress Street, Portland, Maine, 04122

              Ms. Carolyn Tyson (agent at Boyd-Neelon Insurance Associates Co. -an
              intermediary insurance agency – who connected Inotek Corporation and
              UNUM Life Insurance Company) (t. 978-443-7000).

Enclosed:
        Application for Individual Disability Insurance
        Letter from UNUM Co. (February 13, 2001), denying coverage
        Long-Term Disability policy (from Employee Handbook of Inotek Corp.)

    JMG    2-27-01

*ATTACHMENT D*



UNUM Life Insurance Company of Americ
Portland, Maine 04122-215

## APPLICATION FOR DISABILITY INSURANCE - PART I

NOTE: "YOU" and "YOUR" within this application refer to the Proposed Insured. **PLEASE PRINT ALL INFORMATION.**

### Personal Profile

**1 a)** Your Full Legal Name (Last, First, Middle)
GLICK MICHAEL S

**c)** ☑ Male   ☐ Female

**e)** Current Age: 54

**f)** Birthplace (State, Country) Russia

**g)** Citizenship: ☑ US  ☐ Canadian  ☐ Other
* If other, # of yrs. worked/resided in US_____ yrs.

**2 a)**

**b)** Business Name and Address: (Do Not Use P.O. Box)
Employer Name  INotek Corp.
Street _____ Ste.# _____
City _____ State ____ Zip _____

**c)** Mailing Address if other than residence or business:
Box#/Street  Same
City _____ State _____ Zip _____
Apt.# _____

### Occupation

➡ **PRODUCER: Please designate occupation class of applicant** AA ⬅

**3 a)** Occupation and/or Job Title: Researcher
Second Occupation (if any):

**b)** Professional Designation or Degree: MD

**c)** Please provide specialty, if any:

**d)** Yrs. in occupation: 3?   Yrs. with employer: O

**e)** Percent of business you own: O %

**f)** Nature of Business: Biotech R+D

**g)** # of years business has been in existence: 3

**h)** # of full-time employees in business: 20

**i)** Average # of hours worked per week: 40

**j)** Using a typical work week, please describe your occupational duties by indicating the approximate % of time devoted to the following duties:
____% Sales ____% Travel ____% Managerial/Admin. ____% Physical/Manual
9 % Other  If other, please provide details. Research

### Income

**4** Annual Earned Income from personal services as reported to the IRS on your personal or business federal tax return:

|  | Actual Income ~~Last Year~~ CURRENT Specify Yr. _ _ _ _ | Actual Income 2 Years Ago Specify Yr. _ _ _ _ |
|---|---|---|
| **Non-Business Owner :** | | |
| W-2 Income | $ 37,000 | $ |
| 1099 Income less business expenses | $ | $ |
| Other (specify): | $ | $ |
| **Business Owner:** | | |
| W-2 Income from your business | $ | $ |
| Your share of business net profits/losses after all business expenses | $ | $ |
| Other (specify): | $ | $ |

Business Type (check one):____ Proprietorship ____ Partnership____ Corporation____ S-Corporation____ Other (specify)_____

### Insurance & Other Information

**5 a)** Have you ever applied for life, medical, or disability, long term care or nursing home insurance which was declined, postponed, rescinded or modified in any way, or have you been refused renewal or reinstatement of insurance?  ☑ No  ☐ Yes  If Yes, please give details:

**b)** Have you ever filed a disability claim, received benefits or had benefits denied (including Worker's Compensation or State disability claims)?  ☑ No  ☐ Yes  If Yes, please give details:_____

List below all disability coverage in force or applied for in the last 12 months. Type should be shown as:
Individual, A-Association, G-Group (including employer sickpay). OE-Overhead, BS-BuySell, KP-Key Person.

| COMPANY NAME (IF COVERAGE IS PENDING, CHECK HERE ►) | TYPE | ISSUE YEAR | MONTHLY BENEFIT AMOUNT | BENEFIT PERIOD | PERCENTAGE PAID BY | | WILL COVERAGE BE PERMANENTLY | | DATE OF REPLACEMENT/ CHANGE (WITH DETAILS) |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | SELF | EMPLOYER | REPLACED* | CHANGED | |
| Apollo Security | G | ---- | | | | | | | __ / __ / __ |
| (Terminated | | ---- | | | | | | | __ / __ / __ |
| 5/1/02 ) | | ---- | | | | | | | __ / __ / __ |
| ( None ) | | ---- | | | | | | | __ / __ / __ |

Producer must comply with all state replacement regulations.

Are you currently covered by any wage continuation program or disability insurance not mentioned above?
☒ No ☐ Yes   *If Yes, please give details:* _____

Will you be eligible for any wage continuation program or disability insurance within the next 12 months?
☒ No ☐ Yes   *If Yes, please give details:* _____

Have you ever been the subject of any professional disciplinary proceedings? ☒ No ☐ Yes   *If Yes, please give details:* _____

Have you or has a business owned by you ever been the subject of a bankruptcy or reorganization proceeding?
☒ No ☐ Yes   *If Yes, please give details:* _____

## Individual Disability Plans

### INCOME BENEFIT

) Monthly Benefit Amount $ 2150

**Benefit Period**
☒ T65 ☐ 5 year
☐ 2 year

**Elimination Period**
☒ 90 days ☐ 180 days
☐ 360 days ☐ 720 days
(applies to Income Benefit and Disability Plus Benefit, if selected)

) **Optional Benefits:**
☒ Cost of Living
☐ Future Adjustment Option $_____
☐ Nondisabling Injury
☐ Own Occupation Protection
☐ Savings Supplement: ☐ $250 ☐ $500 ☐ $750
☐ $1000 ☐ $1250 ☐ $1500 ☐ Other $_____
☐ Other:_____

) **Additional Coverage:**
Monthly Benefit Amount: $_____
Benefit Period: _____
Elimination Period: _____
Optional Benefits (Please List):
1._____ 2._____ 3._____
4._____ 5._____

### DISABILITY PLUS BENEFIT

d) Monthly Benefit Amount $ 950

**Benefit Period**
☒ T65 ☐ 5 year ☐ 2 year
(Must be less than or equal to the Income Benefit)

**Elimination Period**
(Will be the same as the Income Benefit)

e) **Optional Benefit:**
☐ Cost of Living

f) **Additional Coverage:**
Monthly Benefit Amount: $_____
Benefit Period: _____
Elimination Period: _____
Optional Benefit (Please List):
1._____

## Loss Payee (Designated person/entity to receive benefits, if other than Proposed Insured):
☐ Employer        ☐ Other:   Name_____
                            Address_____
                            City_____ State_____ Zip_____

## Special Requests
☐ Date to Save Age        ☐ Special Policy Date __ __/__ __/__ __ __ __

## Business Disability Plans

12  **a)** ☐ Overhead Expense: Complete Questions 12b - 15
☐ Key Person: Complete Supplemental Application
☐ Buy Sell:  Complete Supplemental Application

**b) OVERHEAD EXPENSE COVERAGE INFORMATION:**

Monthly Benefit Amount     Benefit Period:     Elimination Period:
$_____     ☐ 12 mos.  ☐ 18 mos.  ☐ 24 mos.     ☐ 30 days   ☐ 60 days   ☐ 90 days

**c) OPTIONAL BENEFITS FOR OVERHEAD EXPENSE POLICY**
☐ Partial Disability                    ☐ Business Continuance: $_____
☐ Other:_____          Benefit Period:     ☐ 6 mos.   ☐ 12 mos.
                                         Elimination Period:  ☐ 30 day  ☐ 60 day  ☐ 90 day

13  **Loss payee  (Designate person/entity to receive benefits – can not be the Proposed Insured):**
☐ Employer/Business/Practice        ☐ Other:   Name_____
                                               Address_____
                                               City_____State_____Zip_____

14  **List below your share of the total monthly expenses of the business entity:**

| | | | |
|---|---|---|---|
| Rent or Mortgage Payment | $_____ | Utilities | $_____ |
| Employee Salaries * | _____ | Maintenance | _____ |
| Employee Benefits * | _____ | Accounting/Legal Fees | _____ |
| Malpractice Insurance | _____ | Professional Dues | _____ |
| Property and Casualty Insurance | _____ | Subscriptions | _____ |
| Property Taxes | _____ | Postage/Stationery | _____ |
| Equipment Payments | _____ | Other Miscellaneous | _____ |
| Auto Lease Payments | _____ | **TOTAL MONTHLY EXPENSES** | $_____ |

*Do not include salaries, drawing accounts, profits, benefits and other forms of remuneration which are payable to you or to anyone employed in your business who performs the same regular occupation as you do.

15  **SPECIAL REQUESTS**
☐ Date to Save Age        ☐ Special Policy Date __ /__ /__ __ __ __

## Payment / Billing Information

| | INDIVIDUAL DISABILITY | BUSINESS DISABILITY |
|---|---|---|
| 16  Who will pay the premiums? | ☐ Proposed Insured<br>☐ Proposed Insured -- Salary Deduction<br>☒ Employer<br>☐ Split by percent:<br>   Employer will pay_____% | ☐ Employer/Business/Practice<br>☐ Other: (Specify in Special Requests) |
| 17  Send bills to: | ☐ Residence Address<br>☒ Business Address<br>☐ Other: (Specify in Special Requests) | ☐ Business Address<br>☐ Other: (Specify in Special Requests) |
| 18  How often do you want to be billed? | ☒ Annually    ☐ Semi-Annually<br>☐ Quarterly    ☐ Monthly (Only For Monthly FlexBill & Automatic Bank Withdrawal) | ☐ Annually ☐ Semi-Annually<br>☐ Quarterly☐ Monthly (Only For Monthly FlexBill & Automatic Bank Withdrawal) |
| 19  Special methods: | FlexBill:<br>☐ New   ☒ Add to existing # 4 9 8 6 3 6-<br>FlexBill with Automatic Bank Withdrawal<br>☐ New*  ☐ Add to existing #_____<br>   Special Draw Day_____(1-28)<br>☐ Automatic Bank Withdrawal<br>☐ New*  ☐ Add to existing #_____<br>   Special Draw Day_____(1-28)<br>*If NEW bank withdrawal, complete Authorization on page 10. | FlexBill:<br>☐ New   ☐ Add to existing #_____<br>FlexBill with Automatic Bank Withdrawal<br>☐ New*  ☐ Add to existing #_____<br>   Special Draw Day_____(1-28)<br>☐ Automatic Bank Withdrawal<br>☐ New*  ☐ Add to existing #_____<br>   Special Draw Day_____(1-28)<br>*If NEW bank withdrawal, complete Authorization on page 10. |

|  | | YES | NO |
|---|---|---|---|
| ) During the last 30 days, have you worked less than your usual number of hours (stated in question 3) because of sickness or injury? | | ☐* | ☑ |
| ) In the past 12 months, have you had any indication of, been told you had, or been treated for cancer, a stroke, any heart disease or disorder, or any psychological or emotional disorder? | | ☐* | ☑ |

**IF EITHER 20a OR 20b ARE ANSWERED "YES", PREPAYMENT CANNOT BE ACCEPTED.**

) Height: _5_ ft. _11_ in.   Weight: _225_ lbs.      d) Name and Address of Personal Physician: **(If none, please indicate)**
_Dr Van now    Brighton_

Weight change last year: _—_ lbs.
☐ Gain ☐ Loss   Reason: _____
_____

Date last seen: _10.2.6/19 9_____ Reason: _neck back pn_
Results: _physical therapy_

**OT COMPLETE QUESTIONS 21-25 IF YOU ARE PROVIDING A UNUM MEDICAL EXAM.**

**Have you ever had, been told you had, or been treated for** (circle all conditions that apply and give details in question 25):

|  |  | YES | NO |
|---|---|---|---|
| a) | chest pain, high blood pressure, palpitations, or any disease or disorder of the heart, or circulatory system, blood or blood vessels, lungs, bronchial tubes or respiratory system? | ☑ | ☐ |
| b) | colitis, chronic diarrhea, cirrhosis, disease or disorder of the stomach, intestines, rectum, liver or digestive system? | ☐ | ☑ |
| c) | disease or disorder of either kidney, the prostate, urinary, or reproductive organs, or any sexually transmitted disease? | ☐ | ☑ |
| d) | polyp, tumor, cancer, or a disease or disorder of the immune system? | ☐ | ☑ |
| e) | chronic fatigue, Chronic Fatigue Syndrome, Epstein Barr virus, diabetes, enlarged glands, or any glandular or thyroid disorder? | ☐ | ☑ |
| f) | epilepsy, headaches, migraines, convulsions, dizziness, fainting, paralysis, multiple sclerosis or any other disease or disorder of the brain or nervous system? | ☐ | ☑ |
| g) | mental illness, anxiety, depression, exhaustion for over one week duration, or any psychological or emotional condition or disorder? | ☐ | ☑ |
| h) | pain in the back or neck, sciatica, any disc disorder, or any other disease or disorder of the neck, back, or spine? | ☐ | ☑ |
| i) | arthritis, fibromyalgia, fibrositis, carpal tunnel syndrome, gout, or any disease or disorder of the muscles, tendons, bone, joints, skin, any connective tissue disease, or any chronic pain condition? | ☐ | ☑ |
| j) | complications of pregnancy including miscarriage, preeclampsia, or cesarean section? | ☐ | ☑ |
|  | Are you pregnant?  If "Yes", Due Date __/__/____ | ☐ | ☑ |
| k) | any injuries due to falls or other trauma, any amputation or deformity, partial or total loss of vision, impaired hearing, impaired speech, or disease or disorder of the eyes or ears? | ☐ | ☑ |
| l) | Alzheimer's disease, dementia, confusion, memory loss, Parkinson's disease, stroke, TIA, tremor, or any neurological disorder? | ☐ | ☑ |

|  |  | | |
|---|---|---|---|
| a) | Have you ever used stimulants, hallucinogens, narcotics or any controlled substance other than prescribed by a physician, or been counseled, treated or arrested for excess use of alcohol or drugs? | ☐ | ☑ |
| b) | Have you been medically treated for, or diagnosed by a member of the medical profession, as having Acquired Immune Deficiency Syndrome (AIDS) or AIDS Related Complex (ARC)? | ☐ | ☑ |
| c) | Have you been tested and informed that you have been exposed to the AIDS virus? | ☐ | ☑ |

|  |  | | |
|---|---|---|---|
| a) | Have you used tobacco/nicotine within the past 12 months? | ☐ | ☑ |
| b) | Are you now taking or have you taken medication (prescription or non-prescription) for any reason within the last 12 months? | ☐ | ☐ |
| c) | Are you now experiencing any symptoms, disease, disorder or condition which might require surgery, impair your health or your ability to work, now or in the future, for which you plan to consult a physician? | ☐ | ☐ |
| d) | Do you need human assistance of any kind to perform everyday activities such as bathing, continence, dressing, eating, using the toilet or transferring (for example from the chair to your bed)? | ☐ | ☑ |
| e) | Do you use any special medical equipment or appliances such as a walker, cane, wheelchair, catheter, oxygen tank, pacemaker, or artificial limb? | ☐ | ☑ |

## edical (Cont'd)

| | | | | YES | NO |
|---|---|---|---|---|---|

Other than already mentioned in this application, have you in the past five years:

a) consulted, been advised to consult or received treatment from any physician, psychiatrist, psychologist, counselor, marital or family counselor, chiropractor or other practitioner, clinic or hospital (include regular checkups)? ................................................................................................................................ ☑ ☐

b) had or been advised to have any surgical operation, hospitalization, medical care, electrocardiogram, x-ray, blood test or other diagnostic test? .......................................................................................... ☑ ☐

5  Give details by Question Number for any "Yes" answers to questions 20 - 24. If additional space is needed, please write the information on a separate Part I or Part II application and sign that form.

| QUEST. # | REASON | DIAGNOSIS/ TREATMENT | NAME AND ADDRESS OF PHYSICIAN AND/OR HOSPITAL | DATE LAST SEEN |
|---|---|---|---|---|
| 21 | high blood pressure | High blood pressure | Dr. Vaninov, Brighton | 10/24/1999 |
| | | | | __/__/____ |
| | | | | __/__/____ |
| | | | | __/__/____ |
| | | | | __/__/____ |
| | | | | __/__/____ |
| | | | | __/__/____ |
| | | | | __/__/____ |
| | | | | __/__/____ |

## AGREEMENT

I (each of the undersigned) have **carefully read** this application and I **understand** and **agree** that:

1. All of the statements made in this application must be and are true, complete and correctly recorded to the best of my knowledge and belief. The Company will rely on the information provided in this application and in any supplemental applications, to determine whether to provide the requested coverage. These completed documents shall form a part of my contract of insurance and any coverage based on such information is contestable in accordance with the provisions of the policy providing such coverage.

2. No agent, producer, medical examiner or anyone other than a Home Office underwriter may waive questions asked or answers given in this application or the medical exam; determine if I am eligible for a policy; make, or promise that I will be issued a policy of insurance; or change or waive any rights or requirements of the Company.

3. If I stated in response to question 6a on page 2 of this application that I would permanently change or replace existing insurance and I have not done so when a disability begins, any benefits payable by the Company as a result of this application will be reduced by the amount of existing coverage which I said I would terminate and my premium will be adjusted to reflect the actual benefits received.

4. If I prepaid premium with this application, insurance will become effective only as provided by the terms of the Prepayment Agreement. I have received a copy of the Conditional Receipt/Prepayment Agreement and agree to its terms.

5. If I did not prepay premium with this application, insurance will be effective when a policy has been delivered to me and I have paid the first premium, provided that, on the later of the delivery date or payment date, the answers in this application and in any supplemental application, medical exam or other questionnaire are then still true and complete.

6. Payment of all premium is my responsibility as owner of the policy. If my employer, producer, or any other person collects, pays or forwards any part of the premium for this policy, they act as my agent and not as agent for the Company. If the Company does not receive premium as due, the policy will lapse.

AGREEMENT (continued from previous page)    **IDA 069118**

If a policy is issued, the effective date will be the date coverage begins, the policy date will be the date premium shall be payable from, the approval date will be the date a Home Office underwriter approved issuance of a policy, and the issue date will be the date a policy is generated in the Home Office.

Changes made by the Company on this application and listed under "Corrections and Amendments" will be considered ratified by me if I accept the policy that is issued unless the changes are prohibited in the state in which that policy is issued.

### CORRECTIONS and AMENDMENTS  (Home Office Use Only)

ny person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents lse information in an application for insurance is guilty of a crime and may be subject to fines and confinement in rison.

igned at ___Lynn, MA___ Date: _10/02/ 2000_    ___MGL14___
City/State                                                    Signature of Proposed Insured

certify that this application was solicited by me; that I personally asked the Proposed Insured each question; and that he Proposed Insured's answers are accurately recorded on the application.

Producer _____

---

### DISCLOSURE AUTHORIZATION

authorize any of the following who have information about me, my health, my finances, or claim history to disclose that nformation to UNUM Life Insurance Company of America and its employees, reinsurers, insurance support organizations, Equifax, Inc., and other authorized representatives: 1) any physician, hospital, clinic, or other medical professional or medical acility; 2) the Medical Information Bureau, Inc., 3) any employers or financial institutions; 4) other insurance companies; 5) any person or organization which has information as outlined in the following paragraph.

To facilitate rapid submission of such information, I authorize all said sources, except MIB, to give such records or knowledge to any agency employed by the Company to collect and transmit such information.

nformation which may be disclosed includes information about my financial condition, physical or mental condition, driving record, use or treatment for use of drugs or alcohol; hobbies, avocations and sports or hazardous activities in which I participate.

- **I understand** this information will be used to underwrite my application for insurance and may be used to evaluate a claim for benefits during the time this authorization is valid.
- **I agree** that this authorization will be valid for two and one-half years from the date I sign it.
- For the purpose of verifying information on this application, my telephone number is ( )_____ (circle: work or home), and I may be reached at that number:(specific time/days)_____.
- If an investigative consumer report is prepared, please interview me: ☐ Yes  ☐ No

**I have read** this authorization and understand that I may receive a copy and that a photocopy of this shall be as valid as the original. I have also read and received a copy of the Notice of Information Practices and agree to its terms.

_____    ___MGL14___    ___16/02/2000___
Witness                                      Signature of Proposed Insured              Date

3000-95                                   6                           (5/98) **IDA 069118**

## Producer Information

6 a)   **For commission purposes, please list the producers for this application.**   **IDA 069118**
Use full names, including complete business names. To ensure proper payment of commissions, include each producer's tax identification number (social security number or corporate tax ID). If more than one producer, please be sure to specify split %. For corporate producer, please specify the signing representative's name and ID#'s.

**Please print all information clearly.**

| UNUM Producer # (if known) | Producer Name (Please specify full name) | SS#/Tax ID# | Split Percentage (Must total 100%) | Indicate to Whom to send correspondence |
|---|---|---|---|---|
| 1. _016777_ | _Boyd - Norton_ | _____ | _100_ % | ☐ |
|  | Signing Representative if Corporate Producer |  |  |  |
| 2. _____ | _____ | _____ | _____ % | ☐ |
|  | Signing Representative if Corporate Producer |  |  |  |
| 3. _____ | _____ | RECEIVED DEC 1 3 2000 By | _____ % | ☐ |
|  | Signing Representative if Corporate Producer |  |  |  |
| 4. _____ | _____ | _____ | _____ % | ☐ |
|  | Signing Representative if Corporate Producer |  |  |  |

b)   Please list the fax machine telephone number of the servicing producer to assure timely communication relating to application/policy status.  (_ _ _)-_ _ _ -_ _ _ _

c)   How long have you known the Proposed Insured?_____

*Do not detach unless payment is made at time of application*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

### CONDITIONAL RECEIPT/PREPAYMENT AGREEMENT

Received $_____ From_____ Date: _ _/ _ _/ _ _ _ _

Thank you for your premium prepayment.

Premium prepayment alone does not mean that you are insured. However, in exchange for payment of 1/10th of the annual premium for the policy you requested, UNUM Life Insurance Company of America agrees to determine if you are insurable according to our standard underwriting practices. If you qualify for coverage, the effective date of this coverage will be as follows:

If the prepayment check is received in the Home Office on the same day as the application, the effective date of coverage will be the latest date of the application or any required exam, test, questionnaire or other supplemental application.

If the prepayment check is received in the Home Office after the application but before the approval date, the effective date of coverage will be the latest date of any required exam, test, questionnaire or other supplemental application or the date the check is received in the Home Office.

If you request a change in coverage after the application is signed, the effective date of that coverage will be seven days after the issue date.

If any policy requested is not issued, or is declined, cancelled or returned within 20 days of receipt by you or your agent, or you withdraw the request, prepayment will be refunded to the prepayment payor.

This agreement applies to each policy you have prepaid with your application, and may not be altered in any way by anyone.

_____
Producer (acknowledging receipt of prepayment)

*ATTACHMENT E*

| | |
|---|---|
| **Insured** | John A. Doe |
| **Policy Number** | LA R000000 |
| **Policy Date** | 07-01-95 |
| **Effective Date** | 07-01-95 |

**Individual Disability
Lifelong Disability
Protection℠**

**DISABILITY INCOME POLICY**
GUARANTEED RENEWABLE TO AGE 70. WE HAVE A LIMITED RIGHT TO CHANGE PREMIUMS.

This policy provides disability income benefits under stated conditions. Please refer to the policy provisions where we tell you when and how we will pay benefits. You will find an index of these provisions on Page 2.

Your policy cannot be cancelled by us, as long as the premium paid on time

**TWENTY DAY RIGHT TO EXAMINE POLICY**
Within 20 days after this policy is delivered to you or your representative, you may cancel the policy for any reason. To cancel this policy, you or your representative must mail or deliver the policy to our Home Office or to one of our authorized representatives. If this is done, the policy will be cancelled from the beginning and all of the premium paid will be refunded.

Satisfaction guaranteed full premium refund.

**RENEWAL**
You may renew this policy on each policy anniversary until the policy anniversary when your age is 70 by paying each premium before the Grace Period ends. We reserve the right to adjust premiums for this policy form on a class basis. Any change in premium will be effective on your policy anniversary. We will send you written notice of any adjustment in premium at least 31 days in advance.

This policy becomes effective on the Effective Date shown on page 3.

This policy is renewable to age 70.

(Provisions may vary in certain states)



**UNUM.**
*Protecting everything you work for*

## INDEX OF POLICY PROVISIONS

| | |
|---|---|
| 1 | **Twenty Day Right to Examine Policy** |
| 1 | **Renewal** |
| 3 | **Policy Schedule** |
| 4 | **Premiums** |
| 4 | **Reinstatement** |
| 4 | **Definitions** |
| 7 | **Benefits** |
| 7 | **Income Benefit** |
|   | **Successive Income Benefit Disabilities.** |
| 7 | **Disability Plus® Benefit** |
|   | Successive Disability Plus Benefit. |
| 8 | **Other Benefits** |
|   | Rehabilitation. |
|   | Worksite Modification Benefit. |
| 8 | Lifetime Continuation Provision. |

| | |
|---|---|
| 9 | **Exclusions and Limitations** |
|   | Preexisting Condition Limitation. |
|   | Mental Disorder Limitation. |
| 9 | **Claim Information** |
|   | How to File a Claim. |
|   | Conditions and Time Limits. |
| 10 | How and When We Pay Benefits. |
| 10 | **General Provisions** |
|   | The Contract. |
|   | Time Limit on Certain Defenses. |
|   | Conformity with State Statutes. |
|   | Legal Actions. |
|   | Misstatement of Age. |
| 11 | Owner. |
|   | Loss Payee. |
|   | Assignment. |

Application and any riders follow page 11.

## POLICY SCHEDULE

| | | | |
|---|---|---|---|
| Insured | John A. Doe | 07-01-95 | Policy Date |
| Policy Number | LA R000000 | 07-01-95 | Effective Date |

### SUMMARY OF PREMIUM

The premium mode at issue is ANNUAL

Premiums are payable as follows:

| BEGINNING | ANNUAL | SEMIANNUAL | QUARTERLY |
|---|---|---|---|
| 07-01-1995 | $536.80 | $268.40 | $134.20 |
| 07-01-2030 | Premiums Cease | | |

### SUMMARY OF COVERAGE Group 01

Form - INC95

Income Benefit Elimination period - 90 days

Maximum Income Benefit Period -To the later of (A) age 65 policy anniversary or
(B) 24 months after disability payments begin.

| EFFECTIVE DATE | MAXIMUM INCOME BENEFIT | ANNUAL PREMIUM | PREMIUM CEASE DATE |
|---|---|---|---|
| 07-01-1995 | $2,000 | $498.60 | 07-01-2030 |

| RIDER FORM | DESCRIPTION | RIDER DATE | BENEFIT AMOUNT | ANNUAL PREMIUM | PREMIUM CEASE DATE |
|---|---|---|---|---|---|

Rider Premiums for the Premium Term are included in the Summary of Premium.

### SUMMARY OF COVERAGE GROUP 02

Form - Disability Plus* Benefit

Disability Plus* Elimination period – 90 days

Disability Plus* Benefit Period -To the later of (A) age 65 policy anniversary or
(B) 24 months after disability payments begin.

| EFFECTIVE DATE | MAXIMUM DISABILITY PLUS BENEFIT | ANNUAL PREMIUM | PREMIUM CEASE DATE |
|---|---|---|---|
| 07-01-1995 | $2,000 | $38.20 | 07-01-2030 |

| RIDER FORM | DESCRIPTION | RIDER DATE | BENEFIT AMOUNT | ANNUAL PREMIUM | PREMIUM CEASE DATE |
|---|---|---|---|---|---|

Rider Premiums for the Premium Term are included in the Summary of Premium.

Your choice of premium payment schedule.

You can add optional benefi to further customize coverage for y individual need

## PREMIUMS

All premiums except the first premium are due on or before the due date. They are payable as stated on page 3.

Each premium will keep this policy in effect and continue coverage for the term shown.

The Grace Period is the 31 consecutive days that begin with the day a premium is due. We will keep this policy in effect and continue coverage during that time. If the premium is not paid during those 31 days, this policy and all coverage under this policy will terminate.

If we accept premium after the policy anniversary when your age is 70, we will keep this policy in effect and continue coverage until the end of the period for which we accept it.

If any premium is paid beyond the month in which you die or this policy terminates for some other reason, we will refund the amount of the unearned premium paid.

Premiums must be paid in United States currency.

## REINSTATEMENT

*Reinstatement is possible for up to six months.*

If this policy terminates because a premium is not paid by the end of the Grace Period, you may apply to reinstate this policy at any time until the first unpaid premium is six months overdue.

In order to reinstate this policy, three requirements must be met. They are:

1. you must submit a reinstatement application with evidence of your insurability; and

2. we must approve the reinstatement application; and

3. you must submit the full amount of overdue premium.

If the reinstatement application is prepaid, we will issue a prepayment agreement. The date of the prepayment agreement will be the date the reinstatement application has been completed.

If we approve the reinstatement application, this policy will be reinstated on the approval date. If the overdue premium is paid without submitting a reinstatement application and we keep the premium without requesting a reinstatement application, within a reasonable time, this policy will be reinstated as of the date we received the premium. If we issue a prepayment agreement and do not approve or disapprove your reinstatement application

within 45 days from the date of the prepayment agreement, this policy will be reinstated on that 45th day.

If this policy is reinstated, it will only cover:

1. injury that occurs on or after the date this policy is reinstated; or

2. sickness which first manifests itself more than 10 days after this policy is reinstated.

It WILL NOT cover any injury or sickness which is excluded by name or description.

## DEFINITIONS

## GENERAL DEFINITIONS

*Policy* means the contract of insurance between you and us. This form, all applications, and any riders, endorsements, or amendments that are attached to it comprise the entire contract.

*Coverage* means a type or amount of benefit provided by this policy. Each benefit, each modification of that benefit for which we require evidence of insurability, and each reinstatement of that benefit is a separate coverage.

*You* and *Your* refer to the Insured named on page 3. It is the person whom we are insuring. The Insured cannot be changed.

*We, our* and *us* refer to UNUM Life Insurance Company of America.

*Injury* means bodily harm which is the direct result of an accident or trauma that occurs while your policy is in force and is not related to any other cause.

*Sickness* means an illness or condition which first manifests itself while your policy is in force.

*Preexisting Condition* means you have an injury or sickness that exists on the effective date of the coverage and, during the past five years:

1) was diagnosed; or

2) caused you to consult a health care provider; or

3) caused symptoms for which an ordinarily prudent person would have consulted a health care provider.

*Mental Disorder* means any disorder classified in the Diagnostic and Statistical Manual of Mental Disorders (DSM), published by the American Psychiatric Association which is most current on the date of disability, or its replacement. Such disorders include, but are not limited to, psychotic, emotional or behavioral

disorders, or disorders related to stress or to substance abuse/dependency.

*Medical Care* means:

1. you personally visit a doctor as frequently as is medically required, according to standard medical practice; and

2. you are receiving appropriate treatment and care, according to generally accepted medical standards, by a doctor whose specialty is appropriate for your injury or sickness; and

3. such care is intended to return you to your Regular Occupation.

We may waive these requirements depending on the severity of your injury or sickness.

*Doctor* means:

1. a person performing tasks that are within the limits of his or her medical license; and

2. a person who is licensed to practice medicine and prescribe and administer drugs or to perform surgery; or

3. a person with a doctoral degree in Psychology (Ph.D. or Psy.D.) whose primary practice is treating patients; or

4. a person who is a legally qualified medical practitioner according to the laws and regulations of the governing jurisdiction.

We will not recognize you, or anyone related to you by blood or marriage, as a doctor for a claim that you send to us.

## INCOME BENEFIT DEFINITIONS

*Maximum Income Benefit* means the amount shown on page 3.

*Maximum Income Benefit Period* means the longest period of time we will make payments to you under the Income Benefit for any one period of disability. The Maximum Income Benefit Period is shown on page 3.

*Regular Occupation* means the occupation you are routinely performing at the time the Income Benefit Elimination Period begins. However, after you have received 24 months of benefits due to the same disability, Regular Occupation then means any gainful occupation for which you are reasonably fitted by training, education or experience. If you are not employed at the beginning of a disability, Regular Occupation means any gainful occupation for which you are reasonably fitted by training, education or experience.

*Gainful Occupation* means any occupation that provides or can be expected to provide you an income at least equal to 60% of your Prior Monthly Earnings within 12 months of returning to full-time work in your Regular Occupation.

*To work full time in your regular occupation* means you are able to perform the material and substantial duties of your Regular Occupation and your work, or are able to work, approximately the same average number of hours per week as you were working in the 12 months before the disability began. However, if your average hours worked per week prior to disability exceeds 40, we will consider you to be working full time in your Regular Occupation if you are working, or are capable of working, at least 40 hours per week.

*Income Benefit disability* and *Income Benefit disabled* mean that, as a result of injury or sickness:

1. you are unable to perform the material and substantial duties of your regular occupation; or

2. you are able to perform some, but not all, of the material and substantial duties of your regular occupation; or

3. you are able to perform the material and substantial duties of your regular occupation, but you are not able to work full time in your Regular Occupation; and

4. you are receiving Medical Care.

The suspension, revocation or surrender of a professional or occupational license or certification does not constitute disability.

*Material and Substantial Duties* means those duties that cannot be reasonably omitted or modified in order to perform your Regular Occupation.

*Income Benefit Elimination Period* means the number of days, stated on page 3, preceding the date benefits become payable, during which you are Income Benefit disabled. The Elimination Period begins on the first day that you are Income Benefit disabled.

Different elimination periods may apply to different coverages under this policy. The elimination period for each coverage is described on page 3.

If the Income Benefit disability ceases before you satisfy the elimination period and you become disabled again from the same cause within six months, we will combine those periods of disability to determine when benefits begin.

For the first 24 months of benefit payments, Regular Occupation means your occupation at the onset of disability. Long Term Own Occupation Protection can be provided in select situations through a policy rider.

No loss of inco is required to satisfy the elimination period.

There is no ne elimination per for related disabilities occurring withi months of a previous Incom Benefit disabili

*Monthly Earnings* means any salary, wages, commissions, bonuses and fees regularly earned for services performed by you.

If you own any part of a business or profession, Monthly Earnings also includes your share of business profits or losses (after deducting the usual and customary business expenses) plus any contributions on your behalf to a deferred compensation, pension or profit sharing plan. Usual and customary business expenses are those expenses which are deductible for federal income tax purposes based on the business fiscal year immediately prior to the start of disability.

Monthly Earnings does not include any forms of unearned income, such as dividends, interest, rent, royalties, annuities, distributions of deferred compensation or pension plans, sick pay, benefits received for disability under a formal wage or salary continuation plan or other disability plans. Monthly Earnings may be accounted for on a cash or accrual basis. The same method must be used to determine the Prior Monthly Earnings and current Monthly Earnings during a period of disability.

