UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

YUDIF GLIK, ADMINISTRATOR,

Plaintiff,

v.

INOTEK PHARMACEUTICALS
CORPORATION,

Defendant.

Civil Action No. 05-10360-GAO

**PLAINTIFFF'S RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED
MATERIAL FACTS
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

1. Inotek is a private development-stage pharmaceutical company founded in 1996. Inotek currently develops several products targeting cancer and cardiovascular and inflammatory diseases. Inotek pursues indications in hospital cardiovascular markets as well as specialty care markets including cancer treatment, dermatology, and gastroenterology. All of Inotek's technologies were discovered and developed by Inotek researchers. Inotek currently has approximately 130 employees, based in its headquarters and main laboratories in Beverly, Massachusetts, its clinical operations and manufacturing facilities in Israel and its offices in Australia and New Zealand. Gosselin Aff. at ¶ 3. **Undisputed.**

2. Michael Glik ("Glik") commenced employment with Inotek on September 25, 2000 as a research assistant. Glik's annual salary was $37,000. Glik was an at-will employee. Gosselin Aff. at ¶ 4. **Disputed**: Dr. Glik was not an at-will employee, as he enjoyed rights under the employment handbook, both as to discharge and medically- documented leave. On September

22, 2000, Dr. Glik was hired full-time. Affidavit of Yudif Glik at Paragraph 9. Inotek has a handbook for employment and benefits. Inotek established a long-term disability plan for all of its employees. Policy No. B5. See Defendant's Appendix 1, Ex. 12, Attachment B. Id. at Paragraph 10. Inotek's Human Resources Dept. administered the plan. Id., at 2.1. All full-time employees (like Dr. Michael Glik) are eligible for long term disability (LTD) benefits. Id. 2.2. LTD benefits are paid by defendant. Id. 2.4. Affidavit of Yudif Glik, Paragraph 10. Not until December 15, 2000 did Inotek send Dr. Glik's application for coverage to the Unum Life Insurance Company of America; and the application form was accurate to the best of his knowledge when he completed it. Id. at Paragraph 11. Unfortunately, in October 2000, he was diagnosed with sigmoid cancer (i.e., intestinal cancer.) Id. at Paragraph 12. This meant that, being terminally ill, Dr. Glik had no income whatsoever, or health insurance. Id. at Paragraph 13. See also Deposition of Edith Glik, Ex. 10. This caused him great stress because he always was a breadwinner here and in the U.S.S.R. Id. at Paragraph 14. He died 14 months after he was terminated. Id. at Paragraph 15. In addition, the defendant fired or terminated him as follows. He was sick with sigmoid cancer, and yet Inotek denied him his employee handbook rights. See Policy No. B5 (3.0.) and E9 2.2.2. Affidavit of Yudif Glik, Paragraph 16. The company and its law firm, Testa, Hurwitz, and Thibeault could not find a way to help them, although the law firm acknowledged the delay in the processing of the LTD application. Id. at Paragraph 17. The former law firm (which is not the law firm defending this case) forthrightly admitted that "the actual processing of Mr. Glik's application may have taken more time if it had been submitted during a time of year when business operations are less impacted by holidays and employee vacations." See p.2 of law firm letter annexed to the Affidavit of Yudif Glik. See also Unum Ex. 3. Appendix No. 3 10197.

3.      On October 21, 2000, Glik was diagnosed with colon cancer. On November 21, 2000, Glik had surgery for colon cancer and his cancer was deemed non-removable. Y. Glik Dep. at 23-24; UNUM Dep. at 74-78, 82, Ex. 13 (Glik's Explanation), Ex. 18 (March 20, 2001 letter from Glik to Antonio Ferrante at UNUM). **Contested:** The records indicate that he had intestinal cancer.

4.      On November 16, 2000, when he had worked for Inotek for under two months, Glik requested a three-week leave of absence from Inotek due to surgery for a medical condition. Inotek approved Glik's leave of absence. Y. Glik Dep. at 24-25. Contested, his rights under the employee handbook permit him to be out on medical leave until there is a settled prognosis as to employment, as detailed in Response 2.

5.      On November 21, 2000, Glik had surgery to remove a cancerous abdominal tumor, but the surgeon determined the tumor was inoperable. Y. Glik Dep. at 25. This is uncontested.

