UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| YUDIF GLIK, ADMINISTRATOR, | |
| Plaintiff, | |
| v. | Civil Action No.  05-10360-GAO |
| INOTEK PHARMACEUTICALS CORPORATION, | |
| Defendant. | |

### DEFENDANT'S REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Confronted with the clear record evidence warranting summary judgment for Inotek, Plaintiff tries various fruitless tactics to rescue her claims.  First, Plaintiff attempts to discard her ERISA claim in order to rescue her state law contract claims from preemption.  Her effort is mere gamesmanship that this Court should not endorse; this case plainly involves an ERISA plan.  Next, Plaintiff asserts that she does have an ERISA claim under Section 502(a)(3) of that statute and that she seeks appropriate equitable relief under Section 502(a)(3).  Neither assertion is correct.  The uncontroverted evidence establishes that Plaintiff does not have a viable claim under Section 502(a)(3) and that, even if she did, she has no basis for equitable relief under that provision.  In reality, she seeks damages for an alleged wrongful rejection of an LTD insurance policy application.  Moreover, the undisputed facts establish that Glik's unclean hands bar Plaintiff from obtaining equitable relief in any event.

Plaintiff's attempt to skirt ERISA preemption is fruitless.  Since her state law contract claims relate to an ERISA plan and essentially seek plan benefits, ERISA preempts them.  Even if those claims were not preempted, they must fail.  Not only are they based on a policy

description contained in an employee handbook that Glik never received during his employment, but Plaintiff mischaracterizes the policy itself. There is simply no basis for Plaintiff's contention that Inotek guaranteed disability benefits for its employees. Finally, Plaintiff's wrongful discharge claim fails because she cannot point to any obligation on Inotek's part to keep Glik on its payroll indefinitely after he informed his employer that he would never be able to return to work.

Since Plaintiff has failed to raise a genuine of issue of material fact as to any of her claims, summary judgment for Inotek is warranted as to all four counts of the Amended Complaint.

## ARGUMENT

**I.     Plaintiff Has Asserted A Claim Based Upon An ERISA Plan, And That Claim Fails As A Matter Of Law**

### A.     <u>Despite Plaintiff's Gamesmanship, an ERISA Plan is at Issue</u>

Recognizing ERISA's fatal impact to her state law claims, Plaintiff disingenuously discards her ERISA claim: "[n]othing in this case involves an ERISA plan, and thus, in effect, Plaintiff does not have an ERISA claim at all." Doc. 31, Pl's Memo in Opp. at 5. However, when Inotek removed this action from State court, Plaintiff did not move to remand, but *moved instead to amend her complaint to explicitly add an ERISA claim, stating: "This is an action under [ERISA]." See* Doc. Nos. 13-15. Now, after discovery is complete, and Inotek has moved for summary judgment, Plaintiff asks this Court to hold that ERISA has no bearing here. This Court should not endorse such gamesmanship. *See Hampers v. W.R. Grace*, 202 F.3d 44, 51, 54 (1st Cir. 2000) (holding that a state law claim was preempted because the "complaint alleged a cause of action under ERISA based on precisely the same conduct that underlies his state law contract claim").

Moreover, Inotek's individual long term disability insurance program clearly is an ERISA plan. Employee benefit plans include employee welfare plans, defined by ERISA as "any plan, fund, or program which … is established or maintained by an employer … for the purpose of providing its participants … through the purchase of insurance or otherwise, (A) … benefits in the event of sickness, accident, disability, [or] death …" Section 3 of ERISA, codified at 29 U.S.C. §§ 1002(3), 1002(1).[1]

Plaintiff concedes that Inotek's disability insurance program entailed providing its employees with the opportunity to apply for individual disability insurance coverage, with Inotek paying the insurance premiums for this coverage for employees UNUM determined to be eligible. *See* Doc. 29, Pl's Response to Def's SUMF at ¶ 11. Accordingly, the plan at issue here was an ERISA employee benefits plan. *See Andrews-Clarke v. Lucent Techs.*, 157 F.Supp.2d 93, 103 (D. Mass. 2001) (health insurance provided through an employer-paid insurance policy was an employee welfare benefit plan); *Nadworny v. Shaw's Supermarkets, Inc.*, 405 F.Supp.2d 124, 132 (D. Mass. 2005) ("A court's finding that an employer has an obligation to make payments on a long-term or periodic basis weighs in favor of ERISA preemption").

**B.    Plaintiff Does Not Have a Valid Claim Under Section 502(a)(3) and thus Summary Judgment for Inotek on Plaintiff's ERISA Claim is Warranted**

Having established that Plaintiff cannot jettison her ERISA claim to save her state law claims, Inotek now addresses Plaintiff's contentions that if ERISA does apply, she has a triable ERISA claim. Sifting through Plaintiff's scattershot contentions, she apparently raises a Section

---

[1] Plaintiff apparently believes that if a benefits policy does not explicitly use the term "ERISA," it is not covered by ERISA. *See* Doc. 31, Pl's Memo in Opp. at 5 n.2, 8. Nothing in the definition of an ERISA employee benefits plan found in Section 1002 requires the employer, in its employee handbook's description of a benefit plan, to invoke the term "ERISA" in order for the plan to be covered by ERISA. Imposing such a requirement would elevate form over substance and common sense, and would give employers, by not mentioning the term ERISA in their benefits policies, and end around obligations imposed by ERISA.

502(a)(3) (codified as 29 U.S.C. § 1132(a)(3)) claim contending that Inotek is a fiduciary under ERISA and that it breached its fiduciary duties to Glik by (1) failing to pay LTD benefits to Glik and (2) failing to forward "Dr. Glik's application timely to UNUM." Doc. 31, Pl's Memo in Opp. at 13-14. For these alleged breaches, she seeks an "appropriate equitable relief" in the form of an "accounting." *Id.* at 12.

### 1.    Inotek had no obligation under ERISA to pay LTD benefits to Glik

It is beyond dispute[2] that, had UNUM determined that Glik was eligible for LTD insurance, disability benefits would have been paid by UNUM. Doc. 29, Pl's Resp. to Def's SUMF at ¶ 29. Plaintiff's Affidavit invents an additional provision in Inotek's handbook policy on Long-Term Disability to the effect that Inotek will pay out the LTD benefits for disabled employees. Doc. 31, Pl's Memo in Opp. at 2; Doc. 30, Yudif Glik Aff, ¶ 10. This contention is false. There is no such statement in the policy. *See* Doc. 26, Def's SUMF, Appx. Ex. 1 at Ex. 12, Attachment B.[3]

---

[2] Although Plaintiff purports to "contest" SUMF ¶ 29, it is clear, as her explanation for contesting confirms, that she was not contesting the statement in SUMF ¶ 29 that UNUM, not Inotek, would have paid the disability benefits to Glik. Indeed, Plaintiff's explanation for "contesting" SUMF ¶ 29 is an unsupported *non sequitur* asserted to avoid admitting dispositive facts. Plaintiff's response to SUMF ¶ 29 provides just one of many examples where she failed to provide any basis in the record evidence for contesting one of Inotek's statements of undisputed material fact. Plaintiff's reasons for contesting are frivolous. *E.g.*, Doc. 29, Pl's Resp. to Def's SUMF, ¶¶ 18-20, 22, 29.