*Prior Monthly Earnings* means the greater of:

1. your average Monthly Earnings for the 12 months immediately prior to the start of Income Benefit disability; or

2. your average Monthly Earnings for the full calendar year immediately prior to the start of Income Benefit disability.

*Loss of Monthly Earnings* means your Prior Monthly Earnings minus your Monthly Earnings in the month for which a benefit is claimed. Loss of Monthly Earnings must be caused solely by the injury or sickness which is causing the disability.

## DISABILITY PLUS® DEFINITIONS

*Maximum Disability Plus® Benefit* means the amount shown on page 3.

*Maximum Disability Plus® Benefit Period* means the longest period of time we will make payments to you under the Disability Plus® benefit for any one period of disability. The Maximum Disability Plus® Benefit Period is shown on page 3.

*Disability Plus® disability* and *Disability Plus® disabled* mean that as a result of injury or sickness:

1. you are unable to perform two or more Activities of Daily Living without stand-by assistance; or

2. you are cognitively impaired; and

3. you are receiving Medical Care.

*Disability Plus® Elimination Period* means the number of days stated on page 3, preceding the date benefits become payable, during which you are Disability Plus® disabled. The Elimination Period begins on the first day that you are Disability Plus® disabled.

Different elimination periods may apply to different coverages under this policy. The elimination period for each coverage is described on page 3.

If the Disability Plus® disability ceases before you satisfy the elimination period and you become disabled again from the same cause within six months, we will combine those periods of disability to determine when benefits begin.

*Activities of Daily Living (ADLs)* are:

*Bathing:* the ability to wash yourself, either in the tub or shower or by sponge bath, with or without equipment or adaptive devices.

*Dressing:* the ability to put on and take off all garments and medically necessary braces or artificial limbs usually worn, and to fasten or unfasten them.

*Toileting:* the ability to get to and from and on and off the toilet, to maintain a reasonable level of personal hygiene and to care for clothing.

*Transferring:* the ability to move in and out of a chair or bed with or without equipment such as canes, quad canes, walkers, crutches or grab bars or other support devices including mechanical or motorized devices.

*Continence:* the ability to voluntarily control bowel and bladder function, or, in the event of incontinence, the ability to maintain a reasonable level of personal hygiene.

*Eating:* the ability to get nourishment into the body by any means once it has been prepared and made available to you.

*Stand-by Assistance* means you require the presence of another human being to ensure that all or part of an ADL may be completed or to ensure your safety.

---

*You may choose cash or accrual accounting to calculate Monthly Earnings.*

*Additional b... amounts available to catastrophic disabilities u... Disability Pl...*

*There is no ... elimination p... for related d... abilities occu... within 6 mon... of a previous... Disability Pl... disability.*

*Ability to per... Activities of ... Living is the ... used to dete... mine Disabil... Plus® disabili...*

*Cognitive Impairment* and *Cognitively Impaired* mean that you have suffered a deterioration or loss in your intellectual capacity which requires another person's assistance or verbal cueing to protect yourself or others as measured by clinical evidence and standardize tests which reliably measure your impairment. Such loss in intellectual capacity can result from injury, sickness, Alzheimer's Disease or similar form of senility or irreversible dementia.

## BENEFITS

### INCOME BENEFIT

We will pay an Income Benefit in any month after you have satisfied the Income Benefit Elimination Period that:

1. you are Income Benefit disabled; and
2. your disability is the result of the same injury or sickness which caused you to satisfy the Income Benefit Elimination Period; and
3. you have at least a 20% loss of Monthly Earnings as a result of that same injury or sickness.

The amount payable in any month will be determined by the following formula:

Loss of Monthly Earnings  x  Maximum
Prior Monthly Earnings          Income
                                          Benefit

If your loss of Monthly Earnings is greater than 80%, we will pay the Maximum Income Benefit for that month.

Income Benefit payments will cease once you are able to return to work full-time in your Regular Occupation.

Benefits payable in any month shall not exceed the Maximum Income Benefit. The Income Benefit will not be paid beyond the Maximum Income Benefit Period.

**Successive Income Benefit Disabilities.** A period of Income Benefit disability will be considered a continuation of a prior disability if:

1. it is from the same or related cause; and
2. it occurs within six months of the end of the prior period of Income Benefit disability.

If the new Income Benefit disability is considered a continuation of a prior Income Benefit disability, it will be considered an

extension of the prior disability and you will not need to satisfy a new elimination period.

If the period of Income Benefit disability is from a different or unrelated cause, or if it occurs more than six months after the end of the prior period of Income Benefit disability, it will be considered a new disability, subject to its own elimination period and maximum benefit period.

**Waiver of Premium Benefit.** After the Income Benefit disability has lasted for 90 days while this policy is in effect, we will waive the premium for this policy. We will refund premium already paid for that period on a pro rata basis.

Waiver of Premium will cease once:

1. you have returned to work full time in your Regular Occupation; or
2. you are no longer eligible for an Income Benefit payment for that period of disability.

The Waiver of Premium benefit does not apply to any disability caused by a condition excluded from coverage by name or description.

### DISABILITY PLUS® BENEFIT

We will pay the Maximum Disability Plus® Benefit in any month after you have satisfied the Disability Plus® Elimination Period that:

1. you are Disability Plus® disabled; and
2. your disability is the result of the same injury or sickness which caused you to satisfy the Disability Plus® Elimination Period.

Benefits payable in any month shall not exceed the Maximum Disability Plus® Benefit. The Disability benefit will not be paid beyond the Maximum Disability Plus® Benefit Period.

**Successive Disability Plus® Benefit Disabilities.** A period of Disability Plus® disability will be considered a continuation of a prior disability if:

1. it is from the same or related cause; and
2. it occurs within six months of the end of the prior period of Disability Plus® disability.

If the new Disability Plus® disability is considered a continuation of a prior Disability Plus® disability, it will be considered an extension of the prior disability and you will not need to satisfy a new elimination period.

During Income Benefit disability, your premium may be waived. All premiums paid from the date of loss will be refunded. Consecutive days of disability are not required.

The full monthly Disability Plus® benefit will be paid in the event of the loss of two or more ADLs (Activities of Daily Living).

(left margin, partially cut off)
...rdless of
...er you are
... or residually
...led, Income
...fit payments
...ased on your
...ntage loss of
...ngs.

...ull monthly
...ne Benefit
...e paid if
... loss of
...hly Earnings
...eater than

If the period of Disability Plus• disability is from a different or unrelated cause, or if it occurs more than six months after the end of the prior period of Disability Plus• disability, it will be considered a new disability, subject to its own elimination period and maximum benefit period.

## OTHER BENEFITS

**Rehabilitation.** We have a rehabilitation program to assist you to return to work. This program is offered as a service, and is voluntary on your part and on our part.

While you are receiving disability benefits, you may request or we may suggest a review of your medical and vocational documentation to determine if rehabilitation services might help you return to work.

If we determine that such a program is appropriate, we will develop a mutually agreed upon plan of rehabilitation that is beneficial to you and us. This plan may include, but is not limited to:

- Coordination with your employer to assist you to return to work;
- Coordination of medical services;
- Evaluation of adaptive equipment to allow you to work;
- Occupational evaluation;
- Business/financial planning;
- Job development and placement;
- Retraining for a new occupation.

If we determine that such a program is appropriate, we will pay reasonable expenses for such items as tuition, books, training programs, or additional living expenses. The actual expenses covered and the terms of the plan will be subject to mutual agreement. Our agreement will be outlined in a written plan of rehabilitation. Benefits will continue as provided by this policy unless they are modified by the plan of rehabilitation.

**Worksite Modification Benefit.** A worksite modification might be what is needed to allow you to perform the material and substantial duties of your Regular Occupation. One of our designated professionals will assist you and your employer to identify a modification we mutually agree is likely to help you remain at work or return to work. This mutual agreement will be in writing and must be signed by you, your employer, and us.

When this occurs, we will reimburse your employer for the cost of the modification, up to the lesser of:

- $5,000; or
- Two times your Maximum Income Benefit.

This benefit is payable only once over the lifetime of this policy.

**Lifetime Continuation Provision.** This policy may be exchanged for an individual long term care policy issued by us without submitting evidence of medical or financial insurability, at the following times:

1. on or after age 61, if you choose to terminate this disability policy and you are not then Income Benefit disabled or Disability Plus• disabled under any of the terms of this policy; or
2. on or after age 65, if you are disabled under the provisions of this disability policy and have received the maximum benefits allowable under this disability policy; or
3. the policy anniversary when your age is 70.

The long term care contract will be issued subject to the following terms:

1. the policy will be the individual long term care policy that we offer when the exchange is made;
2. the policy will meet or exceed all applicable federal and state minimum standards in effect for such contracts on the date the exchange is made;
3. the premium for the long term care policy will be the same as the premium paid for this disability policy in the year immediately prior to the exchange. The monthly benefit for the long term care policy will be the amount that this premium will purchase based on the long term care rates we are then charging for your age on the date the exchange is made.

## EXCLUSIONS AND LIMITATIONS

This policy does not pay benefits which are based on injury or sickness caused by, contributed to by or which result from:

1. war or an act of war, whether declared or undeclared; or
2. intentionally self-inflicted injury; or
3. your commission of or your attempt to commit a crime under a state or federal law, or your engagement in an illegal occupation; or
4. the suspension, revocation or surrender of your professional or occupational license or certification.

---

*Flexible rehabilitation program.*

*Helps employers with worksite modification expenses.*

*Guaranteed transformation a UNUM Individual Long Term Care poli[...]*

*These are the conditions unde[...] which benefits are excluded o[...] limited.*

No benefits will be payable for any period of disability in which you are incarcerated in a penal or correctional institution for a period of 30 consecutive days or longer.

**Preexisting Condition Limitation.**

This policy does not pay benefits for a preexisting condition if:

1. if the preexisting condition is not disclosed or is misrepresented in the application; and

2. during the first two years after the effective date of coverage, the preexisting condition:

a. caused you to consult a health care provider; or

b. caused symptoms for which an ordinarily prudent person would have consulted a health care provider.

**Mental Disorder Limitation.**

This policy will pay benefits for a maximum of 24 months during the life of the policy for Income Benefit disability or Disability Plus* disability, caused by a mental disorder. However, we will pay benefits, subject to the Income Benefit and Disability Plus* Maximum Benefit Periods, so long as you are confined as an inpatient in a hospital or institution and under Medical Care.

*Hospital* or *Institution* means an accredited facility licensed to provide care and treatment for the condition causing the disability. "Hospital or institution" does not include a rest, nursing or convalescent home.

We will not apply the Mental Disorder Limitation to dementia if it is a result of:

■ stroke;
■ trauma;
■ viral infection;
■ Alzheimer's disease; or
■ other conditions which are not usually treated by a mental health provider or other qualified provider using psychotherapy, psychotropic drugs, or other similar methods of treatment.

**CLAIM INFORMATION**

**How to File a Claim.** To make a claim under this policy, the following steps must be taken. You must:

1. Give Notice of Claim (someone must notify us that disability has started as defined in this policy);

2. File Proof of Loss (you, or someone acting on your behalf must fully complete and return the claim form and attached authorization provided by us);

3. Promptly and fully complete and return any other forms or requests for information we require, including personal and/or business federal tax returns, if requested.

Failure to comply with these requirements may impede or delay our ability to process your claim. No benefits will be payable if we are unable, as a result of your failure to comply with these requirements, to evaluate your claim.

We will evaluate the claim and either:

1. Pay the benefits specified in the policy; or

2. Notify you and any Loss Payee that benefits are not payable and why; or

3. Notify you that additional information is required before a final claim determination can be made.

**Conditions and Time Limits.** In order for benefits to be considered for payment, there are some conditions and time limits which each of us must meet. They are:

1. We must be given the Notice of Claim within 30 days after the elimination period begins, or as soon as reasonably possible.

2. We will furnish claim forms within 15 days after we receive Notice of Claim. If the forms are not received within 15 days, send us proof of what happened and the extent of the sickness or injury.

3. The claim forms and other information requested by us (Proof of Loss) must be completed and furnished to us within 90 days after each month for which a benefit is payable. However, failure to furnish such proof within 90 days will not reduce or nullify the claim if proof is furnished as soon as reasonably possible within one year after the 90 days. If you are legally unable to notify us, the one year limit does not apply.

ital Disorder
itation does
apply to all
ditions.

9

4. You must undergo a medical examination, functional capacity examination and/or psychiatric examination, including any related tests as are reasonably necessary to the performance of the examination by a doctor or specialist appropriate for the condition at such time and place and with such frequency as we reasonably require. We reserve the right to select the examiner. We will pay for the examination, including the costs associated with your travel to the examination, if the examination cannot be conducted locally.

5. You must meet with our representative for a personal interview or review of records at such time and with such frequency as we reasonably require.

6. We must be given the information which we need to determine if a benefit is payable and how much that benefit should be. We may require relevant portions of federal income tax returns for you or your business, income statements, vouchers for overhead expenses, and other statements or reports of receipts and payments. We may also require evidence that you were liable for an overhead expense before disability began.

**How and When We Pay Benefits.** We will pay benefits due under this policy in United States currency. For periods of disability of less than a month, we will pay 1/30th of the monthly benefit for each day of disability.

We will not pay any benefit until we have sufficient Proof of Loss. When we have determined that the claim is payable, we will pay promptly according to the Benefits provision. If any amount is accrued and unpaid when our liability terminates, we will pay it immediately.

Upon acceptance of liability of your claim, the first disability payment will be due one month from the date the appropriate Elimination Period is satisfied. Benefits accumulate and are paid on a monthly basis. No benefits are due or payable for the Elimination Period.

We will pay all benefits to the loss payee if living, otherwise, we will pay you. If you die while you are entitled to receive benefits, we will pay any remaining benefit and any unearned premium to your estate.

## GENERAL PROVISIONS

**The Contract.** This policy represents the entire contract between you and us. Statements by agents or brokers are not part of this contract. Only an executive officer of this Company can approve a change in this policy. The approval must be in writing and be endorsed on or attached to this policy. No one else can change this policy or waive any of its conditions.

Unless we tell you otherwise, years, months and anniversaries that we refer to are calculated from the Policy Date shown on page 3.

**Time Limit on Certain Defenses.** Except for fraudulent misstatements, we will not contest the policy based on statements made by you in the application for a coverage provided under this policy after that coverage has been in effect for two years.

If disability begins after a coverage has been in effect for two years from the effective date of that coverage, we will not reduce or deny a claim which is based on that disability because of a preexisting condition unless the condition is excluded from coverage by name or description.

**"Contest"** means that we question the validity of coverage under this policy by letter to you. This contest is effective on the date we mail the letter and refund the premium to you.

**Conformity with State Statutes.** If any provision of this policy conflicts with the statutes of the state where you reside on the effective date of that provision, it is amended to conform with the minimum requirements of those statutes.

**Legal Actions.** No one may start legal action to recover on this policy until 60 days after written Proof of Loss has been given to us. Legal action must be started within three years after the written Proof of Loss is required to be furnished.

**Misstatement of Age.** If your age has been misstated, any benefit payable will be changed to the amount which the premium paid would have bought for the correct age.

If we accept premium for a coverage which we would not have issued or which would have ceased according to the correct age, our only liability is to refund the premium for the period not covered.

Your state law prevail.

10

**Owner.** You own this policy. You have all of the rights and privileges granted by this policy while it is in effect. Some of your ownership rights are:

1. the right to continue or terminate this policy;

2. the right to name someone else (a loss payee) to receive the benefits of this policy;

3. the right to suspend this policy while you are in military service; and

4. the right to assign any or all rights under this policy.

You may reduce the amount of your coverage at any time. Premium will be recomputed for the reduced amount based on your age and premium class on the effective dates of the coverages. The reduction will be effective on the date we receive your written request at our Home Office.

**Loss Payee.** If you decide to have someone else receive policy benefits, you must notify us in writing on a form satisfactory to us. The notice will be effective when we receive it at our Home Office.

**Assignment.** You may assign any or all ownership rights to someone else. The assignment must be in writing and must specify the rights which are assigned and for how long. The Loss Payee is not changed by an assignment unless the assignment specifically names a new Loss Payee. When an assignment is in effect, *you* and *your* refer to the assignee in provisions which describe ownership rights.

No assignment is binding on us until the original or an acceptable copy is received at our Home Office. We are not responsible for the validity or effect of any assignment.

11



**UNUM.**

*Protecting everything
you work for*

Unum Life Insurance
Company of America
Portland, Maine 04122
http://www.unum.com
1266-95 (8/99)

Unum is the marketing brand of UnumProvident Corporation.

© 1999 UnumProvident Corporation. Unum®, the lighthouse artwork and "Protecting everything
you work for®" are registered trademarks of UnumProvident Corporation. All rights reserved.

LAW OFFICES



UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 05-10360-GAO

YUDIF GLIK, )
    Plaintiff individually and )
    As Admin. Of Estate of )
    Michael Glik, )
 )
v. )
 )
INOTEK PHARMACEUTICALS )
CORPORATION, )
    Defendant. )

## PLAINTIFF'S RESPONSE TO
## DEFENDANT INOTEK PHARMACEUTICALS CORPORATION'S
## FIRST SET OF INTERROGATORIES

1.  State, in dollars and cents, the damages you allege you and Michael Glik ("Mr. Glik")
    have suffered as a result of the acts or omissions of Inotek and:
    a.   describe in as much detail as possible the method (including any formulas or
         other mathematical techniques) used in arriving at said amount;
         On December 30, 2000 my husband was terminated. He would have received
         $30, 251 in income until his death 14 months mater. During this period of 14
         months, he suffered emotional distress of $200,000.
    b.   set forth in as much detail as possible all facts used and considered in arriving
         at said amount;
         The defendant did not get him his LTD benefits and therefore caused
         emotional distress.
    c.   if at arriving at said amount any writing was relied upon in whole or in part,
         identify such writing;
         Communications involving Unim.
    d.   if at arriving at said amount any oral communication was relied upon in whole
         or in part, identify each such oral communication;
         No.
    e.   identify all persons including experts and attorneys, who assisted you in
         arriving kit said amount.
         No.

## RESPONSE:
    a.   On December 30, 2000 my husband was terminated. He would have received
         $30, 251 in income until his death 14 months mater. During this period of 14
         months, he suffered emotional distress of $200,000.

1

      b.    The defendant did not get him his LTD benefits and therefore caused emotional distress.

      c.    Communications involving Unim.

      d.    No.

      e.    No.

2.    If you cannot describe any portion of your damages, state what information you need and from whom you need it to make such a determination.

    **RESPONSE**: N/A.

3.    For each expert witness you intend to call at trial in this matter, identify:

      a.    the expert's name, business address., and professional qualifications;

      b.    the subject matter on which the expert is expected to testify;

      c.    the substance of the facts and opinions to which each said expert is expected to testify: and

      d.    a summary of the grounds for each expert's opinion(s).

    **RESPONSE**: N/A.

4.    Identify all persons whom you know or believe witnessed or participated in any aspect of the transaction(s) or occurrence(s) giving rise to your claims, or whom you know or believe have discoverable information concerning your claims or Inotek's position or defenses.

    **RESPONSE**:  I am a witness; Dr. Gosselin and Dr. Saltman for the defendant.

5.    As to each person identified in response to Interrogatory 4, provide a statement of the subject(s) about which that person has knowledge or that you believe he or she may have knowledge and a brief summary of that information.

    **RESPONSE**:  They all will talk about the subject of Innterrogatory 1.

6.    Identify all applications for employment Mr. Glik made from November 1, 2000 through the date of his death, specifying the name and address of each potential employer to which Mr. Glik made an application, including the date of each such application and the position for which application was made.

    **RESPONSE**:  He could not apply.

7.    Identify any employment agency, career counselor or other employment recruiter with whom Mr. Glik had contact with from November 1, 2000 through the date of his death, including the date such contact was made and (lie nature of the contact.

    **RESPONSE**:  See No. 6.

8.   Describe in complete detail any other efforts made by Mr. Glik, which are not identified
     in response to the preceding interrogatories, to obtain employment from November 1,
     2000 through the date of his death.

     **RESPONSE:**  See No. 6.

9.   Describe in complete detail each offer for prospective employment received by Mr. Glik
     from November 1, 2000 through the date of his death.

     **RESPONSE:**  N/A.

10.  Please identify all jobs (including self-employment or temporary jobs) Mr. Glik held from
     November 1, 2000 until the time of his death (excluding his employment with Inotek)
     and, far each job, set forth:
     a.        the period for which Mr. Glik held such job; and
     b.        for each year and/or fraction thereof for which he held such job:
               (i)      the hourly wage (wages) and/or salary (salaries) paid to him;
               (ii)     the average hours he worked per week;
               (iii)    a description in complete detail of the benefits he received, including but
                        not limited to health insurance.. life insurance, disability insurance,
                        pension or retirement plans, vacation pay, and holiday pay.

     **RESPONSE:**  N/A.

11.  Identify all medical professionals, including but not limited to physicians, psychiatrists,
     psychologists, therapists, advisors, consultants, or any other person from whom Mr. Glik
     received medical, psychiatric, psychological or emotional treatment, consultation, therapy
     or assistance from October 1998 to the present. Please include in your response each
     processional's last known business address.

     **RESPONSE:**  Christopher Doyle, M.D. BWH.

12.  As to each person identified in response to Interrogatory 11, provide a statement of the
     treatment, counseling, examination or evaluation he or she provided and the condition
     and/or symptoms which for he/she provided treatment. counseling, examination, or
     evaluation.

     **RESPONSE:**  He was the person who found the cancer in October 2000.

13.  Describe in complete detail when Mr. Glik was first diagnosed with cancer and identify
     the physician or health care provider who first diagnosed him with cancer.

     **RESPONSE:**  See 12 above.

14.  Identify all medical professionals, including but not limited to physicians., psychiatrists,
     psychologists, therapists, advisors, consultants, or any other person who has treated,

counseled, examined or evaluated you for emotional distress, mental anguish, or psychiatric or emotional problems since October 1998. Please include in your response each professionals last known business address.

**RESPONSE:** Dr. Mirijana Kondic, Beverly, MA

15. As to each person identified in response to Interrogatory 14, provide a statement of the treatment, counseling, examination or evaluation tic or she provided and the condition and/or symptoms which for he/she provided treatment, counseling, examination, or evaluation.

**RESPONSE:** She aided me in my sleep loss and anxiety issues surrounding my husband's situation.

16. If a document responsive to any of the requests set forth in the "Defendants' First Request For Production of Documents" which has been served contemporaneously herewith, was at one time in your custody. possession or control, but is not available to lie produced in response to that Request. please identify each such document and state the reason for its unavailability and its last known location.

**RESPONSE:** N/A.

17. If you contend that any of the requests set forth in the "Defendants' First Request for Production of Documents" which has been served contemporaneously herewith. calls for production of documents which you assert are protected froth discovery by the attorney-client privilege, by the work-product doctrine. or by any other claim of privilege. please identify each document which you contend is so protected by stating the type of document (e.g. handwritten notes, letter, etc.) the privilege you are asserting far each document. its author. its date, and its general subject matter.

**RESPONSE:** N/A.

SIGNED UNDER THE PENALTIES OF PERJURY.

Date: April _11_, 2006

YUDIF GLIK

4

EXHIBIT

Glick

# 19

6/20/06    KB

DAMAGES:

Application for Disability Insurance. Part 1 p. 2
(June 7, 2001 letter from UNUM to Division of Insurance. Attachment D)

*Individual Disability Plans:*
INCOME BENEFIT:
Monthly Benefit Amount $2150
DISABILITY PLUS BENEFIT:
Monthly Benefit Amount $950

2150 + 950 = $3100 (monthly)
3100 x 14 (months MG lived) = $43400
43400  x 1% (interest – at least) = $434 (simple interest)
43400 + 434 = $43834. Rounded $44K  (Total benefits)

Emotional distress $200K

200K + 44K = $244 (Total benefits and emotional distress)

Attorney's fees (1/3): 244/3 = $81334.  Rounded $81K
Taxes (1/3) = 244/3 = $81334.  Rounded $81K

244K + 81K + 81K = $406K

TOTAL $406

# EXHIBIT 2

ORIGINAL

1

2                    UNITED STATES DISTRICT COURT

3                       DISTRICT OF MASSACHUSETTS

4                    Civil Action No. 05-10360-GAO

5

6

7    YUDIF GLIK, Administrator,

8                          Plaintiff,

9              vs.

10   INOTEK PHARMACEUTICALS

11   CORPORATION,

12                        Defendant.

13

14

15             DEPOSITION of UNUMPROVIDENT CORPORATION,

16   (Nancy M. Brenerman), taken pursuant to subpoena, at the

17   offices of Moon, Moss & Shapiro, 10 Free Street, Portland,

18   Maine, on May 2, 2002, commencing at 10:06 A.M., before

19   Catherine Cook, a Notary Public in and for the State of

20   Maine.

21

22

23

24             Downing & Peters Reporting Associates

25         79 Atlantic Place, South Portland, Maine  04106

Page 12

1    Exhibit 1.

2            MR. BERGER:  Got it.

3        (Exhibit 1, Application Routing Ticket, marked for

4    identification.)

5    Q.    Just take a moment to review that.  Can you tell me

6    what this is?

7    A.    This is an application routing ticket.

8    Q.    How is this used?

9    A.    When an application is received by our company, it has

10   to be entered into our computer system and this paper spits

11   out as a result of all the information that's put in and

12   what requirements are automatically ordered as part of the

13   submission process.

14   Q.    When it is received by your company, the date

15   December 11, 2000, what date would that reflect?

16   A.    That would be the date that the person inputted this

17   data into the system and should be very close to when it

18   was received.

19   Q.    Did this application come into the Portland office or

20   can you tell what office it initially came into?

21   A.    I believe it came into the Portland home office,

22   because it says Portland home office at the top, but that's

23   a part of the process I'm not involved with.

24   Q.    Do you know who would be involved in that part of the

25   process?

Page 15

1    Q.    Under processing information, it says:  Rate type U.

2    What does that mean?

3    A.    I don't know.

4    Q.    How about:  Mental nervous limitation, Y?

5    A.    Y means yes.  This is a policy in which the base

6    contract only has a two-year mental and nervous provision.

7    If you are disabled from mental and nervous, the claim is

8    for two years only.  If you wanted it to be longer than

9    that, you would have to buy a rider, and so this one only

10   has a two-year limitation.

11   Q.    Under producer name telephone number, it says:

12   Boyd-Neelon Insurance Agency.  Do you have any knowledge as

13   to who that may be?

14   A.    All I know is that that's the producer who

15   submitted -- who signed the application that came in.

16   Q.    Under requirements, it says:  DBS/HIV/Urine

17   outstanding.  What does that mean?

18   A.    DBS is a dried blood spot.  It is taking blood.  Based

19   on underwriting guidelines, it automatically requires that

20   you have that and HIV -- it's a dried blood spot that also

21   does the HIV test and urine is the urinalysis to check for

22   other things.  Outstanding means that we have not received

23   it yet.  It didn't come in with the -- or it hasn't been

24   done yet.

25   Q.    When would that typically be done?

Page 23

1    I 0197 to I 0203, and then additionally as part of this

2    same exhibit 0275 and 0276.  I believe this is the complete

3    application for disability insurance.

4              MR. BERGER:  Okay, got it.  Thank you.

5         (Exhibit 3, Dr. Glik's Application for Disability

6    Insurance, marked for identification.)

7    Q.   Take a moment to review that document, please.  All

8    set?

9    A.   All set.

10   Q.   What is this?

11   A.   This is Mr. Michael Glik's application for individual

12   disability insurance with UNUM.

13   Q.   Reviewing this application, let me go to the second

14   page.  The income benefit, can you describe what that

15   income benefit is?

16   A.   What he is applying for?

17   Q.   Yes.

18   A.   He is applying for $2,150 a month.  Just in

19   parenthesis, the reason it says 2200 on the MIB is they

20   round up to the next 100.  That's why it says 2200 instead

21   of 2150.

22   Q.   But in actuality, it is 2150 per month?

23   A.   With a 90-day elimination period.

24   Q.   Which means what?

25   A.   Which means that should he be disabled under the

Page 24

1    contract, he would not receive payments until the 91st day

2    of disability.  Benefit period is to age 65.  The optional

3    benefits are cost of living, which is -- there are rules

4    around it, but in general, after you've waited a certain

5    amount of time, usually a year that you have been on

6    disability, this is a cost of living hit that happens

7    between certain percentage to increase your benefit should

8    you be disabled longer than -- in this case, I believe it's

9    a year, but we would have to look at the rider to make sure

10   I'm correct and it is based on the CPIU, the change in the

11   CPIU.

12   Q.    What's a CPIU?

13   A.    The consumer price index.

14   Q.    So, generally, after your first year of obtaining

15   coverage, your insurance -- the amount you can obtain may

16   go up based on the consumer price index, that percentage?

17   A.    Right, up to a certain point and there are rules

18   around it, and then each year after that it is the change

19   in the CPIU that you would get added on to that base you

20   already have that's been increased.

21   Q.    I'm not sure I understand.  So, the first year, is it

22   based on the CPIU?

23   A.    In the first year, if he were disabled and I'm going

24   to use this in general, because I don't have the rider

25   right with me.  In general, a person -- let's just do it

Page 34

1     or that they have had an indication of the conditions that

2     were mentioned in question 20B, those are red flags that,

3     perhaps, something is wrong and we don't want to bind the

4     contract.

5     Q.    I'll ask you more questions about prepayment when we

6     get to that section of the contract -- I'm sorry, the

7     application.   In 20D, Dr. Glik identifies his doctor as

8     Dr. Vaninov?

9     A.    Yes.

10    Q.    He states that his last date that he saw Dr. Vaninov

11    was October 26th, 1999?

12    A.    That's correct.

13    Q.    And the reason was for neck and back pain; do you see

14    that?

15    A.    Yes.

16    Q.    And that the result was physical therapy?

17    A.    I do see that.

18    Q.    Question 21C -- 21B, can you read that?

19    A.    21B:   Have you ever had, been told you had or been

20    treated for colitis, chronic diarrhea, cirrhosis, disease

21    or disorder of the stomach, intestines, rectum, liver or

22    digestive system.

23    Q.    Dr. Glik's response?

24    A.    No.

25    Q.    21C?

Page 35

1   A.    Have you ever had, been told you had or been treated

2   for disease or disorder of either kidney, the prostate,

3   urinary or reproductive organs or any sexually transmitted

4   disease.

5   Q.    His response?

6   A.    No.

7   Q.    Then 21D, can you also read that one.

8   A.    Have you ever had, been told you had or been treated

9   for polyp, tumor, cancer or a disease or disorder of the

10   immune system.

11   Q.    Dr. Glik's response?

12   A.    No.

13   Q.    Can you go down to question 23B and C.

14   A.    Yes.

15   Q.    Those questions Dr. Glik did not respond to.  I'm just

16   going to read them.  23B is:  Are you now taking or have

17   you taken medication, prescription or nonprescription, for

18   any reason within the last 12 months and 23C is:  Are you

19   now experiencing any symptoms, disease, disorder or

20   condition which might require surgery, impair your health,

21   or your ability to work now or in the future for which you

22   plan to consult a physician.  He did not respond to these.

23   What impact would that have on his application, if any?

24   A.    Had we not decided to postpone this policy based on

25   the information we were able to obtain and if we made a

Page 36

1   decision at that point, if we had not been able to do that,

2   we would have had to go back and ask him to give us the

3   answers to those questions with any details.

4   Q.   In other words, you could not have issued a policy

5   without having these questions answered?

6   A.   We should not have issued them without those questions

7   being answered.

8   Q.   If the answer to those questions was yes for both of

9   them, how would that have impacted whether or not the

10  policy would have issued?

11  A.   It would depend on what he said in those, if he

12  answered yes to both those questions, what the details were

13  and the information that we would have -- if we felt it was

14  serious, go out and get records and what that information

15  would have told us.

16  Q.   Can we go back up for a second to 21A.  Do you mind

17  reading that question and then Dr. Glik's response.

18  A.   Have you ever had, been told you had or been treated

19  for chest pain, high blood pressure, palpitations or any

20  disease or disorder of the heart or circulatory system,

21  blood or blood vessels, lungs, bronchial tubes or

22  respiratory system.

23  Q.   Dr. Glik's response?

24  A.   Yes.

25  Q.   If you turn to the next page, question 25, asks for

Page 37

1   more information concerning questions that were answered

2   yes above, and what does Dr. Glik insert there?

3   A.   In response to our request for details in question 25

4   of any yes answers, he listed No. 21, and he said the

5   reason was high blood pressure, the diagnosis or treatment

6   was high blood pressure.  The name and address of the

7   physician and/or hospital was Dr. Vaninov, Brighton, and

8   the date he last saw him was 10/24/1999.

9   Q.   When Dr. Glik indicated that he had high blood

10  pressure, what would -- what happened as a result of that?

11  A.   I'd actually have to consult the underwriter notes.   I

12  wasn't the underwriter and I don't know what the

13  underwriter did as a result of that.

14  Q.   We will take a look at those in a minute.  Above that,

15  question 24, Dr. Glik has responded to both of those

16  questions as yes concerning whether or not he has consulted

17  or been advised to consult or received treatment from any

18  physician, psychiatrist, psychologist, counselor, marital

19  or family counselor, chiropractor or other practitioner

20  clinic or hospital in the last five years, and also he has

21  answered yes to whether or not in the last five years he

22  has been advised to have any surgical operation,

23  hospitalization, medical care, electrocardiogram, x-ray,

24  blood test or other diagnostic test.  The fact that he

25  responded yes to those two questions, what does that mean

Page 45

1    explain the prepayment agreement; is that correct?

2    A.    Yes.

3    Q.    Section 5 states what will happen if prepayment is not

4    elected; is that correct?

5    A.    That's correct.

6    Q.    What does section 5 say?

7    A.    If I did not prepay premium with this application,

8    insurance will be effective when a policy has been

9    delivered to me and I have paid the first premium provided

10   that on the later of the delivery date or payment date the

11   answers in this application and in any supplemental

12   application, medical exam or other questionnaire are then

13   still true and complete.

14   Q.    We will come back to this document, but I want to have

15   another document marked.   Document marked I 0263 to I 0265

16   marked as Exhibit 4.

17        (Exhibit 4, Underwriting Notes for LAR451315, marked

18   for identification.)

19   Q.    Take a moment to look that over.   Do you know what

20   this is?

21   A.    These are the underwriting notes for LAR451315, which

22   is Michael Glik's policy should have been issued or his

23   application.