6.      After the surgery on November 21, 2000, Glik was too sick ever to return to work. Y. Glik Dep. at 26. This is uncontested.

7.      On December 2, 2000, Glik informed Dr. Timashpolsky, his immediate supervisor at Inotek, that his medical condition prevented him from returning to work. Y. Glik Dep. at 27-28. This is uncontested.

8.      Inotek continued Glik on the payroll until December 31, 2000. Thereafter, Glik was removed from the payroll and was no longer employed by Inotek. Y. Glik Dep. at 28. This is contested: he was still employed until the medical process and the for cause discharge were established. On September 22, 2000, Dr. Glik was hired full-time. Id. at Paragraph 9. Inotek has a handbook for employment and benefits. Inotek established a long-term disability plan for all of its employees. Policy No. B5. See Defendant's Appendix 1, Ex. 12, Attachment B. Id. at

Paragraph 10. Inotek's Human Resources Dept. administered the plan. Id., at 2.1. All full-time employees (like Dr. Michael Glik) are eligible for long term disability (LTD) benefits. Id. 2.2. LTD benefits are paid by defendant. Id. 2.4. Affidavit of Yudif Glik, Paragraph 10. Not until December 15, 2000 did Inotek send Dr. Glik's application for coverage to the Unum Life Insurance Company of America; and the application form was accurate to the best of his knowledge when he completed it. Id. at Paragraph 11. Unfortunately, in October 2000, he was diagnosed with sigmoid cancer (i.e., intestinal cancer.) Id. at Paragraph 12. This meant that, being terminally ill, Dr. Glik had no income whatsoever, or health insurance. Id. at Paragraph 13. See also Deposition of Edith Glik, Ex. 10. In addition, the defendant fired or terminated him as follows. He was sick with sigmoid cancer, and yet Inotek denied him his employee handbook rights. See Policy No. B5 (3.0.) and E9 2.2.2. Affidavit of Yudif Glik, Paragraph 16. The company and its law firm, Testa, Hurwitz, and Thibeault could not find a way to help them, although the law firm acknowledged the delay in the processing of the LTD application. Id. at Paragraph 17. The former law firm (which is not the law firm defending this case) forthrightly admitted that "the actual processing of Mr. Glik's application may have taken more time if it had been submitted during a time of year when business operations are less impacted by holidays and employee vacations." See p.2 of law firm letter annexed to the Affidavit of Yudif Glik. The widow felt that " it is perhaps self-evident but must be pointed out that for a proud man like my husband this shabby and unlawful treatment of him was devastating to his mental health as he became depressed by the stubborn denial of the situation while he got sicker from sigmoid cancer", see Id. at Paragraph 19, and "as for me, this kind of a situation was not what we expected when we uprooted ourselves from the Soviet scientific community to start a new life in the United States because it seems now that the lesson is that American business can be as cruel

LIBB/1420109.3

4

and insipid as some government agencies in the U.S.S.R. " Id. at Paragraph 20. See also Unum Ex. 3. Appendix No. 3 10197.

9.  Glik was unable to ever work again because of his medical condition. Y. Glik Dep. at 28; UNUM Dep. at 96, Ex. 22 (May 10, 2001 letter from Glik to UNUM indicating Glik is not able to work because of his non-removable tumor, ongoing chemotherapy and overall poor health). Contested, this is mixing apples and pears, as the defendant did not find cause for termination or establish the medical grounds for termination under the handbook, as detailed in response above.

10.  Inotek never employed Yudif Glik, Glik's wife. Y. Glik Dep. at 9. Uncontested.

11.  One of the benefits that Inotek offered employees at the time of Glik's employment was the opportunity to apply for individual long term disability insurance. Inotek paid the full cost of the insurance coverage for its employees who were deemed by the insurer to be qualified for this disability insurance. The insurance premium for employees was based on group rates and paid on an annual basis. Gosselin Aff. at ¶ 5. Employees were eligible to apply for such insurance coverage on their first day of employment. Gosselin Aff. at ¶ 5. Uncontested, but the terms and conditions set out in the employee handbook ("the manual") would seem to govern, not an individual's interpretation.

12.  Inotek's Manual of Personnel Policies and Procedures (the "Manual") that was in effect at the time of Glik's employment contained a policy statement regarding long-term disability insurance. That policy did not describe the type of specific benefit that would be provided. Y. Glik Dep. at 76-77, Ex. 12 at Attachment B. Contested: The handbook spells out the specific rights and obligations of the employer and employee and does indeed spell out the rights to the benefits if not the company providing it.