[3] In several instances, *e.g.*, ¶¶ 7-8, 10-11, 20, Plaintiff's affidavit is improper because her statements are made without any personal knowledge and are grounded solely in speculation, belief, or intuition. This is particularly true concerning her representations regarding Glik's state of mind and regarding the processing of Glik's application. As such, Plaintiff's affidavit fails to meet the requirements of Fed. R. Civ. P. 56(e). *E.g.*, *Automatic Radio Mfg. v. Hazeltine Res., Inc.*, 339 U.S. 827, 831 (1950) overruled on other grounds, *Lear, Inc. v. Adkins*, 395 U.S. 653 (1969) (an affidavit based on "information and belief" is inadequate to defeat a summary judgment motion). Further, Plaintiff makes numerous conclusory statements in her affidavit, *e.g.*, 10-11, 14, 16, 21, that are unsupported by any evidence in the record and thus cannot constitute admissible evidence the Court can consider. *E.g.*, *Scott v. Sulzer Carbomedics*, 141 F.Supp.2d 154-, 179-180 (D. Mass. 2001) ("Summary judgment befits claims, such as these, that are premised exclusively on uncorroborated secondhand accounts"). For these reasons, Inotek is filing contemporaneously with this Reply Memorandum a Motion to Strike Objectionable Portions of Plaintiff's Affidavit.

2.    **Inotek did not wrongfully prevent approval of Glik's insurance application**

The record fails to provide any support for Plaintiff's contention that Inotek failed to

properly attend to forwarding Glik's application to UNUM. In support of this contention,

Plaintiff relies solely on a letter from Inotek's former counsel responding to a consumer

complaint by Glik. Doc. No. 31, Pl's Memo in Opp. at 3; Doc. No. 30, Y. Glik Aff., ¶ 10 &

Ex. 1. Plaintiff claims that, in that letter, Inotek acknowledged it delayed the processing of

Glik's application. Plaintiff misrepresents the content of that letter, claiming that

> …although the law firm [for Inotek] acknowledged the delay in the processing of
> the LTD application…The former law firm…forthrightly admitted that 'the actual
> processing of Mr. Glik's application may have taken more [sic] time if it had been
> submitted during a time of year when business operations are less impacted by
> holidays and employee vacations…'

Pl's Memo in Opp. at 3.

At no point does the letter state that Inotek caused any delay in the processing of Glik's

application. Y. Glik Aff., Ex. 1. To the contrary the letter states:

> While Inotek was not involved in the information gathering process or the initial
> processing of Mr. Glik's application, the receipt of the application did coincide
> with the Thanksgiving and Christmas holidays. Thus, the actual processing of
> Mr. Glik's application may have taken more time than if it had been submitted
> during a time of year when business operations are less impacted by the holidays
> and employee vacations. While Inotek has no personal knowledge of the speed
> with which UNUM processed and investigated Mr. Glik's application, it does
> know that Mr. Glik's condition had no impact on the *speed with which Inotek's
> insurance broker forwarded the application to UNUM* (emphasis added).

*Id.*

The uncontroverted record evidence establishes that Glik partially completed the

application for LTD insurance on October 2 and that the insurance broker received it from Inotek

in late October. Finding that Glik's application was incomplete in several ways, the insurance

broker, pursuant to her regular practice, attempted to have Glik fully complete his application.

Doc. 26, Def's SUMF, ¶¶ 18-20 & Appx. Ex. 5, ¶¶ 5-6. Thereafter, the insurance broker received Glik's application back and forwarded it to UNUM on November 28, 2000. *Id.* at ¶¶ 20, 24 & Appx. Ex. 5, at ¶¶ 6-7.

Not only is there no basis in the record for any finding of undue delay by Inotek or the broker, there is no plausible basis for a finding that the application could have been run through UNUM's underwriting process and approved prior to the discovery of Glik's abdominal malignancy. On October 11, 2000, Glik consulted a urologist about a testicular mass. At this time, the urologist discovered an abdominal mass, which proved to be malignant. Accordingly, UNUM would never have underwritten a policy for Glik after October 11[4], 2000.[5] This is clear, as Plaintiff concedes, *see* Doc. 29, Pl's Response to Def's SUMF, at ¶ 27, from UNUM's effective denial of Glik's application when it received Dr. Vainov's records in January, 2001. Thus, any alleged delay in the processing of Glik's application after October 11, 2000 would have had no bearing on Glik's eligibility for LTD insurance coverage.

Plaintiff's argument is based solely on the assumption that Glik submitted his application to Inotek on October 2, 2000 and that, had Inotek immediately forwarded Glik's application on to the insurance broker, and had the insurance broker immediately forwarded it on to UNUM, UNUM would have immediately approved it. Given Glik's failure to answer material questions in his application, UNUM's request for medical records from his primary care physician based on what medical information Glik did reveal in his application, and UNUM's underwriting

---

[4] Had UNUM approved the application, the effective date of the policy would have been the date it was issued – not the date of the application. Doc. No. 29, Pl's Resp. to Def's SUMF, ¶ 15.

[5] Plaintiff's baseless statement in her Affidavit that *Inotek* did not forward Glik's application to UNUM until December 15, 2000 (which in fact it forwarded to its insurance broker in October, 2000, who then forwarded it to UNUM on December 2 after attempting to address omissions in the application) is inconsequential. There is no evidence to suggest that UNUM would have approved Glik's application before October 11 had it received the application in early October, 2000.

processing time of one and one half months from the date it received the application to the decision to effectively deny Glik's application, *see* Exhibit A UNUM Dep. at 95,[6] no reasonable fact-finder could conclude that UNUM would have approved Glik's application for insurance coverage prior to October 11.

Since Plaintiff has failed to raise any genuine issue of material fact that would support a finding that Inotek breached a fiduciary duty, or that Glik lost benefits as a result of such a breach, summary judgment for Inotek is warranted as to Count IV.[7]

### 3.    Plaintiff does not seek appropriate equitable relief under Section 502(a)(3)

Even if Plaintiff has a colorable claim that Inotek breached a fiduciary duty owed to Glik under ERISA, her claim fails because, as a matter of law she seeks legal damages. Plaintiff claims that "happily," the remedy she seeks is an accounting, an equitable remedy. Doc. 31, Pl's Memo in Opp. at 5 n.2 & 12. Plaintiff's fallacious characterization of her claim as equitable cannot rescue it. According to *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 202, 214 n.2 (2002), an accounting is appropriate when the plaintiff is entitled to "a constructive trust on particular property held by the defendant," and permits the plaintiff to recover "profits produced by the defendant's use of that property." Here Plaintiff is not claiming (and has not established) that she is entitled to any constructive trust, cannot point to any particular property of Glik's that Inotek held, and therefore, cannot receive an accounting of profits on any specific

---

[6] Pertinent pages of the deposition of Volume I of the Deposition of UNUMProvident Corporation's corporate representative are attached as Exhibit A.