24   Q.    Again, LAR stands for?

25   A.    It is just the code that we use that reflects that

Case 1:05-cv-10360-GAO    Document 28-4    Filed 08/30/2006    Page 12 of 60
30(b)(6) of UNUMProvident Corporation (Nancy M. Brenerman)    5/2/2006
Page 46

1    this is a life-long disability policy, and LDP policy.

2    Q.    Who created these notes?

3    A.    The underwriter working on the case started the notes.

4    Q.    Who was that?

5    A.    Antonio Ferrante.

6    Q.    The first note there, they are sort of out of order,

7    correct, as far as chronology?

8    A.    No, the decision instruction has one date and then the

9    policy notes are all in the same -- they are in

10    chronological order.

11            MR. BERGER:  Can I interject one thing.  On 265,

12    there seems to be something that's taken out.

13            MS. GAETA:  Yes, by UNUM.

14            MS. CASH:  Yes.

15            MR. BERGER:  Do you know why that is?

16            MS. CASH:  Yes, it was blacked out because it is

17    attorney-client work doctrine -- work product.

18            MR. BERGER:  Do you know what it is regarding?

19            MS. CASH:  It's regarding -- what do you mean?

20    It is regarding Mr. Glik.  Could you be more specific.

21            MR. BERGER:  Yeah, we don't have any claim

22    against you.

23            MS. CASH:  That's correct.

24            MR. BERGER:  Why would there be an

25    attorney-client privilege?

Page 54

1    in for individual disability insurance, are doctors'

2    records always requested?

3    A.    No.

4    Q.    So when are they requested?  Is there -- would

5    there --

6    A.    There are certain times, based on our medical

7    underwriting guidelines that they are required, but there

8    are also times when an underwriter has the right in order

9    to look at the entire case to order medical records if they

10   feel it is pertinent to the underwriting of the case.

11   Q.    Here medical records were ordered because of the

12   hypertension and neck and back pain noted in Dr. Glik's

13   application; is that correct?

14   A.    That's correct.

15   Q.    And the next entry is dated January 19th, 2001,

16   correct?

17   A.    Yes.

18   Q.    What is this entry concerning?  Who is it to?

19   A.    Well, it's to the underwriter, Antonio Ferrante, from

20   somebody named Sarah Scott, with a copy to James Lacasse,

21   and I don't know who Sarah Scott or James Lacasse are, but

22   basically Sarah Scott is providing the address -- correct

23   full address for Dr. Vaninov, so that someone in the home

24   office can order the medical records.

25   Q.    And then the next entry on the next page, also dated

Page 55

1    January 19, 2001, indicates what?

2    A.    That Tony Ferrante, the underwriter, ordered the

3    records from Dr. Vaninov, and when he does that, he notes

4    it here that they've been ordered and then he puts it on

5    our system of requirements that are ordered so that when

6    the broker gets a status report, he will see that these

7    have been ordered and we will know what's outstanding, and

8    then a specialist who supports the underwriter actually

9    goes out and orders the records.

10    Q.    And the February 8th, 2001, that entry indicates what?

11    A.    That the underwriter, Antonio Ferrante, received the

12    records from Dr. Vaninov, and there is a -- on February 7th

13    of 2000 -- I'm sorry, I really don't understand what that

14    date 2/7/00 means actually -- showing an office visit on

15    October 22nd of 2000 where they are going to do an

16    ultrasound due to questionable testicular or prostate

17    cancer, will postpone.  At that point, the underwriter

18    decided to postpone the policy based on that medical

19    information.

20    Q.    I'm going to come back to this document, but I want to

21    have marked the medical records that I believe were

22    received next.  I would like to have marked as Exhibit 5

23    documents I 0171 to I 0183.  You all set with that?

24              MR. BERGER:  Yes.

25              MS. GAETA:  And if we could mark these Exhibit 5

1    and then can you do 5A through whatever.

2         (Exhibit 5A-5L, Records Request and Medical Records of

3    Dr. Glik, marked for identification.)

4    Q.    What's the document marked as Exhibit 5A?

5    A.    Can you do the page numbers, when you do that because

6    I didn't write down the --

7    Q.    171?

8    A.    171 is a printout that we have when we request records

9    from a doctor.  We, as a company, do not get the records

10   ourselves.  We have a subcontractor called PMSI, in the

11   upper right corner, that goes out and gets -- it's a

12   paramed facility, and they go out and get the records for

13   us from the doctor's office.

14         This is the form that prints out that tells

15   them -- tells the person from whom we have requested what

16   the name of the person is, what their date of birth is,

17   what there Social Security is so we can identify the person

18   we are asking for.  The doctor to whom or the facility to

19   whom we are requesting -- from whom we are requesting

20   records.

21         On the right-hand side would be the date we made

22   the request and this is the name of the company UNUM, the

23   policy number, that helps us to match it up when it comes

24   back.  301V tells me that the field office is Boston and

25   the requester is J. Lucky.  I don't know who that is,

Case 1:05-cv-10360-GAO    Document 28-4    Filed 08/30/2006    Page 16 of 60
30(b)(6) of UNUMProvident Corporation (Nancy M. Brenerman)    5/2/2006

Page 57

1   unless it is a nickname for Jeanne Lucey.  I don't know

2   what it is.  I don't know if it is mistyped or what.

3           This will go out to the, I believe, PMSI, and

4   when they get the records, they put this on the top so that

5   when it comes back our support people know how to match it

6   up with the right file.

7   Q.   You said PMSI is -- stands for what?

8   A.   I don't know what it stands for actually.  It may be

9   Paramed Measurement System, Inc.  It's a company that has

10  paramedical technicians that go out and draw blood, et

11  cetera, or go into records for us, and they are all over

12  the country.

13  Q.   Any idea who Jim is that is handwritten on this

14  exhibit?

15  A.   No.

16  Q.   Exhibit 5B, which is Bates stamped 0172, can you tell

17  me what this document is?

18  A.    This is a letter that is part of the records from

19  Dr. Vaninov that PMSI received.  It is a letter from

20  Christopher Doyle to Mr. Michael Glik with a copy to

21  Dr. Eugene Vaninov that says -- that tells Mr. Glik that

22  his recent blood test showed that the level of Alpha Feto

23  Protein, AFP and the PSA were both normal.  This makes the

24  chance of both testes cancer and prostate cancer lower.  It

25  is still reasonable to go ahead with the ultrasound study.

Page 58

```
 1    I will let you know the result when I receive the

 2    information.

 3    Q.    Next document which is 5C, document I 0173, what is

 4    this document?

 5    A.    This is also part of Dr. Vaninov's records that on

 6    October 11th, in 2000, Dr. Doyle, who works at Brigham and

 7    Women's Hospital in Boston, Harvard Medical School, wrote

 8    to Dr. Vaninov providing information to him about

 9    Mr. Glik's office visit with Dr. Doyle.

10    Q.    What does it say in the first paragraph?

11    A.    Thank you for asking me to see Mr. Michael Glik for

12    urological evaluation regarding testicular pain.  He

13    described that he had noted an abnormality in the left

14    hemiscrotum about a week ago with no antecedent trauma or

15    voiding symptoms.  As you know, he has undergone previous

16    rectal cancer surgery as a pull through procedure in Russia

17    at age 25, and passed kidney stones about 30 years ago.

18    Q.    Now, if we can.  If you can also look at Exhibit 3

19    while you are looking at Exhibit 5C for the next question.

20    A.    I have it.

21    Q.    Look at questions 21B, which is Exhibit 3 Bates

22    stamped I 0200.

23    A.    21B?

24    Q.    Yes.

25    A.    Yes.
```

Page 59

1    Q.    Again, can you read that question, 21B.

2    A.    Have you ever had, had been told you had or been

3    treated for colitis, chronic diarrhea cirrhosis disease or

4    disorder of the stomach, intestines, rectum, liver or

5    digestive system.

6    Q.    And Dr. Glik's response?

7    A.    No.

8    Q.    Now, reviewing the document marked Exhibit 5C, the

9    letter dated October 11, 2000, again it states that

10   Dr. Glik previously had rectal cancer.  Would Dr. Glik's

11   response to 21B appear to be accurate to you based on the

12   medical records that were received from Dr. Vaninov?

13            MR. BERGER:   Objection.

14   Q.    You can answer the question, if you understand it.

15   A.    No, it would not be accurate.

16   Q.    Why is that?

17   A.    Because he answered no to the question 21B of having

18   any disease or disorder of the rectum and in this Exhibit,

19   Bates stamp I 0173, the doctor said that he had previous

20   rectal cancer surgery.

21   Q.    Can you read 21D from the application that's Exhibit

22   3, Bates stamped I 0200.

23   A.    21D:  Have you had, been told you had or been treated

24   for polyp, tumor, cancer or disease or disorder of the

25   immune system.

Page 60

1    Q.    Dr. Glik' response?

2    A.    No.

3    Q.    Based on the October 11, 2000 letter marked as Exhibit

4    5C, is his response to question 21D accurate?

5    A.    No, it is not.

6    Q.    Why do you say that?

7    A.    Because he had rectal cancer according to the letter

8    of October 11.

9    Q.    The fact that these responses are inaccurate in the

10    application how does that impact the underwriting process

11    once Dr. Vaninov's medical records are received by UNUM?

12    A.    Could you be a little more specific about how does it

13    impact.

14    Q.    Sure.  Was a determination made by UNUM that the

15    responses by Dr. Glik in his application were inaccurate

16    based on the medical records that were received from

17    Dr. Vaninov?

18    A.    I need to look at Exhibit 4, underwriter notes, and

19    the underwriter's comments were, on Bates stamp I 0264 with

20    the date of February 8th, 2001.  Antonio Ferrante, the

21    underwriter said, received APS from Dr. Vaninov -- and then

22    that 2700, which I don't know what that means -- showing

23    office visit on 10/22/00 where they were going to do an

24    ultrasound due to questionable testicular or prostate

25    cancer.  Will postpone.  As I'm not the underwriter on this

Page 61

1    case, it appears there's other information in Dr. Vaninov's

2    records that Antonio Ferrante referred to for the reason

3    that he postponed the case.

4              Can I talk to my attorney.

5    Q.    Sure.

6              (Discussion off the record.)

7    Q.    Look at the letter marked as Exhibit 5C again.   The

8    last paragraph in that letter, can you read that?

9    A.    Dr. Doyle said I have suggested a CT scan of the

10   abdomen and pelvis to evaluated the possibility of the

11   abdominal mass, tumor markers and a scrotal ultrasound.   I

12   will keep you apprised of developments.

13   Q.    Now looking at Exhibit 4, the entry dated February 8,

14   2001, that you read before, is the reason that the

15   application was postponed due to the information provided

16   in this letter?

17   A.    I really would have to read all the other letters to

18   see if there is also another reference to it.   This

19   certainly would fit the description of what the underwriter

20   said, but I don't know if there is anything behind this.   I

21   think that's the only one in 2000.   If you would just bear

22   with me for a second.   Yes, that's the basis on which the

23   underwriter made the decision to postpone.

24   Q.    Is that also based on the document that's marked

25   Exhibit 5B, which is the letter dated October 22, 2000?

Page 66

1           (The reporter read the requested matter.)

2           MS. GAETA:  I'm going to have document Bates

3    labeled 0215 marked as Exhibit 6.

4           (Exhibit 6, Letter From Office of Consumer Affairs and

5    Business Regulation, Division of Insurance, 2/1/01, marked

6    for identification.)

7    Q.    Have you had a minute to look this over?

8    A.    Yes.

9    Q.    Do you know what this?

10   A.    It is a letter from the director of community service

11   section from the Commonwealth of Massachusetts Office of

12   Consumer Affairs and Business Regulation Division of

13   Insurance to a generic Dear Consumer, written on

14   February 1st, 2001, that says:  Enclosed please find the

15   information you requested.  We hope you will find it

16   useful.

17   Q.    Do you know how UNUM obtained this document or why

18   UNUM has this document?

19   A.    No, I don't.

20   Q.    Any idea what it is?

21   A.    I can guess, but I don't know for sure what it is and

22   how it happened.

23   Q.    That's fine.  I'm going to have document Bates labeled

24   I 0262 marked as Exhibit 7.

25           (Exhibit 7, Final Processing Sheet, 2/9/01, marked for

30(b)(6) of UNUMProvident Corporation (Nancy M. Brenerman)    5/2/2006

Page 67

1    identification.)

2    Q.    When you are ready, let me know.

3    A.    I'm ready.

4    Q.    What is this?

5    A.    This is the final processing sheet that comes out of

6    the computer when a decision has been made on an

7    application and it's put in the file showing what the

8    decision is.

9    Q.    The decision date is what?

10   A.    February 9th, 2001.

11   Q.    And the decision is what?

12   A.    Postponed.

13   Q.    And the reason?

14   A.    Postponed due to information found in medical records

15   from Dr. Vaninov.

16   Q.    Do you know what that is referring to?

17   A.    Could you rephrase your question.

18   Q.    Do you know where it says:  Postponed due to

19   information found in medical records from Dr. Vaninov, what

20   medical records that's referring to?

21   A.    The one we just discussed a moment ago and the

22   information about -- in Exhibit 5, Bates stamped I 0173

23   that talked about the abnormality in the left hemiscrotum

24   and the ordering of a CT scan to find out the nature of

25   that mass.

Page 68

1  Q.    And do you know why it's called a decision in its

2  final processing when the decision is postponement.  Can

3  you just explain that?

4  A.    There are -- we have to take an action on every

5  application that comes in.  In this case, decision means

6  the action that was taken on the file.  That can be to

7  issue a policy, to issue it with a coverage change, we

8  don't give as much money as they ask for, sometimes more,

9  sometimes less.  It could be on condition meaning there's

10  an amendment.  It could be that you withdraw it.  It could

11  be that you postpone it, you decline it.

12  Q.    It is a final decision --

13  A.    Final action on the policy.

14  Q.    -- to postpone an application?

15  A.    Yes.

16  Q.    What is the FMIS code?

17  A.    As I understand it, the actuaries, in order to do an

18  analysis of our block of business, need us to code certain

19  data among which is occupation, income, benefit amount in

20  force, different things that they use to slice and dice the

21  block.  They are just codes that we put in so there is a

22  structure to that analysis that they need to do.

23  Q.    Who is this signed by or reported by?

24  A.    Could you say where you are -- oh.  At the reported

25  by, I don't know whose initials those are.

Page 69

1    Q.    What does that mean, reported by?

2    A.    I believe it means the person who inputted the

3    decision on the system.

4          MS. GAETA:  Mark documents Bates stamped 282 to

5    283 as Exhibit 8, and then at the same time documents Bates

6    stamped 245 to 246 marked as Exhibit 9.

7          (Exhibit 8, Letter to Mr. Glik from Mr. Ferrante,

8    2/13/01, marked for identification.)

9          (Exhibit 9, Letter to Mr. Glik From Mr. Ferrante,

10   2/13/01, marked for identification.)

11   Q.    All set?

12   A.    Not quite.  I'm ready.

13   Q.    What is Exhibit 8?

14   A.    This is a letter that was sent to Mr. Glik over the

15   signature of the underwriter explaining to him the decision

16   that was made on his case was to postpone his coverage and

17   that the reason was due to medical records obtained from

18   Dr. Vaninov and we sent this letter on February 13, 2001.

19   Q.    When a decision is made to postpone coverage, could it

20   have been possible for Dr. Glik to submit additional

21   information to UNUM after receiving this February 13th

22   letter concerning his medical condition?

23   A.    Specifically, in the bottom paragraph on Bates stamp

24   0282, you know, he is able to submit information, but as a

25   general practice, we will always accept information from

Case 1:05-cv-10360-GAO    Document 28-4    Filed 08/30/2006    Page 25 of 60
30(b)(6) of UNUMProvident Corporation (Nancy M. Brenerman)        5/2/2006

Page 70

1    someone via their doctor, not from them directly, but if

2    they have medical records that they want us or another

3    doctor that they didn't disclose they want us to see, we'll

4    always take a look at it.  But he actually says

5    specifically in here that we will take a look at it.

6    Q.    And the document that is marked as Exhibit 9 is signed

7    by the underwriter, correct?

8    A.    That's correct.

9    Q.    Do Exhibit 8 and Exhibit 9 appear to be the same

10   document, aside from the fact that Exhibit 9 is signed by

11   the underwriter and Exhibit A has file copy typed at the

12   top?

13   A.    Yes.  May I correct one other thing that I said.  You

14   asked me who the reported by was on Exhibit --

15   Q.    7?

16   A.    -- 7.  If you look at the name on Bates stamp I 0283

17   the next page of the letter, it says J. Corkum, she was an

18   underwriting specialist to Tony Ferrante and this looks

19   like a JC on the reported by.

20           MS. GAETA:   I'm going to have document Bates

21   stamped I 0296 marked as Exhibit 10.

22       (Exhibit 10, Form Sent to MIB, Report of Medical

23   Condition Code, marked for identification.)

24   Q.    Do you know what this is?

25   A.    Yes, this is a form -- a copy of a form that we send

Page 71

1    to the Medical Information Bureau and we are reporting a

2    medical condition code to MIB as required in our contract

3    with MIB.

4    Q.    So, in this case, Dr. Glik's medical condition was

5    reported to MIB?

6    A.    Yes, it was.

7    Q.    And what medical condition would have been reported,

8    if you can tell, based on this document?

9    A.    I can't tell based on this document because due to

10    confidentiality we whited out the MIB -- blacked out the

11    MIB code.  MIB doesn't like us to show those codes.  I

12    could probably find it in another place, but it would have

13    been his medical history relative to the mass that he was

14    feeling.

15            MS. GAETA:  I'm going to have document Bates

16    stamped 0284 marked as Exhibit 11.

17        (Exhibit 11, Letter from Dr. Glik to UNUM Life

18    Insurance Company, 2/25/01, marked for identification.)

19    Q.    Can you tell me what this is?

20    A.    This is a letter dated February 25th, 2001 from

21    Michael Glik to UNUM Life Insurance Company, Dear Sirs, in

22    which he is requesting -- he is saying he doesn't

23    understand the reason why he didn't get a policy and he

24    wants the reason.

25    Q.    He refers to the policy here as a long-term disability

**30(b)(6) of UNUMProvident Corporation (Nancy M. Brenerman)**    5/2/2006

Page 72

1    policy; is that correct?  Is that what this policy -- this

2    application was for?

3    A.    Yes, it was.  He didn't put in the word individual, so

4    that's the only word that's missing.

5    Q.    He lists three reasons why he believes that he was

6    denied coverage.  Can you read those?

7    A.    One, I did not work at in the Inotek Corporation long

8    enough (only three months).  Two, I'm an immigrant with a

9    short time of living in the U.S., and three, I do not have

10    a positive background.

11    Q.    By the way, was he ever denied coverage?

12    A.    No, coverage was postponed.  It was not denied.

13    Q.    Were any of these three reasons the reasons why his

14    coverage was postponed?

15    A.    I can say categorically that 1 and 2, were not

16    reasons.  I don't know what he means by:  I don't have a

17    positive background.  If he means his medical history, that

18    is the reason it was postponed.  If he means anything else,

19    I don't know what he means.

20            MS. GAETA:   I'm going to have document Bates

21    stamped I 0261 marked as Exhibit 12.

22        (Exhibit 12, Letter From Mr. Ferrante to Mr. Glik,

23    3/8/01, marked for identification.)

24    Q.    What is this letter?

25    A.    This is a letter that was written to Mr. Glik on

Page 73

1    March 8th, 2001 by the underwriter who had underwritten his

2    application giving the reason why his policy was not issued

3    and was postponed.

4    Q.    Is this a response to Dr. Glik's February 25, 2001

5    letter?

6    A.    I believe it is, yes.

7    Q.    What's the reason that's indicated here?

8    A.    The reason for our decision is as follows:    In your

9    medical records from Dr. Vaninov, there is a letter from

10    Dr. Christopher Doyle dated October 11, 2000.    The letter

11    states that you saw Dr. Doyle due to testicular pain.

12    Dr. Doyle suggested that you have a CT scan of the abdomen

13    and pelvis to evaluate the possibility of an abdominal

14    mass, tumor markers and a scrotal ultrasound.    The results

15    of these tests were not in the medical records provided to

16    us.    Since we could not fully evaluate your medical

17    insurability without this information, we postponed your

18    application until results of those tests are completed and

19    a diagnosis is made.

20    Q.    Did UNUM ever receive the results of those tests or

21    diagnosis as far as you are aware?

22    A.    As far as I'm aware, we did not.

23    Q.    Can you refer back to Exhibit 4.    On the second page

24    of Exhibit 4, Bates stamp 264, the entry dated March 8th,

25    2001, is that entry consistent with this March 8th, 2001

Page 74

1    letter?

2    A.    Yes, it is.

3    Q.    By the way, the decision listed on Exhibit 4, page

4    263, is that decision consistent with the explanation given

5    in the March 8th, 2001 letter to Dr. Glik?

6    A.    Yes, it is.

7            MS. GAETA:    I'm going to have document Bates

8    stamped 207 to 214 marked as Exhibit 13.

9            (Exhibit 13, Letter Massachusetts Division of

10    Insurance to Ms. Lee, 3/13/01, With Attached Insurance

11    Complaint, marked for identification.)

12    Q.    Let's me know when you are ready.

13    A.    I'm all set.

14    Q.    Do you know what the first page of this exhibit is?

15    A.    Yes, this is a March 13th, 2001 letter from the

16    Insurance Department of Massachusetts.  We call it

17    corporate complaint when one of our applicants or in force

18    people, in this case applicant has complained about

19    anything that they believe UNUMProvident has done in the

20    course of their relationship with UNUMProvident.  This

21    letter comes from the Department of Insurance telling us

22    that we have a certain amount of days to respond to the

23    complaints that the person cases.

24    Q.    The insurance complaint form that's part of this

25    exhibit, Bates stamped 201, this document was completed by

Page 75

1    Michael Glik; is that correct?

2    A.    I believe so.

3    Q.    And in response to:  Is this a group policy, provide

4    the group employer name, can you read what he wrote?

5    A.    Individual.

6    Q.    Is that a correct description of the policy that he

7    applied for?

8    A.    Yes, it is.

9    Q.    Under the policy claim number, do you see where he

10   wrote a prepayment agreement number?

11   A.    Yes.

12   Q.    What is that, to the best of your knowledge?

13   A.    I would have to look and see what he is referring to,

14   if it is in the application.  He has taken the number off

15   the bottom of Exhibit 3, Bates stamped 2003, and that's the

16   same number that he calls a prepayment agreement, and he

17   put a number down at the bottom.  I don't know what that

18   number is.

19   Q.    Just to clarify, that number actually appears on each

20   page of the application at the bottom?

21   A.    Application number.

22   Q.    Is that an application number?

23   A.    I believe it is, yes.

24   Q.    Is that a prepayment agreement No.?

25   A.    No.

**30(b)(6) of UNUMProvident Corporation (Nancy M. Brenerman)**        5/2/2006

Page 76

1    Q.    Dr. Glik never entered into a prepayment agreement

2    with you; is that correct?

3    A.    That's correct.

4    Q.    On the next page of Exhibit 13, marked -- Bates

5    stamped 210, Dr. Glik indicates on November 21, 2000 he had

6    surgery for cancer of transverse colon that proved to be

7    nonremovable.  Was UNUM aware of this diagnosis prior to

8    receiving this complaint from the division of insurance?

9    A.    No.

10   Q.    And if UNUM had been aware of this diagnosis, what

11   would the decision concerning his application have been?

12   A.    We would have declined his application.

13   Q.    Is there generally a certain number of years that an

14   individual needs to be in remission from cancer before a

15   policy for individual long-term disability would be

16   considered?

17   A.    There -- yes, there are guidelines around how many

18   years someone has to be in remission, but it really depends

19   on which cancer and all kinds of other conditions, but

20   there is -- there are some years in remission, standards

21   around them, but they vary depending on the cancer.

22   Q.    In Dr. Glik's explanation, he said on February 13,

23   2000 UNUM denied my insurance coverage for the reasons of

24   preexisting condition.  Is that an accurate explanation of

25   what UNUM did?

1    A.    No, we didn't deny his insurance.  We postponed it.

2    Q.    In this explanation, Dr. Glik describes his previous

3    treatment for cancer; is that correct?  In fact, can you

4    read the statement below that begins with:  However.

5    A.    The one below that?

6    Q.    The one that begins with:  However.

7    A.    However, this is not true for the following reasons.

8    I had my surgery for rectum tumor in Moscow, Russia in 1973

9    (about 28 years ago).  The surgery dates and extent can be

10   witnessed by a dozen of U.S. citizens.  Since I came to the

11   U.S.A. in February 1993, I first sought medical advice for

12   my colon program in October 2000.

13   Q.    Based on the statement there that Dr. Glik provided,

14   again, can you refer to Exhibit 3, questions 21B and D.

15   Did Dr. Glik -- Dr. Glik responded to both of those

16   questions no; is that correct?

17   A.    That's correct.

18   Q.    Were those responses accurate based on his explanation

19   provided in Exhibit 13?

20   A.    No, they were not.

21   Q.    Why is that?

22   A.    Because he states in Exhibit 13, Bates stamped 210,

23   that he had surgery for rectum tumor in Moscow in 1973.

24   Q.    Looking back at Exhibit 13, there's a list of three

25   doctors, Dr. Eugene Vaninov being one of them and two other

Page 78

1    doctors?

2    A.    Yes.

3    Q.    Was UNUM aware that these other doctors had seen

4    Dr. Glik prior to receiving this explanation?

5    A.    No.

6            MS. GAETA:    Bates stamped Exhibit 216 marked as

7    Exhibit 14.

8            (Exhibit 14, Fax Cover sheet From Ms. Courchaine to

9    Mr. Ferrante, 3/19/01, marked for identification.)

10   Q.    Ready?

11   A.    Yes.

12   Q.    What is this?

13   A.    This is a fax cover sheet from the administrative

14   assistant to the vice president of Northeast Underwriting,

15   Steve Joseph to Tony Ferrante, the person who underwrote

16   Mr. Glik's application, stating that we had gotten a

17   corporate complaint that was first given to Steve Joseph

18   and so, as the VP, he could look at it and then give it to

19   the appropriate person to begin the response.

20   Q.    Who is Terri Brown?

21   A.    I don't know.

22   Q.    And the corporate complaint refers to what complaint?

23   A.    Mr. Glik's complaint and I'm sorry, I don't know the

24   date where he objected to the fact that he was postponed.

25   Q.    His complaint was filed with the Division of

Page 82

1          MS. GAETA:   Document Bates stamped 238 is going

2    to be Exhibit 18.

3          (Exhibit 18, Letter from Dr. Glik to Mr. Ferrante,

4    3/20/01, marked for identification.)

5    A.    I'm all set.

6    Q.    What is this document?

7    A.    This is a letter dated March 20th, 2001 that Mr. Glik

8    wrote to Mr. Ferrante the underwriter saying that he was

9    not satisfied with the form or the content of

10   Mr. Ferrante's March 8th letter to him, the one that

11   explained the reasons for the postponement.

12   Q.    And I'm going to ask that the March 8th letter, you

13   take a look at that as well.  That's marked as Exhibit 12.

14   A.    Yes.

15   Q.    In the March 20th letter, he states:  If you refuse my

16   LTD, please state the reason for that so I could file a

17   court suit.  Did Dr. Glik ever file a lawsuit against UNUM?

18   A.    Not to my knowledge.

19   Q.    In this letter, it states that on October 13th, he had

20   an appointment with a urologist because of urological

21   problem.  I ask you to refer back to Exhibit 5, 5C, which

22   is Bates stamped 0173, letter dated October 11, 2000.  In

23   Exhibit 18, Dr. Glik says that he had his appointment with

24   the urologist on October 13th.  Based on document marked as

25   Exhibit 5C, does that appear to be accurate to you?

Page 86

1    A.    That's the final decision by the chief underwriter who

2    reviewed and worked on the corporate complaint that it was

3    her assessment that the corporate complaint was not

4    justified.

5    Q.    Who is that chief underwriter?

6    A.    Susan R. Nelson.

7    Q.    What's the date of this?

8    A.    March 22, 2000.

9            MS. GAETA:    I'm going to have document Bates

10   stamped 231 marked as Exhibit 20.

11       (Exhibit 20, Letter from Ms. Nelson to Massachusetts

12   Department of Insurance, 3/22/01, marked for

13   identification.)

14   A.    I'm ready.

15   Q.    What is this?

16   A.    This is a letter that the chief underwriter, Susan

17   Nelson, wrote back to the Department of Insurance in

18   Massachusetts responding to the corporate complaint.   We

19   are required to send a letter when we investigate a

20   corporate complaint and we are required to respond to the

21   Department of Insurance and that's what this is.

22   Q.    This letter responds to the document marked as Exhibit

23   13?

24   A.    Yes.

25   Q.    The second paragraph of this letter, can you read

Page 87

1    that.

2    A.    Dr. Glik's application for individual disability

3    coverage was received by UNUM underwriting on December 15,

4    2000.  Dr. Glik signed this application on October 2, 2000.

5    Q.    Do you have any idea why the application wasn't

6    received by UNUM until December 15?

7    A.    No, I don't.

8    Q.    The next paragraph of this letter, can you read the

9    last sentence.

10    A.    As no diagnosis for the current complaint was

11    available at time of underwriting and no prepayment was

12    made with the application, the decision was made to

13    postpone any consideration until such time as a diagnosis

14    was available.

15    Q.    What is the fact that no prepayment was made with the

16    application have to do with the decision to postpone, if

17    anything?

18    A.    I don't think it has anything to do with the decision.

19    Q.    Can you explain that further, why doesn't it have

20    anything to do with the decision?

21    A.    Well, in the course of underwriting, a prepayment

22    agreement says, if we were going to issue this on a

23    standard basis, then we would have an effective date that

24    was a date sooner than had he not sent in a check with his

25    application.  We were not going to issue this on a standard

Page 88

1    basis, so the fact that it was a prepayment agreement or

2    not a prepayment agreement has no bearing on it.

3    Q.    It still would have been postponed?

4    A.    Yes.

5    Q.    Can you read the first -- the second and third

6    sentences of the second paragraph starting with:  These

7    records.

8    A.    These records noted a history in October 2000 of

9    consultation regarding testicular pain and a possible

10   abdominal mass.  Of note in these records, as well, was a

11   history of surgery for rectal cancer.  This history was not

12   disclosed on Dr. Glik's application.

13   Q.    Is that a summary of why his application was

14   postponed?

15   A.    No.  His -- it's a -- it was postponed because there

16   was no diagnosis yet of the mass that he was feeling and

17   that's the reason it was postponed.

18   Q.    The fact that his history of rectal cancer was not

19   disclosed in the application, would that in and of itself

20   have led to a denial?

21   A.    I don't have the underwriting rules in front of me as

22   to rectal cancer in the '70s, was it, and what the effect

23   of that -- we would have had to have gotten the records and

24   what kind.  It certainly gives us pause when there is

25   medical history that we don't know about because it raises

Page 92

1   that history.

2           MR. BERGER:  Motion to strike.

3   Q.   You don't use the term preexisting condition, but for

4   all intents and purposes, if an applicant had an existing

5   condition, that existing condition can prevent the policy

6   from being issued?

7   A.   It can.

8   Q.   Is that correct?

9   A.   Yes.

10          MS. GAETA:  I'm going to have document Bates

11  stamped 144 marked as Exhibit 21.

12      (Exhibit 21, Letter from Dr. Glik to the Massachusetts

13  Division of Insurance, 4/7/01, marked for identification.)

14  A.   I'm all set.

15  Q.   What is this?

16  A.   This is a letter from -- shall I refer to him as

17  Dr. Glik?  I have been referring to him as Mr. -- from

18  Dr. Glik on April 7, 2001 to the Insurance Commission in

19  Massachusetts asserting that he feels there are a number of

20  inaccuracies or intended false statements and he outlines

21  what he thinks those are.

22  Q.   In the first paragraph, can you read the last

23  sentence.

24  A.   Would you begin the word that you want me to --

25  Q.   They.

Page 94

1   Q.   Is that accurate?

2   A.   No, it is not.

3   Q.   Why is that?

4   A.   We, as I stated before, have a contract should it be

5   issued between the employee and our company.  We do not

6   have a contract with the employer.  So it isn't our duty.

7   As a matter of fact, we are precluded by confidentiality

8   laws from discussing applications with employers.

9   Q.   And how about the issue of prepayment?

10   A.   I don't know what he means cannot be held against me.

11   I'd have to know exactly what he meant about that, but as

12   I've stated before, the prepayment agreement says, if we

13   were going to issue you a policy on a standard basis, then

14   when that would become effective, had you sent in the check

15   with the policy, would be sooner than if you had not sent

16   in a check.

17   Q.   Do you know if any of the applicants from Inotek

18   elected prepayment?

19   A.   No, I don't know.

20   Q.   And could you read the second to the last paragraph,

21   beginning with:  To sum it up.

22   A.   To sum it up, lack of diagnosis, no prepayment and

23   late date of application did not happen through my fault or

24   oversight.  These are the results of inertia of the UNUM

25   company.

Page 104

```
 1    A.    I'm all set.

 2    Q.    What is this?

 3    A.    This is the tracking form that is used when a

 4    complaint -- corporate complaint is forwarded to an area

 5    and asks them -- they are asked to respond to it and this

 6    one is dated 6/5/2001.  It is signed by Sue Nelson and it

 7    says that the complaint was not justified.

 8    Q.    Which means?

 9    A.    That we will not change the action on our decision

10    based on the information we got from the person.

11    Q.    This consumer action notice refers to the complaint

12    marked as Exhibit 24; is that correct?

13    A.    I believe so, yes, the second complaint, follow-up

14    complaint.

15          MS. GAETA:  I'm going to have documents Bates

16    stamped I 137 to 167 marked as Exhibit 29.

17          (Exhibit 29, Response to the Division of Insurance,

18    6/7/01, marked for identification.)

19    A.    I'm ready whenever you are ready.

20    Q.    What is this?

21    A.    This is the response to the Insurance Department of

22    Massachusetts to the second complaint or the follow-up

23    complaint, as we call it, from Dr. Glik, and it's our

24    company's response signed by Sue Nelson and sent to the

25    Department of Insurance on June 7th, 2001.
```

Page 105

1  Q.   This is responding to the May 21, 2001 complaint; is

2  that correct?

3  A.   Exhibit 24, is that what it is?  Is that May 21st?

4  May 21st, yes, it is.

5  Q.   On No. 1 it states that there is no contractual

6  relationship between UNUM and Inotek Corporation.  Can you

7  explain that again?

8  A.   This is an individual -- this was an application for

9  an individual disability policy between Dr. Glik and our

10  company and it had nothing to do with Inotek.

11  Q.   Also states that the fact that Inotek's management had

12  knowledge of Dr. Glik's diagnosis has no bearing upon

13  Dr. Glik's application for insurance.  Can you explain

14  that -- what that means?