13. The insurance company that provided this coverage for Inotek employees was UNUM Life Insurance Company of America ("UNUM"). Inotek's insurance broker facilitated the application process. At the time of Glik's employment, Boyd-Neelon Associates was the insurance broker. UNUM Dep. at 15; Tyson Aff. at ¶ 3; Gosselin Aff. at ¶ 6. Uncontested.

14. On October 2, 2000, Glik signed a UNUM application for individual disability insurance. UNUM Dep. at 23, Ex. 3 (Application for Disability Insurance). Uncontested.

15. Glik did not enter into a premium prepayment agreement with UNUM. If Glik had selected prepayment (paying 1/10th of the cost of the annual premium at time the application was submitted), the effective date of the coverage, if UNUM approved of the application, would have been the latest date of the application or any required exam, test, questionnaire or other supplemental application. If the policy requested were not issued (as is the case here), or were declined, cancelled or returned, prepayment would be refunded. Since the prepayment option was not selected, the effective date of the policy would have been the date the policy issued. Inotek, as a matter of general practice, did not offer to pay for premium prepayment on behalf of its employees. UNUM Dep. at 23, Ex. 3; Gosselin Aff. at ¶ 7. Uncontested but irrelevant because these are not the facts in evidence.

16. The application completed by Glik states that "[a]s part of our [UNUM's] normal underwriting procedure, we need to obtain information to determine a Proposed Insured's eligibility for insurance. Much of that information will come from you [the Proposed Insured]; however, we often obtain additional information or verify information through other sources." The application indicates that, in making eligibility determinations, UNUM relies primarily on the Proposed Insured's application, including his certified answers to the medical questionnaire. However, UNUM may need to obtain additional information from other sources. The

application completed by Glik also states that "[a]ny person who knowingly presents ... false information in an application for insurance is guilty of a crime and may be subject to fines and confinement." UNUM Dep. at 23, Ex. 3. Uncontested.

17. One of the specific questions in the application required Glik to disclose whether he had ever had a "polyp, tumor, cancer...." Although Glik had previously undergone surgery for rectal cancer, he answered "NO" to this question. Similarly, one of UNUM's questions asked whether Glik had ever been treated for any disease or disorder of the rectum, and again he answered "NO." UNUM Dep. at 23 & Ex. 3. Contested. These questions were unclear and Dr. Glik responded accurately to the extent of his knowledge.

18. Carolyn Tyson, an underwriting manager with Boyd-Neelon Associates, received Glik's application for individual disability insurance coverage from Inotek in the later part of October 2000. Tyson Aff. at ¶ 4. Contested, as Dr. Glik states that his application was forwarded in November, 2000.

19. Glik's application was incomplete in several ways. For example, Glik failed to provide the name and address of his personal physician on the application. Glik also failed to complete Sections 22 and 23 on the application. Specifically, Glik did not respond to questions 22(b), 22(c), 23(b) or 23(c). UNUM Dep. at 35-36, Ex. 3; Tyson Aff. at ¶¶ 2, 5. Contested, it appears that Dr. Glik considered himself to be his own personal physician, and he would supplement the information.

20. As Glik's application was incomplete and pursuant to Ms. Tyson's regular practice, she returned Glik's application to Inotek with a request that the application be fully completed. Tyson Aff. At ¶¶ 5-6. Contested: the timing is the problem and not the nature of the process.

21. At some point thereafter, Ms. Tyson received the application back from Inotek. While Glik provided the name of his treating physician and responded to questions 22(b) and 22(c), he still did not respond to questions 23(b) or 23(c). Question 23(b) asks: "Are you now taking or have you taken medication (prescription or non-prescription) for any reason within the last 12 months?" Question 23(c) asks: "Are you experiencing any symptoms, disease, disorder or condition which might require surgery, impair your health or your ability to work, now or in the future, for which you plan to consult a physician?" Glik also failed to correct his answers to questions about cancer and rectal diseases. Tyson Aff. at ¶¶ 6; UNUM Dep. at 23, 35-36, Ex. 3. Contested, essentially, all of this information was too late, as he was in an advanced state of cancer by this time.