[7] Plaintiff cites to a state law discrimination case, *Cargill v. Harvard Univ.*, 60 Mass.App.Ct. 585 (Mass.App.Ct. 2004) and argues that summary judgment is not appropriate in this action because "of the basic problem that state of mind is the key consideration in all employment cases." *See* Doc. 31, Pl's Memo in Opp. at 4. While state of mind considerations are significant in employment discrimination or retaliation claims like the claim in *Cargill*, state of mind has no relevance to the limited inquiry here of whether Glik was entitled to LTD insurance benefits under the terms of an ERISA plan.

property held in a constructive trust. The benefits Glik would have received if eligible for LTD

insurance coverage would have been paid by UNUM, not Inotek. Plaintiff cannot point to any

identifiable funds in Inotek's possession that she is equitably entitled to recover. Under *Sereboff

v. Mid Atlantic Med. Servs., Inc.*, 126 S.Ct. 1869, 1874 (2006), a plaintiff can only have a

constructive trust on a "specifically identified fund." *See also Coan v. Kaufman*, 457 F.3d 250,

263 (2nd Cir. 2006) (recognizing that *Sereboff* "reaffirmed the holding in *Knudson*"). Plaintiff

cannot meet this requirement; it is clear she impermissibly seeks to use Section 502(a)(3) to

obtain damages. *E.g., Larocca v. Borden*, 276 F.3d 22, 28-29 (1st Cir. 2002). Since Plaintiff

plainly is seeking compensatory damages, summary judgment for Inotek is warranted. *See

Sereboff*, 126 S.Ct. at 1874;[8] *see also* cases cited on pages 9-10 of Doc. 27, Def's Memo in

Support.

### 4.    Plaintiff has failed to raise a triable issue with respect to Inotek's unclean hands defense

Even if Plaintiff has a viable Section 502(a)(3) claim seeking appropriate equitable relief,

she has failed to point to any evidence demonstrating a genuine issue of material fact as to

whether Glik's unclean hands bar recovery under Section 502(a)(3). Plaintiff does not deny that

Glik's answers were wrong, but only states, without foundation, that Glik's application form

"was accurate to the best of his knowledge when he completed it" and dismisses the questions as

"confusing." Doc. 31, Pl's Memo in Opp. at 2, 15. Plaintiff provides no basis for these

---

[8] Plaintiff asserts that *Sereboff v. Mid Atlantic Med. Servs., Inc.*, 126 S.Ct. 1869 (2006) eliminated the "law-equity game" related to appropriate relief under Section 502(a)(3). Doc. 31, Pl's Memo in Opp. at 5 n.2. She misreads that case. *Sereboff* did not eviscerate Congress' intent to limit relief under Section 502(a)(3). Far from permitting claims for legal remedies under that section as Plaintiff contends, the Court instead reiterated that a plaintiff can only recover "appropriate equitable relief" under Section 502(a)(3). 126 S.Ct. at 1873-1874.

conclusory assertions, and such speculation is refuted by the record.  The questions were straightforward, and to suggest that a trained medical professional like Glik would not understand direct questions about cancer history and rectal diseases or disorders defies common sense.  Nor does Plaintiff dispute that UNUM would have relied upon Glik's answers.  *See* Doc. 29, Pl's Resp. to Def's SUMF, ¶ 16; *see also*, Exhibit A, UNUM Dep. Vol. I, at 38-39.  Glik's plainly false answers preclude his estate from recovering equitable relief under Section 502(a)(3), and thus summary judgment is appropriate for Inotek as to Plaintiff's ERISA claim. *See* Cases cited at Def's Memo in Support at 12.

**II.     Plaintiff's State Law Contract Claims Seeks Damages For Claimed Breaches Of Plan Obligations And Thus, Are Preempted As A Matter of Law**

Contrary to Plaintiff's baseless contentions, her state law contract claims are preempted. Plaintiff relies on one clearly distinguishable First Circuit decision, *Carpenters v. United States Fidelity & Guaranty*, 215 F.3d 136 (1st Cir. 2000), and boldly claims that "[v]ery little now is pre-empted by ERISA."  Doc. 31, Pl's Memo in Opp. at 4, 6.  Plaintiff has misread or ignored controlling authority.  First, the Supreme Court has reiterated, since *Carpenters*, that ERISA preemption is "clearly expansive" and includes: "[A]ny state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted." *Egelhoff v. Egelhoff*, 532 U.S. 141, 146 (2001); *Aetna Health Inc. v. Davila*, 542 U.S. 200, 209 (2004).  Such claims include ones that call for interpretation or evaluation of an ERISA Plan, even when the state law relates to areas of "traditional state regulation."  *See Egelhoff*, 532 U.S. at 151 (preempting state law claim based upon state statute regulating family law and probate, both areas of traditional state regulation); *Carrasquillo v. Pharmacia Corp.*, -- F.3d --, 2006 WL 2848569, at * 5-6 (Oct. 6, 2006) (affirming district court's ruling preempting state law claims of

fraudulent inducement and intentional infliction of emotional distress when those claims "would require an analysis of the Plan") (copy attached as Exhibit B). It is for these reasons that courts routinely find preempted state law contract claims, such as the "garden-variety" ones found here,[9] that seek damages for an alleged breach of a benefits plan. *See* cases cited on pages 13-15 of Inotek's Memo in Support; *see also Andrews-Clarke v. Lucent Techs.*, 157 F.Supp.2d 93, 104 (D. Mass. 2001) ("bad faith" and breach of contract claims seeking damages for a breach of an employee benefits plan were preempted by ERISA); *Tinsley v. Gen. Motors Corp.*, 622 F.Supp. 1547 (N.D. Ind. 1985) (breach of contract claim based on alleged ambiguity in General Motors' handbook's policy on disability benefits was preempted by ERISA).

*Carpenters* and the Supreme Court cases cited therein recognize some limitation on the scope of ERISA preemption in holding that certain state laws are not sufficiently "related" to ERISA to merit preemption. However, none of those cases involved attempts, as Plaintiff's here, to use state laws to seek additional remedies for alleged breaches of obligations under a plan. For example, *Carpenters* held that a Massachusetts bond statute requiring contractors on public works projects to post a bond covering labor and materials, including fringe benefits, was not preempted by ERISA. 215 F.3d at 139, 144.[10] Indeed, the First Circuit and this Court have rejected attempts by plaintiffs to assert state common law claims for breaches of obligations

---

[9] Plaintiff's reliance upon Massachusetts cases recognizing that, in some circumstances, an employee handbook can create a contractual obligation for the employer or that, under limited circumstances, an employee at will has a claim for a breach of the implied covenant of good faith and fair dealing is misplaced None of the cases she cites at Doc. 31, Pl's Memo in Opp. at 7, concerned an ERISA plan and a plaintiff's attempt to obtain plan benefits by relying upon a policy in an employee handbook.