15  A.   Again, the application is filled out by the applicant

16  and he is the one responsible for giving all truthful

17  information with complete details and signing it.  He is

18  attesting to the fact that it was true.  And the fact that

19  Inotek's management knew anything has no bearing on that

20  because it is an application from the client -- from the

21  applicant to UNUMProvident directly.

22  Q.   On the next page, the second paragraph states:  UNUM

23  has sufficient documentation to support a denial of

24  Dr. Glik's application.  Do you see that?

25  A.   Yes, I do.

Page 116

1                          SIGNATURE PAGE

2     TO BE COMPLETED BY DEPONENT:

3          I, _Nancy M Brenerman_____ have read the

4     foregoing pages of my testimony or have had the foregoing

5     pages of my testimony read to me and have noted any changes

6     in form or substance of my testimony together with their

7     respective corrections and the reasons therefor, on the

8     following __1__ Errata Sheet(s).

9                        (Signature) _Nancy M Brenerman___

10                       (Date) _____5/30/06_____

11

12     _____

13

14    TO BE COMPLETED BY NOTARY PUBLIC OR ATTORNEY:

15         I, _____Susan A. Carter_____ , a Notary

16    Public/Attorney in and for the State of Maine, hereby

17    acknowledge that the above-named deponent personally

18    appeared before me, swore to the truth of the foregoing

19    statements and affixed his/her signature above as his/her

20    own true act and deed.

21

22                       (Signature) _Susan A. Carter___

23                       (Date) ____May 30, 2006_____

24

25    My Commission Expires: ____10/20/09_____

ERRATA SHEET

| PAGE | LINE | FROM: (Quote words you wish to change) | TO: (Write change you wish to make) | REASON: (e.g. typo, wrong word, word omitted, etc.) |
|------|------|----------------------------------------|-------------------------------------|------------------------------------------------------|
| 17 | 7 | belongs to it | belong to it | typo |
| 24 | 7 | Percentage | Percentages | typo |
| 25 | 20 | Standard | (remove this word) | I misspoke |
| 42 | 16 | on a standard basis | (remove these words) | I misspoke |
| 45 | 22 | Should have | add "it" - should it have been | word missing |
| 46 | 1 | and | an | typo |
| 74 | 23 | cases | makes | typo |
| 80 | 15 | compliant | did "is" - compliant is | missing word |
| 84 | 23 | on to | on to | typo |
| 87 | 23 | on a | remove words | I misspoke |
| 87 | 23 | Standard basis | remove words | I misspoke |
| 87 | 25 | on a standard | remove words | I misspoke |
| 88 | 1 | basis | remove word | I misspoke |
| 93 | 18 | request | requested | typo |
| 94 | 13 | on a standard basis | remove words | I misspoke |
| 94 | 5 | issued between | issued is between | word omitted |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

SIGNATURE: _Mary M. Brummer_ PAGE _1_ OF _1_

DOWNING & PETERS REPORTING ASSOCIATES 79 Atlantic Place, South Portland, Maine 04106 Phone (207) 772-6221 Facsimile (207) 772-2056

1

2                                    CERTIFICATE

3

4              I, Catherine Cook, a Notary Public in and for the

5      State of Maine, hereby certify that the within-named

6      deponent was sworn to testify the truth, the whole truth,

7      and nothing but the truth, in the aforementioned cause of

8      action.

9

10             I further certify that this deposition was

11     stenographically reported by me and later reduced to print

12     through Computer-Aided Transcription, and the foregoing is

13     a full and true record of the testimony given by the

14     deponent.

15

16             I further certify that I am a disinterested

17     person in the event or outcome of the above-named cause of

18     action.

19

20             IN WITNESS WHEREOF, I subscribe my hand and affix

21     my seal this date:    May 11, 2006

22

23     Dated at                _____

24     Portland, Maine.          Catherine Cook, Notary Public

25     My Commission Expires:  October 31, 2008

# APPLICATION- ROUTING TICKET
## Portland Home Office
### 12/11/2000
### IDA069118

| | | | |
|---|---|---|---|
| Insured | GLIK*MICHAEL S | **ACCOUNT NUMBERS** | |
| Flex Name | INOTEK CORPORATION | Insured | 517485-UM |
| Flex Number | 494863G1-UM | Bill Instr Number | NFA0297534-LA |
| Field Office | 0301V | Payor | 494863-UM |
| Policy # | LAR451315 | Loss Payee | 517485-UM |
| Underwriter | Antonio Ferrante Jr ( C1T1F ) | | |
| Submit Date | 12/11/2000 | | |
| Prepared By | Jeanne Lucey  ## | | |

---

**Money Information**

**Non-prepaid**

**Premium**
Annlz $1447.24
Modal $1,447.24

Mode  Annual

---

**Processing Information**
Rate Type: U
Mental Nervous Limitation: Y

---

**Flex**
Existing Flex Number        494863G1-UM

---

**Producer Information**

| Producer Name Telephone Number | UNUM Prod # | Serv Prod | % of Comm | Annlz Ind | Rep Name | 1st Case | Star Prod | Pro Perf |
|---|---|---|---|---|---|---|---|---|
| Boyd-Neelon Ins Agency Inc (978) 443-7000 | 016777 | Y | 100 | | Kevi Fenderson | N | N/A | N/A |

---

**Requirements**

| | |
|---|---|
| DBS/HIV/Urine | Outstanding |
| Signed Informed Consent Form | Received |
| Income Verification Needed | Received |

---

**Things To Do At Issue**

---

**F.O. Notes**

EXHIBIT
UNUM
1
5/2/06

I  0266

EXHIBIT
UNUM
3
PENGAD 800-631-6989
4    5/2/06

 UNUM.

UNUM Life Insurance Company of Americ
Portland, Maine 04122-215

## APPLICATION FOR DISABILITY INSURANCE - PART I

NOTE: "YOU" and "YOUR" within this application refer to the Proposed Insured. **PLEASE PRINT ALL INFORMATION.**

### Personal Profile

**1 a)** Your Full Legal Name (Last, First, Middle)
GULIK MICHAEL S

**c)** ☑ Male
☐ Female

**e)** Current Age: 54

**f)** Birthplace (State, Country) Russia

**g)** Citizenship: ☑ US  ☐ Canadian ☐ Other
* If other, # of yrs. worked/resided in US _____ yrs.

**2 a)**

**b)** Business Name and Address: (Do Not Use P.O. Box)
Employer Name _Inotek Corp._
Street _____ Ste.# _____
City _____ State ____ Zip _____

**c)** Mailing Address if other than residence or business:
Box#/Street __same__
City _____ State _____ Zip _____ Apt.# _____

### Occupation  ➡ PRODUCER: Please designate occupation class of applicant __AA__ ⬅

**3 a)** Occupation and/or Job Title:
_Researcher_
Second Occupation (if any):

**b)** Professional Designation or Degree:
_M.D_

**c)** Please provide specialty, if any:

**d)** Yrs. in occupation: ~~31~~    Yrs. with employer: _0_

**e)** Percent of business you own: _0_ %

**f)** Nature of Business:
_Biotech R & D_

**g)** # of years business has been in existence: _3_

**h)** # of full-time employees in business: _20_

**i)** Average # of hours worked per week: _40_

**j)** Using a typical work week, please describe your occupational duties by indicating the approximate % of time devoted to the following duties:
_____ % Sales _____ % Travel _____ % Managerial/Admin. _____ % Physical/Manual
_Y_ % Other    If other, please provide details. _Research_

### Income

**4** Annual Earned Income from personal services as reported to the IRS on your personal or business federal tax return:

|  | Actual Income ~~Last Year~~ (Current) Specify Yr. _ _ _ _ | Actual Income 2 Years Ago Specify Yr. _ _ _ _ |
|---|---|---|
| **Non-Business Owner :** | | |
| W-2 Income | $ 37,000 | $_____ |
| 1099 Income less business expenses | $_____ | $_____ |
| Other (specify):_____ | $_____ | $_____ |
| **Business Owner:** | | |
| W-2 Income from your business | $_____ | $_____ |
| Your share of business net profits/losses after all business expenses | $_____ | $_____ |
| Other (specify): | $_____ | $_____ |

Business Type (check one): _____ Proprietorship _____ Partnership _____ Corporation _____ S-Corporation _____ Other (specify) _____

### Insurance & Other Information

**5 a)** Have you ever applied for life, medical, or disability, long term care or nursing home insurance which was declined, postponed, rescinded or modified in any way, or have you been refused renewal or reinstatement of insurance? ☑ No  ☐ Yes  If Yes, please give details: _____

**b)** Have you ever filed a disability, claim, received benefits or had benefits denied (including Worker's Compensation or State disability claims)? ☑ No ☐ Yes  If Yes, please give details: _____

## nsurance & Other Information (Con'1)

a) List below all disability coverage in force or applied for in the last 12 months. Type should be shown as:
I-Individual, A-Association, G-Group (including employer sickpay), OE-Overhead, BS-BuySell, KP-Key Person.

| # | COMPANY NAME | TYPE | ISSUE YEAR | MONTHLY BENEFIT AMOUNT | BENEFIT PERIOD | PERCENTAGE PAID BY | | WILL COVERAGE BE PERMANENTLY | | DATE OF REPLACEMENT/ CHANGE |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | SELF | EMPLOYER | REPLACED* | CHANGED | (WITH DETAILS) |
| | COVERAGE IS PENDING, CHECK HERE → | | | | | | | | | |
| | *Apollo Security* | G | - - - - | | | | | | | _ _ / _ _ / _ _ |
| 2. | *(Terminated* | | - - - - | | | | | | | _ _ / _ _ / _ _ |
| 3. | *8/1/00 )* | | - - - - | | | | | | | _ _ / _ _ / _ _ |
| 4. | *( NONE )* | | - - - - | | | | | | | _ _ / _ _ / _ _ |

*Producer must comply with all state replacement regulations.

b) Are you currently covered by any wage continuation program or disability insurance not mentioned above?
☑ No ☐ Yes  *If Yes, please give details:* _____

c) Will you be eligible for any wage continuation program or disability insurance within the next 12 months?
☑ No ☐ Yes  *If Yes, please give details:* _____

Have you ever been the subject of any professional disciplinary proceedings? ☑ No ☐ Yes  *If Yes, please give details:* _____

Have you or has a business owned by you ever been the subject of a bankruptcy or reorganization proceeding?
☑ No ☐ Yes  *If Yes, please give details:* _____

## ndividual Disability Plans

### INCOME BENEFIT

a) **Monthly Benefit Amount** $ *2150*

| Benefit Period | Elimination Period |
|---|---|
| ☑ T65  ☐ 5 year | ☑ 90 days  ☐ 180 days |
| ☐ 2 year | ☐ 360 days  ☐ 720 days |

(applies to Income Benefit and Disability Plus Benefit, if selected)

b) **Optional Benefits:**
☒ Cost of Living
☐ Future Adjustment Option $_____
☐ Nondisabling Injury
☐ Own Occupation Protection
☐ Savings Supplement: ☐ $250 ☐ $500 ☐ $750
   ☐ $1000 ☐ $1250 ☐ $1500 ☐ Other $_____
☐ Other:_____

c) **Additional Coverage:**
Monthly Benefit Amount: $_____
Benefit Period:  _____
Elimination Period:  _____
Optional Benefits (Please List):
1._____ 2._____ 3._____
4._____ 5._____

### DISABILITY PLUS BENEFIT

d) **Monthly Benefit Amount** $ *950*

| Benefit Period | Elimination Period |
|---|---|
| ☑ T65  ☐ 5 year ☐ 2 year | (Will be the same as |
| (Must be less than or equal to the Income Benefit) | the Income Benefit) |

e) **Optional Benefits:**
☐ Cost of Living

f) **Additional Coverage:**
Monthly Benefit Amount: $_____
Benefit Period:  _____
Elimination Period:  _____
Optional Benefit (Please List):
1._____

**0 Loss Payee** (Designated person/entity to receive benefits, if other than Proposed Insured):
☐ Employer ☐ Other: Name_____
Address_____
City_____ State_____ Zip_____

**1 Special Requests**
☐ Date to Save Age ☐ Special Policy Date _ _ / _ _ / _ _ _ _

## Business Disability Plans

**12  a)** ☐ Overhead Expense: Complete Questions 12b - 15
☐ Key Person: Complete Supplemental Application
☐ Buy Sell:  Complete Supplemental Application

**b) OVERHEAD EXPENSE COVERAGE INFORMATION:**

| Monthly Benefit Amount | Benefit Period: | | | Elimination Period: | | |
|---|---|---|---|---|---|---|
| $_____ | ☐ 12 mos. | ☐ 18 mos. | ☐ 24 mos. | ☐ 30 days | ☐ 60 days | ☐ 90 days |

**c) OPTIONAL BENEFITS FOR OVERHEAD EXPENSE POLICY**
☐ Partial Disability                           ☐ Business Continuance: $_____
☐ Other:_____              Benefit Period:    ☐ 6 mos.   ☐ 12 mos.
                                                Elimination Period:  ☐ 30 day  ☐ 60 day  ☐ 90 day

**13  Loss payee  (Designate person/entity to receive benefits -- can not be the Proposed Insured):**
☐ Employer/Business/Practice            ☐ Other:   Name_____
                                                   Address_____
                                                   City_____State____Zip_____

**14  List below your share of the total monthly expenses of the business entity:**

| | | | |
|---|---|---|---|
| Rent or Mortgage Payment | $_____ | Utilities | $_____ |
| Employee Salaries * | _____ | Maintenance | _____ |
| Employee Benefits * | _____ | Accounting/Legal Fees | _____ |
| Malpractice Insurance | _____ | Professional Dues | _____ |
| Property and Casualty Insurance | _____ | Subscriptions | _____ |
| Property Taxes | _____ | Postage/Stationery | _____ |
| Equipment Payments | _____ | Other Miscellaneous | _____ |
| Auto Lease Payments | _____ | **TOTAL MONTHLY EXPENSES** | $_____ |

*Do not include salaries, drawing accounts, profits, benefits and other forms of remuneration which are payable to you
or to anyone employed in your business who performs the same regular occupation as you do.

**15  SPECIAL REQUESTS**
☐ Date to Save Age        ☐ Special Policy Date __ _/__ __/__ _ _ _

## Payment / Billing Information

| | | INDIVIDUAL DISABILITY | BUSINESS DISABILITY |
|---|---|---|---|
| **16** | Who will pay the premiums? | ☐ Proposed Insured<br>☐ Proposed Insured -- Salary Deduction<br>☒ Employer<br>☐ Split by percent:<br>   Employer will pay_____% | ☐ Employer/Business/Practice<br>☐ Other: (Specify in Special Requests) |
| **17** | Send bills to: | ☐ Residence Address<br>☒ Business Address<br>☐ Other: (Specify in Special Requests) | ☐ Business Address<br>☐ Other: (Specify in Special Requests) |
| **18** | How often do you want to be billed? | ☒ Annually  ☐ Semi-Annually<br>☐ Quarterly  ☐ Monthly (Only For Monthly FlexBill & Automatic Bank Withdrawal) | ☐ Annually ☐ Semi-Annually<br>☐ Quarterly☐ Monthly (Only For Monthly FlexBill & Automatic Bank Withdrawal) |
| **19** | Special methods: | FlexBill:<br>☐ New  ☒ Add to existing # 4 9 v 8 6 3 6-<br>FlexBill with Automatic Bank Withdrawal<br>☐ New*  ☐ Add to existing #_____<br>   Special Draw Day_____(1-28)<br><br>☐ Automatic Bank Withdrawal<br>☐ New*  ☐ Add to existing #_____<br>   Special Draw Day_____(1-28)<br>*If NEW bank withdrawal, complete<br>  Authorization on page 10. | FlexBill:<br>☐ New  ☐ Add to existing #_____<br>FlexBill with Automatic Bank Withdrawal<br>☐ New*  ☐ Add to existing #_____<br>   Special Draw Day_____(1-28)<br><br>☐ Automatic Bank Withdrawal<br>☐ New*  ☐ Add to existing #_____<br>   Special Draw Day_____(1-28)<br>*If NEW bank withdrawal, complete<br>  Authorization on page 10. |

Medical

20  a) During the last 30 days, have you w~ ed **less** than your usual number of hours ~ated in question 3)   YES   NO
because of sickness or injury? ...................................................................................................   ☐*   ☑

b) In the past 12 months, have you had any indication of, been told you had, or been treated for cancer, a
stroke, any heart disease or disorder, or any psychological or emotional disorder? ...........................   ☐*   ☑

**\*IF EITHER 20a OR 20b ARE ANSWERED "YES", PREPAYMENT CANNOT BE ACCEPTED.**

c) Height: 5 ft. 11 in.  Weight: 205 lbs.    d) Name and Address of Personal Physician: **(If none, please indicate)**

Dr Vaninov   Brighton

Weight change last year: _____ lbs.    _____

☐ Gain ☐ Loss  Reason: _____    _____

Date last seen: 11/2/10/19 9   Reason: neck back pain
_____    Results: Physical therapy

## DO NOT COMPLETE QUESTIONS 21-25 IF YOU ARE PROVIDING A UNUM MEDICAL EXAM.

21   Have you ever had, been told you had, or been treated for **(circle all conditions that apply and give details in question 25):**

a) chest pain, high blood pressure, palpitations, or any disease or disorder of the heart, or circulatory   YES   NO
system, blood or blood vessels, lungs, bronchial tubes or respiratory system? .............................   ☑   ☐

b) colitis, chronic diarrhea, cirrhosis, disease or disorder of the stomach, intestines, rectum, liver or
digestive system? .......................................................................................................................   ☐   ☑

c) disease or disorder of either kidney, the prostate, urinary, or reproductive organs, or any sexually
transmitted disease? ...................................................................................................................   ☐   ☑

d) polyp, tumor, cancer, or a disease or disorder of the immune system? ..........................................   ☐   ☑

e) chronic fatigue, Chronic Fatigue Syndrome, Epstein Barr virus, diabetes, enlarged glands, or any
glandular or thyroid disorder? ....................................................................................................   ☐   ☑

f) epilepsy, headaches, migraines, convulsions, dizziness, fainting, paralysis, multiple sclerosis or any
other disease or disorder of the brain or nervous system? ............................................................   ☐   ☑

g) mental illness, anxiety, depression, exhaustion for over one week duration, or any psychological or
emotional condition or disorder? .................................................................................................   ☐   ☑

h) pain in the back or neck, sciatica, any disc disorder, or any other disease or disorder of the neck, back,
or spine? ....................................................................................................................................   ☐   ☑

i) arthritis, fibromyalgia, fibrositis, carpal tunnel syndrome, gout, or any disease or disorder of the
muscles, tendons, bone, joints, skin, any connective tissue disease, or any chronic pain condition? ...........   ☐   ☑

j) complications of pregnancy including miscarriage, preeclampsia, or cesarean section? .....................   ☐   ☑
Are you pregnant?                                         If "Yes", Due Date __/__/____   ☐   ☑

k) any injuries due to falls or other trauma, any amputation or deformity, partial or total loss of vision,
impaired hearing, impaired speech, or disease or disorder of the eyes or ears? ..............................   ☐   ☑

l) Alzheimer's disease, dementia, confusion, memory loss, Parkinson's disease, stroke, TIA, tremor, or any
neurological disorder? .................................................................................................................   ☐   ☑

22  a) Have you ever used stimulants, hallucinogens, narcotics or any controlled substance other than
prescribed by a physician, or been counseled, treated or arrested for excess use of alcohol or drugs? .........   ☐   ☑

b) Have you been medically treated for, or diagnosed by a member of the medical profession, as having
Acquired Immune Deficiency Syndrome (AIDS) or AIDS Related Complex (ARC)? ........................   ☐   ☑

c) Have you been tested and informed that you have been exposed to the AIDS virus? .......................   ☐   ☑

23  a) Have you used tobacco/nicotine within the past 12 months? ...........................................................   ☐   ☑

b) Are you now taking or have you taken medication (prescription or non-prescription) for any reason
within the last 12 months? ..........................................................................................................   ☐   ☐

c) Are you now experiencing any symptoms, disease, disorder or condition which might require surgery,
impair your health or your ability to work, now or in the future, for which you plan to consult a
physician? ..................................................................................................................................   ☐   ☐

d) Do you need human assistance of any kind to perform everyday activities such as bathing, continence,
dressing, eating, using the toilet or transferring (for example from the chair to your bed)? .................   ☐   ☑

Do you use any special medical equipment or appliances such as a walker, cane, wheelchair, catheter,
oxygen tank, pacemaker, or artificial limb? .................................................................................   ☐   ☑

| Medical (Cont'd) | | | | | | |
|---|---|---|---|---|---|---|

**24** Other than already mentioned in this application, have you in the past five years:  **YES**  **NO**

a) consulted, been advised to consult or received treatment from any physician, psychiatrist, psychologist, counselor, marital or family counselor, chiropractor or other practitioner, clinic or hospital (include regular checkups)? ............................................................................................................................... ☑ ☐

b) had or been advised to have any surgical operation, hospitalization, medical care, electrocardiogram, x-ray, blood test or other diagnostic test? ............................................................................................... ☑ ☐

**25** Give details by Question Number for any "Yes" answers to questions 20 - 24. If additional space is needed, please write the information on a separate Part I or Part II application and sign that form.

| QUEST. # | REASON | DIAGNOSIS/ TREATMENT | NAME AND ADDRESS OF PHYSICIAN AND/OR HOSPITAL | DATE LAST SEEN |
|---|---|---|---|---|
| 21 | high blood pressure | High blood pressure | Dr. Vaninov, Brighton | 10/24/1999 |
| | | | | __/__/____ |
| | | | | __/__/____ |
| | | | | __/__/____ |
| | | | | __/__/____ |
| | | | | __/__/____ |
| | | | | __/__/____ |
| | | | | __/__/____ |
| | | | | __/__/____ |

## AGREEMENT

I (each of the undersigned) have **carefully read** this application and I **understand** and **agree** that:

1. All of the statements made in this application must be and are true, complete and correctly recorded to the best of my knowledge and belief. The Company will rely on the information provided in this application and in any supplemental applications, to determine whether to provide the requested coverage. These completed documents shall form a part of my contract of insurance and any coverage based on such information is contestable in accordance with the provisions of the policy providing such coverage.

2. No agent, producer, medical examiner or anyone other than a Home Office underwriter may waive questions asked or answers given in this application or the medical exam; determine if I am eligible for a policy; make, or promise that I will be issued a policy of insurance; or change or waive any rights or requirements of the Company.

3. If I stated in response to question 6a on page 2 of this application that I would permanently change or replace existing insurance and I have not done so when a disability begins, any benefits payable by the Company as a result of this application will be reduced by the amount of existing coverage which I said I would terminate and my premium will be adjusted to reflect the actual benefits received.

4. If I prepaid premium with this application, insurance will become effective only as provided by the terms of the Prepayment Agreement. I have received a copy of the Conditional Receipt/Prepayment Agreement and agree to its terms.

5. If I did not prepay premium with this application, insurance will be effective when a policy has been delivered to me and I have paid the first premium, provided that, on the later of the delivery date or payment date, the answers in this application and in any supplemental application, medical exam or other questionnaire are then still true and complete.

6. Payment of all premium is my responsibility as owner of the policy. If my employer, producer, or any other person collects, pays or forwards any part of the premium for this policy, they act as my agent and not as agent for the Company. If the Company does not receive premium as due, the policy will lapse.

**AGREEMENT** (continued from previous page)                    **IDA 069118**

7. If a policy is issued, the effective date will be the date coverage begins, the policy date will be the date premium shall be payable from, the approval date will be the date a Home Office underwriter approved issuance of a policy, and the issue date will be the date a policy is generated in the Home Office.

8. Changes made by the Company on this application and listed under "Corrections and Amendments" will be considered ratified by me if I accept the policy that is issued unless the changes are prohibited in the state in which that policy is issued.

**CORRECTIONS and AMENDMENTS** (Home Office Use Only)

**Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.**

Signed at _Lynn, MA_    Date: _10/02/2000_    _MGLIY_
      City/State                                      Signature of Proposed Insured

...certify that this application was solicited by me; that I personally asked the Proposed Insured each question; and that the Proposed Insured's answers are accurately recorded on the application.

Producer _____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**DISCLOSURE AUTHORIZATION**

I authorize any of the following who have information about me, my health, my finances, or claim history to disclose that information to UNUM Life Insurance Company of America and its employees, reinsurers, insurance support organizations, Equifax, Inc., and other authorized representatives: 1) any physician, hospital, clinic, or other medical professional or medical facility; 2) the Medical Information Bureau, Inc., 3) any employers or financial institutions; 4) other insurance companies; 5) any person or organization which has information as outlined in the following paragraph.

To facilitate rapid submission of such information, I authorize all said sources, except MIB, to give such records or knowledge to any agency employed by the Company to collect and transmit such information.

Information which may be disclosed includes information about my financial condition, physical or mental condition, driving record, use or treatment for use of drugs or alcohol; hobbies, avocations and sports or hazardous activities in which I participate.

- I understand this information will be used to underwrite my application for insurance and may be used to evaluate a claim for benefits during the time this authorization is valid.
- I agree that this authorization will be valid for two and one-half years from the date I sign it.
- For the purpose of verifying information on this application, my telephone number is ( )_____ (circle: work or home), and I may be reached at that number:(specific time/days)_____.

If an investigative consumer report is prepared, please interview me: ☐ Yes   ☐ No

I have read this authorization and understand that I may receive a copy and that a photocopy of this shall be as valid as the original. I have also read and received a copy of the Notice of Information Practices and agree to its terms.

_Lisa Jane_        _MGLIY_                    _10/02/2000_
Witness            Signature of Proposed Insured           Date

## Producer Information

26 a)   **For commission purposes, please list the producers for this application.**     **IDA 069118**
Use full names, including complete business names. To ensure proper payment of commissions, include each producer's tax identification number (social security number or corporate tax ID). If more than one producer, please be sure to specify split %. For corporate producer, please specify the signing representative's name and ID#'s.

**Please print all information clearly.**

| UNUM Producer # (if known) | Producer Name (Please specify full name) | SS#/Tax ID# | Split Percentage (Must total 100%) | Indicate to Whom to send correspondence |
|---|---|---|---|---|
| 1. _016777_ | _Boyd - Noelon_ | _____ | _100_ % | ☐ |
| | Signing Representative if Corporate Producer | | | |
| 2. _____ | _____ | _____ | _____ % | ☐ |
| | Signing Representative if Corporate Producer | _____ | | |
| 3. _____ | _____ | ⫸RECEIVED⫷ | _____ % | ☐ |
| | Signing Representative if Corporate Producer | DEC 1 3 2000 | | |
| 4. _____ | _____ | By_____ | _____ % | ☐ |
| | Signing Representative if Corporate Producer | | | |

b)   Please list the fax machine telephone number of the servicing producer to assure timely communication relating to application/policy status.  (_ _ _)-_ _ _ -_ _ _ _

c)   How long have you known the Proposed Insured?_____

- - - - - - - - - - - - - *Do not detach unless payment is made at time of application* - - - - - - - - - - - - - - -
### CONDITIONAL RECEIPT/PREPAYMENT AGREEMENT
Received $_____ From_____ Date: _ _/_ _/_ _ _ _

Thank you for your premium prepayment.

Premium prepayment alone does not mean that you are insured. However, in exchange for payment of 1/10th of the annual premium for the policy you requested, UNUM Life Insurance Company of America agrees to determine if you are insurable according to our standard underwriting practices. If you qualify for coverage, the effective date of this coverage will be as follows:

If the prepayment check is received in the Home Office on the same day as the application, the effective date of coverage will be the latest date of the application or any required exam, test, questionnaire or other supplemental application.

If the prepayment check is received in the Home Office after the application but before the approval date, the effective date of coverage will be the latest date of any required exam, test, questionnaire or other supplemental application or the date the check is received in the Home Office.

If you request a change in coverage after the application is signed, the effective date of that coverage will be seven days after the issue date.

If any policy requested is not issued, or is declined, cancelled or returned within 20 days of receipt by you or your agent, or you withdraw the request, prepayment will be refunded to the prepayment payor.

This agreement applies to each policy you have prepaid with your application, and may not be altered in any way by anyone.

_____
Producer (acknowledging receipt of prepayment)

2000-05                                        9            I  0203         (5/99) **IDA 069118**

To handle your insurance business, we may need to disclose your test results or other AIDS-related information to others such as our affiliates, reinsurers, employees or contractors who need AIDS-related information for underwriting, claims or another necessary business purpose in connection with your insurance transaction. These persons and entities have been informed of their clear legal obligation to maintain the confidentiality of all AIDS-related information, including test results. Similar privacy safeguards have also been adopted by the laboratory that will perform tests on your blood sample, and by any contractor, reinsurer or attorney to whom we might grant access to AIDS-related information. If we need to disclose to anyone else information about you and AIDS, we must again ask you to provide prior written consent to such disclosure. However, AIDS-related information could be disclosed without your consent in response to a subpoena. If you believe that your right to the confidentiality of any AIDS-related information about you has been violated, you should contact the Division of Insurance by writing to the Division's Consumer Services Section, 470 Atlantic Avenue, Boston, MA 02210-2223.

**Medical Information Bureau (MIB).** If your test result is positive, we will make a report indicating a nonspecific abnormal blood test result to the Medical Information Bureau, Inc. (MIB). The nature of the test will not be reported; there will be no record with the MIB that you had a positive HIV antibody test. The MIB is a nonprofit organization of life insurance companies which operates an information exchange for its members. Our decision on whether or not to issue you a policy will not be sent to the MIB. If you later apply to another MIB member company for life or health insurance or submit a claim for life or disability insurance benefits, the MIB will, upon request, provide that company with information in its file, including information we have furnished. Otherwise the MIB will observe confidentiality safeguards similar to our own stated above. Upon your request, the MIB will arrange for disclosure to you of any information it has in your file. If you feel the information in the MIB's file is not correct, you may contact the MIB and seek a correction in accordance with the procedures outlined in the Federal Fair Credit Reporting Act. The address of the MIB's information office is: MIB, Inc., P.O. Box 105, Essex Station, Boston, MA 02112. The MIB telephone number is (617) 426-3660.

**Disclosure and Access to Information**

If we disclose any AIDS-related information to a person or entity who is not our employee, reinsurer, attorney, or contractor as described above, or the MIB, we will notify you in writing unless we are prohibited from doing so by law or court order. Upon your written request, we will provide you, either directly, or at your option, through a physician designated by you, with copies of any information relating to you and AIDS in our files, for the reasonable cost of photocopying those documents. If you believe any of the information in our files is incorrect, you may write to us to request that it be corrected.

**Authorization**

I have read and understand this Notice of AIDS Virus Antibody Testing and Authorization for Testing and Disclosure. I understand that: if I test positive I may be denied the insurance for which I have applied; I may experience increased anxiety as a result of having this test; the people and entities described above will or may have access to the results of my test as stated above the for the purposes identified on this form; I will be given a copy of this form; and this authorization is valid for ninety (90) days from the date of my signature below.

I authorize the drawing and testing of my blood for HIV antibodies and the disclosure of the test results as stated on this form.

**Notification of Positive Test Result**

In the event of a positive test result:

☑ Please send the result to me at:

☑ I authorize UNUM Life Insurance Company of America to send the result to my physician and understand that such results become part of my physician's permanent medical records concerning me:

*Dr. Eugene Vaninov*
Physician's Name
*Washington St*
Address
*Brighton MA*

*Oct 2nd, 2000*
Date
*Oct 6 2000*
Date

*Michael GLIY*
Name of Individual
*MGLIY*
Signature of Individual

_____
Signature of Legal Guardian, if any

_____
Name & Address of Insurance Producer

_____
Name & Address of Person Administering Test

_____
Name & Address of Laboratory

I 0276

**Notice of AIDS Virus Antibody Testing
and Authorization for Testing and Disclosure**

In connection with your insurance, your blood sample will be tested for the presence of the AIDS virus (HIV) antibody. Before consenting to this test, you are urged to read the following information about AIDS, the nature of the test and our policy concerning confidentiality of test and other AIDS-related information. After you read this material, you will find a request for your written authorization to be tested for the AIDS virus and for subsequent disclosure of test results. You should be aware that a positive test result may result in the denial of your insurance application.

**Information About AIDS**

AIDS is a condition caused by the human immunodeficiency virus (HIV). In some individuals the virus reduces the body's normal defense mechanisms against certain diseases or infections. As a result, such people often develop such unusual conditions as severe pneumonia or a rare skin cancer. The symptoms of AIDS may include the following, although other causes of these symptoms are more likely: unexplained weight loss, persistent night sweats, cough, shortness of breath, diarrhea and white spots evidencing fungal infection; fever and swollen lymph nodes lasting more than one month; and raised purple spots on or under the skin or on mucous membranes.

From medical studies, it is clear that the following groups are at a high risk of contracting AIDS:

- Past or present users of intravenous drugs;
- Males who have had sex with more than one male since the late 1970's;
- Recipients of blood or blood products infected by the HIV virus; and
- Sexual partners of individuals belonging to any of the above categories.

**HIV Antibody Test**

The HIV antibody test is actually a series of tests designed to detect the presence of antibodies to the AIDS virus rather than detect the virus itself. Antibodies to the AIDS virus are found in the blood of most patients with AIDS and AIDS-related complex (ARC), and can be found in people who do not have AIDS or ARC but have been exposed to the virus.

Your blood sample will first be subjected to a test known as ELISA (enzyme-linked immunosorbent assay). If the result of this test is positive, the ELISA test will be repeated. If this repeat ELISA test is also positive, your blood specimen will then be subjected to another, more specific technique called the Western blot test, for confirmation. Your test result is considered positive only after positive results are obtained on two ELISA tests and a Western blot test.

**Positive Test Results.** In general, if you receive such a positive test result, there is a high probability that you have HIV antibodies in your blood. However, there is a risk that a person who has not been exposed to the virus will be incorrectly classified by the test as having a positive test result. This is called a "false positive" result. People who are not in one of the "high risk" groups listed above who get a positive test result are much more likely to receive a "false positive" than those who are in a high risk group.

A positive test result does not mean that you have AIDS. The diagnosis of AIDS is established using a patient's history, symptoms and physical examination. A positive test result does mean, however, that you are at risk of developing AIDS or AIDS-related conditions. It also means that, without taking precautions, you may transmit the virus to other people. Therefore, the following steps are recommended to limit the spread of AIDS: (1) stop donating blood; (2) limit sexual contacts and follow "safe sex" practices; (3) inform your sexual partners; (4) notify your doctor; and (5) if you are considering having a child, carefully evaluate the risks to the fetus.