22. When Glik's application was returned, it indicated that he had high blood pressure and that he was last seen by his physician, Dr. Vaninov, on October 26, 1999. Glik's application stated that he had not had any indication of, been told or been treated for cancer within the last 12 months. Tyson Aff. at ¶ 6; UNUM Dep. at 23, 34, 36-37, Ex. 3. Contested, as high blood pressure is not necessarily an indication of cancer.

23. The application signed by Glik contains an affirmation that he agreed that "[a]ll of the statements made in this application must be true, complete and correctly recorded to the best of [his] knowledge and belief" and that "[i]f [he] did not prepay [the] premium with [his] application, insurance will be effective when a policy has been delivered to [him] and [he] has paid the first premium, provided that, on the later of the delivery date or payment date, the answers in this application and in any supplemental application, medical exam or other questionnaire are then still true and complete." UNUM Dep. at 23, Ex. 3. Uncontested.

24. On November 28, 2000, Ms. Tyson sent Glik's application to UNUM in Woburn, Massachusetts. After the application was sent to UNUM's Woburn office it had to be forwarded to UNUM's offices in Maine. UNUM received the application in December 2000. Tyson Aff. at ¶ 7; UNUM Dep. at 12, Ex. 1 (Application-Routing Ticket), Ex. 3. Uncontested: NB: by this time he was critically ill with cancer.

25. On January 19, 2001, given Glik's disclosure of hypertension and neck/back pain, pursuant to its regular underwriting practice, UNUM requested Glik's medical records from Dr. Vaninov. UNUM Dep. at 45-46, 54-56, Ex. 4 (Underwriting Notes), Ex. 5 (Records Request). Uncontested.

26. In February 2001, UNUM received Glik's medical records from Dr. Vaninov. These records revealed the following: On or before October 11, 2000, Glik was referred by Dr. Vaninov to a urologist, Dr. Christopher Doyle, because of testicular pain. Dr. Doyle examined Glik on October 11. Glik described to Dr. Doyle that he had discovered an abnormality in his left hemiscrotum about a week prior October 11, 2000. Glik informed Dr. Doyle that he had previously undergone rectal cancer surgery. During his examination of Glik, Dr. Doyle "suspected the presence of a mid abdominal mass." Dr. Doyle suggested a CT scan of the abdomen and pelvis to evaluate the possibility of the abdominal mass, tumor markers and a scrotal ultrasound. On October 22, 2000, Dr. Doyle wrote to Glik and advised him that his blood tests were normal but that he should proceed with the ultrasound study. UNUM Dep. at 56-61, Ex. 4 (October 11, 2000 letter from Dr. Doyle to Dr. Vaninov), Ex. 5, (October 22, 2000) letter from Dr. Doyle to Glik); Doyle Dep. at 5-7, 10-15. Uncontested. These materials appeared in the medical record but that does not establish that Dr. Glik knew of everything in the medical record when he applied for the LTD.

27. As a result of the above described medical records, on February 13, 2001, UNUM sent Glik a letter informing him that it was postponing a determination concerning Glik's application for individual disability insurance because of Glik's medical records it had received. UNUM Dep. at 66-70, Ex. 4, Ex. 7 (Final Processing Sheet), Ex. 8 (February 13, 2001 letter from UNUM to Dr. Glik). Uncontested: NB: it was postponing and not rejecting the application for LTD.

28. In February 2002, Glik died as a result of colon cancer. Y. Glik Dep. at 5. Uncontested.

29. If UNUM had deemed Glik qualified for individual disability insurance coverage and approved his application, disability benefits would have been paid to Glik by UNUM. Such benefit payments would have commenced ninety days after the commencement of the disability. Glik would have received payments from the insurer on a periodic basis as opposed to a lump sum payment. Such benefits would have ceased on the date of Glik's death. The maximum benefit that Glik could have received, if UNUM had deemed him qualified for a policy, was $3,100 per month for approximately one year. UNUM Dep. at 23-24, 28-29, Ex. 3; Y. Glik Dep. at 31, 67-70, Ex. 18, Plaintiff's Responses to Defendant's Interrogatories; Ex. 19, "Damages." Contested: NB: a problem here is that the denial of benefits barred the doctor from medical care.