[10] *See also Calif. Div. of Labor Standards Enforcement v. Dillingham Constr.*, 519 U.S. 316, 334 (1997) (holding that state prevailing wage law was not preempted by ERISA because it did not "dictate the choices facing ERISA plans"); *De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 815-816 (1997) (holding that state tax law on gross receipts for patient services at diagnostic and treatment centers was not preempted by ERISA); *Turner v. Fallon Cmty. Health Plan, Inc.*, 127 F.3d 196, 199 (1st Cir. 1997) (rejecting the notion that Supreme Court case law developments permit a plaintiff to bring state law claims seeking damages for breaches of obligations under an ERISA plan).

under an ERISA plan. *See* cases Inotek set forth on pages 13-15 of its Memo in Support; *see also Carrasquillo.*, -- F.3d --, 2006 WL 2848569, at * 5-6; *Andrews-Clarke*, 157 F.Supp.2d at 104.

Finally, Plaintiff's interpretation of ERISA preemption would undermine Congress's intent to create uniformity in benefits laws and would expose plan sponsors and administrators to different legal obligations in different states. *See Egelhoff*, 532 U.S. at 148 ("One of the principal goals of ERISA is to enable employers to 'establish a uniform administrative scheme'…[u]niformity is impossible, however, if plans are subject to different legal obligations in different States") (quoting *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 9 (1987)). For example, the myriad of differing state laws on whether there is an implied covenant of good faith and fair dealing in an employment at will relationship would expose employer-plan administrators or sponsors to varying obligations based upon provisions in their handbooks related to ERISA plans. *Compare Bard v. Bath Iron Works*, 590 A.2d 152, 156 (Me. 1991) (refusing to find an implied covenant of good faith and fair dealing when the nature of the employment relationship was at will) *with Fortune v. National Cash Register Co.*, 364 N.E.2d 1251, 1255, 373 Mass. 96, 102 (Mass. 1977) (finding such a covenant for the limited purpose of preventing an employer from depriving an employee of future income previously earned through past efforts).

Plaintiff final resort is to argue that if her ERISA claim fails because she does not have an ERISA remedy, then ERISA cannot preempt state court remedies. The First Circuit rejected a similar argument in *Turner* and held that the lack of an equitable remedy under Section 502(a)(3) did not preclude preemption of the plaintiff's state law claims for damages based on a wrongful

denial of ERISA plan benefits to which plaintiff claimed her decedent was entitled. 127 F.3d at 200.

For the foregoing reasons, ERISA clearly preempts Plaintiff's state law contract claims – Counts I-III.

### III.     Plaintiff Has Failed To Present Any Evidence That Supports Her State Law Contract Claims

Even if Plaintiff's state law contract claims were not preempted, they would fail as a matter of law because Plaintiff has not presented any evidence raising a genuine issue of material fact which, if resolved in her favor, would enable her to prevail on any of the three claims.

Plaintiff claims in Count I that Inotek breached a contractual obligation in its handbook to guarantee Glik LTD insurance coverage. This contention fails for several reasons. First, it is undisputed that Glik never received the employee handbook while employed with Inotek; thus, the handbook cannot be the basis of a contract between the parties. Doc. 26, Def's SUMF, at Appx. Ex. 1, pg. 76; *O'Brien v. New England Tele. and Tele. Co.*, 422 Mass. 686, 693-693; 664 N.E.2d 843, 848 (Mass. 1996) (tacitly requiring an offer and acceptance for an employee handbook to binding upon an employer). Second, Plaintiff misreads Inotek's handbook. The handbook provides that Inotek would pay for the insurance *premiums* for eligible employees. It does not state that employees were guaranteed LTD insurance, nor does it even state what the benefits under the policy would be. Plaintiff cannot establish the existence of a contractual obligation, different from Inotek's actual policy and practice, on the basis of such a vague policy description. *See Mass. Cash Register, Inc. v. Comtrex Sys Corp.*, 901 F.Supp. 404, 417 (D. Mass 1995) ("The alleged agreement between the parties in unenforceable due to its indefiniteness. It is axiomatic that a contract's essential terms must be sufficiently definite so that the nature and extent of the obligations of the parties are ascertainable") (internal quotation omitted). Inotek's

practice under the policy was to offer employees an opportunity to apply for individual disability insurance through UNUM, and Inotek would pay the premiums (charged by the insurer at group rates) on behalf of those employees to whom UNUM issued a policy. Doc. 29, Pl's Resp. to Def's SUMF, ¶ 11.

In Count II, Plaintiff claims that Inotek breached an implied covenant of good faith by terminating Plaintiff and then making it impossible for him to receive his LTD benefits. However, she points to evidence to support her claim. The undisputed facts establish that UNUM declined to approve Glik's policy application because of his medical issues, not because of any wrongful action by Inotek. Inotek terminated Glik, an at-will employee,[11] because he was no longer able to work – not to prevent him from obtaining disability insurance.

In Count III, Plaintiff claims that UNUM stopped processing Glik's application because it was not notified of Glik's employment status and was not forwarded his medical information. Am. Complaint, ¶ 17 . Plaintiff presents no evidence to support this claim and it is utterly refuted by the undisputed record. The evidence establishes that UNUM did not approve Glik's application because of the medical records it did receive. Doc. 29, Pl's Resp. to Def's SUMF, ¶ 27. Glik's "employment status" had nothing to do with UNUM's decision.

## IV.    Inotek Lawfully Terminated Glik After He Reported That He Would Never Be Able To Work Again

Plaintiff claims that Inotek "denied [Glik] his employee handbook rights" by terminating his employment when he was "sick with sigmoid cancer." Pl's Memo in Opp. at 2. It is undisputed that, in mid-December, 2000, Glik notified Inotek that he would never be able to

---

[11] Plaintiff asserts that Glik was not an at will employee, citing Inotek's employee handbook. Pl's Memo in Opp. at 6. However, the handbook clearly states that employment is at will. Doc. 29, Pl's Resp. to Def's SUMF, ¶¶ 41-42. Further, the cases Plaintiff relies upon on page 11 of her Memo. in Opp. have no application to an employment at will relationship, and in fact do not concern employment relationships at all.

return to work. Nothing in Inotek's employee handbook provided that Inotek would retain

employees who would never be able to work again on its payroll.

## CONCLUSION

For all of the foregoing reasons and those stated in Defendant's Memorandum in Support

of its Motion for Summary Judgment, Inotek respectfully submits that the Court should GRANT

its Motion for Summary Judgment on all counts of Plaintiff's Complaint and dismiss Plaintiff's

Complaint in its entirety.

<div style="margin-left: 40%;">

Respectfully submitted,

INOTEK PHARMACEUTICALS
CORPORATION

By its attorneys,

/s/ Wilfred J. Benoit, Jr.
Wilfred J. Benoit, Jr. (BBO No. 037900)
Anne M. Gaeta (BBO No. 643299)
Goodwin Procter LLP
Exchange Place
Boston, MA 02109-2881
(617) 570-1000

</div>

Dated: October 13, 2006

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the
registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies
will be sent to those indicated as non registered participants on October 13, 2006.

<div style="margin-left: 40%;">

/s/ Wilfred J. Benoit, Jr.
Wilfred J. Benoit, Jr.