If your test result is positive, the test result will be sent to the doctor you designate on this form, or if you prefer, we will mail the result directly to you no later than 45 days after your blood sample is taken. It is strongly recommended that you consult a physician or obtain counseling to learn more about the meaning of such a result.

**Negative Test Results.** If your test result is not positive, you most likely have not been infected by the virus. However, it is possible to have been infected with the virus within the past year and not yet have developed antibodies that cause a positive test result. It is possible to receive a "false negative" result.

**Counseling and Alternative Test Sites**

You may experience increased anxiety as a result of having this test performed or receiving a positive test result. Many public health organizations recommend that before a person takes an AIDS-related test, he or she obtain counseling about the test and about AIDS. A source of information about AIDS and counseling is the AIDS Action Line. In addition, the Massachusetts Department of Public Health offers free anonymous HIV antibody testing, with pre-test and post-test counseling at its Alternative Test Sites. For additional information regarding AIDS, AIDS testing or counseling, or to obtain a free, anonymous test, individuals in the high risk categories listed above are encouraged to contact the Massachusetts Department of Public Health, Alternative Test Sites for an appointment. Confidential and/or anonymous HIV antibody testing (not blood donation) and counseling is also available at various locations in Massachusetts for a fee of $35 by appointment with the American Red Cross.

If you wait up to 21 days from the date you receive this form to decide whether to be tested, unless other circumstances relating to your eligibility change, this delay will not affect our decision to offer you insurance.

**Confidentiality**

Under Massachusetts law we must treat all AIDS-related information (including test results) as highly confidential. We have established safeguards within our company that will protect the privacy of any AIDS-related information that is in your files. We have designated employees who are responsible for keeping this information confidential. We have designated certain personnel who will have access to AIDS-related information if they need the information in connection with an insurance transaction. Other personnel are aware that they are not permitted access to such information. We will make sure that AIDS-related information that is stored in a computer data bank or other files is protected by reasonable security safeguards.

I  0275

EXHIBIT

UNUM
4

a    5/2/06

# Underwriting Notes for lar451315

**Insured Name**    GLIK*MICHAEL S

| Occ Code | M51000 | | Income | 37000 | | | |
|---|---|---|---|---|---|---|---|
| Replacement (Y/N) | N | | | | | | |
| Total          DI: | | | OE: | | | KP: | |
| Group: | | | BS: | | | | |
| Exclusion Codes | | | | | | | |
| MIB Codes | ▓▓▓▓ | | | | | | |
| Impairment Codes | | | | | | | |
| Rating % | | | | | | | |

| Decision Instructions |
|---|
| **2001-02-08   C1T1F**   Postponed until full work up/diagnosis of testicular mass noted in records from Dr. Vaninov. |

| Policy Notes |
|---|

**2000-12-21   C1T1F**   Add on to 12 life flex, 54 y/o researcher with a PHD, ok AA

Financial: income verified at $37K, using ind. Taxable limits ok for amnts.

Medical: No codes, build ok, last visit to doc 10/99 for neck and back pain, also states hx of htn, will get APS, same doc for both conditions.

````
-----Original Message-----
From:        Ferrante Jr, Antonio
Sent:        Thursday, December 21, 2000 11:33 AM
To:          Fenderson, Kevin (Provident); Lucey, Jeanne (Provident)
Subject:     Michael Glik LAR451315
````

Hi Kevin and Jeanne. .I need to order an APS from Dr. Vaninov due to the history of hypertension and neck/back pain. However, the applicant did not give a complete address for his doc. Can you please get the address and request an APS from Vaninov?  Thanks.  Tony

**2001-01-19   c8j8l  From:     Scott, Sarah (Provident)**
**Sent:**      Friday, January 19, 2001 9:19 AM
**To:**        Ferrante, Antonio  (Provident)
**Cc:**        Lacasse, James W
**Subject:**   LAR451315 Michael Glik
Dr. Address for Glik:
**Dr. Vaninov**
**71 Washington Street**
**Brighton, MA  02135**

**617-254-4966**

I  0263

| | | |
|---|---|---|
| **2001-01-19** | **C1T1F** | ordered APS from Vaninov. |
| **2001-02-08** | **C1T1F** | recv'd APS from Dr. Vaninov 2/7/00 showing office visit on 10/22/00 where they were going to due a ultrasound due to questionable testicular or prostate cancer. Will postpone. |
| **2001-03-08** | **C1T1F** | recv'd letter from applicant requesting clear explanation for application being postponed. Wil send letter stating due to testicular mass found in records from Dr. Vaninov. |

April 25, 2006

PERSONAL & CONFIDENTIAL
Mr. Michael Glik

Unum File Number: LAR451315

Dear Mr. Glik:

Your request has been referred to me for handling. I am pleased to respond at this time to explain our decision concerning your application.

Your application has been fully evaluated, taking into account the complete medical history known to us. Our decision was based upon information found in medical records from Dr. Vaninov.

The reason(s) for our decision is as follows: In your medical records from Dr. Vaninov there is a letter from Dr. Christopher Doyle dated October 11, 2000. The letter states that you saw Dr. Doyle due to testicular pain. Dr. Doyle suggested that you have a CT scan of the abdomen and pelvis to evaluate the possibility of an abdominal mass, tumor markers and a scrotal ultrasound. The results of these tests were not in the medical records provided to us.

Since we could not fully evaluate your medical insurability without this information, we postponed your application until the results of these tests are completed and a diagnosis is made.

We appreciate your interest in Unum and hope that this letter will be helpful to your understanding of our decision. If you any further questions or need additional clarification please contact your insurance advisor.

Sincerely,


Antonio Ferrante
Individual Disability Underwriting
Unum Life Insurance Company of America

I  0264

**2001-03-22   C1T1F**  recv'd complaint from MA Office of Consumer Affairs and Business
Regulation Division of Insurance.  Will reply.

——Original Message——
From:       Ferrante Jr, Antonio
Sent:       Thursday, March 22, 2001 10:29 AM
To:         Nelson, Susan R
Subject:    Michael Glik LAR451315

Hi Sue.  Here is the letter.  Please review.  Please let me know if you would like to review the file or complaint
again prior to sending this letter and I'll drop by.

I don't think we need to send anything in addition to this letter?  If there is something you want to include please
let me know.  Thanks, Tony



Glik LAR451315.doc

---

**2006-01-31   C1N1B**  file appeared in my office but nothing new in the file and nothing new on
Underwriter Notes from 2002 so I returned the file to the records dept

**2006-02-16   C1N1B** 

I called Karen Anderson in Adv Sales who checked info from two sources:
- Lotus Notes: the system that tracks the LDP cases Portland had sent to Worcester at the time of the
  merger in 1998-99
- Case Tracker: the system which tracks GSI offers made since the merger.

There is no info on Inotek Corp on those systems.

Therefore, I must conclude that no GSI offer nor special considerations were made to Inotek.

Status of this application: On 2/8/01 Mr Glik's application was postponed until we receive a full work-
up/diagnosis of testicular mass noted in records from Dr Vaninov.  Therefore, Mr Glik never had a
policy with UnumProvident

NO.: 578486H-01
CTL.:

RECORDS REQUEST

MSI
254)299-4000

PO Box 2505
Waco TX 76702-2505

PLEASE RETURN THIS FORM
WITH COPIES OF RECORDS

NAME:    MICHAEL S GLIK

DATE:    1/19/2001

CO. NAME:  UNUM - INDIVIDUAL DISABILITY

CASE NO.:  LAR451315
           0301V

JIM

FACILITY: EUGENE L VANINOV
ADDRESS:   71 WASHINGTON ST
           BRIGHTON, MA  02135
PHONE NO: 617/254-4966

REQUESTER: J LUCKY

DESK:  6  TEAM:  331

U/W TEAM:

----------------------------------------------------------------------------
----------------------------------------------------------------------------

EXHIBIT
UNUM
5A
a   5/2/06
PENGAD 800-631-6989

2/06/2001   13:06:55  IDR212      6271  331    6

5B

10/22/00

Mr. Michael Glik

Dear Mr. Glik,

      Your recent blood tests showed that the level of Alpha Feto Protein (AFP) and PSA were both normal. This makes the chance of both testes cancer and prostate cancer lower. It is still reasonable to go ahead with the ultrasound study. I will let you know result when I receive the information.

With best regards,

Christopher Doyle MD

Cc: Dr. Eugene Vaninov
71 Washington Street
Brighton, MA 02135

I 0172

5C

 **BRIGHAM AND WOMEN'S HOSPITAL**

 **HARVARD MEDICAL SCHOOL**

45 Francis Street-ASB II -3
Boston, Massachusetts 02115

Tel: 617 732-6325, Fax: 617 566-3475

CHRISTOPHER J. DOYLE, MD
*Clinical Instructor*
*Division of Urological Surgery*

October 11, 2000

Eugene Vaninov, M.D.
71 Washington Street
Brighton, MA 02135

RE:  Glik, Michael
MRN: 16469595

Dear Dr. Vaninov:

Thank you for asking me to see Mr. Michael Glik for urological evaluation regarding testicular pain. He described that he had noted an abnormality in the left hemiscrotum about a week ago with no antecedent trauma or voiding symptoms. As you know, he has undergone previous rectal cancer surgery as a pull through procedure in Russia at age 25, and passed kidney stones about 30 years ago.

PHYSICAL EXAMINATION: I suspected the presence of a mid abdominal mass. He declined rectal examination because of the narrowness of the neoanus which is slightly posterior to the normal orifice. The penis was normal. The right testis cannot be identified as a smooth, slightly fluctuant, firm mass is present consistent with a hydrocele.

I have suggested a CT scan of the abdomen and pelvis to evaluated the possibility of the abdominal mass, tumor markers, and a scrotal ultrasound. I will keep you apprised of developments.

With best regards,

Christopher Doyle, M.D.

ge:WS:6601 ; DD:10-14-00 ; DT:10-14-00 ; DV:10-11-00

I 0173

OFFICE NOTE

Glik, Mikhail
October 26, 1999

Patient comes in with complaints of neck pain and back pain at the
mid thoracic level, which started about a week ago after a motor
vehicle accident, which he was involved in on October 20, 1999.  He
says he was rear-ended by another car at speeds about 30, 40 miles
per hour.  He says he was belted, but describes whiplash injury.
He denies loss of consciousness.  He says that right after the
accident, he did not feel any particular pain, but late in the day
felt headache and somewhat nauseated.  Since that time, he has been
having neck pain and mid thoracic back pain which shows in
particular when he is moving around or trying to lie flat.

He did not go the Emergency Room, and did not have x-rays done.  He
denies visual changes, no chest pain, abdominal pain, no shortness
of breath.   No lower back pain, no dysuria, problems with
incontinence.

He has history of hypertension and has been taking his medications.
He says that his blood pressure at home has been on the high side,
about 160/90 or 150/90.

Medications:  Procardia XL 90 p.o. q.d., Toprol XL 100 mg p.o. q.d.

Allergies:  No known drug allergies.

Physical Examination:  Blood pressure 110/80, 130/90.  Pulse 68.
He is alert and oriented x 3, in no acute distress.  Head is
atraumatic, normocephalic.  Face symmetric.  Eyes EOMI/PERRL.
Fundi with sharp discs.  Ears, tympanic membranes pale bilaterally,
no exudate.  Mouth moist mucosa.  Neck supple but with significant
tenderness, particularly on the right side on the trapezius muscle.
Tenderness on the left side is less prominent.  Range is motion is
slightly decreased due to discomfort, particularly with bending of
the head and rotation to the left.  Back, there is tenderness to
palpation over the upper thoracic level paraspinally.  Lungs clear
to auscultation.  Heart S1, S2, regular, no murmurs, rubs or
gallops appreciated.  Abdomen with old mid abdominal scar,
nontender, bowel sounds present throughout, no hepatosplenomegaly
appreciated, no mass appreciated.  Extremities full range of motion
in all joint, no obvious deformity or tenderness.  No calf
tenderness or edema.  Positive peripheral pulses.  Neuro nonfocal.

Assessment and Plan:  Patient is status post motor vehicle
accident, with neck and back pain.  Will x-ray his C&T spine.  Will
send for PT.  Patient was advised to take Advil 600 mg p.o. t.i.d.,
may alternate with Tylenol 650 mg p.o. t.i.d.  Will increase Toprol
to 150 mg p.o. q.d. for better blood pressure control.  Patient was
advised regarding physical exam, and need for follow-up on his GI
malignancy.

I 0174

Glik, Mikhail                    -2-              October 26, 1999


Alla Tandetnik, M.D.

DD: 10/26/99
DT: 11/05/99
DV: 10/26/99
/rm

I 0175

5E

NOTE

Glik, Mikhail
October 30, 1998

The patient is a 52-year-old male with a history of hypertension
who comes in for follow-up. He has been doing fine. He denies any
complaints of chest pain or shortness of breath. He says that his
blood pressure at home is 135/85, but here in the office it is
140/100.

MEDICATIONS:
    1) Procardia-XL 90 mg P.O. qd.
    2) Toprol-XL 100 mg P.O.
    3) ProSom 2 mg P.O. q h.s.

PHYSICAL EXAMINATION:  BP 140/100, pulse 80.  He is alert and
oriented X3 in no acute distress.  Mouth - moist mucosa.  Neck
supple.  Lungs clear.  Heart - S1/S2 regular; no murmurs, rubs or
gallops appreciated.  Abdomen soft, non-tender.  Extremities
without edema.

ASSESSMENT/PLAN:
    1) Hypertension.  I asked him to check his blood pressure at
home for the next 2 weeks, record it and come back for medication
adjustment.  I suspect that his blood pressure at home is higher
than he thinks and he will need probably ACE inhibitor to be added
to his medical regimen.  I am going to check his chem-A and lipid
profile.

Follow-up in 1 month.


Dr. Tandetnik

/lm

I 0176

5L

| 16630162 | 02/25/98 | 02/25/9... | | Diagnostics | CAM...IDGE, MASS. 02139<br>TEL...HONE (617) 547-8900 | | 4960 |
|---|---|---|---|---|---|---|---|

**PATIENT**

| GLIK,MIKHAIL | | | | **SPECIMEN DATE** | **DATE OF BIRTH** | | 34 (55); 55 (10) |
|---|---|---|---|---|---|---|---|
| | | | | 02/24/98 | | | **REFERRED BY**<br>DRS. VANINOV & TANDETNIK<br>71 WASHINGTON STREET<br>BRIGHTON, MA 02135<br>Dr. VANINOV,EUGENE |
| | | | | **SPECIMEN TIME**<br>07:18PM | M | 51 | |

FINAL                    Director: Gerald H. Shoys, Ph.D.

| Ca | PO4 | GLU | BUN | CREAT | BUN/CR | URIC | CHOL | TRIG | HDL | TP | ALB | GLOB | A/G | ALKP | LDH | SGOT | SGPT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 11 | 1.1 | | | | | | | | | | | | | |
| | | | 6-26<br>mg/dL | 0.5-1.5<br>mg/dL | | | | | | | | | | | | | |

| BILI | BILI D | BILI I | Na | K | Cl | CO2 | ANION | Fe | TIBC | GGT | T3U | T4 | FTI | TSH | T4 F | B12 | FOLIC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 142 | 4.6 | 102 | 24 | | | | | | | | | | | |
| | | | 136-145<br>mEq/L | 3.5-5.2<br>mEq/L | 96-108<br>mEq/L | 22-31<br>mEq/L | | | | | | | | | | | |

## Comments



RBC's present, Chemistry result(s) may be affected

REV 12/06

5F

# ROCKOFF DERMATOLOGY GROUP

Alan S. Rockoff, M.D.
Dermatology and Laser Surgery

Jay L. Cohen, M.D.
Edward A. Gross, M.D.
Dermatology

••••••••••• • •••••••••••

June 18, 1998


Eugene Vaninov, M.D.
71 Washington Street
Brighton, MA  02135

RE:  MIKHAIL GLIK


Dear Dr. Vaninov:

Thank you for referring Mr. Glik.  I removed skin tags from
his axillae.  I also recommended that he take Sporanox 200 mg.
twice a day one week per month for a three month course for
the tinea of his toenails especially his left great toenail.

Finally, there's a cyst on his left groin which bothers him.
That will need to be surgically removed.  I gve him the name
of a surgeon, but I asked him to call you for a referral.  Any
general surgeon would be able to do this.

Thank you.

Sincerely,

Alan S. Rockoff, M.D.

ASR/de

I  0177

5G

Glik, Mikhail
2/24/98    CC: F/U visit
51 y.o. ♂ c̄ poorly controlled
HTN came for F/U, stated
his BP's > 130/90 - 100/60 since he
started to take Procardia 90mg in
3 divided doses and Topro 100
in 4 divided doses. He stated
no HA or u/v, denies of
palpitations, SOB, still c/o insomnia

On PE: BP 160/96, HR 72
neck supple, Ø JVD
lungs CTA
cor, RRR, S₁ - S₂ Ømurmur,
abd, soft, Ø organomegaly
extrem, Ø c/C/E

A/P ① HTN - cont. current tx,
√ BUN, creatinine, lytes

② Insomnia - D/C Ambien,
Rx Prosom 2mg po hs (Ø Refills)

RTC 2u.

I 0178

Glik, Mikhail

12/30/97   CC: Pt stated frequent HA,

Meds        poorly controlled HTN, fatigue

Atenolol     Denies CP, SOB, edema

100mg          On PE   BP 160/100, HR 80

Procardia  pt   neck   supple, Ø lymphadenop.

Ambien  does   lungs  CTA
        not
        know dosage.   cor.  RRR, S₁-S₂ Ø murmur

        abd   soft, Ø organomeg.

        extrem.  Ø c/c/e

        Rest of ex — unremarkable

A/p: ① HTN: Pt stated HAs frequent,

developing c̄ Atenolol —

change to Toprol XL 100mg #30 QD

cont. Procardia but ↑ to 90mg QD

Rx Ambien 10mg #30 ī QHS given

for insomnia

✓ lytes, BUN, creat,

RTC 1m.

I 0179

5 I

**EUGENE L. VANINOV M.D.**
*Cardiology/Internal Medicine*

Date: _illegible_
Name: _illegible_
Age: _illegible_

Chief complaint: _illegible_ hypertension

Present illness: Several years w/o HTN

Past medical history:
① w/o rectal ca
② hepatitis A

Allergies: NKDA

Medications: ① Propranolol 80 mg BID  ③ Zocor 10 mg QD
② Atenolol 75 mg QD   ④ Lasix 20 mg QD

Social history: ⊘ smoking  ⊘ NKDA ⊘ _illegible_

Review of systems:

|  | Neg. |
|---|---|
| Skin: | ✓ |
| HEENT: | ✓ |
| Neck: | ✓ |
| Breasts: | ✓ |
| Pulmonary: | ✓ |
| Cardiac: | ✓ |
| Gastrointestinal: | ✓ |
| GU: | ✓ |
| Musculoskeletal: | ✓ |
| Neuropsychiatric: | ✓ |
| Hematologic: | ✓ |

ECG: ND

Physical exam: BP 140/100  HR 60

Skin: _illegible_ normal
Lymph nodes: _illegible_
HEENT: _illegible_
Neck: _illegible_
Lungs: _illegible_
Heart: _illegible_
Breasts: _illegible_
Abdomen: _illegible_
Extremities: _illegible_
Rectal: _illegible_
Neuro: _illegible_
Genitalia: _illegible_

Assessment and plan:
① HTN
② w/o rectal ca, hepatitis A

_illegible_

I 0180

**Beth Israel HealthCare**

*Medical Director*
*Cardiology*
*Internal Medicine*



**Harvard Medical School**

*Instructor in Medicine*

**Eugene L. Vaninov, MD**

71 Washington Street
Brighton, MA 02135
(617) 254-4966 • FAX (617) 254-4928

## VITAL SIGN FLOW SHEET

patient: _GLIK, MIKHAIL_

| DATE | HEIGHT/ WEIGHT | PULS | RESP | BLOOD PRESSURE | |
|---|---|---|---|---|---|
| 11-25-97 | 205 | 68 | | 140/100 | |
| 12-30-97 | 205 | 90 | | 160/100 | 160/100 |
| 2-24-98 | 210 | 79 | | 160/108 | |
| 10-30-98 | 205 | 83 | | 160/100 | |
| 10-26-99 | 205 | 68 | | 140/80 | 130/90 |

Beth Israel HealthCare is a general internal medicine and excludes certain physicians and surgeons and other health professionals associated with Boston's Beth Israel Hospital, a major teaching and research affiliate of Harvard Medical School.

5 K

 **Harvard Medical Faculty Physicians - Radiology**

1101 Beacon Street
Brookline, MA 02446

(617) 731-5250
Fax (617) 731-2773

GLIK,MIKHAIL                    M58 (07/22/48)              1042361
VANINOV,EUGENE I.              POP-1181          9:58 AM NOV 10,99
C-SPINE, NON-TRAUMA;T-SPINE                      CHIP # 202 0107
REASON: TRAUMA; S/P MVA

                  ***FINAL REPORT***
      C. SPINE AND T. SPINE, 11/10/99.
      HISTORY: NECK AND SPINE PAIN, STATUS-POST OLD MVA.
      AP/LATERAL CERVICAL SPINE: NO FRACTURES OR DISLOCATIONS
ARE SEEN. THERE IS MILD TO MODERATE NARROWING OF C6-7 DISC
SPACE WITH PROMINENT ANTERIOR OSTEOPHYTES AT THIS LEVEL, AS
WELL AS AT C5-6. NO DESTRUCTIVE BONY LESIONS ARE IDENTIFIED.
DEGENERATIVE CHANGES ARE ALSO NOTED IN THE UNCOVERTEBRAL JOINTS
AT C5-6 AND C6-7.
      IMPRESSION: DEGENERATIVE CHANGES, AS DETAILED ABOVE.
      AP/LATERAL THORACIC SPINE: MODERATE TO LARGE-SIZED
OSTEOPHYTES ARE PRESENT IN THE MID AND LOWER T. SPINE.
ALIGNMENT IS UNREMARKABLE. NO FRACTURES OR OBVIOUS DESTRUCTIVE
BONY LESIONS ARE IDENTIFIED.
      IMPRESSION: DEGENERATIVE CHANGES IN THE MID AND LOWER
THORACIC SPINE.

         DR. DAVID H PORTER    THU NOV 11,1999 9:27 PM
                                          QM

DATE MAILED: 11/12/99

I 0182

EXHIBIT
UNUM
7
CC    5/2/06

# FINAL PROCESSING SHEET
## 02/09/2001

| | | | |
|---|---|---|---|
| Insured | **GLIK*MICHAEL S** | Underwriter | **FERRANTE** |
| Policy # | **LAR451315** | | **JR,ANTONIO** |
| Flex Group # | **494863G1-UM** | Decision By | **C1T1F** |
| Flex Group | | Decision Date | **02/09/2001** |
| | | Insurability Date | |

---

**Decision**                                          **Reason/Message**

Postponed                                      Postponed due to information found in medical
                                               records from Dr. Vaninov.

---

**Issue Processing Notes**

State Letter Required
0

---

**FMIS Codes**

Occ

---

**Flexbill Data**
U/W Program                 Discount %          1st Yr.
Codes                                           Commission %

---

**MIB Codes**

630#ZN                                                 **Reported by :**

                                                       JC
                                                       2/15/01

 UNUM.

Unum Life Insurance
Company Of America
2211 Congress Street
Portland, Maine 04122

February 13, 2001



Mr. Michael S. Glik

xxxxxxxxxxxxxxxxx
xxxx FILE COPY xxxx
xxxxxxxxxxxxxxxxx

Re:  Proposed Insured:  Michael S. Glik
     Application and Premium Prepayment Agreement No:  IDA069118
     Policy Number(s):  LAR451315

Dear Mr. Glik:

We wish to thank you for your application for individual disability insurance
coverage with our Company. After careful consideration we found it necessary
to postpone coverage.

The specific reasons for this action are as follows:

    .Due to medical records obtained from Dr Vaninov.

You have the right to know the specific items of information that support the
reasons given above, the identity of any institutional source of that
information and the right to see copies of certain documents relating to this
decision. This right does not extend to information if we have a reasonable
suspicion that criminal activity, fraud, material misrepresentation or
nondisclosure is involved.

Disclosure of medical records or examination information will be made to the
specifically named physician of your choice upon your written request to do
so. Information pertaining to an investigative report, if applicable, may be
obtained from the appropriate Consumer Reporting Agency.

Some Medical conditions, due to their delicate nature, shall be supplied
directly to you, only with the approval of the qualified professional person
with treatment responsibility for the condition to which the information
relates.

If, after reviewing the information about you in our files, you believe that
it is incorrect, you may request in writing that we correct, amend or delete
any item of personal information.  Within thirty (30) business days of our
receipt of your request, you will be notified if we can comply with your
request. If we are unable to comply with your request, we will tell you why
and allow you to file a statement of your disagreement. This statement will be
sent to anyone to whom we have disclosed this information in the past two

I 0282

years, and in the future.

If you would like additional information concerning this action or your rights, please submit a written request to the Individual Underwriting Department at the following address within ninety (90) business days from the date above.

> UNUM Life Insurance Company of America
> Attn: Individual Disability Underwriting Dept.
> 2211 Congress St.
> Portland, ME  04122

Thank you for your interest in our Company and the opportunity to consider your application for coverage. We hope that the above information has been of assistance to you.

Sincerely,


Antonio Ferrante, Jr.
Individual Disability Underwriting
UNUM Life Insurance Company of America

cc: Boyd-Neelon Ins Agency Inc

Jcorkum

I 0283

February 25, 2001

UNUM Life Insurance
Company of America
2211 Congress Street
Portland, Maine 04122



Re:    Proposed Insured: Michael S. Glik]
       Application and Premium Prepayment Agreement N: IDA069118
       Policy Number: LAR451315

Dear Sirs:

I have read the letter where you refuse to issue a Long-Term Disability policy for me
three times, and I still do not understand the reason for it.

I have a feeling that you used this cryptic language and vague expressions specifically
against me as an immigrant to confuse me with your answer.

This is why, I insist, you must state the reason in plain English.

Until then I can suppose you did it because:

1. I did not work in the Inotek Corp. long enough (only 3 months)
2. I am an immigrant with the short time of living in the US
3. I do not have a positive background

Once again I implore you to give me a substantiated justification of my coverage
postponement (without involvement of the third parties)

Sincerely,

Michael Glik

I 0284

 UNUM.

**Unum Life Insurance
Company of America**
2211 Congress Street
Portland, Maine  04122

March 8, 2001

PERSONAL & CONFIDENTIAL
Mr. Michael Glik

Unum File Number: LAR451315

Dear Mr. Glik:

Your request has been referred to me for handling.  I am pleased to respond at this time to explain our decision concerning your application.

Your application has been fully evaluated, taking into account the complete medical history known to us.  Our decision was based upon information found in medical records from Dr. Vaninov.

The reason(s) for our decision is as follows: In your medical records from Dr. Vaninov there is a letter from Dr. Christopher Doyle dated October 11, 2000.  The letter states that you saw Dr. Doyle due to testicular pain.  Dr. Doyle suggested that you have a CT scan of the abdomen and pelvis to evaluate the possibility of an abdominal mass, tumor markers and a scrotal ultrasound.  The results of these tests were not in the medical records provided to us.

Since we could not fully evaluate your medical insurability without this information, we postponed your application until the results of these tests are completed and a diagnosis is made.

We appreciate your interest in Unum and hope that this letter will be helpful to your understanding of our decision.   If you any further questions or need additional clarification please contact your insurance advisor.

Sincerely,

Antonio Ferrante
Individual Disability Underwriting
Unum Life Insurance Company of America



EXHIBIT
UNUM
12
q̄          5/2/06

PRN040 800-631-6989

I  0261



# COMMONWEALTH OF MASSACHUSETTS
### Office of Consumer Affairs and Business Regulation
## DIVISION OF INSURANCE
One South Station • Boston, MA 02110 - 2208
(617) 521-7777 • FAX (617) 521-7575
Springfield Office (413) 785-5526
TTY/TDD (617) 521-7490
http://www.state.ma.us/doi

**ARGEO PAUL CELLUCCI**
GOVERNOR

**JANE SWIFT**
LIEUTENANT GOVERNOR

**JENNIFER DAVIS CAREY**
DIRECTOR, CONSUMER AFFAIRS
AND BUSINESS REGULATION

**LINDA RUTHARDT**
COMMISSIONER OF INSURANCE

March 13, 2001

MAR 1 6 2001

Unum Life Insurance Company
2211 Congress Street
Portland, ME 04122
Attention: Ms. Joan Sarles Lee, Second VP , Chief Compliance Officer

RE:    Michael S. Glik
DOI File Number:    565036

Dear Ms. Lee :

Attached herewith please find a copy of a complaint recently received by the Consumer Service Section.

Kindly review this complaint, and provide two (2) copies of your detailed, substantive, written response to the issue(s) raised in the complaint. Your response must include any and all documentation that supports your response. Such supporting documentation may include, but not be limited to, the following: (1) the application for insurance; (2) the insurance policy; (3) relevant notices; (4) internal memos; (5) correspondence; and (6) the appropriate NAIC registration number for Unum Life Insurance Company.

Please be advised that your response is due no later than **fourteen (14) days** after receipt of this letter. Your failure to file a timely response may result in a separate administrative action.

In advance, I thank you for your anticipated cooperation. If you have any questions or need to speak to me, I can be reached at (617) 521-7455 or, in the alternative, at Walter.Marcinkus@state.ma.us.

Sincerely,

Walter Marcinkus
Senior Insurance Compliance Analyst

**EXHIBIT**
UNUM
13
cc    5/2/06
PENGAD 800-631-6989

I 0207

Enclosure(s)

I 0208



# COMMONWEALTH OF MASSACHUSETTS
### Office of Consumer Affairs and Business Regulation
## DIVISION OF INSURANCE
One South Station · Boston, MA 02110 - 2208
(617) 521-7777 · FAX (617) 521-7575
Springfield Office (413) 785-5526
TTY/TDD (617) 521-7490
http //www.state.ma.us/doi

ARGEO PAUL CELLUCCI
GOVERNOR

JANE SWIFT
LIEUTENANT GOVERNOR

JENNIFER DAVIS CAREY
DIRECTOR CONSUMER AFFAIRS
AND BUSINESS REGULATION

LINDA RUTHARDT
COMMISSIONER OF INSURANCE

## INSURANCE COMPLAINT FORM
### (PLEASE PRINT ALL INFORMATION CLEARLY)

Name: _Michael S. GLIK_   Daytime Phone #: _____

E-mail Address: _____

Before you file a complaint with the Massachusetts Division of Insurance, you should first contact the insurance company, agent or broker in an effort to resolve the issue(s). If you do not receive a satisfactory response, then complete this form, attach copies of any important papers that relate to your complaint. If you are represented by an attorney, do **NOT** complete this form. If this is an employer sponsored plan, the employer must fill out the form on behalf of the group. Do **NOT** send original documents. Please mail or fax your completed form to the address shown above.

Type of Insurance:   Auto ____   Health ____   Homeowners ____   Life ____
Other: _Long Term Disability_

Is the complaint about your policy or someone else's? _mine_

If this is a group policy, provide the group/employer name. _individual_

Name of Insurance Company: _UNUM Life Insurance Company of America, 2211 Congress St., Portland ME_

Name of the Insurance Agent or Agency: _Ms. Carolyn Tyson at Boyd-Neelon Ins. Co._

Policy/Claim #: _HAR 451315_   Date of Loss: _November 21, 200_
_Prepayment agreement # IDA069118_

Have you contacted the company, agent or broker? If yes, indicate the person(s) and date(s) contacted in your explanation. _Feb. 6, 01 — Ms. Carolyn Tyson_

Have you previously written to the Division of Insurance about this matter?
Yes ____   No _V_   DOI File #: _____   Date: _____

Have you reported this to the Attorney General's Office, the Executive Office of Consumer Affairs or any other government agency?   If yes, please provide: _NA_
Name of agency. _____   File #: _____

_SMG 2-27-01_

Page 2 of 3                    12:37 00        **I 0209**

MAR 19 '01 10:41                        207 770 7963        PAGE.07

# Explanation

Since September 22 through December 31, 2000 I was a full-time employee of Inotek Corporation that provided me as part of my benefit package with the Individual Long-Term Disability insurance coverage with UNUM Life-Insurance Company of America. November 21, 00 – I had surgery for cancer of transverse colon that proved to be non-removable.

February 13, 2000 – UNUM Life Insurance Company of America denied my insurance coverage for the reasons of pre-existing condition (see enclosed copy of the letter). However, this is not true for the following reasons:

- I had my surgery for rectum tumor in Moscow, Russia, in 1973 (about 28 years ago). The surgery dates and extent can be witnessed by a dozen of US citizens.
- Since I came to the USA in February 1993 I first sought medical advice for my colon problem in October 2000.

For the eight year period:

- I did not receive any medical treatment or consultation for the colon disease
- The first apparent symptoms of the disease were discovered accidentally by an urologist in October, 2000
- In 1973 I had rectal tumor, in 2000 – it is colon cancer (which can be verified by colonoscopy results).
- The suggestion by the Insurance Co. that these two diseases can share the same etiology is groundless for the following reasons:
    a. There is no way of biopsy verification (of the 1973 tumor)
    b. Absolutely no symptoms of the disease and good health till October, 2000:
        - invariable 80-100 hour working week (can be substantiated by my paychecks)
        - stable stamina in the working place
        - no sick days throughout my whole working history
        - never sought medical advice except for my high blood pressure problem

I am looking forward for your help in reinstating my Long-Term Disability policy at the time when my life span is limited and I do not have any other means to provide for myself.

You can request my medical records from:

Dr. Eugene Vaninov – Primary Care Physician – t. 617-254-4966
Dr. Robert Osteen – Surgeon at Brigham and Women's Hospital – t. 617-732-6718
Dr. Peter Enzinger – Oncologist at Dana-Farber Center – t. 617-632-5136

Contacted:    UNUM Life Insurance Company of America, Individual Disability Underwriting Dept. 2211 Congress Street, Portland, Maine, 04122

Ms. Carolyn Tyson (agent at Boyd-Neelon Insurance Associates Co. -an intermediary insurance agency – who connected Inotek Corporation and UNUM Life Insurance Company) (t. 978-443-7000).

Enclosed:
Application for Individual Disability Insurance
Letter from UNUM Co. (February 13, 2001), denying coverage
Long-Term Disability policy (from Employee Handbook of Inotek Corp.)

JMG  2-27-01

I 0210

UNUM AMERICA COMPLIANCE

*(DETAILS OF YOUR COMPLAINT)*

Please see enclosed
computer print-out
MG 2-27-01

I authorize the release of any information regarding this complaint to help the Division of Insurance with their review. I acknowledge that **complaints filed are not confidential.** I authorize the Division of Insurance to send a copy of this complaint and related material to any company, agent or licensee involved in this matter.