30. There is no contractual relationship between Inotek and UNUM. Inotek is not a policy holder. Inotek facilitated the application process for its employees and, if UNUM approved an employee's application, Inotek paid the policy premiums while the employee was employed with it. Gosselin Aff. at ¶ 8; UNUM Dep. at 104-105, Ex. 29 (June 7, 2001 letter from UNUM to the Massachusetts Division of Insurance); UNUM Dep. Vol. II at 133-135. Contested: an employee handbook creates common law contact rights and ERISA rights.

31. On February 25, 2001, Dr. Glik wrote to UNUM complaining about UNUM's "refus[al] to issue a Long-Term Disability policy for [him]." UNUM responded to Glik's complaint in a letter explaining that UNUM's decision was based upon the medical records from Dr. Vaninov and, specifically, the October 11, 2000 letter from Dr. Doyle to Dr. Vaninov regarding his examination of Glik. That letter indicated that Glik had an October 2000 consultation regarding a testicular mass and possible abdominal mass, with no indication of a diagnosis for those issues, as well as a history of surgery for cancer. UNUM Dep. at 71-74, Ex. 11 (February 25, 2001 letter from Glik to UNUM), Ex. 12 (March 8, 2001 letter from UNUM to Glik). Uncontested but irrelevant.

32. Glik then filed a complaint against UNUM with the Massachusetts Division of Insurance (the "DOI"). Glik further described his surgery for colon cancer in November 2000 and his surgery for a rectal tumor in 1973. The DOI forwarded Glik's complaint to UNUM for a response. UNUM Dep. at 74-78, Ex. 13 (Glik's Complaint). Uncontested but irrelevant.

33. When UNUM received the complaint, it learned for the first time that Glik did indeed have colon cancer. Since UNUM had not issued a policy to Glik, it was not necessary to change its determination to a denial. Notably, however, if UNUM had not already made the decision to postpone Glik's application, it would have denied Glik's application based on the diagnosis of cancer. UNUM Dep. at 76. Uncontested but irrelevant and very speculative.

34. Glik threatened to file a lawsuit in court against UNUM for not approving his application for insurance coverage, but he never filed such an action. UNUM Dep. at 82, Ex. 18 (March 20, 2001 letter from Glik to UNUM); Y. Glik Dep. at 58. Uncontested but irrelevant.

35.   In a March 22, 2001 letter to the DOI, UNUM again explained its reasons for postponing Glik's application, as follows: Glik's medical records indicated a history in October 2000 of consultation regarding testicular pain and possible abdominal mass, as well as a history of rectal cancer. UNUM Dep. at 86-88, Ex. 20 (March 22, 2001 letter from UNUM to DOI). Uncontested but irrelevant.

36.   In its March 22, 2001 letter, UNUM also noted that pre-payment was not made with Glik's application. However, even if pre-payment had been made, this would not have changed the result. Glik's application would still have been postponed and would never have been issued because of his diagnosis of cancer. As the prepayment agreement in the application states, the effective date of coverage is not until the *latest* date of the application or any required exam, test, questionnaire, or other supplemental information. UNUM required supplemental information (in the form medical records) from Glik based on his application. These medical records led UNUM to postpone Glik's coverage. UNUM Dep. at 23, 86-88, Ex. 3, Ex. 20. Uncontested but irrelevant and speculative.

37.   Glik blamed the fact that he did not receive insurance coverage on UNUM's "inertia." UNUM Dep. at 92, 94, Ex. 21 (April 7, 2001 letter from Glik to the DOI); Y. Glik Dep. at 54-55, Ex. 10 (Letter April 10, 2001 Glik to dePontbriand). Uncontested but irrelevant.

38.   The DOI chose not to take any action against UNUM. Y. Glik Dep. at 58. Uncontested but irrelevant.

39.     Inotek's Manual (that was in effect at the time of Glik's employment) states that "[t]he policies and procedures that are contained in this manual are not terms and conditions of your employment, nor a contract, and the manual itself is not a contract or an offer to enter into a contract." Gosselin Aff. at ¶ 9, Ex. 1, Manual. Uncontested but irrelevant. Disclaimers are entitled to no weight under the common law or ERISA. *See O'Brien v. New Eng. Tel. & Tel. Co.*, 422 Mass. 686, 664 N.E.2d 843, 847-49 (1996). In some instances, such handbooks may meet the requirements for the formation of a contract. *See, e.g., id.* at 849. In other instances, they do not. *See, e.g., Weber v. Cmty. Teamwork, Inc.*, 434 Mass. 761, 752 N.E.2d 700, 714 (2001); *Jackson v. Action for Boston Cmty. Dev.*, 403 Mass. 8, 525 N.E.2d 411, 415 (1988). But ERISA does not pre-empt the garden variety handbook claim and there are many material facts in controversy about what Glik gets or doesn't get under the handbook for health and welfare and employment benefits.