</div>

**EXHIBIT A**

ORIGINAL

Page 1

1

2                UNITED STATES DISTRICT COURT

3                 DISTRICT OF MASSACHUSETTS

4               Civil Action No. 05-10360-GAO

5

6

7    YUDIF GLIK, Administrator,

8                      Plaintiff,

9           vs.

10   INOTEK PHARMACEUTICALS

11   CORPORATION,

12                      Defendant.

13

14

15            DEPOSITION of UNUMPROVIDENT CORPORATION,

16   (Nancy M. Brenerman), taken pursuant to subpoena, at the

17   offices of Moon, Moss & Shapiro, 10 Free Street, Portland,

18   Maine, on May 2, 2002, commencing at 10:06 A.M., before

19   Catherine Cook, a Notary Public in and for the State of

20   Maine.

21

22

23

24            Downing & Peters Reporting Associates

25         79 Atlantic Place, South Portland, Maine  04106

EXHIBIT

A

1    as far as the underwriting process?

2    A.    We would then look down in question 25 and see if he

3    gave us details of those questions.

4    Q.    Okay.  That's what -- question 25 asks him to give you

5    the details for questions 20 through 24, including that

6    response above?

7    A.    Yes.

8    Q.    Looking at the agreement section of the application,

9    the No. 1 of the agreement section states that:  All of the

10    statements made in this application must be and are true,

11    complete and correctly reported to the best of my knowledge

12    and belief.  Why is that in there?

13    A.    Individual disability insurance is based on a trust

14    relationship between the applicant and the company.  We

15    trust that they provide us with all the information that we

16    request on the application which has been approved by the

17    insurance commissioner in the state in which -- from which

18    he is applying, and that everything is true and complete,

19    that there is no missing information.  And he can trust

20    that if we issue a policy that we will live up to our

21    responsibility with regard to that policy.  So this

22    statement is important because it says that the information

23    above is not only true but it's complete, and he has

24    recorded it correctly.

25    Q.    What if UNUM determined later that it was not, what

1   happens?

2   A.   That would -- there is a two-year contestability

3   period on this policy in which, if we find that something

4   was not -- if a policy were issued and we find that there

5   was actually some information that is different than what

6   is on the policy, we can either reform it, we can issue it

7   in a different way, or we can rescind it, we can take it

8   back.  Beyond that, there are rules about fraud with which

9   I'm not familiar.  You would have to talk to the legal

10   department, if we find fraud.

11   Q.   So you mean apart from being able to rescind the

12   policy should it be issued and it is later determined that

13   the application was not true and complete, there is also --

14   the legal department also deals with fraud issues?

15   A.   Yes.

16   Q.   Which may have remedies separate and apart from

17   rescinding the policy?

18   A.   Yes.

19   Q.   No. 2 states that -- just to summarize, that the home

20   office is the only office that can issue the policy; is

21   that correct?

22   A.   I think it says more than that.

23   Q.   Do you want to read it?

24   A.   Yes.  No agent, producer, medical examiner or anyone

25   other than a home office underwriter may waive questions

Case 1:05-cv-10360-GAO   Document 32-2   Filed 10/13/2006   Page 5 of 8
30(b)(6) of UNUMProvident Corporation (Nancy M. Breiterman)          5/2/2006

Page 95

1    Q.    Do you agree with that?

2    A.    I don't know what he means:  Did not happen through my

3    fault or oversight.  I really don't understand what he is

4    trying to say there.

5    Q.    Was the decision made by UNUM, delayed in any way, or

6    in your opinion was there a problem with UNUM's inertia in

7    reaching that decision?

8    A.    If you look at Exhibit 4, we received the application

9    to look at on December 21st by the underwriter and he made

10   a decision on February 8th after receiving records from

11   Dr. Vaninov.  So I would say there was no inertia at all on

12   the part of UNUM.

13   Q.    Do you mean no lack of inertia on the part of UNUM?

14   There was no delay?

15   A.    There was no delay on UNUM's part.

16   Q.    By the way, the application was received by the

17   underwriter on December 21, 2000, according to the

18   underwriting notes.  The application was received by the

19   UNUM office in Portland on or about December 11th, 2000; is

20   that correct, based on Exhibit 11?

21   A.    Was it Boston?  It was received in Boston, not

22   Portland.

23   Q.    How long would it take the application to get from

24   Boston to Portland?

25   A.    It doesn't take very long.  They submit -- what they

1

2                       CERTIFICATE

3

4           I, Catherine Cook, a Notary Public in and for the

5     State of Maine, hereby certify that the within-named

6     deponent was sworn to testify the truth, the whole truth,

7     and nothing but the truth, in the aforementioned cause of

8     action.

9

10          I further certify that this deposition was

11    stenographically reported by me and later reduced to print

12    through Computer-Aided Transcription, and the foregoing is

13    a full and true record of the testimony given by the

14    deponent.

15

16          I further certify that I am a disinterested

17    person in the event or outcome of the above-named cause of

18    action.

19

20          IN WITNESS WHEREOF, I subscribe my hand and affix

21    my seal this date:  May 11, 2006

22

23    Dated at

24    Portland, Maine.        Catherine Cook, Notary Public

25    My Commission Expires:  October 31, 2008

Page 116

```
1                        SIGNATURE PAGE

2    TO BE COMPLETED BY DEPONENT:

3         I, __Nancy M Brenerman_____ have read the

4    foregoing pages of my testimony or have had the foregoing

5    pages of my testimony read to me and have noted any changes

6    in form or substance of my testimony together with their

7    respective corrections and the reasons therefor, on the

8    following __1__ Errata Sheet(s).

9                        (Signature) __Nancy M Brenerman__

10                       (Date) __5/30/06_____

11

12    _____

13

14   TO BE COMPLETED BY NOTARY PUBLIC OR ATTORNEY:

15        I, ____Susan A. Carter_____ , a Notary

16   Public/Attorney in and for the State of Maine, hereby

17   acknowledge that the above-named deponent personally

18   appeared before me, swore to the truth of the foregoing

19   statements and affixed his/her signature above as his/her

20   own true act and deed.

21

22                       (Signature) __Susan A Carter__

23                       (Date) __May 30, 2006_____

24

25   My Commission Expires: ___10/20/09_____
```

# ERRATA SHEET

| PAGE | LINE | FROM: (Quote words you wish to change) | TO: (Write change you wish to make) | REASON: (e.g. typo, wrong word, word omitted, etc.) |
|---|---|---|---|---|
| 17 | 7 | belongs to it | be brought it | typo |
| 24 | 2 | percentage | percentages | typo |
| ? | 20 | Standard | (remove this insert) | I misspoke |
| 42 | 16 | on standard basis | (remove these words) | I misspoke |
| 45 | 20 | Someone says | add the two sentences | word missing |
| 46 | 1 | give | an | typo |
| 74 | 23 | cases | make | typo |
| 80 | 15 | complaint | Add 's - complaint is | missing word |
| 84 | 23 | on to | on to | typo |
| 87 | 22 | on a | remove words | this spoke |
| 87 | 23 | Standard basis | different words | I misspoke |
| 87 | 25 | On a standard | remove words | I misspoke |
| 88 | 1 | basis | remove word | I misspoke |
| 93 | 18 | request | requested | typo |
| 94 | 13 | on a standard basis | remove words | I misspoke |
| 94 | 5 | issued between | issued is between | word omitted |

SIGNATURE: Henry M. Blummenal   PAGE 1 OF 1

DOWNING & PETERS REPORTING ASSOCIATES  79 Atlantic Place, South Portland, Maine 04106 Phone (207) 772-6221 Facsimile (207) 772-2056

**EXHIBIT B**

Westlaw.