SIGNATURE  *MGLIY*                    DATE: 2-27-01

I 0211

| Authorized: | Policy: | Long-Term Disability |
|---|---|---|
| | Effective Date: | |
| | Policy Number: | B5 |

### 1.0    Purpose

To establish a Long - Term Disability plan for all full-time employees of Inotek Corporation.

### 2.0    Policy

2.1    It is the responsibility of the Human Resources Department to administer the Long-Term Disability Plan and employee enrollment.

2.2    All full time employees are eligible for LTD Insurance on the first day of active employment.

2.3    Each full-time employee will receive a Group Disability Insurance booklet, which outlines the specifics of the LTD coverage.

2.4    LTD insurance premiums are fully paid by Inotek Corporation with no co-payment by the employee.

### 3.0    Procedure

After an employee has been absent from work due to sickness or injury for a period of 60 days, the Human Resources Department will contact the employee and the attending physician to receive a prognosis on the employee's condition.  If the prognosis is such that the employee is expected to be away from work for a period longer than 90 days, Human Resources will assist the employee in completing the insurance forms necessary to apply for benefits under the LTD policy.

### 4.0    Exceptions

Exceptions to this policy require the prior written approval of the President of Inotek Corporation.

FMR 19 '01 11:47 FR MLFMRR / S.JOSEPH    508 929 5004 TO 92075733325    P.10
MON 10:29 FAX 207 770 1903    UNUM AMERICA COMPLIANCE    @010

 **UNUM.**

Unum Life Insurance
Company Of America
2211 Congress Street
Portland, Maine 04122

February 13, 2001

Mr. Michael S. Glik

Re:  Proposed Insured:  Michael S. Glik
     Application and Premium Prepayment Agreement No:  IDA069118
     Policy Number(s):  LAR451315

Dear Mr. Glik:

We wish to thank you for your application for individual disability insurance
coverage with our Company. After careful consideration we found it necessary
to postpone coverage.

The specific reasons for this action are as follows:

     .Due to medical records obtained from Dr Vaninov.

You have the right to know the specific items of information that support the
reasons given above, the identity of any institutional source of that
information and the right to see copies of certain documents relating to this
decision. This right does not extend to information if we have a reasonable
_____ of a criminal activity, fraud, material misrepresentation or
nondisclosure is involved.

Disclosure of medical records or examination information will be made to the
specifically named physician of your choice upon your written request to do
so. Information pertaining to an investigative report, if applicable, may be
obtained from the appropriate Consumer Reporting Agency.

Some Medical conditions, due to their delicate nature, shall be supplied
directly to you, only with the approval of the qualified professional person
with treatment responsibility for the condition to which the information
relates.

If, after reviewing the information about you in our files, you believe that
it is incorrect, you may request in writing that we correct, amend or delete
any item of personal information. Within thirty (30) business days of our
receipt of your request, you will be notified if we can comply with your
request. If we are unable to comply with your request, we will tell you why
and allow you to file a statement of your disagreement. This statement will be
sent to anyone to whom we have disclosed this information in the past two

I 0213

MAR 19 '01 11:47 FR M.MARK / S.JOSEPH    508 529 5804 TO 92075755525    P.11

UNUM AMERICA COMPLIANCE    @011

Policy Number:  LAR45131
02/14/2001
Page:   2

years, and in the future.

[illegible] ditional information herein. If this action or your
rights, please submit a written request to the Individual Underwriting
Department at the following address within ninety (90) business days from the
date above.

> UNUM Life Insurance Company of America
> Attn: Individual Disability Underwriting Dept.
> 2211 Congress St.
> Portland, ME  04122

Thank you for your interest in our Company and the opportunity to consider
your application for coverage. We hope that the above information has been of
assistance to you.

Sincerely,

Antonio Ferrante, Jr.
Individual Disability Underwriting
UNUM Life Insurance Company of America

cc: Boyd-Neelon Ins Agency Inc

Jcorkum

*rec'd after DOI response sent.*

March 20, 2001

Mr. Antonio Ferrante
Individual Disability Underwriting
UNUM Life Insurance Company of America
2211 Congress Street
Portland, Maine 04122

From:  Mr. Michael Glik

Unum File Number: LAR451315

Dear Mr. Ferrante,

I am not satisfied either with the form or the contents of your letter of March 8, 2001. I see it as an obvious attempt to get rid of me.

I need a distinct answer to the question: When will my Long Term Disability Insurance start?

If you refuse me the LTD, please state the reason for that so that I could file a court suit.

I will repeat the chronology of the events:

September 23, 2001 I was hired by Inotek Corporation as a full-time employee with a comprehensive benefit package, LTD being one of them.

October 2 -- I filed the application for LTD.

October 13 -- I had an appointment with an urologist because of a urological problem.

October 21 -- after additional tests I was initially diagnosed with sigmoid cancer.

November 21 -- I had surgery for non-removable sigmoid cancer.  I am disabled ever since.

Consequently, your reference to the fact that in my "medical records from Dr. Vaninov there is a letter from Dr. Christopher Doyle dated October 11, 2000" cannot serve the reason for postponing the processing of my LTD application.

Please start immediately the payments for my LTD considering the time passed since my illness began.

Sincerely yours,

Michael Glik   *MGLIK*

EXHIBIT
UNUM
18
4    5/2/06
PENGAD 800-631-6989

 **UNUM.**

**Unum Life Insurance**
**Company of America**
2211 Congress Street
Portland, Maine 04122

March 22, 2001

Walter Marcinkus
Senior Insurance Compliance Analyst
Commonwealth of Massachusetts Office of Consumer Affairs and Business Regulation
Division of Insurance
One South Station
Boston, MA 02110-2208

RE:    Michael S. Glik
       Policy Number: LAR451315
       DOI File Number: 565036

Dear Mr. Marcinkus:

I am responding to your letter of March 13 regarding a complaint received by your office from the above mentioned applicant relative to the postponement of his individual disability application to UNUM Life Insurance Company.

Dr. Glik's application for individual disability coverage was received by UNUM Underwriting on December 15, 2000. Dr. Glik signed this application on October 2, 2000.

During the course of underwriting, medical records were requested from Dr. Vaninov due to medical history as outlined on the application. These records noted a history in October 2000 of consultation regarding testicular pain and a possible abdominal mass. Of note in these records as well was a history of surgery for rectal cancer; this history was not disclosed on Dr. Glik's application. As no diagnosis for the current complaint was available at time of underwriting, and no pre-payment was made with the application, the decision was made to postpone any consideration until such time as a diagnosis was available.

Please note that the policy applied for was an individually underwritten, guaranteed renewable disability policy, with no underwriting limitation as to pre-existing conditions. Based on the information sent to you by Dr. Glik, it appears he may be confusing this policy with a group long-term disability policy possibly available through his employer

Please feel free to contact me should you have any questions or need additional information.

Sincerely,

Susan R. Nelson
Chief Underwriter
Individual Disability Underwriting
Unum Life Insurance Company of America

EXHIBIT
UNUM
20
5/2/06
PENGAD 800-631-6989

I 0231

APR 1 6 2001                April 7, 2001

Walter Marcinkus
Senior Insurance Compliance Analyst
Commonwealth of Massachusetts Office of Consumer Affairs and Business Regulation
Division of insurance
One South Station
Boston, MA 02110-2208

RE:    UNUM Life Insurance Company
       DOI File Number: 565036

Dear Mr. Marcinkus,

In response of UNUM Life Insurance Company of March 22, 2001, there is a number of
inaccuracies or intended false statements:

(1)    UNUM Co. is asserting that up to this moment they have no information about the
diagnosis of my condition. However, the management of my company – Inotek Corp. – was
aware of the fact that it was sigmoid cancer before my surgery (October 27, 00), and that the
cancer was nonremovable after my surgery (November 27,00). I personally talked to Dr.
Saltzman (President of Inotek Corp.) regarding this situation. Mr. Gosselin knew about it
when he first spoke to the insurance company about the application. They could not have
avoided this question because it was the very reason for seeking long-term disability.

The UNUM insurance Co. had the responsibility to request the information from Dr. Eugene
Vaninov – my Primary Care Physician (t. 617-254-4966), Dr. Robert Osteen– surgeon at
General Surgery Department of BWH (t. 617-732-6718), and Dr. Peter Enzinger- oncologist
at Dana-Farber Institute (t. 617-632-5136). They chose not to do it.

(2)    The fact that no pre-payment was made with the application cannot be held against
me. It is the duty of the underwriting company to discuss this question with my employer
with whom they have the contract to ensure the disability policy for the employees.

(3)    In their response UNUM Company mentioned that my individual disability
application was received on December 15, 2000. I applied for Individual Disability Insurance
(October 2, 2000) soon after I was hired. It was never my responsibility to transfer the
application to the insurance company.

To sum it up, lack of diagnosis, no pre-payment and late date of application did not happen
through my fault or oversight. These are the results of inertia of the UNUM Co.

Please notify me about the potential administrative or legal ways to resolve my situation.

Sincerely yours,  *M GLIK*

Michael Glik



EXHIBIT
UNUM
21
u        5/2/06

PENGAD 800-531-6989



## UNUM.

*Protecting everything you work for*



June 7, 2001

Walter Marcinkus, Senior Insurance Compliance Analyst
Commonwealth of Massachusetts
Office of Consumer Affairs and Business Regulation
Division of Insurance
One South Station
Boston, MA  02110-2208

RE:     DOI File #:      565036
        NAIC#:           565-62235 – UNUM Life Insurance Company of America
        Policy #:        LAR451315
        Insured:         Michael S. Glik

Dear Mr. Marcinkus:

Your letter dated May 21, 2001, addressed to Joan Sarles Lee, has been forwarded to this department for response.  We appreciate the opportunity to respond to your request.

The situs of the Individual Disability Income contract applied for by Dr. Glik is Massachusetts.

In keeping with your request, each concern raised by Dr. Glik in his letter dated April 7, 2001, is addressed below:

1)  As noted in my original letter dated March 22, 2001, to you, a copy of which is enclosed as Attachment A, there is no group policy and there is no contractual relationship between UNUM and Inotek Corporation.  Dr. Glik's application was for an individually underwritten, guaranteed renewable disability insurance policy.  The page Dr. Glik submitted with his original complaint, a copy of which is enclosed as Attachment B, is neither a UNUM document, nor a reflection of the individual disability insurance coverage Dr. Glik applied for from UNUM.

    If UNUM had approved Dr. Glik's application for coverage, the policy issued would have been an individual policy issued to Dr. Glik.  The premiums for the policy would have been remitted to UNUM by Inotek in accordance with UNUM's list bill.  Inotek merely provides certain administrative services; it is not the policyholder.  Inotek has no rights or obligations under the terms of the individual policies.  The mere fact that Inotek's management had knowledge of Dr. Glik's diagnosis has no bearing upon Dr. Glik's application for insurance.  Moreover, Inotek's management did not share their knowledge with UNUM and UNUM had no responsibility or authorization to obtain it from

UNUMPROVIDENT CORPORATION
2211 Congress Street, Portland, Maine 04122
207.575.2211

Unum is the marketing brand of UnumProvident Corporation

I 0137

Inotek. Accordingly, UNUM did not seek or obtain any information from sources other than the doctor whom Dr. Glik authorized to provide us with medical records (i.e., Dr. Eugene Vaninov) and the applicant himself.

Currently, the only knowledge UNUM has regarding Dr. Glik's diagnosis of sigmoid cancer is from the summary of events that Dr. Glik provided to you as support for his original complaint, a copy of which is enclosed as Attachment C. As a result of the summary of events and the medical records provided by Dr. Vaninov, UNUM has sufficient documentation to support a denial of Dr. Glik's application. Moreover, it also appears that Dr. Glik failed to complete questions 23(b) and 23(c) on the Application for Disability Insurance, regarding symptoms and medication over the prior 12 months and responded falsely to questions 21(b) and 21(d). Dr. Glik's Application for Disability Insurance is enclosed as Attachment D.

Regarding Dr. Glik's statement that "UNUM Insurance Co. had the responsibility to request the information from Dr. Eugene Vaninov…,Dr. Robert Osteen…, and Dr. Peter Enzinger", UNUM did request records from Dr. Vaninov. UNUM did not become aware of Dr. Osteen and Dr. Enzinger, however, until the summary of events was received by UNUM. By the time UNUM was in receipt of the information, the underwriting decision had already been made and there was neither a need nor an obligation to order additional medical records. Moreover, Dr. Glik has not identified any inaccuracies in the information provided by Dr. Vaninov, which might have changed the underwriting decision.

2)  As explained above, UNUM does not have a contractual relationship with Inotek. In fact, by signing the application, Dr. Glik agreed to the following provision: "Payment of all premium is my responsibility as owner of the policy. If my employer, producer, or any other person collects, pays or forwards any part of the premium for this policy, they act as my agent and not as agent for the Company." See page 5, provision 5 of the Application which is enclosed as Attachment D. Thus, Dr. Glik's application makes clear that UNUM had no obligation to discuss prepayment or lack thereof with Dr. Glik's employer.

Further, Dr. Glik did not enter into a prepayment agreement at the time of application. UNUM's standard application includes a prepayment option, the terms of which are outlined on the application itself. See Attachment D, page 9. Since Dr. Glik did not make any prepayment and did not enter into prepayment agreement, Dr. Glik had no reasonable expectation of coverage.

3)  The date Dr. Glik's application was received by UNUM was only mentioned in my March 22, 2001, letter to establish the chronology of events leading up to our underwriting decision. It had no bearing on our review of Dr. Glik's application.

If you have specific questions about this response, please contact me directly. If you require additional written correspondence or documentation on this matter, please send your request to: Deborah Jewett, Manager, Customer Relations, 2211 Congress Street, Portland, Maine 04122. Forwarding this request

through our Compliance Department will ensure that it is logged appropriately and responded to within the required timeframe.

As requested, I have enclosed two copies of this letter. In addition to the attachments mentioned above, per your request, I am attaching a specimen contract enclosed as Attachment E. No contract was ever issued to Dr. Glik.

Sincerely,

Susan R. Nelson
Chief Underwriter
UNUM Life Insurance Company of America

Enc

*ATTACHMENT A*

 UNUM.

**Unum Life Insurance
Company of America**
2211 Congress Street
Portland, Maine 04122

March 22, 2001

Walter Marcinkus
Senior Insurance Compliance Analyst
Commonwealth of Massachusetts Office of Consumer Affairs and Business Regulation
Division of Insurance
One South Station
Boston, MA 02110-2208

RE:    Michael S. Glik
       Policy Number: LAR451315
       DOI File Number: 565036

Dear Mr. Marcinkus:

I am responding to your letter of March 13 regarding a complaint received by your office from the above mentioned applicant relative to the postponement of his individual disability application to UNUM Life Insurance Company.

Dr. Glik's application for individual disability coverage was received by UNUM Underwriting on December 15, 2000. Dr. Glik signed this application on October 2, 2000.

During the course of underwriting, medical records were requested from Dr. Vaninov due to medical history as outlined on the application. These records noted a history in October 2000 of consultation regarding testicular pain and a possible abdominal mass. Of note in these records as well was a history of surgery for rectal cancer; this history was not disclosed on Dr. Glik's application. As no diagnosis for the current complaint was available at time of underwriting, and no pre-payment was made with the application, the decision was made to postpone any consideration until such time as a diagnosis was available.

Please note that the policy applied for was an individually underwritten, guaranteed renewable disability policy, with no underwriting limitation as to pre-existing conditions. Based on the information sent to you by Dr. Glik, it appears he may be confusing this policy with a group long-term disability policy possibly available through his employer

Please feel free to contact me should you have any questions or need additional information.

Sincerely,

Susan R. Nelson
Chief Underwriter
Individual Disability Underwriting
Unum Life Insurance Company of America

I 0146

03/19/01  MON 10:28 FAX 207 770 7963          UNUM AMERICA COMPLIANCE                    @012

ATTACHMENT B

Authorized:                    Policy:                Long-Term Disability
                               Effective Date:        _____
_____          Policy Number:         _____B5_____

1.0    Purpose

       To establish a Long - Term Disability plan for all full-time employees of Inotek
       Corporation.

2.0    Policy

       2.1    It is the responsibility of the Human Resources Department to administer the
              Long-Term Disability Plan and employee enrollment.
       2.2    All full time employees are eligible for LTD Insurance on the first day of active
              employment.
       2.3    Each full-time employee will receive a Group Disability Insurance booklet, which
              outlines the specifics of the LTD coverage.
       2.4    LTD insurance premiums are fully paid by Inotek Corporation with no co-
              payment by the employee.

3.0    Procedure

       After an employee has been absent from work due to sickness or injury for a period of 60
       days, the Human Resources Department will contact the employee and the attending
       physician to receive a prognosis on the employee's condition.  If the prognosis is such
       that the employee is expected to be away from work for a period longer than 90 days,
       Human Resources will assist the employee in completing the insurance forms necessary
       to apply for benefits under the LTD policy.

4.0    Exceptions

       Exceptions to this policy require the prior written approval of the President of Inotek
       Corporation.

*ATTACHMENT C*

*Explanation*

Since September 22 through December 31, 2000 I was a full-time employee of Inotek
Corporation that provided me as part of my benefit package with the Individual Long-
Term Disability insurance coverage with UNUM Life-Insurance Company of America.
November 21, 00 – I had surgery for cancer of transverse colon that proved to be non-
removable.
February 13, 2000 – UNUM Life Insurance Company of America denied my insurance
coverage for the reasons of pre-existing condition (see enclosed copy of the letter).
However, this is not true for the following reasons:
-         I had my surgery for rectum tumor in Moscow, Russia, in 1973 (about 28 years
          ago).  The surgery dates and extent can be witnessed by a dozen of US citizens.
-         Since I came to the USA in February 1993 I first sought medical advice for my
          colon problem in October 2000.
For the eight year period:
-   I did not receive any medical treatment or consultation for the colon disease
-   The first apparent symptoms of the disease were discovered accidentally by an
    urologist in October, 2000
-   In 1973 I had rectal tumor, in 2000 – it is colon cancer (which can be verified by
    colonoscopy results).
-   The suggestion by the Insurance Co. that these two diseases can share the same
    etiology is groundless for the following reasons:
               a.   There is no way of biopsy verification (of the 1973 tumor)
               b.   Absolutely no symptoms of the disease and good health till October, 2000:
    ■   invariable 80-100 hour working week (can be substantiated by my paychecks)
    ■   stable stamina in the working place
    ■   no sick days throughout my whole working history
    ■   never sought medical advice except for my high blood pressure problem
I am looking forward for your help in reinstating my Long-Term Disability policy at the
time when my life span is limited and I do not have any other means to provide for
myself.
             You can request my medical records from:
Dr. Eugene Vaninov – Primary Care Physician – t. 617-254-4966
Dr. Robert Osteen – Surgeon at Brigham and Women's Hospital – t. 617-732-6718
Dr. Peter Enzinger – Oncologist at Dana-Farber Center – t. 617-632-5136

Contacted:      UNUM Life Insurance Company of America, Individual Disability
                Underwriting Dept.2211 Congress Street, Portland, Maine, 04122

                Ms. Carolyn Tyson (agent at Boyd-Neelon Insurance Associates Co. -an
                intermediary insurance agency – who connected Inotek Corporation and
                UNUM Life Insurance Company) (t. 978-443-7000).

. Enclosed:
                Application for Individual Disability Insurance
                Letter from UNUM Co. (February 13, 2001), denying coverage
                Long-Term Disability policy (from Employee Handbook of Inotek Corp.)

          *JMG    2-27-01*

ATTACHMENT D

 UNUM.

UNUM Life Insurance Company of Americ
Portland, Maine 04122-215

## APPLICATION FOR DISABILITY INSURANCE - PART I
NOTE: "YOU" and "YOUR" within this application refer to the Proposed Insured. PLEASE PRINT ALL INFORMATION.

### Personal Profile

1  **a)** Your Full Legal Name (Last, First, Middle)
GILIK MICHAEL S

**c)** ☑ Male ☐ Female

**e)** Current Age: 54   **f)** Birthplace (State, Country) Russia   **g)** Citizenship: ☑ US ☐ Canadian ☐ Other
* If other, # of yrs. worked/resided in US _____ yrs.

2  **a)**

**b)** Business Name and Address: (Do Not Use P.O. Box)
Employer Name INOTEK Corp.
Street _____ Ste.# _____
City _____ State ____ Zip _____

**c)** Mailing Address if other than residence or business:
Box#/Street Same _____ Apt.# _____
City _____ State _____ Zip _____

### Occupation    ➡ PRODUCER: Please designate occupation class of applicant AA ⬅

3  **a)** Occupation and/or Job Title:
Researcher
Second Occupation (if any):

**b)** Professional Designation or Degree:
MD

**c)** Please provide specialty, if any:

**d)** Yrs. in occupation: 21   Yrs. with employer: O   **e)** Percent of business you own: O %

**f)** Nature of Business:
BIOTECH R+D

**g)** # of years business has been in existence: 3

**h)** # of full-time employees in business: 20

Average # of hours worked per week: 40

**j)** Using a typical work week, please describe your occupational duties by indicating the approximate % of time devoted to the following duties:
____ % Sales ____ % Travel ____ % Managerial/Admin. ____ % Physical/Manual
Y % Other  If other, please provide details. Research

### Income

4  Annual Earned Income from personal services as reported to the IRS on your personal or business federal tax return:

|  | Actual Income ~~Last Year~~ CURRENT Specify Yr. _ _ _ _ | Actual Income 2 Years Ago Specify Yr. _ _ _ _ |
|---|---|---|
| **Non-Business Owner :** | | |
| W-2 Income | $ 37,000 | $ |
| 1099 Income less business expenses | $ | $ |
| Other (specify): _____ | $ | $ |
| **Business Owner:** | | |
| W-2 Income from your business | $ | $ |
| Your share of business net profits/losses after all business expenses | $ | $ |
| Other (specify): _____ | $ | $ |

Business Type (check one): ____ Proprietorship ____ Partnership ____ Corporation ____ S-Corporation ____ Other (specify) ____

### Insurance & Other Information

5  **a)** Have you ever applied for life, medical, or disability, long term care or nursing home insurance which was declined, postponed, rescinded or modified in any way, or have you been refused renewal or reinstatement of insurance?  ☑ No ☐ Yes  If Yes, please give details: _____

**b)** Have you ever filed a disability claim, received benefits or had benefits denied (including Worker's Compensation or State disability claims)?  ☑ No ☐ Yes  If Yes, please give details: _____

## urance & Other Information (Cont'd)

ı) List below all disability coverage in force or applied for in the last 12 months. Type should be shown as:
I-Individual, A-Association, G-Group (including employer sickpay), OE-Overhead, BS-BuySell, KP-Key Person.

| # | COMPANY NAME | TYPE | ISSUE YEAR | MONTHLY BENEFIT AMOUNT | BENEFIT PERIOD | PERCENTAGE PAID BY | | WILL COVERAGE BE PERMANENTLY | | DATE OF REPLACEMENT/ CHANGE |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | SELF | EMPLOYER | REPLACED* | CHANGED | (WITH DETAILS) |
| | *VERAGE IS PENDING, CHECK HERE ▶ | | | | | | | | | |
| 1. | Apollo Security | G | ---- | | | | | | | __ / __ / __ |
| 2. | (Termincited | | ---- | | | | | | | __ / __ / __ |
| 3. | 8/1/00 ) | | ---- | | | | | | | __ / __ / __ |
| 4. | (NONE) | | ---- | | | | | | | __ / __ / __ |

*Producer must comply with all state replacement regulations.

ɒ) Are you currently covered by any wage continuation program or disability insurance not mentioned above?
☑ No ☐ Yes  *If Yes, please give details:* _____

ɔ) Will you be eligible for any wage continuation program or disability insurance within the next 12 months?
☑ No ☐ Yes  *If Yes, please give details:* _____

Have you ever been the subject of any professional disciplinary proceedings? ☑ No ☐ Yes  *If Yes, please give details:* _____

Have you or has a business owned by you ever been the subject of a bankruptcy or reorganization proceeding?
☑ No ☐ Yes  *If Yes, please give details:* _____

## ividual Disability Plans

### NCOME BENEFIT

ı) **Monthly Benefit Amount $** _2150_

**Benefit Period**
☑ T65 ☐ 5 year
☐ 2 year

**Elimination Period**
☑ 90 days ☐ 180 days
☐ 360 days ☐ 720 days
(applies to Income Benefit and Disability Plus Benefit, if selected)

**Optional Benefits:**
☒ Cost of Living
☐ Future Adjustment Option $_____
☐ Nondisabling Injury
☐ Own Occupation Protection
☐ Savings Supplement: ☐ $250 ☐ $500 ☐ $750
☐ $1000 ☐ $1250 ☐ $1500 ☐ Other $_____
☐ Other:_____

ɔ) **Additional Coverage:**
Monthly Benefit Amount: $_____
Benefit Period: _____
Elimination Period: _____
Optional Benefits (Please List):
1._____  2._____  3._____
4._____  5._____

### DISABILITY PLUS BENEFIT

d) **Monthly Benefit Amount $** _950_

**Benefit Period**
☑ T65 ☐ 5 year ☐ 2 year
(Must be less than or equal to the Income Benefit)

**Elimination Period**
(Will be the same as the Income Benefit)

e) **Optional Benefit:**
☐ Cost of Living

f) **Additional Coverage:**
Monthly Benefit Amount: $_____
Benefit Period: _____
Elimination Period: _____
Optional Benefit (Please List):
1._____

## Loss Payee (Designated person/entity to receive benefits, if other than Proposed Insured):
☐ Employer    ☐ Other:    Name_____
Address_____
City_____ State_____ Zip_____

## Special Requests
☐ Date to Save Age    ☐ Special Policy Date __ __/__ __/__ __ __ __

I 0150

## Business Disability Plans

**12** a) ☐ Overhead Expense: Complete Questions 12b - 15
   ☐ Key Person: Complete Supplemental Application
   ☐ Buy Sell:  Complete Supplemental Application

b) **OVERHEAD EXPENSE COVERAGE INFORMATION:**

Monthly Benefit Amount      Benefit Period:                      Elimination Period:
$_____    ☐ 12 mos.  ☐ 18 mos.  ☐ 24 mos.      ☐ 30 days   ☐ 60 days   ☐ 90 days

c) **OPTIONAL BENEFITS FOR OVERHEAD EXPENSE POLICY**

☐ Partial Disability                         ☐ Business Continuance: $_____
☐ Other:_____      Benefit Period:    ☐ 6 mos.   ☐ 12 mos.
                                        Elimination Period:   ☐ 30 day   ☐ 60 day   ☐ 90 day

**13** Loss payee  (Designate person/entity to receive benefits -- can not be the Proposed Insured):
   ☐ Employer/Business/Practice           ☐ Other:   Name_____
                                           Address_____
                                           City_____ State_____ Zip_____

**14** List below your share of the total monthly expenses of the business entity:

| | | | |
|---|---|---|---|
| Rent or Mortgage Payment | $_____ | Utilities | $_____ |
| Employee Salaries * | _____ | Maintenance | _____ |
| Employee Benefits * | _____ | Accounting/Legal Fees | _____ |
| Malpractice Insurance | _____ | Professional Dues | _____ |
| Property and Casualty Insurance | _____ | Subscriptions | _____ |
| Property Taxes | _____ | Postage/Stationery | _____ |
| Equipment Payments | _____ | Other Miscellaneous | _____ |
| Auto Lease Payments | _____ | **TOTAL MONTHLY EXPENSES** | $_____ |

*Do not include salaries, drawing accounts, profits, benefits and other forms of remuneration which are payable to you
or to anyone employed in your business who performs the same regular occupation as you do.

**15** SPECIAL REQUESTS
   ☐ Date to Save Age      ☐ Special Policy Date __ /__ /__ __ __ __

## Payment / Billing Information

| | | INDIVIDUAL DISABILITY | BUSINESS DISABILITY |
|---|---|---|---|
| **16** | Who will pay the premiums? | ☐ Proposed Insured<br>☐ Proposed Insured -- Salary Deduction<br>☒ Employer<br>☐ Split by percent:<br>    Employer will pay_____% | ☐ Employer/Business/Practice<br>☐ Other: (Specify in Special Requests) |
| **17** | Send bills to: | ☐ Residence Address<br>☒ Business Address<br>☐ Other: (Specify in Special Requests) | ☐ Business Address<br>☐ Other: (Specify in Special Requests) |
| **18** | How often do you want to be billed? | ☒ Annually   ☐ Semi-Annually<br>☐ Quarterly   ☐ Monthly (Only For Monthly FlexBill & Automatic Bank Withdrawal) | ☐ Annually ☐ Semi-Annually<br>☐ Quarterly☐ Monthly (Only For Monthly FlexBill & Automatic Bank Withdrawal) |
| **19** | Special methods: | FlexBill:<br>☐ New  ☒ Add to existing # 4 9 v 8u 3 C-1<br>FlexBill with Automatic Bank Withdrawal<br>☐ New*  ☐ Add to existing #_____<br>    Special Draw Day_____(1-28)<br>☐ Automatic Bank Withdrawal<br>☐ New*  ☐ Add to existing #_____<br>    Special Draw Day_____(1-28)<br>**\*If NEW bank withdrawal, complete Authorization on page 10.** | FlexBill:<br>☐ New  ☐ Add to existing #_____<br>FlexBill with Automatic Bank Withdrawal<br>☐ New*  ☐ Add to existing #_____<br>    Special Draw Day_____(1-28)<br>☐ Automatic Bank Withdrawal<br>☐ New*  ☐ Add to existing #_____<br>    Special Draw Day_____(1-28)<br>**\*If NEW bank withdrawal, complete Authorization on page 10.** |

_dical

a) During the last 30 days, have you work 'ess than your usual number of hours (s    d in question 3) because of sickness or injury? ............................................................................................ YES ☐*  NO ☑

b) In the past 12 months, have you had any indication of, been told you had, or been treated for cancer, a stroke, any heart disease or disorder, or any psychological or emotional disorder? ...................... ☐*  ☑

F EITHER 20a OR 20b ARE ANSWERED "YES", PREPAYMENT CANNOT BE ACCEPTED.

c) Height: 5 ft. 11 in.  Weight: 225 lbs.

Weight change last year: ___—___ lbs.
☐ Gain ☐ Loss  Reason: _____
_____

d) Name and Address of Personal Physician: (If none, please indicate)
Dr Van inov  Brighton
_____
_____
Date last seen: 11/2_/99 ___ Reason: neck back pain
Results: physical therapy

NOT COMPLETE QUESTIONS 21-25 IF YOU ARE PROVIDING A UNUM MEDICAL EXAM.

Have you ever had, been told you had, or been treated for (circle all conditions that apply and give details in question 25):

a) chest pain, high blood pressure, palpitations, or any disease or disorder of the heart, or circulatory system, blood or blood vessels, lungs, bronchial tubes or respiratory system? ............................... YES ☑  NO ☐

b) colitis, chronic diarrhea, cirrhosis, disease or disorder of the stomach, intestines, rectum, liver or digestive system? ......................................................................................................... ☐  ☑

c) disease or disorder of either kidney, the prostate, urinary, or reproductive organs, or any sexually transmitted disease? ........................................................................................................ ☐  ☑

d) polyp, tumor, cancer, or a disease or disorder of the immune system? ...................................... ☐  ☑

e) chronic fatigue, Chronic Fatigue Syndrome, Epstein Barr virus, diabetes, enlarged glands, or any glandular or thyroid disorder? ........................................................................................... ☐  ☑

f) epilepsy, headaches, migraines, convulsions, dizziness, fainting, paralysis, multiple sclerosis or any other disease or disorder of the brain or nervous system? .................................................... ☐  ☑

g) mental illness, anxiety, depression, exhaustion for over one week duration, or any psychological or emotional condition or disorder? .................................................................................... ☐  ☑

h) pain in the back or neck, sciatica, any disc disorder, or any other disease or disorder of the neck, back, spine? ..................................................................................................................... ☐  ☑

_hritis, fibromyalgia, fibrositis, carpal tunnel syndrome, gout, or any disease or disorder of the muscles, tendons, bone, joints, skin, any connective tissue disease, or any chronic pain condition? ............ ☐  ☑

j) complications of pregnancy including miscarriage, preeclampsia, or cesarean section? ..................... ☐  ☑
Are you pregnant? ....................................... If "Yes", Due Date __/__/__ _ _ _ _  ☐  ☑

k) any injuries due to falls or other trauma, any amputation or deformity, partial or total loss of vision, impaired hearing, impaired speech, or disease or disorder of the eyes or ears? ............................ ☐  ☑

l) Alzheimer's disease, dementia, confusion, memory loss, Parkinson's disease, stroke, TIA, tremor, or any neurological disorder? ................................................................................................ ☐  ☑

a) Have you ever used stimulants, hallucinogens, narcotics or any controlled substance other than prescribed by a physician, or been counseled, treated or arrested for excess use of alcohol or drugs? ......... ☐  ☑

b) Have you been medically treated for, or diagnosed by a member of the medical profession, as having Acquired Immune Deficiency Syndrome (AIDS) or AIDS Related Complex (ARC)? ............................ ☐  ☑

c) Have you been tested and informed that you have been exposed to the AIDS virus? ...................... ☐  ☑

a) Have you used tobacco/nicotine within the past 12 months? ................................................. ☐  ☑

b) Are you now taking or have you taken medication (prescription or non-prescription) for any reason within the last 12 months? ............................................................................................ ☐  ☐

c) Are you now experiencing any symptoms, disease, disorder or condition which might require surgery, impair your health or your ability to work, now or in the future, for which you plan to consult a physician? ................................................................................................................. ☐  ☐

d) Do you need human assistance of any kind to perform everyday activities such as bathing, continence, dressing, eating, using the toilet or transferring (for example from the chair to your bed)? ................... ☐  ☑

_ you use any special medical equipment or appliances such as a walker, cane, wheelchair, catheter, _ygen tank, pacemaker, or artificial limb? ........................................................................ ☐  ☑

**Medical (Cont'd)**

| Other than already mentioned in this application, have you in the past five years: | YES | NO |
|---|---|---|
| a) consulted, been advised to consult or received treatment from any physician, psychiatrist, psychologist, counselor, marital or family counselor, chiropractor or other practitioner, clinic or hospital (include regular checkups)? ................................................................................................................ | ☑ | ☐ |
| b) had or been advised to have any surgical operation, hospitalization, medical care, electrocardiogram, x-ray, blood test or other diagnostic test? ........................................................................................... | ☑ | ☐ |

25  Give details by Question Number for any "Yes" answers to questions 20 - 24. If additional space is needed, please write the information on a separate Part I or Part II application and sign that form.

| QUEST. # | REASON | DIAGNOSIS/ TREATMENT | NAME AND ADDRESS OF PHYSICIAN AND/OR HOSPITAL | DATE LAST SEEN |
|---|---|---|---|---|
| 21 | high blood pressure | High blood pressure | Dr. Vaninov, Brighton | 10/24/1999 |
| | | | | __/__/__ |
| | | | | __/__/__ |
| | | | | __/__/__ |
| | | | | __/__/__ |
| | | | | __/__/__ |
| | | | | __/__/__ |
| | | | | __/__/__ |
| | | | | __/__/__ |

## AGREEMENT

I (each of the undersigned) have carefully read this application and I understand and agree that:

1.  All of the statements made in this application must be and are true, complete and correctly recorded to the best of my knowledge and belief. The Company will rely on the information provided in this application and in any supplemental applications, to determine whether to provide the requested coverage. These completed documents shall form a part of my contract of insurance and any coverage based on such information is contestable in accordance with the provisions of the policy providing such coverage.