40.     The Manual states that "[t]he Company ... reserves the right to change or eliminate its policies and procedures as necessary and without having to consult with or obtain agreement from anyone" and "[t]he Company remains free to establish and change employee's ... benefits." Gosselin Aff. at ¶ 10, Ex. 1. Uncontested but irrelevant. Disclaimers are entitled to no weight under the common law or ERISA. *See O'Brien v. New Eng. Tel. & Tel. Co.*, 422 Mass. 686, 664 N.E.2d 843, 847-49 (1996). In some instances, such handbooks may meet the requirements for the formation of a contract. *See, e.g., id.* at 849. In other instances, they do not. *See, e.g., Weber v. Cmty. Teamwork, Inc.*, 434 Mass. 761, 752 N.E.2d 700, 714 (2001); *Jackson v. Action for*

*Boston Cmty. Dev.*, 403 Mass. 8, 525 N.E.2d 411, 415 (1988). But ERISA does not pre-empt the garden variety handbook claim and there are many material facts in controversy about what Glik gets or doesn't get under the handbook for health and welfare and employment benefits.

41. The Manual explains that "[u]nless otherwise agreed in writing by the Board of Directors, no employee is hired for a specific term, upon any specific condition, or pursuant to any contract of employment ... the Company has the ... right to terminate the employment of any employee as it determines in its sole discretion, and for any reason, is appropriate." Accordingly, "[t]he Company remains free to ... discharge any employee with or without just cause and with or without notice." Inotek's employment at-will policy (policy number E5) states, in relevant part, "[y]our employment with the Company is 'at will' and, accordingly, may be terminated by you or the Company at any time without notice." Gosselin Aff. at ¶ 11, Ex. 1. Uncontested but irrelevant. Disclaimers are entitled to no weight under the common law or ERISA. *See O'Brien v. New Eng. Tel. & Tel. Co.*, 422 Mass. 686, 664 N.E.2d 843, 847-49 (1996). In some instances, such handbooks may meet the requirements for the formation of a contract. *See, e.g., id.* at 849. In other instances, they do not. *See, e.g., Weber v. Cmty. Teamwork, Inc.*, 434 Mass. 761, 752 N.E.2d 700, 714 (2001); *Jackson v. Action for Boston Cmty. Dev.*, 403 Mass. 8, 525 N.E.2d 411, 415 (1988). But ERISA does not pre-empt the garden variety handbook claim and there are many material facts in controversy about what Glik gets or doesn't get under the handbook for health and welfare and employment benefits.

42. Manual policy E9 concerning termination of employment (which states that it must be read in conjunction with the Company's Employment At-Will policy), makes clear that an employee's employment may be involuntarily terminated for reasons including, for example, excessive unexcused absence/unauthorized absenteeism and job abandonment. Gosselin Aff. at

¶ 12, Ex. 1. Uncontested but irrelevant. Disclaimers are entitled to no weight under the common law or ERISA. *See O'Brien v. New Eng. Tel. & Tel. Co.*, 422 Mass. 686, 664 N.E.2d 843, 847-49 (1996). In some instances, such handbooks may meet the requirements for the formation of a contract. *See, e.g., id.* at 849. In other instances, they do not. *See, e.g., Weber v. Cmty. Teamwork, Inc.*, 434 Mass. 761, 752 N.E.2d 700, 714 (2001); *Jackson v. Action for Boston Cmty. Dev.*, 403 Mass. 8, 525 N.E.2d 411, 415 (1988). But ERISA does not pre-empt the garden variety handbook claim and there are many material facts in controversy about what Glik gets or doesn't get under the handbook for health and welfare and employment benefits.

/s/
Robert O. Berger (BBO No. 038900)
11 Beacon Street, Suite 1210
Boston, MA 02108
(617) 423-7575 Tel
(617) 275-8000 Fax
Attorney for Plaintiff