--- F.3d ----                                                                  Page 1

--- F.3d ----, 2006 WL 2848569 (C.A.1 (Puerto Rico))
(Cite as: --- F.3d ----)

**H**
Briefs and Other Related Documents
Otero Carrasquillo v. Pharmacia Corp.C.A.1
(Puerto Rico),2006.Only the Westlaw citation is
currently available.
    United States Court of Appeals,First Circuit.
    Robur OTERO CARRASQUILLO, Maria T.
    Negron Cedeño and the Conjugal Partnership
    formed between them and Jennifer Otero M.
    Negron, Plaintiffs, Appellants,
              v.
    PHARMACIA CORPORATION; Pfizer
    Pharmaceuticals; Zaida Sanabria in her official and
    personal capacity; Companies X, Y, Z, Jane Doe
    and John Doe, Defendants, Appellees.
              No. 05-2373.

        Submitted June 8, 2006.
        Decided Oct. 6, 2006.

Appeal from the United States District Court for the
District of Puerto Rico, José Antonio Fusté, U.S.
District Judge.

Vilma M. Dapena Rodríguez, for appellants.
Carl Schuster, with whom Lourdes C. Herná
ndez-Venegas, María Santiago-Ramos and Schuster
& Aguiló LLP were on brief, for appellees.

Before LYNCH and HOWARD, Circuit Judges,
and STAFFORD,[FN*]Senior District Judge.
HOWARD, Circuit Judge.
**\*1** Robur Otero Carrasquillo brought an action in
the Puerto Rico District Court against his former
employer, Pharmacia Corporation,[FN1] his former
supervisor, Zaida Sanabria, and unnamed
administrators and fiduciaries of Pharmacia's
separation benefits plan. At its core, the complaint
alleges that Pharmacia violated the Employee
Retirement Income Security Act ("ERISA"), 29
U.S.C. § 1001 et seq., and Article 1802 of the
Puerto Rico Civil Code by improperly denying
Otero severance benefits after he left his

employment with the company. The district court
granted the defendants' motion for summary
judgment, but assessed civil penalties against
Pharmacia for failing to comply with ERISA's
reporting and disclosure provision. We affirm.

                **I.**

Otero worked as a research associate for Pharmacia
at its Arecibo, Puerto Rico, fermentation plant from
the late 1980's until November 2001. He was
responsible for the fermentation of antibiotics. In
February 2000, Pharmacia notified its employees
that, effective June 2001, the Arecibo plant would
close, and the fermentation process would be
relocated to an affiliate facility in Kalamazoo,
Michigan.[FN2] Because this relocation would result
in the elimination of all jobs at the Arecibo plant,
Pharmacia presented adversely affected employees
with two options: (1) apply, between April 2000
and December 2001, for the company's Separation
Package Plan ("Plan"), a supplement to worker
unemployment benefits, or (2) continue to work for
the company in a different position. In the interim,
regardless of election, employees would remain
active in their current positions until their services
were no longer needed or the Arecibo plant closed.
At that time, those who had elected to remain with
the company would be transferred to their newly
assigned positions. For those who had elected to
receive the separation benefits, the company would
initiate an administrative process, designated the "
Windows Exit Program," that would provide
employees with 60 days to complete the necessary
Plan paperwork.

During his last 18 months at Pharmacia, Otero was
upset by several events that transpired at the plant.
He alleges that Andres Lugo, the plant supervisor,
incorrectly informed Otero that he could not apply
for Plan benefits until the last fermentation of
antibiotics had been completed, thereby inducing
him to wait while other plant employees received

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.


EXHIBIT
B

--- F.3d ----                                                                    Page 2

--- F.3d ----, 2006 WL 2848569 (C.A.1 (Puerto Rico))
**(Cite as: --- F.3d ----)**

job transfers or applied for separation benefits. Otero's repeated inquiries regarding his employment prospects were ignored or treated in a cursory manner. Receiving no prospective offers of employment, Otero eventually applied for various vacant positions with Pharmacia's remaining Puerto Rico branches, but these slots were given to more experienced applicants. Otero's difficulties were exacerbated in March 2001, when defendant Sanabria replaced Lugo as the plant supervisor. She was more critical of Otero's work than his previous supervisors, and gave him only an "average" employee review, well below the "excellent" reviews he had customarily received. Finally, in August 2001, Pharmacia offered Otero a position as a microbiologist. Although Pharmacia considered it a lateral transfer, Otero perceived it as a demotion.

*2 On November 5, 2001, Otero declined the microbiologist position and requested separation benefits. Linda Diaz, Pharmacia's Senior Director of Human Resources, immediately contacted the Plan administrator, who stated that Otero was no longer eligible to receive separation benefits. Although the Plan provided that terminated employees are generally eligible to receive such benefits, an exception existed for employees whose employment was discontinued due to a "transfer to an affiliated business," and who had been offered "a comparable position" within the company. Because Pharmacia interpreted the relocation of the fermentation process from Arecibo to Kalamazoo as a "transfer to an affiliated business," and Otero had been offered what it considered a "comparable position," the Plan administrator determined that Otero was not eligible to receive benefits.[FN3]

Immediately following the administrator's decision, Otero sought to personally deliver a letter to Pharmacia's Human Resources Manager, Carmen Calcano, to further inquire about his Plan eligibility and the basis for his denial. As he waited in Calcano's office, Otero suffered an emotional breakdown, collapsed to the floor, and injured his back. Because Otero required surgery and various other treatments for physical and psychological ailments, Otero qualified for the company's short-term disability program (under which he received 100% of his pre-disability salary), and

ultimately, for the long-term disability program (under which he received upwards of 60% of his annual salary).

On July 5, 2002, Otero sent a letter to Pharmacia requesting information on a "Serious Health Condition" provision in the long-term disability plan, under which an injured employee could receive up to 100% of his annual salary. Receiving no response, Otero sent several additional letters requesting information and copies of the long-term disability plan. On August 29, 2002, 55 days after his initial inquiry, Pharmacia responded with the requested materials. Included was a copy of the Summary of Material Modifications, a document (previously circulated to all Pharmacia employees in 1999) that outlined all the changes that had been made to the long-term disability plan. The form explained that the Serious Health Condition provision had been excised from the Plan. Unsatisfied, Otero continued to send letters requesting information on the Serious Health Condition provision, to which Pharmacia consistently replied that all requests had been adequately fulfilled by its August 29th response.