2.  No agent, producer, medical examiner or anyone other than a Home Office underwriter may waive questions asked or answers given in this application or the medical exam; determine if I am eligible for a policy; make, or promise that I will be issued a policy of insurance; or change or waive any rights or requirements of the Company.

3.  If I stated in response to question 6a on page 2 of this application that I would permanently change or replace existing insurance and I have not done so when a disability begins, any benefits payable by the Company as a result of this application will be reduced by the amount of existing coverage which I said I would terminate and my premium will be adjusted to reflect the actual benefits received.

4.  If I prepaid premium with this application, insurance will become effective only as provided by the terms of the Prepayment Agreement. I have received a copy of the Conditional Receipt/Prepayment Agreement and agree to its terms.

5.  If I did not prepay premium with this application, insurance will be effective when a policy has been delivered to me and I have paid the first premium, provided that, on the later of the delivery date or payment date, the answers in 's application and in any supplemental application, medical exam or other questionnaire are then still true and .mplete.

Payment of all premium is my responsibility as owner of the policy. If my employer, producer, or any other person collects, pays or forwards any part of the premium for this policy, they act as my agent and not as agent for the Company. If the Company does not receive premium as due, the policy will lapse.

## AGREEMENT (continued from previous page)                    **IDA 069118**

If a policy is issued, the effective date will be the date coverage begins, the policy date will be the date premium shall
payable from, the approval date will be the date a Home Office underwriter approved issuance of a policy, and
the issue date will be the date a policy is generated in the Home Office.

8. Changes made by the Company on this application and listed under "Corrections and Amendments" will be
considered ratified by me if I accept the policy that is issued unless the changes are prohibited in the state in which
that policy is issued.

### CORRECTIONS and AMENDMENTS  (Home Office Use Only)

**Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents
false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in
prison.**

Signed at ___Lynn, MA___  Date: _10/02/2000_    ____M661Y____
          City/State                                     Signature of Proposed Insured

...fy that this application was solicited by me; that I personally asked the Proposed Insured each question; and that
the Proposed Insured's answers are accurately recorded on the application.

Producer _____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

### DISCLOSURE AUTHORIZATION

I authorize any of the following who have information about me, my health, my finances, or claim history to disclose that
information to UNUM Life Insurance Company of America and its employees, reinsurers, insurance support organizations,
Equifax, Inc., and other authorized representatives:  1) any physician, hospital, clinic, or other medical professional or medical
facility;  2) the Medical Information Bureau, Inc., 3) any employers or financial institutions;  4) other insurance companies;
5) any person or organization which has information as outlined in the following paragraph.
To facilitate rapid submission of such information, I authorize all said sources, except MIB, to give such records or knowledge
to any agency employed by the Company to collect and transmit such information.
Information which may be disclosed includes information about my financial condition, physical or mental condition, driving
record, use or treatment for use of drugs or alcohol; hobbies, avocations and sports or hazardous activities in which I
participate.
- I understand this information will be used to underwrite my application for insurance and may be used to evaluate a claim
  for benefits during the time this authorization is valid.
- I agree that this authorization will be valid for two and one-half years from the date I sign it.
- For the purpose of verifying information on this application, my telephone number is ( )_____ (circle: work or
  ...me), and I may be reached at that number:(specific time/days) _____
  ...investigative consumer report is prepared, please interview me:  ☐ Yes   ☐ No
  ...ve read this authorization and understand that I may receive a copy and that a photocopy of this shall be as valid as the
original. I have also read and received a copy of the Notice of Information Practices and agree to its terms.

_____    ____M661Y____    _16/02/2000_
Witness                 Signature of Proposed Insured      Date

## ...ducer Information

**2. a)  For commission purposes, please list the producers for this application.**                    **IDA 069118**

Use full names, including complete business names. To ensure proper payment of commissions, include each producer's tax identification number (social security number or corporate tax ID). If more than one producer, please be sure to specify split %. For corporate producer, please specify the signing representative's name and ID#'s.

**Please print all information clearly.**

| UNUM Producer # (if known) | Producer Name (Please specify full name) | SS#/Tax ID# | Split Percentage (Must total 100%) | Indicate to Whom to send correspondence |
|---|---|---|---|---|
| 1. 016777 | Boyd - Noelon | | 100 % | ☐ |
| | Signing Representative if Corporate Producer | | | |
| 2. _____ | _____ | _____ | _____ % | ☐ |
| | Signing Representative if Corporate Producer | | | |
| 3. _____ | _____ | _____ | _____ % | ☐ |
| | Signing Representative if Corporate Producer | | | |
| _____ | _____ | _____ | _____ % | ☐ |
| | Signing Representative if Corporate Producer | | | |

RECEIVED DEC 1 3 2000 By

**b)**  Please list the fax machine telephone number of the servicing producer to assure timely communication relating to application/policy status.  (__ __ __)-__ __ __-__ __ __ __

**c)**  How long have you known the Proposed Insured? _____

*Do not detach unless payment is made at time of application*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
### CONDITIONAL RECEIPT/PREPAYMENT AGREEMENT

Received $_____  From _____  Date:  __ / __ / __ __ __ __

Thank you for your premium prepayment.

Premium prepayment alone does not mean that you are insured. However, in exchange for payment of 1/10th of the annual premium for the policy you requested, UNUM Life Insurance Company of America agrees to determine if you are insurable according to our standard underwriting practices. If you qualify for coverage, the effective date of this coverage will be as follows:

If the prepayment check is received in the Home Office on the same day as the application, the effective date of coverage will be the latest date of the application or any required exam, test, questionnaire or other supplemental application.

If the prepayment check is received in the Home Office after the application but before the approval date, the effective date of coverage will be the latest date of any required exam, test, questionnaire or other supplemental application or the date the check is received in the Home Office.

If you request a change in coverage after the application is signed, the effective date of that coverage will be seven ...'s after the issue date.

...ny policy requested is not issued, or is declined, cancelled or returned within 20 days of receipt by you or your ...gent, or you withdraw the request, prepayment will be refunded to the prepayment payor.

This agreement applies to each policy you have prepaid with your application, and may not be altered in any way by anyone.

_____
Producer (acknowledging receipt of prepayment)

2000-05                                    9                    I 0155            (5/98) **IDA 069118**

ATTACHMENT 5

| | |
|---|---|
| **Insured** | John A. Doe |
| **Policy Number** | LA R000000 |
| **Policy Date** | 07-01-95 |
| **Effective Date** | 07-01-95 |

**Individual Disability**
**Lifelong Disability**
**Protection℠**

## DISABILITY INCOME POLICY

GUARANTEED RENEWABLE TO AGE 70. WE HAVE A LIMITED RIGHT TO CHANGE PREMIUMS.

This policy provides disability income benefits under stated conditions. Please refer to the policy provisions where we tell you when and how we will pay benefits. You will find an index of these provisions on Page 2.

Your policy cannot be cancelled by us, as long as the premium is paid on time.

## TWENTY DAY RIGHT TO EXAMINE POLICY

Within 20 days after this policy is delivered to you or your representative, you may cancel the policy for any reason. To cancel this policy, you or your representative must mail or deliver the policy to our Home Office or to one of our authorized representatives. If this is done, the policy will be cancelled from the beginning and all of the premium paid will be refunded.

Satisfaction guaranteed or full premium refund.

## RENEWAL

You may renew this policy on each policy anniversary until the policy anniversary when your age is 70 by paying each premium before the Grace Period ends. We reserve the right to adjust premiums for this policy form on a class basis. Any change in premium will be effective on your policy anniversary. We will send you written notice of any adjustment in premium at least 31 days in advance.

This policy becomes effective on the Effective Date shown on page 3.

This policy is renewable to age 70.

(Provisions may vary in certain states)



UNUM.

*Protecting everything you work for*

I 0156

## INDEX OF POLICY PROVISIONS

1   Twenty Day Right to Examine Policy
1   Renewal
3   Policy Schedule
4   Premiums
4   Reinstatement
4   Definitions
7   Benefits
7   Income Benefit
        Successive Income Benefit Disabilities.
7   Disability Plus® Benefit
        Successive Disability Plus Benefit.
8   Other Benefits
        Rehabilitation.
        Worksite Modification Benefit.
8   Lifetime Continuation Provision.

9   Exclusions and Limitations
        Preexisting Condition Limitation.
        Mental Disorder Limitation.
9   Claim Information
        How to File a Claim.
        Conditions and Time Limits.
10  How and When We Pay Benefits.
10  General Provisions
        The Contract.
        Time Limit on Certain Defenses.
        Conformity with State Statutes.
        Legal Actions.
        Misstatement of Age.
11  Owner.
        Loss Payee.
        Assignment.
Application and any riders follow page 11.

I 0157

## POLICY SCHEDULE

| | | | |
|---|---|---|---|
| Insured | John A. Doe | 07-01-95 | Policy Date |
| Policy Number | LA R000000 | 07-01-95 | Effective Date |

### SUMMARY OF PREMIUM

The premium mode at issue is ANNUAL

Premiums are payable as follows:

| BEGINNING | ANNUAL | SEMIANNUAL | QUARTERLY |
|---|---|---|---|
| 07-01-1995 | $536.80 | $268.40 | $134.20 |
| 07-01-2030 | Premiums Cease | | |

### SUMMARY OF COVERAGE Group 01

Form - INC95

Income Benefit Elimination period - 90 days

Maximum Income Benefit Period -To the later of (A) age 65 policy anniversary or (B) 24 months after disability payments begin.

| EFFECTIVE DATE | MAXIMUM INCOME BENEFIT | ANNUAL PREMIUM | PREMIUM CEASE DATE |
|---|---|---|---|
| 07-01-1995 | $2,000 | $498.60 | 07-01-2030 |

| RIDER FORM | DESCRIPTION | RIDER DATE | BENEFIT AMOUNT | ANNUAL PREMIUM | PREMIUM CEASE DATE |
|---|---|---|---|---|---|

Rider Premiums for the Premium Term are included in the Summary of Premium.

### SUMMARY OF COVERAGE GROUP 02

Form - Disability Plus* Benefit

Disability Plus* Elimination period - 90 days

Disability Plus* Benefit Period -To the later of (A) age 65 policy anniversary or (B) 24 months after disability payments begin.

| EFFECTIVE DATE | MAXIMUM DISABILITY PLUS BENEFIT | ANNUAL PREMIUM | PREMIUM CEASE DATE |
|---|---|---|---|
| 07-01-1995 | $2,000 | $38.20 | 07-01-2030 |

| RIDER FORM | DESCRIPTION | RIDER DATE | BENEFIT AMOUNT | ANNUAL PREMIUM | PREMIUM CEASE DATE |
|---|---|---|---|---|---|

Rider Premiums for the Premium Term are included in the Summary of Premium.

Your choice of premium payment schedule.

You can add optional benefi[t] to further customize coverage for y[our] individual need[s]

I 0158

## PREMIUMS

All premiums except the first premium are due on or before the due date. They are payable as stated on page 3.

Each premium will keep this policy in effect and continue coverage for the term shown.

The Grace Period is the 31 consecutive days that begin with the day a premium is due. We will keep this policy in effect and continue coverage during that time. If the premium is not paid during those 31 days, this policy and all coverage under this policy will terminate.

If we accept premium after the policy anniversary when your age is 70, we will keep this policy in effect and continue coverage until the end of the period for which we accept it.

If any premium is paid beyond the month in which you die or this policy terminates for some other reason, we will refund the amount of the unearned premium paid.

Premiums must be paid in United States currency.

## REINSTATEMENT

Reinstatement is possible for up to six months.

If this policy terminates because a premium is not paid by the end of the Grace Period, you may apply to reinstate this policy at any time until the first unpaid premium is six months overdue.

In order to reinstate this policy, three requirements must be met. They are:

1. you must submit a reinstatement application with evidence of your insurability; and

2. we must approve the reinstatement application; and

3. you must submit the full amount of overdue premium.

If the reinstatement application is prepaid, we will issue a prepayment agreement. The date of the prepayment agreement will be the date the reinstatement application has been completed.

If we approve the reinstatement application, this policy will be reinstated on the approval date. If the overdue premium is paid without submitting a reinstatement application and we keep the premium without requesting a reinstatement application, within a reasonable time, this policy will be reinstated as of the date we received the premium. If we issue a prepayment agreement and do not approve or disapprove your reinstatement application

within 45 days from the date of the prepayment agreement, this policy will be reinstated on that 45th day.

If this policy is reinstated, it will only cover:

1. injury that occurs on or after the date this policy is reinstated; or

2. sickness which first manifests itself more than 10 days after this policy is reinstated.

It WILL NOT cover any injury or sickness which is excluded by name or description.

## DEFINITIONS

## GENERAL DEFINITIONS

*Policy* means the contract of insurance between you and us. This form, all applications, and any riders, endorsements, or amendments that are attached to it comprise the entire contract.

*Coverage* means a type or amount of benefit provided by this policy. Each benefit, each modification of that benefit for which we require evidence of insurability, and each reinstatement of that benefit is a separate coverage.

*You* and *Your* refer to the Insured named on page 3. It is the person whom we are insuring. The Insured cannot be changed.

*We, our* and *us* refer to UNUM Life Insurance Company of America.

*Injury* means bodily harm which is the direct result of an accident or trauma that occurs while your policy is in force and is not related to any other cause.

*Sickness* means an illness or condition which first manifests itself while your policy is in force.

*Preexisting Condition* means you have an injury or sickness that exists on the effective date of the coverage and, during the past five years:

1) was diagnosed; or

2) caused you to consult a health care provider; or

3) caused symptoms for which an ordinarily prudent person would have consulted a health care provider.

*Mental Disorder* means any disorder classified in the Diagnostic and Statistical Manual of Mental Disorders (DSM), published by the American Psychiatric Association which is most current on the date of disability, or its replacement. Such disorders include, but are not limited to, psychotic, emotional or behavioral

4

I 0159

disorders, or disorders related to stress or to substance abuse/dependency.

*Medical Care* means:

1. you personally visit a doctor as frequently as is medically required, according to standard medical practice; and

2. you are receiving appropriate treatment and care, according to generally accepted medical standards, by a doctor whose specialty is appropriate for your injury or sickness; and

3. such care is intended to return you to your Regular Occupation.

We may waive these requirements depending on the severity of your injury or sickness.

*Doctor* means:

1. a person performing tasks that are within the limits of his or her medical license; and

2. a person who is licensed to practice medicine and prescribe and administer drugs or to perform surgery; or

3. a person with a doctoral degree in Psychology (Ph.D. or Psy.D.) whose primary practice is treating patients; or

4. a person who is a legally qualified medical practitioner according to the laws and regulations of the governing jurisdiction.

We will not recognize you, or anyone related to you by blood or marriage, as a doctor for a claim that you send to us.

## INCOME BENEFIT DEFINITIONS

*Maximum Income Benefit* means the amount shown on page 3.

*Maximum Income Benefit Period* means the longest period of time we will make payments to you under the Income Benefit for any one period of disability. The Maximum Income Benefit Period is shown on page 3.

*Regular Occupation* means the occupation you are routinely performing at the time the Income Benefit Elimination Period begins. However, after you have received 24 months of benefits due to the same disability, Regular Occupation then means any gainful occupation for which you are reasonably fitted by training, education or experience. If you are not employed at the beginning of a disability, Regular Occupation means any gainful occupation for which you are reasonably fitted by training, education or experience.

*Gainful Occupation* means any occupation that provides or can be expected to provide you an income at least equal to 60% of your Prior Monthly Earnings within 12 months of returning to full-time work in your Regular Occupation.

*To work full time in your regular occupation* means you are able to perform the material and substantial duties of your Regular Occupation and your work, or are able to work, approximately the same average number of hours per week as you were working in the 12 months before the disability began. However, if your average hours worked per week prior to disability exceeds 40, we will consider you to be working full time in your Regular Occupation if you are working, or are capable of working, at least 40 hours per week.

*Income Benefit disability* and *Income Benefit disabled* mean that, as a result of injury or sickness:

1. you are unable to perform the material and substantial duties of your regular occupation; or

2. you are able to perform some, but not all, of the material and substantial duties of your regular occupation; or

3. you are able to perform the material and substantial duties of your regular occupation, but you are not able to work full time in your Regular Occupation; and

4. you are receiving Medical Care.

The suspension, revocation or surrender of a professional or occupational license or certification does not constitute disability.

*Material and Substantial Duties* means those duties that cannot be reasonably omitted or modified in order to perform your Regular Occupation.

*Income Benefit Elimination Period* means the number of days, stated on page 3, preceding the date benefits become payable, during which you are Income Benefit disabled. The Elimination Period begins on the first day that you are Income Benefit disabled.

Different elimination periods may apply to different coverages under this policy. The elimination period for each coverage is described on page 3.

If the Income Benefit disability ceases before you satisfy the elimination period and you become disabled again from the same cause within six months, we will combine those periods of disability to determine when benefits begin.

For the first 24 months of benefit payments, Regular Occupation means your occupation at the onset of disability. Long Term Own Occupation Protection can be provided in select situations through a policy rider.

No loss of income is required to satisfy the elimination period.

There is no new elimination period for related disabilities occurring within [ ] months of a previous Income Benefit disability

I 0160

*Monthly Earnings* means any salary, wages, commissions, bonuses and fees regularly earned for services performed by you.

If you own any part of a business or profession, Monthly Earnings also includes your share of business profits or losses (after deducting the usual and customary business expenses) plus any contributions on your behalf to a deferred compensation, pension or profit sharing plan. Usual and customary business expenses are those expenses which are deductible for federal income tax purposes based on the business fiscal year immediately prior to the start of disability.

Monthly Earnings does not include any forms of unearned income, such as dividends, interest, rent, royalties, annuities, distributions of deferred compensation or pension plans, sick pay, benefits received for disability under a formal wage or salary continuation plan or other disability plans. Monthly Earnings may be accounted for on a cash or accrual basis. The same method must be used to determine the Prior Monthly Earnings and current Monthly Earnings during a period of disability.

*Prior Monthly Earnings* means the greater of:

1. your average Monthly Earnings for the 12 months immediately prior to the start of Income Benefit disability; or

2. your average Monthly Earnings for the full calendar year immediately prior to the start of Income Benefit disability.

*Loss of Monthly Earnings* means your Prior Monthly Earnings minus your Monthly Earnings in the month for which a benefit is claimed. Loss of Monthly Earnings must be caused solely by the injury or sickness which is causing the disability.

## DISABILITY PLUS® DEFINITIONS

*Maximum Disability Plus® Benefit* means the amount shown on page 3.

*Maximum Disability Plus® Benefit Period* means the longest period of time we will make payments to you under the Disability Plus® benefit for any one period of disability. The Maximum Disability Plus® Benefit Period is shown on page 3.

*Disability Plus® disability* and *Disability Plus® disabled* mean that as a result of injury or sickness:

1. you are unable to perform two or more Activities of Daily Living without stand-by assistance; or

2. you are cognitively impaired; and

3. you are receiving Medical Care.

*Disability Plus® Elimination Period* means the number of days stated on page 3, preceding the date benefits become payable, during which you are Disability Plus® disabled. The Elimination Period begins on the first day that you are Disability Plus® disabled.

Different elimination periods may apply to different coverages under this policy. The elimination period for each coverage is described on page 3.

If the Disability Plus® disability ceases before you satisfy the elimination period and you become disabled again from the same cause within six months, we will combine those periods of disability to determine when benefits begin.

**Activities of Daily Living (ADLs) are:**

*Bathing:* the ability to wash yourself, either in the tub or shower or by sponge bath, with or without equipment or adaptive devices.

*Dressing:* the ability to put on and take off all garments and medically necessary braces or artificial limbs usually worn, and to fasten or unfasten them.

*Toileting:* the ability to get to and from and on and off the toilet, to maintain a reasonable level of personal hygiene and to care for clothing.

*Transferring:* the ability to move in and out of a chair or bed with or without equipment such as canes, quad canes, walkers, crutches or grab bars or other support devices including mechanical or motorized devices.

*Continence:* the ability to voluntarily control bowel and bladder function, or, in the event of incontinence, the ability to maintain a reasonable level of personal hygiene.

*Eating:* the ability to get nourishment into the body by any means once it has been prepared and made available to you.

*Stand-by Assistance* means you require the presence of another human being to ensure that all or part of an ADL may be completed or to ensure your safety.

*You may choose cash or accrual accounting to calculate Monthly Earnings.*

Additional be amounts available to catastrophic disabilities u Disability Pl

There is no elimination p for related di abilities occu within 6 mor of a previous Disability Plu disability.

Ability to per Activities of Living is the used to dete mine Disabili Plus® disabili

*Cognitive Impairment* and *Cognitively Impaired* mean that you have suffered a deterioration or loss in your intellectual capacity which requires another person's assistance or verbal cueing to protect yourself or others as measured by clinical evidence and standardize tests which reliably measure your impairment. Such loss in intellectual capacity can result from injury, sickness, Alzheimer's Disease or similar form of senility or irreversible dementia.

## BENEFITS

## INCOME BENEFIT

We will pay an Income Benefit in any month after you have satisfied the Income Benefit Elimination Period that:

1. you are Income Benefit disabled; and
2. your disability is the result of the same injury or sickness which caused you to satisfy the Income Benefit Elimination Period; and
3. you have at least a 20% loss of Monthly Earnings as a result of that same injury or sickness.

The amount payable in any month will be determined by the following formula:

Loss of Monthly Earnings  x  Maximum
Prior Monthly Earnings          Income
                                Benefit

If your loss of Monthly Earnings is greater than 80%, we will pay the Maximum Income Benefit for that month.

Income Benefit payments will cease once you are able to return to work full-time in your Regular Occupation.

Benefits payable in any month shall not exceed the Maximum Income Benefit. The Income Benefit will not be paid beyond the Maximum Income Benefit Period.

**Successive Income Benefit Disabilities.** A period of Income Benefit disability will be considered a continuation of a prior disability if:

1. it is from the same or related cause; and
2. it occurs within six months of the end of the prior period of Income Benefit disability.

If the new Income Benefit disability is considered a continuation of a prior Income Benefit disability, it will be considered an

extension of the prior disability and you will not need to satisfy a new elimination period.

If the period of Income Benefit disability is from a different or unrelated cause, or if it occurs more than six months after the end of the prior period of Income Benefit disability, it will be considered a new disability, subject to its own elimination period and maximum benefit period.

**Waiver of Premium Benefit.** After the Income Benefit disability has lasted for 90 days while this policy is in effect, we will waive the premium for this policy. We will refund premium already paid for that period on a pro rata basis.

Waiver of Premium will cease once:

1. you have returned to work full-time in your Regular Occupation; or
2. you are no longer eligible for an Income Benefit payment for that period of disability.

The Waiver of Premium benefit does not apply to any disability caused by a condition excluded from coverage by name or description.

## DISABILITY PLUS* BENEFIT

We will pay the Maximum Disability Plus* Benefit in any month after you have satisfied the Disability Plus* Elimination Period that:

1. you are Disability Plus* disabled; and
2. your disability is the result of the same injury or sickness which caused you to satisfy the Disability Plus* Elimination Period.

Benefits payable in any month shall not exceed the Maximum Disability Plus* Benefit. The Disability benefit will not be paid beyond the Maximum Disability Plus* Benefit Period.

**Successive Disability Plus* Benefit Disabilities.** A period of Disability Plus* disability will be considered a continuation of a prior disability if:

1. it is from the same or related cause; and
2. it occurs within six months of the end of the prior period of Disability Plus* disability.

If the new Disability Plus* disability is considered a continuation of a prior Disability Plus* disability, it will be considered an extension of the prior disability and you will not need to satisfy a new elimination period.

### Margin notes (left):

...of
...ou are
...ly or residually
...bled, Income
...efit payments
...based on your
...entage loss of
...ings.

...full monthly
...me Benefit
...be paid if
...loss of
...thly Earnings
...eater than
...

### Margin notes (right):

During Income Benefit disability, your premium may be waived. All premiums paid from the date of loss will be refunded. Consecutive days of disability are not required.

The full monthly Disability Plus* benefit will be paid in the event of the loss of two or more ADLs (Activities of Daily Living).

I 0162

If the period of Disability Plus® disability is from a different or unrelated cause, or if it occurs more than six months after the end of the prior period of Disability Plus® disability, it will be considered a new disability, subject to its own elimination period and maximum benefit period.

## OTHER BENEFITS

**Rehabilitation.** We have a rehabilitation program to assist you to return to work. This program is offered as a service, and is voluntary on your part and on our part.

While you are receiving disability benefits, you may request or we may suggest a review of your medical and vocational documentation to determine if rehabilitation services might help you return to work.

If we determine that such a program is appropriate, we will develop a mutually agreed upon plan of rehabilitation that is beneficial to you and us. This plan may include, but is not limited to:

- Coordination with your employer to assist you to return to work;
- Coordination of medical services;
- Evaluation of adaptive equipment to allow you to work;
- Occupational evaluation;
- Business/financial planning;
- Job development and placement;
- Retraining for a new occupation.

If we determine that such a program is appropriate, we will pay reasonable expenses for such items as tuition, books, training programs, or additional living expenses. The actual expenses covered and the terms of the plan will be subject to mutual agreement. Our agreement will be outlined in a written plan of rehabilitation. Benefits will continue as provided by this policy unless they are modified by the plan of rehabilitation.

**Worksite Modification Benefit.** A worksite modification might be what is needed to allow you to perform the material and substantial duties of your Regular Occupation. One of our designated professionals will assist you and your employer to identify a modification we mutually agree is likely to help you remain at work or return to work. This mutual agreement will be in writing and must be signed by you, your employer, and us.

When this occurs, we will reimburse your employer for the cost of the modification, up to the lesser of:

- $5,000; or
- Two times your Maximum Income Benefit.

This benefit is payable only once over the lifetime of this policy.

**Lifetime Continuation Provision.**

This policy may be exchanged for an individual long term care policy issued by us without submitting evidence of medical or financial insurability, at the following times:

1. on or after age 61, if you choose to terminate this disability policy and you are not then Income Benefit disabled or Disability Plus® disabled under any of the terms of this policy; or

2. on or after age 65 if you are disabled under the provisions of this disability policy and have received the maximum benefits allowable under this disability policy; or

3. the policy anniversary when your age is 70.

The long term care contract will be issued subject to the following terms:

1. the policy will be the individual long term care policy that we offer when the exchange is made;

2. the policy will meet or exceed all applicable federal and state minimum standards in effect for such contracts on the date the exchange is made;

3. the premium for the long term care policy will be the same as the premium paid for this disability policy in the year immediately prior to the exchange. The monthly benefit for the long term care policy will be the amount that this premium will purchase based on the long term care rates we are then charging for your age on the date the exchange is made.

## EXCLUSIONS AND LIMITATIONS

This policy does not pay benefits which are based on injury or sickness caused by, contributed to by or which result from:

1. war or an act of war, whether declared or undeclared; or

2. intentionally self-inflicted injury; or

3. your commission of or your attempt to commit a crime under a state or federal law, or your engagement in an illegal occupation; or

4. the suspension, revocation or surrender of your professional or occupational license or certification.

Flexible rehabilitation program.

Helps employers with worksite modification expenses.

Guaranteed transformation a UNUM Individual Long Term Care poli.

These are the conditions unde which benefits are excluded or limited.

I 0163

No benefits will be payable for any period of disability in which you are incarcerated in a penal or correctional institution for a period of 30 consecutive days or longer.

**Preexisting Condition Limitation.**

This policy does not pay benefits for a preexisting condition if:

1. if the preexisting condition is not disclosed or is misrepresented in the application; and

2. during the first two years after the effective date of coverage, the preexisting condition:

a. caused you to consult a health care provider; or

b. caused symptoms for which an ordinarily prudent person would have consulted a health care provider.

**Mental Disorder Limitation.**

This policy will pay benefits for a maximum of 24 months during the life of the policy for Income Benefit disability or Disability Plus• disability, caused by a mental disorder. However, we will pay benefits, subject to the Income Benefit and Disability Plus• Maximum Benefit Periods, so long as you are confined as an inpatient in a hospital or institution and under Medical Care.

*Hospital* or *Institution* means an accredited facility licensed to provide care and treatment for the condition causing the disability. "Hospital or institution" does not include a rest, nursing or convalescent home.

We will not apply the Mental Disorder Limitation to dementia if it is a result of:

■ stroke;

■ trauma;

■ viral infection;

■ Alzheimer's disease; or

■ other conditions which are not usually treated by a mental health provider or other qualified provider using psychotherapy, psychotropic drugs, or other similar methods of treatment.

## CLAIM INFORMATION

**How to File a Claim.** To make a claim under this policy, the following steps must be taken. You must:

1. Give Notice of Claim (someone must notify us that disability has started as defined in this policy);

2. File Proof of Loss (you, or someone acting on your behalf must fully complete and return the claim form and attached authorization provided by us);

3. Promptly and fully complete and return any other forms or requests for information we require, including personal and/or business federal tax returns, if requested.

Failure to comply with these requirements may impede or delay our ability to process your claim. No benefits will be payable if we are unable, as a result of your failure to comply with these requirements, to evaluate your claim.

We will evaluate the claim and either:

1. Pay the benefits specified in the policy; or

2. Notify you and any Loss Payee that benefits are not payable and why; or

3. Notify you that additional information is required before a final claim determination can be made.

**Conditions and Time Limits.** In order for benefits to be considered for payment, there are some conditions and time limits which each of us must meet. They are:

1. We must be given the Notice of Claim within 30 days after the elimination period begins, or as soon as reasonably possible.

2. We will furnish claim forms within 15 days after we receive Notice of Claim. If the forms are not received within 15 days, send us proof of what happened and the extent of the sickness or injury.

3. The claim forms and other information requested by us (Proof of Loss) must be completed and furnished to us within 90 days after each month for which a benefit is payable. However, failure to furnish such proof within 90 days will not reduce or nullify the claim if proof is furnished as soon as reasonably possible within one year after the 90 days. If you are legally unable to notify us, the one year limit does not apply.

*(left margin note)* ...ntal Disorder ...mitation does ...t apply to all ...nditions.

9

I 0164

4. You must undergo a medical examination, functional capacity examination and/or psychiatric examination, including any related tests as are reasonably necessary to the performance of the examination by a doctor or specialist appropriate for the condition at such time and place and with such frequency as we reasonably require. We reserve the right to select the examiner. We will pay for the examination, including the costs associated with your travel to the examination, if the examination cannot be conducted locally.

5. You must meet with our representative for a personal interview or review of records at such time and with such frequency as we reasonably require.

6. We must be given the information which we need to determine if a benefit is payable and how much that benefit should be. We may require relevant portions of federal income tax returns for you or your business, income statements, vouchers for overhead expenses, and other statements or reports of receipts and payments. We may also require evidence that you were liable for an overhead expense before disability began.

**How and When We Pay Benefits.** We will pay benefits due under this policy in United States currency. For periods of disability of less than a month, we will pay 1/30th of the monthly benefit for each day of disability.

We will not pay any benefit until we have sufficient Proof of Loss. When we have determined that the claim is payable, we will pay promptly according to the Benefits provision. If any amount is accrued and unpaid when our liability terminates, we will pay it immediately.

Upon acceptance of liability of your claim, the first disability payment will be due one month from the date the appropriate Elimination Period is satisfied. Benefits accumulate and are paid on a monthly basis. No benefits are due or payable for the Elimination Period.

We will pay all benefits to the loss payee if living, otherwise, we will pay you. If you die while you are entitled to receive benefits, we will pay any remaining benefit and any unearned premium to your estate.

## GENERAL PROVISIONS

**The Contract.** This policy represents the entire contract between you and us. Statements by agents or brokers are not part of this contract. Only an executive officer of this Company can approve a change in this policy. The approval must be in writing and be endorsed on or attached to this policy. No one else can change this policy or waive any of its conditions.

Unless we tell you otherwise, years, months and anniversaries that we refer to are calculated from the Policy Date shown on page 3.

**Time Limit on Certain Defenses.** Except for fraudulent misstatements, we will not contest the policy based on statements made by you in the application for a coverage provided under this policy after that coverage has been in effect for two years.

If disability begins after a coverage has been in effect for two years from the effective date of that coverage, we will not reduce or deny a claim which is based on that disability because of a preexisting condition unless the condition is excluded from coverage by name or description.

**"Contest"** means that we question the validity of coverage under this policy by letter to you. This contest is effective on the date we mail the letter and refund the premium to you.

**Conformity with State Statutes.** If any provision of this policy conflicts with the statutes of the state where you reside on the effective date of that provision, it is amended to conform with the minimum requirements of those statutes.

**Legal Actions.** No one may start legal action to recover on this policy until 60 days after written Proof of Loss has been given to us. Legal action must be started within three years after the written Proof of Loss is required to be furnished.

**Misstatement of Age.** If your age has been misstated, any benefit payable will be changed to the amount which the premium paid would have bought for the correct age.

If we accept premium for a coverage which we would not have issued or which would have ceased according to the correct age, our only liability is to refund the premium for the period not covered.

Your state law prevail.

I 0165

**Owner.** You own this policy. You have all of the rights and privileges granted by this policy while it is in effect. Some of your ownership rights are:

1. the right to continue or terminate this policy;

2. the right to name someone else (a loss payee) to receive the benefits of this policy;

3. the right to suspend this policy while you are in military service; and

4. the right to assign any or all rights under this policy.

You may reduce the amount of your coverage at any time. Premium will be recomputed for the reduced amount based on your age and premium class on the effective dates of the coverages. The reduction will be effective on the date we receive your written request at our Home Office.

**Loss Payee.** If you decide to have someone else receive policy benefits, you must notify us in writing on a form satisfactory to us. The notice will be effective when we receive it at our Home Office.