In July 2003, Otero filed suit against Pharmacia, Sanabria, and unnamed Plan administrators and fiduciaries, claiming that Pharmacia's denial of benefits violated ERISA, that Pharmacia's failure to produce Plan documents within the time period designated by ERISA's reporting and disclosure provision warranted the imposition of civil penalties, and that the actions of Lugo, Sanabria and others amounted to intentional infliction of emotional distress and fraudulent inducement under Commonwealth law. The district court granted the defendants' motion for summary judgment, concluding that Pharmacia's decision was not arbitrary and capricious and that Otero's supplemental Commonwealth law claims were preempted by ERISA. The court, however, found that Pharmacia had violated ERISA's reporting and disclosure provision, and accordingly ordered Pharmacia to pay Otero $2500 in civil penalties.[FN4] Otero now appeals.

**II.**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                              Page 3

--- F.3d ----, 2006 WL 2848569 (C.A.1 (Puerto Rico))
(Cite as: --- F.3d ----)

*3 On appeal, Otero claims that Pharmacia's denial of his request for separation benefits was arbitrary and capricious, his supplemental state law claims are not preempted by ERISA, and the district court incorrectly calculated the civil penalties against Pharmacia.

### A. The Benefits Decision

We begin with Otero's challenge to Pharmacia's denial of Plan benefits. It is undisputed that because the Plan reserved interpretative discretion to its administrators,[FN5] judicial review of Pharmacia's eligibility determination is limited to ascertaining whether the administrator's decision was arbitrary or capricious. *Leahy v. Raytheon Co.,* 315 F.3d 11, 15 (1st Cir.2002). Thus, while we review summary judgment decisions de novo, *Mattias-Correa v. Pfizer, Inc.,* 345 F.3d 7, 12 (1st Cir.2003), where, as here, the underlying decision is subject to arbitrary and capricious review, we evaluate the district court's determination by asking "whether the aggregate evidence, viewed in a light most favorable to the non-moving party, could support a rational determination that the plan administrator acted arbitrarily in denying a claim for benefits," *Leahy,* 315 F.3d at 18. In other words, the question here is whether the district court correctly concluded that Pharmacia's interpretation of the Plan's language, and its ultimate benefits determination based upon that interpretation, were reasonable. *Liston v. Unum Corp. Officer Severance Plan,* 330 F.3d 19, 24 (1st Cir.2003).

Pharmacia had determined that, because Otero's research associate position had been eliminated due to a transfer of the job to an affiliated business, and because Otero was offered a comparable position as a microbiologist, he was not eligible to receive separation benefits. Otero argues that, according to the Plan, an employee whose job elimination results from a transfer to an affiliated business is only ineligible to receive benefits when the transfer is a product of the total or partial sale of the company. The eligibility provision that Otero cites provides, in relevant part, that:
benefits under the Plan shall *not* be provided to any Employee [whose] employment termination is due

to ... (6) his or her transfer to an affiliate company or its transfer *due to the total or partial sale of the Company,* either by the sale of its stocks or assets in which the Employee is offered a "Similar Position."

(Emphasis added). Since no sale precipitated the transfer of his job, Otero argues, this exception to benefits eligibility is inapplicable.

We disagree. Otero's argument relies on an inoperative version of the Plan. Otero's proffered language comes from a certified translation of a Spanish language document that had been circulated to employees at the Puerto Rico plant and was itself a translation of the original English language Plan. But the Spanish language translation explicitly stated on its front page that any terminological discrepancy between it and the original English language version would be resolved in accordance with the terms of the original Plan, and that copies of the original English language Plan would be made available at Human Resources. Thus, the original English language Plan is the controlling document. Because the original Plan does not require that the transfer of the job be "due to" a sale of the company for the ineligibility provision to be triggered, Otero's argument fails.[FN6] Under the controlling Plan language, we see no basis to deem unreasonable Pharmacia's interpretation that an employee is ineligible to receive separation benefits when his job is eliminated due to *either* a transfer to an affiliated business or a total or partial sale of the company, and he is offered a comparable position with the company.[FN7]

*4 Otero also argues that Pharmacia acted unreasonably by designating the move of the fermentation process from Arecibo to Kalamazoo as a "transfer to an affiliate business." In Otero's view, the move to the Kalamazoo facility could not be a "transfer" because that facility already operated a fermentation plant.

Where, as here, a term is not defined by the benefits plan, we give it "an ordinary and popular" reading " as would a [person] of average intelligence and experience." *Richardson v. Pension Plan of Bethlehem Steel Corp.,* 112 F.3d 982, 985 (9th Cir.1997); *Kolkowski v. Goodrich Corp.,* 448 F.3d

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                    Page 4

--- F.3d ----, 2006 WL 2848569 (C.A.1 (Puerto Rico))
**(Cite as: --- F.3d ----)**

843, 850 (6th Cir.2006); *see also* 29 U.S.C. § 1022 ( "A summary plan description of any employee benefit plan ... shall be written in a manner calculated to be understood by the average plan participant...."). The term "transfer" is commonly defined as "to convey from one person, place, or situation to another." *Merriam-Webster's Collegiate Dictionary* 1249 (10th ed.2001). That the Kalamazoo facility may have already maintained a fermentation plant is not by itself inconsistent with this definition. Otero has presented no evidence that Pharmacia failed to convey some level of capacity from Arecibo to Kalamazoo. Indeed, the record suggests that Pharmacia conveyed the function of the Arecibo plant to Kalamazoo to save on electricity costs. Accordingly, Pharmacia's interpretation was not unreasonable.

Finally, Otero argues that Pharmacia's denial of benefits was arbitrary and capricious because the positions of microbiologist and research associate are not "comparable." The Plan defines " Comparable Position" as:

employment with the Company or a successor employer in which the individual's level of responsibilities is substantially similar, as determined by the Company, to the individual's immediately prior position with the Company, requiring similar skill levels and offering similar pay (within 10%) and in which the Employee is not asked to move his or her principal business location more than 50 miles.

Otero concedes that the positions pay identical salaries, are performed within the same principal business location, and require the same educational background and basic skill levels. Nevertheless, he contends that the level of responsibilities of a microbiologist are not "substantially similar" to those of a research associate. Otero argues that a microbiologist has less substantial supervisory responsibilities, is not on call 24 hours a day, and has no office, cellular phone or beeper. The district court was unpersuaded, finding that the positions were comparable because Otero's qualifications fulfilled the requirements of both jobs.

While the positions' respective levels of responsibility are not identical, the Plan only

requires that they be "substantially similar as determined by the Company." Employing the company's traditional methodology for comparing two positions, Pharmacia found that, based on job descriptions, job requirements, salary, educational requirements and banding (the company's general method for systematizing position responsibilities), the positions of research associate and microbiologist were in fact comparable.

*5 Otero states that as a microbiologist he would no longer be "producing millions in money for [the company]" as he had before, and that he would no longer be responsible for highly valuable company products and equipment. Statements at this level of abstraction, however, do not establish that the administrator's decision was arbitrary. *See Liston,* 330 F.3d at 25 (holding that the appellant's claim that she was "no longer responsible for developing and implementing growth and service strategies as well as piloting new work processes" was too abstract to stand as proof of "diminished responsibility" under the company's employee benefits plan, and therefore was not enough to make the company's denial of benefits arbitrary and capricious). Nor do Otero's more concrete arguments-that the microbiologist is not on call, and has no office, cellular phone or beeper-suffice to negate the otherwise substantially similar level of responsibilities, benefits and qualifications of the positions. In light of the broad interpretive discretion that Pharmacia reserved to itself, *see supra* note 5, we cannot say that its determination was arbitrary and capricious.