**Assignment.** You may assign any or all ownership rights to someone else. The assignment must be in writing and must specify the rights which are assigned and for how long. The Loss Payee is not changed by an assignment unless the assignment specifically names a new Loss Payee. When an assignment is in effect, *you* and *your* refer to the assignee in provisions which describe ownership rights.

No assignment is binding on us until the original or an acceptable copy is received at our Home Office. We are not responsible for the validity or effect of any assignment.

I 0166



## UNUM.

*Protecting everything
you work for*

Unum Life Insurance
Company of America
Portland, Maine 04122
http://www.unum.com
1266-95 (8/99)

Unum is the marketing brand of UnumProvident Corporation.

© 1999 UnumProvident Corporation. Unum®, the lighthouse artwork and "Protecting everything you work for®" are registered trademarks of UnumProvident Corporation. All rights reserved.

I 0167

# EXHIBIT 3

# ORIGINAL

1

2               UNITED STATES DISTRICT COURT

3                 DISTRICT OF MASSACHUSETTS

4               Civil Action No. 05-10360-GAO

5

6

7    YUDIF GLIK, Administrator,

8                   Plaintiff,              VOLUME II

9              vs.

10   INOTEK PHARMACEUTICALS

11   CORPORATION,

12                   Defendant.

13

14

15              DEPOSITION OF UNUMPROVIDENT CORPORATION

16   (Nancy M. Brenerman), taken pursuant to subpoena, at the

17   offices of Moon, Moss & Shapiro, Ten Free Street, Portland,

18   Maine, on June 7, 2006, commencing at 10:14 A.M., before

19   Tammy L. Martell, Registered Professional Reporter, a

20   Notary Public in and for the State of Maine.

21

22

23

24          Downing & Peters Reporting Associates

25      79 Atlantic Place, South Portland, Maine   04106

Page 133

1              (The reporter read the requested matter.)

2    A.    Could you explain your question, please.

3    Q.    Yeah.  Did you tell Dr. Glik that since your company

4    has put him on hold that he should apply to another company

5    for a disability policy?

6              MR. BENOIT:  Objection.

7    A.    No, we did not.

8    Q.    Okay.  Now, I am looking at a letter dated June 7th,

9    2001.

10             MR. BENOIT:  Excuse me, Bob, do you have a -- is

11   that an exhibit?

12             MR. BERGER:  It is.  The one from Susan Nelson.

13             MR. BENOIT:  Do you have -- do you have the

14   number of the exhibit?

15             MR. BERGER:  I don't have the number.

16             MR. BENOIT:  Can you give -- give us a moment?

17             MR. BERGER:  It is a letter to Walter Marcinkus.

18   The letter that you were referring to.

19             MR. BENOIT:  I think you are referring to Exhibit

20   29, is that -- from Susan Nelson to Walter Marcinkus?

21             MR. BERGER:  Right.

22   Q.    Let me ask you some questions about this letter if I

23   may.  My first question is what is the basis for saying

24   there is no contractual relationship between UNUM and

25   Inotek Corporation?

Page 134

1   A.    There is no contractual relationship.

2   Q.    And why is that?

3   A.    Because when someone requests insurance from our

4   company they fill out an application and the policy is

5   issued or not issued to that person.  It is a relationship

6   between the applicant and our company, not between us and

7   the employer.

8   Q.    Well, let me ask you this:  Is this statement true

9   when the employer agrees to pay for the health benefit?

10          MR. BENOIT:  Objection, health benefit.

11  A.    Are you asking if the employer -- if a policy -- is

12  this hypothetical, if a policy is issued?

13          MR. BERGER:  It is not hypothetical.  I believe

14  those are the -- this is the situation here.

15          Miss stenographer, do you want to just give her

16  the question again?  I think it was reasonably clear.

17              (The reporter read the requested matter.)

18  A.    There is no contractual relationship between our

19  company and the employer.  The person who owns the contract

20  is responsible for paying the bill, and if he or she

21  chooses to use their company as the vehicle to send in that

22  money that's their choice, but the contract, the policy, is

23  between the insured and our company.

24  Q.    Okay.  Okay.  And that's unalterable, that's always

25  the case, that there is no contractual relationship between

Page 135

1  UNUM and the employer?

2  A.    There is no contractual relationship on a policy

3  between UNUM and the employer.  It is with the insured.

4  Q.    Okay.  Now, when there is a delay in the processing of

5  a policy is there anything that you do?

6        Let me break that down.  In other words, in this

7  case there seems to have been a gap in time.  Did you point

8  that out -- the gap in time between the application and

9  your receipt of it.  Did you point that gap of time out to

10  Dr. Glik?

11        MR. BENOIT:  Objection.

12  A.    As I stated before I -- I wasn't the underwriter on

13  this case.  The notes that I have read, the Underwriter

14  Notes, do not indicate that that was pointed out to Dr.

15  Glik.

16  Q.    Now, in the ordinary course what does UNUM do when

17  there is an application dated say a month and a half two

18  months before the receipt of the application in the way of

19  a follow-up?

20  A.    I believe that if a policy is over 120 days old we ask

21  for a declaration of insurability at the time of issue.  If

22  it is over 180 days old we ask for a new application.

23  Q.    And when it is less does it have any impact on the

24  application?

25  A.    The mere fact that it is -- it was signed in October

Page 141

1                        SIGNATURE PAGE

2    TO BE COMPLETED BY DEPONENT:

3        I, _Nancy Brenerman_____ have read the

4    foregoing pages of my testimony or have had the foregoing

5    pages of my testimony read to me and have noted any changes

6    in form or substance of my testimony together with their

7    respective corrections and the reasons therefor, on the

8    following _1_ Errata Sheet(s).

9                        (Signature) _Nancy M Brenerman_

10                       (Date) _6/28/06_

11

12                       _____

13

14   TO BE COMPLETED BY NOTARY PUBLIC OR ATTORNEY:

15       I, _Susan A. Carter_____ , a Notary

16   Public/~~Attorney~~ in and for the State of Maine, hereby

17   acknowledge that the above-named deponent personally

18   appeared before me, swore to the truth of the foregoing

19   statements and affixed his/her signature above as his/her

20   own true act and deed.

21

22                       (Signature) _Susan A. Carter_

23                       (Date) _6/28/06_

24

25   My Commission Expires: _10/20/09_

## ERRATA SHEET

| PAGE | LINE | FROM: (Quote words you wish to change) | TO: (Write change you wish to make) | REASON: (e.g. typo, wrong word, word omitted, etc.) |
|------|------|----------------------------------------|-------------------------------------|-----------------------------------------------------|
|      |      |                                        |                                     |                                                     |
|      |      |                                        |                                     |                                                     |
|      |      |                                        |                                     |                                                     |
|      |      |                                        |                                     |                                                     |
|      |      |                                        |                                     |                                                     |
|      |      |                                        |                                     |                                                     |
|      |      |                                        |                                     |                                                     |
|      |      |                                        |                                     |                                                     |
|      |      |                                        |                                     |                                                     |
|      |      |                                        |                                     |                                                     |
|      |      |                                        |                                     |                                                     |
|      |      |                                        |                                     |                                                     |
|      |      |                                        |                                     |                                                     |
|      |      |                                        |                                     |                                                     |
|      |      |                                        |                                     |                                                     |
|      |      |                                        |                                     |                                                     |
|      |      |                                        |                                     |                                                     |
|      |      |                                        |                                     |                                                     |
|      |      |                                        |                                     |                                                     |
|      |      |                                        |                                     |                                                     |

SIGNATURE: _____ PAGE _1_ OF _1_

DOWNING & PETERS REPORTING ASSOCIATES 79 Atlantic Place, South Portland, Maine 04106 Phone (207) 772-6221 Facsimile (207) 772-2056

1

2                          CERTIFICATE

3

4          I, Tammy L. Martell, a Notary Public in and for

5     the State of Maine, hereby certify that the within-named

6     deponent was sworn to testify the truth, the whole truth,

7     and nothing but the truth, in the aforementioned cause of

8     action.

9

10         I further certify that this deposition was

11    stenographically reported by me and later reduced to print

12    through Computer-Aided Transcription, and the foregoing is

13    a full and true record of the testimony given by the

14    deponent.

15

16         I further certify that I am a disinterested

17    person in the event or outcome of the above-named cause of

18    action.

19

20         IN WITNESS WHEREOF, I subscribe my hand and affix

21    my seal this date:   June 15, 2006

22

23    Dated at

24    Portland, Maine.          Tammy L. Martell, Notary Public

25    My Commission Expires:  March 18, 2011

**EXHIBIT 4**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

---------------------------------
YUDIF GLIK, ADMINISTRATOR               :
                    Plaintiff           :
                                        :
                                        : Civil Action
      VS.                               : No. 05-10360-GAO
                                        :
INOTEK PHARMACEUTICALS                  :
CORPORATION,                            :
                    Defendant           :
---------------------------------

              DEPOSITION OF **CHRISTOPHER DOYLE**,
taken on behalf of the Defendant, pursuant to the
applicable provisions of the Federal Rules of Civil
Procedure, before Linda J. Modano, CSR No. 121093,
a Registered Professional Reporter and Notary Public
in and for the Commonwealth of Massachusetts, at the
Brigham and Women's Hospital, 45 Francis Street,
Boston, Massachusetts, on Thursday, June 15, 2006,
commencing at 3:05 p.m.


APPEARANCES:

WILFRED J. BENOIT, JR., ESQ., of  Goodwin
Procter LLP, Exchange Place, 16th Floor,
Boston, Massachusetts, 02109, for the Defendant.

ROBERT O. BERGER, ESQ., 11 Beacon Street,
Suite 1210, Boston, Massachusetts, 02108,
for the Plaintiff.

## Leavitt Reporting, Inc.

1207 Commercial Street, Rear
Weymouth, MA 02189

Tel. 781-335-6791
Fax: 781-335-7911
leavittreporting@att.net

Hearings ◆ Conferences ◆ Legal Proceedings

5

1     A.   Yes.

2     Q.   And just for the record, I'm going to show

3  you what's been marked as Exhibit 3.  Is that a

4  signed copy of that letter?

5     A.   Yes.

6     Q.   I'll put these exhibits in front of you so

7  that you can feel free to refer to them as you answer

8  my questions, okay?

9          And by the way, if for some reason you

10  don't understand one of my questions, will you let me

11  know and I'll try to rephrase it?

12     A.   Yes.

13     Q.   Do you recall seeing Dr. Michael Glik in

14  October of 2000?

15     A.   Yes.

16     Q.   Can you describe the circumstances which led

17  to your seeing Doctor Glik?

18     A.   Well, I have distinct memories of one aspect

19  of the visit but not of the whole visit.  And then

20  I've looked at my notes about the visit, so I could

21  describe those.

22     Q.   Would you do that.  Tell us what led up to

23  the visit, how you happened to come to see him in the

7

1  really ahead of time of why I'm seeing them and --

2  but my office usually tries to fit patients into the

3  schedules appropriately, so if someone comes in with

4  an acute problem they'd be given a prompt appointment

5  and that sort of arrangement is made.

6      Q.  So did Doctor Glik tell you that he noted at

7  some time previous to his visit that there was a

8  swelling in the --

9      A.  Yes.  Well, he wrote it -- We have a

10 questionnaire we ask the patient to fill out.  And in

11 his handwriting in the office record is a note that

12 his -- his left -- quote, My left testis began to be

13 painful and swelled.  Then I have additional notes

14 about that.

15     Q.  By the way -- Let me back up.  Strike that.

16 What was the date of that first visit?

17     A.  October 11, 2000.

18     Q.  Did he at that time tell you when he first

19 began to experience that pain and swelling?

20     A.  In my note it says one week of abnormality on

21 self exam.  So it would have been a short time

22 before.

23     Q.  Aside from your note do you have any

10

1    on it and I would have honored that and thought that

2    it was probably a fairly short duration since that's

3    how he described it.

4        Q.   And by fairly short duration, what kind of

5    duration are you referring to?

6        A.   Weeks.

7        Q.   Weeks?

8        A.   Well, that's what -- I think my notes

9    indicate that there was -- that he said it had -- I

10   wrote down one week of abnormality on self

11   examination and swelling.

12       Q.   In your judgment could it have -- could that

13   condition have existed more than a week prior to the

14   visit?

15       A.   Yes.   The physical findings are not specific

16   and don't indicate a definite time.

17       Q.   You indicated that you thought it might be a

18   hydrocele.

19       A.   Correct.

20       Q.   Did you make any recommendation or take any

21   action with respect to treatment based on that

22   diagnosis?

23       A.   I believe that I -- I guess I ordered a

11

1   scrotal ultrasound and tumor markers to evaluate the

2   possibility since I -- that there might be a tumor

3   there.

4       Q.   When did that examination take place?

5       A.   The ultrasound?

6       Q.   Yes.

7       A.   Sir, it was ordered for October 30th.  I

8   don't think I have that in this note.

9       Q.   I'm looking at a document that's in the

10  record, Exhibit 2.  Appears to be dated October 17,

11  2000.

12      A.   Sir, that's an abdominal CT scan report.  I

13  don't see -- I ordered that the same day because of

14  the abnormality that I noted in his abdomen, and I

15  could look in the hospital record and get the

16  ultrasound report.

17      Q.   Could you?

18      A.   Yes, sir.

19      Q.   Thanks.

20              (Brief pause.)

21      A.   Here it is.  It's dated October 26, 2000, and

22  it showed a normal left testicle, a normal right

23  testicle, and the epididymis was enlarged on the left

12

1   and there was a medium-sized hydrocele.

2        Q.   Did you prescribe any treatment with respect

3   to the hydrocele?

4        A.   No, sir.

5        Q.   Go ahead.

6        A.   A hydrocele is a fairly innocent process

7   usually.    There were some findings in there

8   consistent with chronic epididymitis, but I didn't

9   prescribe any of those -- He had no reason to --

10  There was no malignancy present.

11            This mass appeared, mostly swelling,

12  some chronic changes in the epididymis, but it was

13  not an acute process.

14            And surmounting that, or of more

15  importance, was that the abdominal mass examination

16  lead to a diagnosis of a life-threatening condition.

17  And so the scrotal swelling kind of got pushed --

18  was -- did not seem paramount after that.

19       Q.   Let's focus on the abdominal mass then.   You

20  said you observed that at the time of your initial

21  consultation with Doctor Glik?

22       A.   Yes, sir.

23       Q.   Describe what you observed and what action

13

1  was taken with respect to the treatment.

2      A.  Well, when I examined him I noticed a mass

3  and I ordered a CT scan.  And then that report is

4  what you showed me earlier here, and that revealed a

5  thickening of the sigmoid colon.  And I referred him

6  to a general surgeon.

7      Q.  Was that an issue that he had initially

8  complained to you about?

9      A.  No, sir.

10     Q.  Or seemed concerned about?

11     A.  No.  I was very surprised.  It's not a common

12 thing to find, you know, a major mass like that in a

13 person just on incidental palpation of the abdomen.

14     Q.  Did he express surprise that you discovered

15 it?

16     A.  I don't recall.

17     Q.  Did he comment at all about the abdominal

18 mass at the time that you found it?

19     A.  I don't recall that, sir.  A person who has a

20 possible testicular tumor might have retroperitoneal

21 metastasis so it could have been germane to the

22 presenting complaint, but I don't recall a reaction

23 to that.

14

1       He did mention in his history that -- he

2  gave me a past history that he had a colon tumor or

3  rectal tumor many years ago, operated on in the

4  Soviet Union.

5       And he did have an abnormal rectal

6  examination, showed evidence of prior surgery and

7  reconstruction in that area.

8     Q.   That term that you mentioned earlier, rectal

9  peritoneal metastasis --

10    A.   Retroperitoneal --

11    Q.   Rectal peritoneal --

12    A.   I'm sorry.  Retroperitoneal.  The peritoneal

13 cavity is the space in the abdomen where the

14 intestines are.

15       And then behind that is the

16 retroperitoneal where the great vessels are and the

17 kidneys, and that would be a site of implantation

18 where a testicular tumor might -- would go from the

19 testis up to the lymph nodes along the aorta.

20       And so the person might get a palpable

21 abdominal mass because of metastasis from a testis

22 tumor.  So I did order the markers, those tumor

23 markers.

15

1           And they were negative which was

2    encouraging and made it less likely that this was due

3    to the mass that I felt was due to a testicular

4    primary.

5       Q.   You said that once you got the report back on

6    the abdominal mass, you referred Doctor Glik to a

7    general surgeon?

8       A.   Yes, sir.

9       Q.   Who was that?

10      A.   Dr. Stan Ashley.

11      Q.   Did you continue to follow Doctor Glik or to

12   treat Doctor Glik or consult with Doctor Glik after

13   that referral?

14      A.   No.

15      Q.   Did you have any further contact with him at

16   all?

17      A.   What would be described in the notes.   I

18   think I heard -- Excuse me.   In my notes I see that I

19   did prescribe an antibiotic for the epididymitis that

20   was present on the ultrasound.   This is going back to

21   that chronic epididymitis.

22           You asked did I treat the testicular

23   problem and I did prescribe that.   No, after that I

LEAVITT REPORTING, INC.

20

1

2

COMMONWEALTH OF MASSACHUSETTS)
                                                    )   ss.
3

COUNTY OF PLYMOUTH                    )

4

    I, Linda J. Modano, Certified Shorthand Reporter
5  and Notary Public duly appointed and qualified in and
   for the Commonwealth of Massachusetts do hereby
6  certify there came before me the deponent in the
   foregoing deposition, who was by me satisfactorily
7  identified according to the Laws of the Commonwealth
   of Massachusetts, and duly sworn to testify to the
8  truth and nothing but the truth concerning the
   matters in this cause.

9

    I further certify that the foregoing transcript
10 is a true and correct transcript of my original
   stenographic notes.

11

    I further certify that I am neither attorney or
12 counsel for, nor related to or employed by any of the
   parties to the action in which this deposition is
13 taken; and furthermore, that I am not a relative or
   employee of any attorney or counsel employed by the
14 parties hereto or financially interested in the
   action.

15

    IN WITNESS WHEREOF, I have hereunto set my hand
16 and affixed my Notarial Seal this 27th day of
   June, 2006.

17

18 LINDA J. MODANO
   NOTARY PUBLIC
19 My commission expires
   June 2, 2011

20

PLEASE NOTE:
21     THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT
   DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY
22 MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR
   DIRECTION OF THE CERTIFYING REPORTER.

23

LEAVITT REPORTING, INC.

# EXHIBIT 5

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

YUDIF GLIK, ADMINISTRATOR, )
                                     )
                Plaintiff,         )
                                     )
                                   )
v.                                  )       Civil Action No. 05-10360-GAO
                                   )
                                   )
INOTEK CORPORATION,     )
                                   )
            Defendant.      )

**<u>AFFIDAVIT OF CAROLYN TYSON</u>**

1.     I make this affidavit in support of Defendant's Motion for Summary Judgment. I have personal and first hand knowledge of the matters described herein.

2.     I am employed by Boyd-Neelon Associates, located in Sudbury, Massachusetts, as an underwriting manager. I have been employed by Boyd-Neelon Associates for over ten years.

3.     From approximately 1999 to 2001, one of Boyd-Neelon Associates' clients was Inotek Corporation.

4.     In the later part of October 2000, I received an application for individual disability insurance coverage for Michael Glik, an employee of Inotek Corporation.

5.     Mr. Glik's application was incomplete in several ways. For example, Mr. Glik failed to provide the name and address of his personal physician on the

1

application.  Mr. Glik also failed to complete Sections 22 and 23 on the application.  Specifically, he did not respond to questions 22(b), 22(c), 23(b) or 23(c).

6.    Pursuant to my regular practice, I returned Mr. Glik's application to Inotek Corporation with a request that the application be fully completed.  At some point thereafter, I received the application back from Inotek Corporation with some additional information from Mr. Glik.  Mr. Glik had still not responded to questions 23(b) and 23(c).

7.    On November 28, 2000, I sent Mr. Glik's application to UNUM Life Insurance Company of America at 800 Cummings Park, Suite 5225, Woburn, Massachusetts  01801.

8.    Sometime thereafter, I received a letter from UNUM Life Insurance Company of America dated February 13, 2001, stating that UNUM Life Insurance Company of America had postponed coverage of Mr. Glik.

9.    Aside from the above referenced February 13, 2001 letter, I do not have any recollection of specific communications with UNUM Life Insurance Company of American, Inotek Corporation or Mr. Glik concerning Mr. Glik's application for insurance coverage.

Signed under the penalties of perjury, this 23 day of February, 2006.

Carolyn Tyson

2

**EXHIBIT 6**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| YUDIF GLIK, ADMINISTRATOR,<br><br>          Plaintiff,<br><br>v.<br><br>INOTEK PHARMACEUTICALS<br>CORPORATION,<br><br>          Defendant. | Civil Action No. 05-10360-GAO |

## AFFIDAVIT OF JEAN-PAUL GOSSELIN

1.      I, Jean-Paul Gosselin, make this affidavit in support of Defendant, Inotek

Pharmaceuticals Corporation's Motion for Summary Judgment. I have personal and first hand

knowledge of the matters described herein.

2.      I am employed by Inotek as its Vice President, Finance & Administration. I have been

employed by Inotek for 6 years, during which time I held the position of Chief Financial Officer

until March 2006.

3.      Inotek is a private development-stage pharmaceutical company founded in 1996. Inotek

currently develops several products targeting cancer and cardiovascular and inflammatory

diseases. Inotek pursues indications in hospital cardiovascular markets as well as specialty care

markets including cancer treatment, dermatology, and gastroenterology. All of Inotek's

technologies were discovered and developed by Inotek researchers. Inotek currently has

approximately 130 employees, based in its headquarters and main laboratories in Beverly,

Massachusetts, its clinical operations and manufacturing facilities in Israel, and its offices in

Australia and New Zealand.

4.     Michael Glik commenced employment with Inotek on September 25, 2000 as a research assistant. Dr. Glik's annual salary was $37,000. Dr. Glik was an at-will employee.

5.     One of the benefits that Inotek offered employees at the time of Dr. Glik's employment was the opportunity to apply for individual disability insurance (also called individual long term disability insurance). Inotek paid the full cost of the insurance coverage for its employees who qualified for this disability insurance. The insurance premium for employees was based on group rates, and paid on an annual basis. Under Inotek's policy and practice, employees were eligible to apply for this company-paid insurance on their first day of employment with Inotek.

6.     The insurance company that provided this coverage for Inotek employees was UNUM Life Insurance Company of American ("UNUM"). UNUM provided this coverage through Inotek's insurance broker at the time of Dr. Glik's employment, Boyd-Neelon Associates.

7.     Inotek, as a matter of general practice, did not offer to pay for premium prepayment on behalf of its employees who applied for individual disability insurance.

8.     There is no contractual relationship between Inotek and UNUM. Inotek is not a policy holder. Inotek did facilitate the application process for its employees and if UNUM approved an employee's application for individual disability insurance, Inotek paid the policy premiums while the employee was employed with it.

9.      Inotek's Manual of Personnel Policies and Procedures (the "Manual") (that was in effect

at the time of Dr. Glik's employment) is not a contract with employees. The Manual states in

relevant part that "[t]he policies and procedures that are contained in this manual are not terms

and conditions of your employment, nor a contract, and the manual itself is not a contract or an

offer to enter into a contract." A true and accurate copy of the pertinent pages of the Manual are

attached as Exhibit 1.

10.     Inotek has the absolute right, in its sole discretion, to change or eliminate any policies or

procedures. The Manual states that "[t]he Company ... reserves the right to change or eliminate

its policies and procedures as necessary and without having to consult with or obtain agreement

from anyone" and "[t]he Company remains free to establish and change employee's ... benefits."

11.     Unless there is a written employment contract between the parties, Inotek employees are

at-will employees. The Manual explains that "[u]nless otherwise agreed in writing by the Board

of Directors, no employee is hired for a specific term, upon any specific condition, or pursuant to

any contract of employment ... the Company has the ... right to terminate the employment of

any employee as it determines in its sole discretion, and for any reason, is appropriate."

Accordingly, "[t]he Company remains free to ... discharge any employee with or without just

cause and with or without notice." Inotek's employment at-will policy (policy number E5) states

in relevant part that "[y]our employment with the Company is 'at will' and, accordingly, may be

terminated by you or the Company at any time without notice."

12.     Manual policy E9 concerning termination of employment (which states that it must be

read in conjunction with the Company's Employment At-Will policy), makes clear that an

employee's employment may be involuntarily terminated for reasons including, for example,

excessive unexcused absence/unauthorized absenteeism and job abandonment.

Jean-Paul Gosselin

Subscribed and sworn to before me,
this 25th day of _August_ 2006.

Notary Public
My Commission expires:

JUDITH H. KENNEDY
Notary Public
Commonwealth of Massachusetts
My Commission Expires
March 26, 2010

# EXHIBIT 1

## TABLE OF CONTENTS

| POLICY NO. | POLICY TITLE | LATEST REVISION |
|---|---|---|
| EMPLOYMENT | | |
| E1 | Equal Employment Opprotunity | 1/11/00 |
| E2 | Harassment & Sexual Harassment | 1/11/00 |
| E3 | Problem Resolution | 1/11/00 |
| E4 | Employee Patent, Proprietary and Information | |
| | Utilization Agreement | 1/11/00 |
| E5 | Employment At-Will | 1/11/00 |
| E6 | Conflict of Interest | 1/11/00 |
| E7 | Outside Employment | 1/11/00 |
| E8 | Employee Status & Rate Definitions | 1/11/00 |
| E9 | Termination of Employment | 1/11/00 |
| | | |
| SALARY & PERFORMANCE | | |
| S1 | Performance Appraisals | 1/11/00 |
| S2 | Attendance | 1/11/00 |
| S3 | Disciplinary Action | 1/11/00 |
| S4 | Compensatory Time Off | 1/11/00 |
| | | |
| BENEFITS | | |
| B1 | Vacation Time | 1/11/00 |
| B2 | Sick Time | 1/11/00 |
| B3 | Holiday Schedule | 1/11/00 |
| B4 | Medical & Dental Insurance | 1/11/00 |
| B5 | Long Term Disability | 1/11/00 |
| B6 | 401K / Pension Plan | 1/11/00 |
| B7 | Professional Development Fund | 1/11/00 |
| B8 | Leave of Absence | 1/11/00 |
| B9 | Family and Medical Leave Act | 1/11/00 |
| B10 | COBRA | 1/11/00 |
| | | |
| GENERAL | | |
| G1 | Travel & Business Expense | 1/11/00 |
| G2 | Confidential Information | 1/11/00 |
| G3 | Substance Abuse | 1/11/00 |
| G4 | Safety | 1/11/00 |
| G5 | E-mail & Internet Usage | |

I 0070

# Introduction

Inotek Corporation is pleased to provide you with this manual of personnel policies and procedures. This policy manual does not attempt to cover all areas, but is designed to acquaint you with significant information about your employment and to answer the questions that are most frequently asked by our employees.

The policies and procedures that are contained in this manual are not terms and conditions of your employment, nor a contract, and the manual itself is not a contract or an offer to enter into a contract. If you have any questions about a particular subject, please ask your manager or the Human Resources Department.

As you can understand, the best interests of our Company and its employees require that we maintain flexibility and discretion in establishing and administering policies and procedures. The Company, therefore, reserves the right to change or eliminate its policies and procedures as necessary and without having to consult with or obtain agreement from anyone. To keep your manual current, revisions, additions, and deletions will be made periodically through a "Corporate Policy Manual Revision", which will be distributed to all employees.

Your employment with the Company is based on mutual consent. Unless otherwise agreed in writing by the Board of Directors, no employee is hired for a specific term, upon any specific conditions, or pursuant to any contract of employment. You should be aware that you have the right to terminate your employment with Inotek Corporation at any time for any reason. Similarly, the Company has the corresponding right to terminate the employment of any employee as it determines in its sole discretion, and for any reason, is appropriate. The Company remains free to establish and change employee's wages, hours, benefits, and working conditions, and to discipline or discharge any employee with or without just cause and with or without notice, unless superseded by law.

*The Company expects all employees to read, understand and comply with the policies within this manual. If you have difficulties understanding the manual due to inability to read or understand English, please contact the Human Resources Department. The Company will gladly make assistance available to any employee who needs it.*

Authorized:                 Policy:           Employment At-Will
                            Effective Date:   _____
_____             Policy Number:    _____ E5 _____

1.0    Purpose

        To reaffirm Inotek Corporation's policy concerning the "Employment At-Will"
        relationship between the Company and its Employees. This policy supplements and
        should be read in conjunction with the Company's policies on Employment Status & Rate
        Definitions, Termination of Employment, Performance, and Disciplinary Action.

2.0    Policy
        2.1    The Company's goal is to make this a satisfying work environment that
               encourages and rewards long-term employment. However, it should be
               understood that unless there is a written employment contract between the parties,
               there is no obligation on the part of the Company or any employee to continue
               this relationship for any guaranteed or specific time.
        2.2    Your employment with the Company is "at will" and, accordingly, may be
               terminated by you or the Company at any time without notice.
        2.3    No one has the authority to make any promises or guarantees of employment on
               behalf of the Company, other than the President of Inotek. The President of
               Inotek Corporation can only do so if it is done specifically in a written agreement
               that is executed by both he and the employee.
        2.4    The Company recognizes and understands the desire for job security at every
               level of employment. No business has the power, however, to promise a lifetime
               job for anyone. The Company believes that the best way to achieve continued
               success and job security is through the joint efforts of management and all
               employees to continually offer services to our customers and clients. Job security
               is not something that any company can promise its employees. Your future is
               something you create for yourself through your own skills and dedication.
        2.5    It is the Company's policy to avoid layoffs and terminations insofar as possible.
               The Company, however, reserves the right to take such actions as are necessary
               for the survival and well being of the organization.

3.0    Procedure

        3.1    Any employee that accepts employment with the Company is required to execute
               an At-Will Employment Acknowledgement form as a condition of employment.
        3.2    You are free to resign your position at any time you wish, with or without notice,
               and for any reason you deem appropriate. While the Company would appreciate
               advance notice if you plan to resign, this is a matter of courtesy and is not
               required by law. Likewise, the Company has the right to terminate any employee
               at any time, with or without notice, for any reason not prohibited by specific
               contracts or laws.

4.0    Exceptions
        None.

**I 0080**

| Authorized: | Policy: | Termination of Employment |
|---|---|---|
| | Effective Date: | |
| | Policy Number: | E9 |

## 1.0    Purpose

To establish Inotek Corporation's policy on termination of employees. This policy supplements and should be read in conjunction with the Company's policies concerning Employment At-Will, Conflict of Interest, Attendance, Disciplinary Action, Long- Term Disability, and Work Place Violence Prevention.

## 2.0    Policy

Termination of an individual's employment occurs by resignation, discharge, retirement, or death. Each termination will be evaluated for equitable treatment and the privileges of the employee.

2.1    *Voluntary Termination*

Employees who resign are requested, but not obligated to give the Company the maximum possible advance notice. The impacted manager may elect to set an earlier termination date. A "Letter of Resignation" will be completed by the employee and submitted to the Human Resources Department.

2.2    *Involuntary Termination or Discharge for Cause*

2.2.1    The decision to release an employee will be initiated by the employee's supervisor or a higher level manager, with the approval of the Human Resources Department. The Human Resources Department is to be advised as soon as termination becomes a possibility. This will be done before the employee is told of impending action to ensure that:

- all termination action is consistent throughout the Company
- all necessary approvals are obtained
- suitable notification procedures can be followed, and
- contractual provisions if any, related to the employee's employment are researched.

2.2.2    An employee whose conduct is found to be in conflict with the Company rules, or is detrimental to the welfare of a fellow employee may be terminated for cause without advance notice. Violations will be justification for immediate discharge on the first offense. It is not possible to identify every type of possible misconduct, infraction or performance problem that can result in immediate discharge. The following is , therefore, a partial list of reasons that an employee may be discharged "for cause/ gross misconduct":

- Insubordination, including improper conduct toward a supervisor or refusal to perform tasks assigned by a supervisor in the appropriate manner.
- Falsifying or making a material omission on an employment application or any other Company records
- Disclosing trade secrets or other confidential information about the Company or its customers.

**I 0086**

- Dishonesty or unauthorized possession or removal of property from the Company, fellow employees, customers, or anyone on Company property.
- Violation of Company rules, practices or policies.
- Involvement in malicious disturbances on Company premises.
- Willful destruction, damages, or misuse of property of the Company, a fellow employee, a customer, or a visitor.
- Bringing dangerous or unauthorized materials, such as explosives, firearms, or other similar items onto Company property.
- Violations of security regulations.
- The entry, use, sale, transfer, or possession of alcohol drugs controlled substances, drug paraphernalia or any combination thereof, on any Company premises or work sites.
- Being under the influence of alcohol or illegal drugs.
- Sexual harassment

2.2.3   There are other circumstances that may warrant the involuntary termination of an employee. Once again, it is not possible to identify every type of possible misconduct, infraction, or performance issue that may result in immediate termination. The following is, therefore, simply a partial list of types of conduct that may result in immediate termination:

- Excessive unexcused/ unauthorized absenteeism
- Excessive tardiness
- Job abandonment
- Carelessness or negligence when performing job duties
- Unacceptable or unsatisfactory performance and or work attitude
- Behavior that is offensive to other employees
- Refusing to follow the directions of a supervisor
- Abuse or misuse of the Company's property

2.3   *Pay or Notice*
Certain situations require immediate discharge. Notice will not be given in those cases of personal misconduct. In the case of an involuntary discharge the final paycheck will be presented. For voluntary resignations the final paycheck will be issued on the next normal payday.

2.4   *Group Insurance*
A terminated employee will be covered for group insurance through his/her last day of employment. Each terminated employee (unless terminated for cause) has the option to extend medical and/or dental coverage for themselves and dependants by paying 102% of the total premium in accordance with the Consolidated Omnibus Budget Reconciliation Act of 1986 (COBRA).

2.5   *Vacation Time*
Terminated employees will receive pay for unused accrued vacation time.

2.6   *Exit Interviews*
The Human Resources Department will conduct an exit interview for all terminated employees. Any expression regarding Inotek's activities, philosophies,

or practices that will aid management in understanding employee needs and attitudes will be appreciated.

3.0    Procedure

3.1    When a supervisor receives a written resignation or decides to terminate an employee, the Department Director and the Human Resources Department will be notified immediately.

3.2    The Human Resources Department will initiate the "Exit Interview Questionnaire", "Termination Checklist", "Personnel Action Form", and "Notice of Change of Status" for each terminating employee.

3.3    After termination, it will be the supervisor's responsibility to complete the "employee Termination Report".

4.0    Exceptions

None.

I 0088