### B. Preemption

We next turn to the district court's finding that Otero's state law claims are preempted by ERISA, 29 U.S.C. § 1144(a). In light of ERISA's goal to promote uniformity in the nationwide regulation of employee benefit plans, Congress designed the statute to supersede "any and all State [causes of action] insofar as they may now or hereafter *relate to* any employee benefit plan." *Id.* (emphasis added). The Supreme Court has identified two instances where a state cause of action relates to an employee benefit plan: where the cause of action

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                    Page 5

--- F.3d ----, 2006 WL 2848569 (C.A.1 (Puerto Rico))
**(Cite as: --- F.3d ----)**

requires "the court's inquiry [to] be directed to the plan," or where it conflicts directly with ERISA. *Ingersoll-Rand Co. v. McClendon,* 498 U.S. 133, 140-42, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990). Because the resolution of Otero's Commonwealth law claims for fraudulent inducement and intentional infliction of emotional distress would require analysis of the Plan, the district court correctly concluded that they are preempted.

In his complaint, Otero alleges that Pharmacia fraudulently induced him to continue his employment at the Arecibo plant by incorrectly informing him that he could not apply for severance benefits until all fermentation at Arecibo was completed, changing the benefits application deadline without informing him, and falsely promising him a comparable position at the company whenever he expressed concern for his job security. To determine whether these acts constitute fraudulent inducement, the district court would have to consult the severance plan to identify the application dates and the administrative process for determining and informing the employees of such dates. Additionally, to determine whether Pharmacia's promises of comparable employment were fraudulent, the court would have to consult the Plan to determine whether the offered microbiologist position was "comparable" to his prior job as a research associate. Because the court's inquiry would necessarily "be directed to the Plan," the court is correct to dismiss the fraudulent inducement claims. *See Carlo v. Reed Rolled Threat Die Co.,* 49 F.3d 790, 794 (1st Cir.1995) (holding that plaintiff's misrepresentation claim was preempted by ERISA because the computation of damages would require reference to the severance plan).

*6 Otero's claim for intentional infliction of emotional distress is similarly unavailing. The factual basis supporting his emotional distress claim is simply a reiteration of the facts supporting his fraudulent inducement claims. Thus, "because the emotional distress claim obviously piggybacks on the facts underlying the [fraudulent inducement] claim, which [is] preempted, the emotional distress claim, too, is preempted." *Danca v. Private Health Care Sys., Inc.,* 185 F.3d 1, 7 n. 9 (1st Cir.1999).

### C. Civil Penalties

Finally, Otero appeals the district court's method for calculating the civil penalties owed by Pharmacia for violating ERISA's reporting and disclosure provision. *See* 29 U.S.C. § 1132(c) (providing that any administrator who fails, within 30 days, "to comply with a request for any information which such administrator is required" to furnish, "may in the court's discretion be personally liable ... in the amount of up to $100 a day from the date of such failure"). Finding that Pharmacia provided all the necessary materials 55 days after Otero's July 5th inquiry, the district court determined that Pharmacia's reply was 25 days late. *See id.* By assessing the maximum discretionary penalty of $100 a day, the court calculated an award of $2500 in civil penalties. We review the court's determination for abuse of discretion. *Sullivan v. Raytheon Co.,* 262 F.3d 41, 52 (1st Cir.2001).

Otero has presented nothing that causes us to question the district court's calculation. He argues that neither Pharmacia's August 29th response nor any of its subsequent correspondence contained information regarding the "Serious Health Condition" provision about which he requested information. But Pharmacia's August 29th correspondence fully explained that the "Serious Health Condition" provision was no longer in effect. Pharmacia was not obligated to provide any further explanation regarding an inactive provision. *See Shields v. Local 705, Intern. Broth. of Teamsters Pension Plan,* 188 F.3d 895, 903 (7th Cir.1999).

### III.

For the foregoing reasons, the judgment of the district court is *affirmed.*

FN* Of the Northern District of Florida, sitting by designation.

FN1. Pharmacia has since become a subsidiary of Pfizer, Inc.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 6

--- F.3d ----, 2006 WL 2848569 (C.A.1 (Puerto Rico))
**(Cite as: --- F.3d ----)**

FN2. The facility at Kalamazoo was owned and operated by Pharmacia's parent company, Pharmacia & Upjohn.

FN3. Sanabria initially told Otero that he was too late to receive Plan benefits because the administrative window had closed. Otero argues that, because Linda Diaz failed to inform him of the "Windows Exit Program," the defendants breached their fiduciary duties under ERISA. *See* 29 U.S.C. § 1104. But, as the district court correctly recognized, although there was some initial confusion in response to Otero's request, the Windows Exit Program was nothing more than an administrative tool providing employees with notice of their termination date so that they would have time to prepare the necessary paperwork. It had no bearing on Pharmacia's substantive benefits decisions.

FN4. The district court also granted summary judgment for the defendants on Otero's additional claims of invasion of privacy and violation of ERISA's notice provision for failure to notify him of amendments to the long-term disability plan. Otero has not appealed these rulings.

FN5. The relevant provision of the Plan provides that:
The company or its delegate will determine, in its or their sole discretion, the eligibility of each terminated employee to participate in the Plan, the amount of Benefits to which a terminated Employee is entitled, and the manner and time of payment of the Benefits.... Any decisions, actions or interpretations to be made under the Plan by [Pharmacia] ... shall be made in its respective sole discretion, not in any fiduciary capacity and need not be uniformly applied to similarly situated individuals and shall be final, binding and conclusive upon all parties.

FN6. The eligibility provision of the original Plan provides:

The Company shall grant Benefits to any Terminated Employee whose services are terminated by reason of Job Elimination.... Notwithstanding anything herein to the contrary, a Terminated Employee will not [receive separation benefits] if his or her employment is discontinued due to [inter alia] ... a transfer to an affiliated business, the sale of Pharmacia & Upjohn, Inc. or any portion thereof, either through a sale or exchange of stock or assets, or the outsourcing of a division, department, business unit or function where the employee has been offered a comparable position with the Company or the new employer.

FN7. Additionally, there is a presumption that judicial review is limited to the evidentiary record presented to the administrator. *See Liston,* 330 F.3d at 23-24. Because the Plan administrator was located in the mainland United States, and the original English language Plan was the controlling version, we presume that it was the version that informed the administrator's decision. Otero has not presented any basis to believe otherwise, nor has he presented any argument for why we should consider the Spanish language version the controlling document.

C.A.1 (Puerto Rico),2006.
Otero Carrasquillo v. Pharmacia Corp.
--- F.3d ----, 2006 WL 2848569 (C.A.1 (Puerto Rico))

Briefs and Other Related Documents (Back to top)

• 2006 WL 1929833 (Appellate Brief) Surreply Brief for Defendants-Appellees (Jun. 2, 2006)
• 05-2373 (Docket) (Sep. 21, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.